SEEGER WEISS LLP
CHRISTOPHER A. SEEGER
55 Challenger Road, 6th Floor
Ridgefield Park, NJ  07660
Telephone:  973/639-9100
973/679-8656 (fax)
cseeger@seegerweiss.com

Attorneys for Plaintiff

[Additional counsel appear on signature page.]

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CITY OF SOUTHFIELD FIRE AND POLICE RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>HAYWARD HOLDINGS, INC., KEVIN HOLLERAN, EIFION JONES, CCMP CAPITAL ADVISORS, LP, and MSD PARTNERS, L.P.,<br><br>Defendants. | No.<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><br><br><br><br>DEMAND FOR JURY TRIAL |

Plaintiff City of Southfield Fire and Police Retirement System ("plaintiff"), individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings of Hayward Holdings, Inc. ("Hayward" or the "Company"), the Company's press releases, and analyst reports, media reports, and other publicly disclosed reports and information about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of all persons who purchased shares of Hayward common stock between March 2, 2022 and July 27, 2022, both dates inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "1934 Act") against Hayward and certain of the Company's senior officers and directors and controlling shareholders.

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R.

§240.10b-5, promulgated thereunder.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act, 15 U.S.C. §78aa.

3.      Venue is proper in this District pursuant to 28 U.S.C. §1391(b), and §27 of the 1934 Act, because Hayward was headquartered in this District at the start of the Class Period and many of the acts and practices complained of herein occurred in substantial part in this District.

4.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

5.      Plaintiff City of Southfield Fire and Police Retirement System, as set forth in the certification attached hereto and incorporated by reference herein, purchased Hayward common stock during the Class Period and suffered damages as a result.

6.      Defendant Hayward was headquartered in Berkley Heights, New Jersey for much of the Class Period, and subsequently completed a relocation of its headquarters to Charlotte, North Carolina in July 2022.  The Company is a global designer, manufacturer, and marketer of a broad portfolio of pool equipment and

associated automated systems.  Hayward common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "HAYW."

7.     Defendant Kevin Holleran ("Holleran") was at all relevant times the Chief Executive Officer ("CEO") and President of Hayward.

8.     Defendant Eifion Jones ("Jones") was at all relevant times the Chief Financial Officer ("CFO") and Senior Vice President of Hayward.

9.     The defendants referenced above in ¶¶7-8 are collectively referred to herein as the "Individual Defendants."  The Individual Defendants, together with Hayward, are referred to herein as "defendants."

10.     Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, competition, acquisition plans, and present and future business prospects, as alleged herein.  In addition, the Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

11.     As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the 1934 Act and trade on the

NYSE, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, business, services, markets, competition, acquisition plans, and present and future business prospects. In addition, the Individual Defendants each had a duty to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded common shares would be based upon truthful and accurate information. Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

12.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

13.     Defendant CCMP Capital Advisors, LP ("CCMP") is a New York-based private equity firm specializing in buyouts and growth equity investments.  CCMP spun off from JP Morgan Chase & Co. in August 2006.

14.     Defendant MSD Partners, L.P. ("MSD Partners") is a New York-based investment advisor.  It was formed in 2009 by the principals of MSD Capital, L.P. ("MSD Capital") to enable a select group of investors to invest in strategies developed by MSD Capital.  MSD Capital manages the wealth of tech entrepreneur Michael Dell and his family.

15.     The defendants referenced above in ¶¶13-14 are collectively referred to herein as the "Sponsor Defendants."

16.     The Sponsor Defendants served as controlling shareholders of Hayward during the Class Period.

17.     Immediately following Hayward's March 2021 initial public offering (the "IPO"), affiliates of CCMP and MSD Partners each beneficially owned approximately 30% of Hayward's outstanding common stock and they collectively maintained majority voting control during the Class Period.  As such, Hayward was considered a "controlled company" under NYSE rules.  The Sponsor Defendants entered into a stockholders' agreement with the Company pursuant to which they agreed to coordinate the voting of their shares collectively, ensuring them majority voting

control over the Company, and providing them with certain special rights and privileges unavailable to outside shareholders.

18.     The Sponsor Defendants also oversaw and controlled the management of the Company.  For example, the Sponsor Defendants caused Hayward to hire defendants Holleran and Jones as CEO and CFO, respectively, prior to the IPO. Numerous directors of Hayward were also affiliated with CCMP and MSD Partners, including Mark McFadden (Managing Director of CCMP), Timothy Walsh (President and CEO of CCMP), Greg Brenneman (Executive Chairman of CCMP), Christopher Stevenson (Principal of CCMP), Kevin Brown (Co-Head of MSD Partners' Private Capital Group), and Christopher Bertrand (Managing Director of MSD Partners' Private Capital Group).  In addition, the Executive Chairman of Hayward, Stephen Felice, is a former Dell executive, and in that sense affiliated with MSD Partners.  As Hayward has acknowledged, after the IPO it did "not have a majority of independent directors."

19.     The Sponsor Defendants used their control over the Company to complete the IPO, in which they each sold over 7 million Hayward shares at $17 per share, as well as multiple follow-in offerings, including a May 2022 secondary offering ("SPO") in which CCMP sold over $245 million worth of Hayward stock at fraud-inflated prices during the Class Period.  Moreover, the Sponsor Defendants caused Hayward to enter into various agreements with them favorable to their own

financial interests, such as a lucrative advisory services agreement. As Hayward acknowledged in the IPO prospectus: "Our Sponsors will continue to have significant influence over us and decisions made by our stockholders upon completion of this offering and may have interests that differ from yours."

## BACKGROUND

20.    Hayward is a global designer, manufacturer, and marketer of pool equipment and associated automated systems. At the start of the Class Period, the Company's corporate headquarters were located in Berkeley Heights, New Jersey.

21.    Hayward's products perform various core and auxiliary functions to improve and deliver the pool experience for pool owners. Examples of the Company's products include speed pumps, water sanitization equipment, energy-efficient heaters, pool lights, and mobile applications to allow for pool connectivity.

22.    The majority of Hayward's sales are through specialty distributors, who in turn sell to pool builders, retailers, and servicers. Hayward claims to have long-standing relationships with these trade customers and contractual agreements to support the Company's continued sales through this channel. The remaining sales are directly to large retailers, pool builders and servicers, and buying groups which are composed of independent businesses that, as a group, receive competitive pricing and special incentives. Hayward recognizes revenue at the time it ships products to its

customers (who are generally industry middlemen), rather than at the time they are sold to actual consumers.

23.     Hayward's business is organized in two reportable segments: North America and Rest of World.  The North America segment accounts for approximately 80% of Hayward's sales, while the Rest of the World segment accounts for the remaining 20%.

24.     Hayward was incorporated in Delaware in June 2017 in connection with an acquisition by CCMP and MSD Partners, as well as certain of their affiliates and other investors, of the underlying business.  Hayward completed the IPO in March 2021, selling over 40 million shares for $17 per share.  CCMP and MSD Partners both sold over $100 million worth of Hayward stock in the IPO.

25.     Following the IPO, Hayward claimed to be experiencing rapid growth and robust demand trends.  For example, on October 27, 2021, Hayward announced that quarterly net sales for the third quarter of 2021 had increased 56% year-over-year to $350.6 million.[1]  Hayward raised 2021 expected net sales growth to a range of 59% to 62%, compared to a prior range of 54% to 58%, and reaffirmed expected 2021 adjusted earnings to a range of $405 million to $425 million, representing 75% to 84% year-over-year growth.  At the time, defendant Holleran stated: "'Our third quarter

---

[1]     Hayward's fiscal quarters end on the Saturday closest to the calendar quarter end, with the exception of year-end which ends on December 31 of each fiscal year.

results were driven by our team's ability to execute and capture the sustained demand for Hayward products as we continue to see strength in the pool market.'"

26.    After this announcement, the price of Hayward stock rose above $20 per share, eventually peaking above $27 per share by mid-November 2021.  On December 20, 2021, Hayward announced that the Board of Directors (the "Board") (controlled by the Sponsor Defendants) had authorized a $450 million share repurchase program. Ordinarily, a company engages in a share repurchase program because it believes its shares are undervalued, and therefore buying its own shares would be a prudent use of company capital.  Thus, Hayward's share repurchase program signaled to outside investors that the management of Hayward believed the price of Hayward stock was likely to rise in the future.  Notably, defendants used the share repurchase program to allow the Sponsor Defendants to dump tens of millions of dollars' worth of Hayward stock.  In the first quarter of 2022 alone, Hayward allowed the Sponsor Defendants to sell approximately $81 million worth of Hayward stock back to the Company at nearly $20 per share.

27.    During the Class Period, Hayward management continued to represent to investors that the Company was experiencing record-setting demand.  For example, on March 2, 2022 – the first day of the Class Period – Hayward issued a press release hailing the Company's "Record Net Sales" for the year which purportedly had increased "60% year-over-year to $1,401.8 million."  Defendant Holleran was quoted

in the release as stating: "'We continue to benefit from key secular tailwinds within our industry and with our leading product portfolio and technology we were able to enhance our market share at improved profitability levels'" and "'are entering 2022 with significant momentum.'"

28.     These and similar representations were materially false and misleading when made.  Unbeknownst to investors, defendants had engaged in a channel-stuffing scheme in order to artificially inflate the Company's revenues and create the appearance of demand that far exceeded actual demand trends.  In a channel-stuffing scheme, a company inflates its sales and earnings figures by deliberately sending its distribution channel partners more products than they are able to sell to consumers. The practice creates an ephemeral boost in performance, but ultimately cannibalizes future sales as distributors must eventually de-stock or write down the excess inventory.

29.     Defendants' failure to disclose these adverse facts caused the price of Hayward stock to trade at artificially inflated prices, reaching a high of almost $19 per share during the Class Period.  With the price of Hayward stock artificially inflated, in May 2022 Hayward conducted a follow-on registered stock offering, pursuant to which defendant CCMP and another financial backer of the Company sold over 27.3 million Hayward shares (including a partial exercise of the overallotment option) at $13.88 per share (the "SPO").  CCMP alone sold 17.6 million shares in the SPO,

generating $245 million in gross sale proceeds.  Unusually, Hayward purchased 8 million shares in the SPO through the previously announced share repurchase program, providing further artificial price support and indicating to outside investors that, in the opinion of Hayward management, the stock was undervalued.

30.     Then, on July 28, 2022, Hayward reported deeply disappointing second quarter 2022 results – *the same quarter during which the SPO was conducted*.  Most notably, Hayward disclosed the need to do a massive inventory de-stocking as its distribution partners had far more product than they could sell to consumers. Hayward slashed expected 2022 net sales growth from a range of 9% to 12% to a decline of 2% to 6%.  In addition, Hayward cut expected 2022 adjusted earnings from a range of $460 million to $475 million to a range of just $385 million to $400 million, a 16% decline at the mid-point.  Because Hayward had already achieved $254 million in adjusted earnings during the first six months of the year, at the low end of this range Hayward's adjusted earnings would fall by *half* over the next six months.

31.     As a result of this disclosure, the price of Hayward stock fell nearly 24% in a single day to a low of just $10.48 per share during market trading on July 29, 2022, causing Class members (defined herein) to suffer substantial financial losses and economic damages under the federal securities laws.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

32.     The Class Period begins on March 2, 2022.  On that date, Hayward issued a release which announced the Company's financial results for its fourth fiscal quarter and full year of 2021 (the "FY21 release").  For the fourth quarter, the FY21 release stated that Hayward had generated a 35% year-over-year increase in net sales to $352.4 million, and a 43% year-over-year increase in Adjusted EBITDA to $105.7 million.  For the full year, the FY21 release stated that Hayward generated a 60% year-over-year increase in net sales to achieve a "[r]ecord" $1.4 billion in net sales and an 82% year-over-year increase in Adjusted EBITDA to $421.7 million.  In the release, defendant Holleran stated that the Company was "'entering 2022 with significant momentum'" and he continues to be "'encouraged by underlying industry demand levels.'"  In regard to the Company's outlook for 2022, the release stated that "Hayward is well positioned to deliver continued net sales and adjusted EBITDA growth in 2022," and "expects net sales growth of 9% to 12% year-over-year and Adjusted EBITDA in the range of $460 million to $475 million, or growth range of 9% to 13% year-over-year."

33.     That same day Hayward held an earnings call with analysts and investors to discuss Hayward's fourth quarter and full year 2021 results hosted by defendants Holleran and Jones.  In his prepared remarks, defendant Jones stated that Hayward was pleased with "the continued demand and ongoing adoption for our pool products

- 12 -

that we have seen throughout the channel."  Defendant Holleran added that in looking at 2022 "[w]e continue to be very positive about the health of the overall pool industry" and asserted that "[o]ur dealers remain bullish about 2022 as they carry strong order files into the new year."  Defendant Holleran reiterated the Company's outlook for 2022, stating that the Company was on track to achieve net sales growth in the range of 9% to 12% compared to the record 2021 results, which "reflects strong carryover demand."  Defendant Holleran added: "We expect to deliver adjusted EBITDA in the range of $460 million to $475 million for the full fiscal year 2022, a growth range of 9% to 13% year-over-year."

34.     In response to an analyst question about the Company's inventory levels and backlog, defendant Holleran represented that the Company was confident it did not have too much inventory and that product levels reflected underlying customer demand, stating in pertinent part as follows:

>     I think it's more of the latter, Mike.  I think it's a very credible order file.  There's been plenty of price increases that we've had to announce into the industry.  We ran kind of a modest early buy last year. ***If the channel was feeling as if they had too much or were unhappy with their inventory turns, I think there was opportunity for them to slow the bookings or even cancel and we've seen negligible cancellations through those time periods.  So we feel very good about the credibility of that order file***.
>
>     ***As for inventory levels, they are getting back to more normal levels, good turns on it.  We don't think it's elevated***.

35.    In response to an analyst question regarding the prudence of the Company's 2022 forecast, defendant Jones reassured investors that there was "a level of conservatism built into our forecast here."

36.    On March 9, 2022, Hayward filed with the SEC on Form 10-K the Company's financial results for the fiscal year 2021 ended December 31, 2021, which was signed by the Individual Defendants.  The Form 10-K contained the financial information regarding Hayward's fiscal year 2021 financial results contained in the FY21 release and related earnings call.

37.    On April 28, 2022, Hayward issued a release which announced the Company's financial results for its first fiscal quarter of 2022 (the "1Q22 release").  The 1Q22 release stated that Hayward had generated a 23% increase in net sales to $410.5 million, and an 18% increase in Adjusted EBITDA to $126.2 million.  The 1Q22 release also reiterated the Company's full year guidance of net sales growth of 9% to 12% and an Adjusted EBITDA range of $460 million to $475 million, reflecting growth of 9% to 13% year-over-year.  In the 1Q22 release, defendant Holleran stated that "'[w]e entered 2022 with significant momentum given the robust end market demand,'" adding that "'[t]he backdrop for the pool industry remains attractive and continues to be supported by sustainable secular demand trends across new construction and the aftermarket which represents approximately 80% of our

business.'"  The release also stated that "Hayward remains well positioned to achieve net sales and adjusted EBITDA growth for the full year."

38.     That same day Hayward held an earnings call with analysts and investors to discuss the Company's first quarter 2022 results hosted by defendants Holleran and Jones.  In his prepared remarks, defendant Jones stated that "we are pleased to report record results in the first quarter of 2022 driven by the continued adoption of our pool products that we are seeing throughout the channel."  Defendant Jones added that net sales for the first quarter increased 23% to $410.5 million, and he attributed the growth to "a 17% price realization [and] 7% positive volume growth and mix."

39.     In his prepared remarks, defendant Holleran stated that "[w]e are off to a good start to the year with strong performance in sales and profitability during the first quarter."  After reaffirming Hayward's 2022 guidance, defendant Holleran further stated: "[W]e continue to be confident about Hayward's position within the market and the opportunity to expand upon our achievements in 2022 and the years to come."  Later in the call, defendant Holleran responded affirmatively to an analyst question about whether the Company's 2022 second half guidance was "very conservative," stating that "it's wise to be cautionary right now."

40.     When asked whether he was seeing any signs of consumer spending slowing down or any cancellations, defendant Holleran responded that they "haven't seen any kind of cancellations."  He continued: "We're in pretty close contact with

both channel partners and our dealers, and the work on the books and new lead generation both remain strong despite plenty of price increases." Defendant Holleran further represented that "the channel inventory position has gotten better," and "[w]e're in a much better position going into the start of the season in 2022." Finally, defendant Holleran stated that "we're still seeing robust demand and the order file on the books is still very strong and seems to be pressure tested, and product is going to be installed in the backyard."

41.    When asked by an analyst to comment on Hayward's channel inventory in light of "some chatter [in] public markets on how some of your channel partners are thinking about inventory and restocking," defendant Holleran responded that Hayward was confident that its channel partners were not overstocked and, if anything, lacking in certain items in light of supply chain issues and the robust demand the Company was seeing, stating in pertinent part as follows:

> Yes. ***We do keep close tabs on it with our channel partners to make sure that we all feel comfortable with the amount of inventory staged closer to point of sale***, and they are largely replenished and in a much better position starting the 2022 season than they were either in the last 2 years.
>
> It's not a perfect balance. There are SKUs and product categories based upon a material availability that we need more of. They need more of for sale. Maybe some solve then some sand filters, variable speed pumps, some controls, but it's much improved over the prior year.
>
> In absolute dollars, as I said, it's higher at the end of Q1 2022 than the same period. But I think there are a few things to keep in mind that as we look at it from a days on hand standpoint, obviously, that

inventory value has a lot of price embedded in it. ***The industry has also grown, so there needs to be additional inventory in there to support the overall industry growth, which has been 30-plus percent over the last few years. And then from – specifically to Hayward, some of our share gains, that would require some incremental inventory positions for the Hayward product in the channel***.

So all that said, ***we feel comfortable with our inventory position from a days on hand standpoint here at the start of the season. Our guidance assumes that there will be greater sell out than sell into the channel during the 2022 season. And these are the things that we're going to keep close tabs on as we work through the year and start – continue with our guidance updates and look out into 2023***, Mike.

42.    On April 29, 2022, Hayward filed with the SEC on Form 10-Q the Company's financial results for the first quarter of 2022 ended April 2, 2022, which was signed by the Individual Defendants.  The Form 10-Q contained the financial information regarding Hayward's first fiscal quarter financial results contained in the 1Q22 release and related earnings call.

43.    On May 4, 2022, Hayward filed with the SEC a prospectus supplement on Form 424B7, which together with other documents incorporated by reference formed the registration statement for the SPO (the "Registration Statement") and was signed by the Individual Defendants and representatives of the Sponsor Defendants on the Board.  The Registration Statement created the false and misleading impression that Hayward was continuing to experience robust demand for its products.  For example, the Registration Statement stated that Hayward had achieved net sales of $1.4 billion for full year 2021, an increase of 60% compared to 2020, and adjusted

earnings of $421.7 million, an increase of 82% compared to the prior year.  Further, the Registration Statement represented that Hayward's net sales for the first quarter of 2022 had been $410.5 million, an increase of 22.8% compared to the first quarter of 2021, and its adjusted earnings had been $126.2 million for the quarter, an increase of 17.6% compared to the first quarter of 2021, "driven primarily by higher net sales."

44.    The Registration Statement also stated that the increase in net sales in the first quarter of 2022 "was primarily the result of increases in price and volume." Further, the Registration Statement stated that Hayward's recent increase in net sales was "mainly in residential pool equipment sales from continued demand for pool upgrades and increasing new pool construction."   Similarly, the Registration Statement stated that the increase in net sales in Hayward's North America segment was due to "higher sales of residential pool equipment as demand for more efficient, environmentally friendly and automated pool products remained robust," while the increase in Hayward's Europe & Rest of World segment was due to "strong customer demand for pool products and the easing of governmental restrictions relating to COVID-19 in Fiscal Year 2021 as compared to Fiscal Year 2020."

45.    Defendants' statements referenced in ¶¶32-44 above were materially false and misleading when made because they misrepresented and failed to disclose the adverse facts about Hayward's business, operations, and prospects, which were known to defendants or recklessly disregarded by them, as follows:

(a)    that Hayward and its management had engaged in a channel-stuffing scheme designed to artificially boost Hayward's short-term sales and earnings;

(b)    that Hayward had flooded its channel partners with inventory that they did not want or need at a level that far outpaced then-existing consumer demand;

(c)    that Hayward's channel partners were suffering from an inventory glut as a result of the channel-stuffing scheme that would require a massive de-stocking in the second half of 2022;

(d)    that Hayward's channel-stuffing scheme had cannibalized future sales, materially impairing the Company's ability to sell to its customers;

(e)    that the demand for pool equipment had slowed down, which, combined with flooding channel partners with more inventory, led to an inventory glut and the need for these channel partners to reduce inventory levels; and

(f)    that as a result of (a)-(e) above, Hayward's projected 2022 financial results were not achievable and lacked a reasonable basis in fact.

46.    Furthermore, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(b)(2)(ii) ("Item 303"), required defendants to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Similarly, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105 ("Item

105"), required, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of the material factors that make an investment in the registrant or offering speculative or risky" and required each risk factor to "adequately describe[] the risk."

47.     The failure of the Company's periodic SEC filings to disclose Hayward's channel-stuffing scheme and the negative impact of the scheme on the Company's sales ability violated Item 303, because these undisclosed facts were known to defendants and would (and did) have an unfavorable impact on the Company's sales, revenues, and income from continuing operations.  This failure also violated Item 105, because these adverse facts created significant risks that were not disclosed even though they were some of the most significant factors that made an investment in Hayward securities speculative or risky.   Indeed, the boilerplate discussions of potential risks provided by defendants during the Class Period were themselves materially misleading, because they discussed potential future contingencies regarding how uncertainty regarding demand for Hayward's products "*could*" cause them to reduce their ordering of Hayward's products, but failed to disclose that Hayward's ability to generate sales had *already* been negatively impacted by the channel-stuffing scheme, which had materially adversely impacted Hayward's financial results and business prospects.

48.   Then, on July 28, 2022, Hayward issued a release announcing the Company's financial results for the second fiscal quarter of 2022 (the "2Q22 release").   Shocking analysts and investors, the 2Q22 release revealed that the Company was expecting its channel partners to reduce their Hayward inventory on hand by approximately four to six weeks in the second half of 2022.   As a result, the Company reduced its 2022 guidance to reflect a massive inventory reduction in the second half of the year.   Hayward slashed expected 2022 net sales growth from a range of 9% to 12% to a decline of 2% to 6%.   In addition, Hayward cut expected 2022 adjusted earnings from a range of $460 million to $475 million to a range of just $385 million to $400 million, a 16% decline at the mid-point.   Because Hayward had already achieved $254 million in adjusted earnings during the first six months of the year, at the low end of this range Hayward's adjusted earnings would fall by ***half*** over the next six months.   Notably, during an earnings call held that same day, defendant Holleran admitted that the inventory bottleneck traced back to inventory decisions made "***at the end of 2021***" – *i.e.*, before the Class Period.

49.   As a result of this news, the price of Hayward common stock dropped from $13.71 per share when the market closed on July 27, 2022 to a low of $10.48 per share during market trading on July 28, 2022, a nearly 24% decline on abnormally heavy volume of over 6 million shares traded.

50.    As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of Hayward common stock, plaintiff and other Class members have suffered significant losses and economic damages under the federal securities laws.

## CLASS ACTION ALLEGATIONS

51.    Plaintiff brings this action as a class action on behalf of a class consisting of all persons who purchased Hayward common stock during the Class Period (the "Class").  Excluded from the Class are defendants and their families, the officers, directors, and affiliates of defendants, at all relevant times, and members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

52.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Hayward common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Hayward or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in

securities class actions, including being given an opportunity to exclude themselves from the Class.

53.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

54.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

55.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

        (a)     whether defendants' statements during the Class Period were materially false and misleading;

        (b)     whether defendants acted with scienter in issuing materially false and misleading statements during the Class Period; and

        (c)     the extent of injuries sustained by the members of the Class and the appropriate measure of damages.

56.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members

may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## ADDITIONAL SCIENTER ALLEGATIONS

57.    As alleged herein, defendants acted with scienter in that defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company, or in their own name, during the Class Period were materially false and misleading.  Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding Hayward, and their control over and/or receipt and/or modification of Hayward's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

58.    Defendants knew and/or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.

59.    The Individual Defendants, because of their positions with Hayward, controlled the contents of Hayward's public statements during the Class Period.  The Individual Defendants were each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected.  Because of their positions and access to material, non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading.  Indeed, the specific undisclosed issues involved critical information for investors that the Individual Defendants held themselves out as most knowledgeable about during quarterly conference calls.  For example, during the April 28, 2022 conference call, defendant Holleran stated: "We do keep close tabs on [inventory levels] with our channel partners to make sure that we all feel comfortable with the amount of inventory staged closer to point of sale" and that Hayward management would continue "to keep close tabs on [it] as we work through the year."  As a result, each of the Individual Defendants was responsible for the accuracy of Hayward's corporate statements during the Class Period and was, therefore, responsible and liable for the representations contained therein.

60.    The scienter of defendants is further underscored by the certifications of defendants Holleran and Jones mandated by the Sarbanes-Oxley Act of 2002, filed during the Class Period, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about Hayward was made known to them and that the Company's disclosure-related controls were operating effectively.

61.    In addition, Hayward insiders and controlling shareholders – including defendant CCMP – sold over $385 million worth of Hayward stock during the Class Period.  CCMP sold Hayward stock in the SPO at a price almost 25% higher than it was trading at the end of the Class Period only two months later, further bolstering an already compelling inference of scienter.

## LOSS CAUSATION

62.    During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Hayward common stock and operated as a fraud or deceit on Class Period purchasers of Hayward common stock by failing to disclose and misrepresenting the adverse facts detailed herein.  When defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Hayward common stock declined significantly as the prior artificial inflation came out of the stock's price.

63.     As a result of their purchases of Hayward common stock during the Class Period, plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.  Defendants' false and misleading statements had the intended effect and caused Hayward common stock to trade at artificially inflated levels throughout the Class Period, trading as high as $18.83 per share on March 2, 2022, the first day of the Class Period.

64.     By concealing from investors the adverse facts detailed herein, defendants presented a misleading picture of Hayward's business, risks, and future financial prospects.  When the truth about the Company was revealed to the market, the price of Hayward common stock fell significantly, dropping to a low below $11 per share by July 28, 2022, removing the inflation therefrom and causing economic loss to investors who had purchased Hayward common stock during the Class Period.

65.     The decline in the price of Hayward common stock after the corrective disclosures came to light was a direct result of the nature and extent of defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price decline in Hayward common stock negates any inference that the losses suffered by plaintiff and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent conduct.

66.     The economic loss, *i.e.*, damages, suffered by plaintiff and the other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the price of Hayward common stock and the subsequent significant declines in the value of Hayward common stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

### APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

67.     At all relevant times, the market for Hayward common stock was an efficient market for the following reasons, among others:

(a)     Hayward common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient, national stock market;

(b)     as a regulated issuer, Hayward filed periodic public reports with the SEC;

(c)     Hayward regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Hayward was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain

customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

68.    As a result of the foregoing, the market for Hayward common stock promptly digested current information regarding Hayward from all publicly available sources and reflected such information in the price of the stock.  Under these circumstances, all purchasers of Hayward common stock during the Class Period suffered similar injury through their purchases of Hayward common stock at artificially inflated prices and a presumption of reliance applies.

69.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on defendants' material misstatements and/or omissions.  Because this action involves defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

**NO SAFE HARBOR**

70.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.  Many of the specific statements pled herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pled herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of Hayward who knew that those statements were false when made.

**COUNT I**

**For Violation of §10(b) of the 1934 Act**
**and Rule 10b-5 Promulgated Thereunder**
**Against Hayward and the Individual Defendants**

71.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

72.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

73.     The defendants named herein violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes, and artifices to defraud;

(b)     made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Hayward common stock during the Class Period.

74.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Hayward common stock.  Plaintiff and the Class would not have purchased Hayward common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by defendants' misleading statements.

75.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Hayward common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

76.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

77.    The Individual Defendants acted as controlling persons of Hayward within the meaning of §20(a) of the 1934 Act.  By reason of their positions with the Company, and their ownership of Hayward stock, the Individual Defendants had the power and authority to cause Hayward to engage in the wrongful conduct complained of herein.   The Sponsor Defendants controlled Hayward and the Individual Defendants for the reasons detailed herein, including their ownership of a majority of Hayward voting stock, control of the Board, influence over Hayward management, historical relationship with the Company, and the various agreements that these defendants had caused the Company to enter into.  Hayward controlled the Individual Defendants and all of its employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.      Designating plaintiff as Lead Plaintiff and declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper, including permitting any putative Class members to exclude themselves by requesting exclusion through noticed procedures.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  August 2, 2023                    SEEGER WEISS LLP
                                          CHRISTOPHER A. SEEGER


                                          s/ Christopher A. Seeger
                                          _____
                                          CHRISTOPHER A. SEEGER

55 Challenger Road, 6th Floor
Ridgefield Park, NJ  07660
Telephone:  973/639-9100
973/679-8656 (fax)
cseeger@seegerweiss.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
VICKI MULTER DIAMOND
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
vdiamond@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
BRIAN E. COCHRAN
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
bcochran@rgrdlaw.com

VANOVERBEKE, MICHAUD &
  TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

Attorneys for Plaintiff

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

City of Southfield Fire and Police Retirement System ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:  *See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:  None.

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 17th day of July, 2023.

City of Southfield Fire and Police
Retirement System

By:    _John Kohler_

Its:    _President_

HAYWARD

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Stock**

| Date<br>Acquired | Amount of<br>Shares Acquired | Price |
|---|---|---|
| 05/16/2022 | 245 | $14.35 |
| 05/17/2022 | 325 | $14.82 |
| 05/17/2022 | 775 | $14.85 |
| 05/18/2022 | 230 | $14.45 |
| 05/19/2022 | 295 | $14.24 |
| 05/20/2022 | 565 | $14.14 |
| 05/23/2022 | 155 | $14.33 |
| 05/24/2022 | 445 | $14.00 |
| 05/25/2022 | 80 | $14.44 |
| 06/14/2022 | 75 | $14.74 |

Prices listed are rounded to two decimal places.