Peter S. Pearlman
Matthew F. Gately
**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
Park 80 West-Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, NJ 07663
Telephone: 201-845-9600
Facsimile: 201-845-9423
psp@njlawfirm.com

*Counsel for Lead Plaintiff*
*Fulton County Employees' Retirement System*

[*Additional Counsel Appear on Signature Page*]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CITY OF SOUTHFIELD FIRE AND POLICE RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>HAYWARD HOLDINGS, INC., KEVIN HOLLERAN, EIFION JONES, CCMP CAPITAL ADVISORS, LP, and MSD PARTNERS, L.P.,<br><br>Defendants. | Civil Action No. 2:23-cv-04146<br><br>Hon. William J. Martini<br><br>CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |

Lead Plaintiff Fulton County Employees' Retirement System ("Plaintiff"), maintaining its principal place of business at Fulton County Retirement System Department of Finance, 141 Pryor Street, Suite 7001, Atlanta, GA 30303, by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, *inter alia*, counsel's investigation, which includes review and analysis of: (a) regulatory filings made by Hayward Holdings, Inc. ("Hayward" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases and media reports issued and disseminated by the Company; (c) analyst reports concerning Hayward; (d) other public information regarding the Company, including transcripts of earnings calls and conferences held and/or attended by the Company; and (e) interviews with former Hayward employees. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    SUMMARY OF THE ACTION

1.    This securities class action is brought on behalf of all persons or entities that purchased Hayward common stock between October 27, 2021, and July 28, 2022, inclusive (the "Class Period"). The claims arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder. Defendants are Hayward, its CEO Kevin Holleran, its CFO Eifion Jones, and two investment firms that took control of Hayward, CCMP and MSD (as defined below).

2.    Hayward manufactures pool products, and this case involves Defendants' failure to disclose that, prior to and during the Class Period, Hayward's primary customers, its channel of distributors, had saturated inventory levels after loading up on products following a burst of demand in the pool industry at the start of the Covid pandemic. Further, Defendants failed to

disclose that, part and parcel with the channel's saturated inventory, demand from the distributor channel was dropping significantly and Hayward was at the same time having difficulty selling to the channel, even as it continued to manufacture products far in excess of its demand. These undisclosed problems were central to Hayward's operations and performance, so that Defendants knew of, tracked, had access to, and attempted unsuccessfully to address them prior to and during the Class Period—which Defendants subsequently acknowledged and confidential witnesses ("CWs") confirmed.

3.    Defendants nevertheless concealed these problems from investors through a series of materially false and misleading statements and omissions throughout the Class Period, while taking advantage of this misconduct for their personal gain by making substantial stock sales at artificially inflated prices. These sales were highly problematic in terms of their size, timing, and other factors.

4.    Prior to the Class Period, Hayward had long been a family run company until a consortium led by Defendants CCMP and MSD acquired and took control of it in 2017. Defendants CCMP and MSD maintained tight control of Hayward through stock, board seats, and appointing executives like Defendants Holleran and Jones, who had no prior experience in the pool industry.

5.    Pool product manufacturing was steady, if unremarkable, from Defendants' acquisition of Hayward until the summer of 2020, when the Covid pandemic created a burst of demand, with outdoor and home-based activities at a premium. Hayward's revenue grew by about 20% year-over-year ("YoY") in 2020, prompting Defendants to quickly conduct an IPO in early March 2021, through which Defendants CCMP and MSD made over $260 million. Even after that sale, however, Hayward remained a controlled company, dominated by those Defendants.

6.      The burst of demand at the start of the pandemic, along with a tight supply chain and accompanying logistical challenges, led Hayward and its distributors to respond with actions that soon, and prior to the Class Period, disadvantaged Hayward.  For their part, Defendants caused Hayward to dramatically increase the amount of raw materials it was procuring and finished products it was manufacturing, in the hopes that high demand would continue and it could sell more products.

7.      However, distributors responded to those conditions by loading up on inventory over the course of 2021, so that they would not continue to be burdened by the logistics challenges in place at the start of the pandemic.  After the Class Period, Defendants acknowledged (as they had known all along) that distributors had loaded up on this security, or "safety," stock during that period, and several CWs recounted distributors doing so by, for example, placing double orders in 2021 for both that year and 2022.

8.      Accordingly, in mid-2021, prior to the Class Period, Hayward's distribution channel was saturated with inventory, as multiple CWs recounted.  Defendants knew this, and subsequently acknowledged that they "keep close tabs" on the critical channel inventory.  CWs also described systems at Hayward which tracked that information.

9.      Part and parcel with the channel's saturated inventory, the channel's demand for Hayward's products consequently started dropping significantly in mid-2021, and Hayward was therefore having difficulty selling to the channel.  By that time, the supply chain and logistical challenges from the start of Covid had substantially subsided, which undercut the impetus for double orders placed far in advance of when the products were needed and excess safety stock losing their importance, and reduced demand as well.

3

10.     Defendants also knew that channel demand was dropping significantly and that Hayward was having difficulty selling to channel distributors, and a number of CWs described instructions from Hayward management to use incentives and pressure tactics with distributors to try to increase their orders.  At the end of the Class Period, Defendants acknowledged this, stating that they had "expected to sell less into the channel" in 2022 "due to the strategic positions that many of our channel partners took at the end of 2021."

11.     Defendants' last-ditch sales tactics had only a minimal effect, and distributors overburdened with unneeded inventory went on to cancel orders from Hayward.  Defendants tracked this significant problem, with, for example, a CW recounting reports prepared for Defendant Jones on cancelled orders.  Channel demand remained weak, and the channel ultimately stopped replenishing its inventory with new orders until it had reduced its stock of Hayward products by about $150 million before all was said and done.

12.     Meanwhile, Defendants continued manufacturing at a rate far in excess of demand, and, as a consequence of the drop in channel orders, Hayward's own inventory of raw materials and finished goods increased substantially.  Defendants tracked this troubling issue, too.  A CW who prepared reports for Defendant Jones and Hayward's then-Chief Supply Officer recounted that both of those C-level executives were concerned by Hayward's own ballooning inventory.

13.     In response to this problem, CWs recounted that by late 2021 or early 2022, management ordered a slowdown in Hayward's manufacturing, but that Hayward failed to execute that directive promptly.  Hayward eventually had about $100 million of excess inventory, which was a considerable expense for the Company.

14.     Aware that the channel's saturated inventory and significantly dropping demand was damaging, material information, and still holding a substantial amount of Hayward stock,

Defendants concealed those problems with a series of material misrepresentations and omissions during the Class Period.  For example, at the start of the Class Period, when asked whether there had been an increase in channel inventory, Defendant Holleran responded, "it's an improving position, but certainly not too much by any means," even though he knew the channel was already saturated with inventory.  Similarly, later in the Class Period, Defendant Holleran told analysts that, "[i]f the channel was feeling as if they had too much or were unhappy with their inventory turns, I think there was opportunity for them to slow the bookings or even cancel and we've seen negligible cancellations through those time periods," when channel demand had dropped significantly and cancelled orders had become a problem Defendants were tracking.

15.    Further, under cover of those misrepresentations and omissions, Defendants sold a substantial amount of Hayward stock at prices they had artificially inflated.  Defendant CCMP sold nearly 24.5 million Hayward shares during the Class Period, which was more than 34% of its stock following the IPO, netting $379,634,832 in the process, including sales before key negative announcements.  And roughly a month before the truth was fully and finally disclosed, in June 2022, Defendant Jones sold close to half of his Hayward stock outside of a 10b-5 trading plan (even though most of his other stock sales were made pursuant to such a plan), making roughly $2 million in the process.

16.    The truth gradually emerged through a series of materializations of the undisclosed risks and partial disclosures as Hayward's performance slowed.  But Defendants repeatedly and falsely maintained that channel inventory was not elevated and that channel demand along with sales to the channel were strong until the end of the Class Period, after they had time to unload their stock.  On the last day of the Class Period, Defendants finally and fully disclosed that the channel had far more inventory than it needed, and that the channel was therefore reducing its

stock of Hayward products by approximately $150 million which was crushing Hayward's sales. With this news, Hayward's stock dropped another 18.23%, and it overall fell from $22.73 per share at the start of the Class Period to $11.21 at the close. In this manner, over the course of the Class Period, Plaintiff and the Class suffered substantial damages.

## II.    JURISDICTION AND VENUE

17.    The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5.

18.    This court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

19.    Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and §27 of the Exchange Act. Hayward was headquartered in this District at the start of the Class Period and many of the acts and practices complained of herein occurred in substantial part in this District.

20.    In connection with the acts and omissions alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communication, and the facilities of the national securities markets.

## III.    PARTIES

### A.    Plaintiff

21.    Lead Plaintiff Fulton County Employees' Retirement System, as set forth in its previously filed certification (ECF No. 2-6), purchased Hayward's common stock during the Class Period and suffered damages as a result of the federal securities law violations and actionable misstatements and material omissions alleged herein.

**B.     Defendants**

22.     Defendant Hayward (the "Company") was headquartered in Berkeley Heights, New Jersey for much of the Class Period, and subsequently completed a relocation of its headquarters to Charlotte, North Carolina in July 2022.  The Company is a U.S.-based designer and manufacturer of pool equipment.  Hayward's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "HAYW."

23.     Defendant Kevin Holleran ("Holleran") was at all relevant times Hayward's Chief Executive Officer ("CEO") and President.

24.     Defendant Eifion Jones ("Jones") was at all relevant times Hayward's Chief Financial Officer ("CFO") and Senior Vice President.  During the Class Period, Defendant Jones sold 189,945 personally held Hayward shares for proceeds of $3,292,353.

25.     Defendants Holleran and Jones are referred to herein collectively as the "Individual Defendants."

26.     The Individual Defendants possessed the power and authority to control the contents of Hayward's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Hayward's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions within Hayward, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

27. Defendant CCMP Capital Advisors, LP ("CCMP") is a New York-based private equity firm specializing in buyouts and growth equity investments.

28. Defendant MSD Partners, L.P. ("MSD") is a New York-based investment advisor.

29. During the Class Period, CCMP and MSD served as controlling shareholders of Hayward. Immediately following Hayward's March 2021 initial public offering ("IPO"), affiliates of CCMP and MSD each beneficially owned approximately 30% of Hayward's outstanding common stock, and they collectively maintained majority voting control during the Class Period. As such, Hayward was considered a "controlled company" under NYSE rules.

30. In addition, CCMP and MSD entered into a stockholders' agreement with the Company and Alberta Investment Management ("AIMCo"), a Canadian institutional investment manager, pursuant to which they agreed to coordinate the voting of their shares collectively, ensuring them majority voting control over the Company, and providing them with special rights and privileges unavailable to outside investors.

31. Within this consortium, Defendants CCMP and MSD maintained control, as compared to AIMCo. All three shareholders and Hayward were parties to an Amended and Restated Stockholders' Agreement (the "AARSA"), executed concurrently with the IPO, which contained certain restrictions on AIMCo but not CCMP or MSD. For example, AIMCo, unlike CCMP and MSD, was restricted from requesting an underwritten shelf take-down pursuant to a Shelf Registration—though if CCMP or MSD initiated an underwritten shelf take-down, AIMCo could "tag along." Similarly, AIMCo was restricted from selling stock until after CCMP had "consummated a secondary sale after the Company IPO" in March 2021. AIMCo also only held one position on Hayward's Board of Directors (the "Board"), compared to CCMP and MSD's

combined six for the majority of the Class Period.  Thus AIMCo was beholden to CCMP and MSD and incentivized to support their actions.

32.     Defendants CCMP and MSD also oversaw and controlled the management of Hayward.  For example, CCMP and MSD caused Hayward to hire Defendants Holleran and Jones as CEO and CFO, respectively, prior to the IPO.  Further, numerous directors of Hayward were affiliated with CCMP and MSD, including Mark McFadden (Managing Director of CCMP), Timothy Walsh (President and CEO of CCMP), Greg Brenneman (Executive Chairman of CCMP), Christopher Stevenson (Principal of CCMP), Kevin Brown (Co-Head of MSD's Private Capital Group), Christopher Bertrand (Managing Director of MSD's Private Capital Group), Douglas Londal (Partner of MSD), and Ali Afraz (Director, Private Equity, Mubadala Capital[1]).  As Hayward has acknowledged, after the IPO it did "not have a majority of independent directors."

33.     Hayward's Board played a critical role.  The Company's first Definitive Proxy Statement, issued on April 8, 2022, states that Hayward's "board of directors is responsible for the supervision and oversight of our business affairs.  In executing this responsibility, our board of directors establishes corporate policies, sets strategic direction and oversees management."

34.     CCMP and MSD used their control over the Company to, among other things, sell significant amounts of stock at inflated prices, including during the Class Period.  It was Hayward's Board, controlled by directors affiliated with CCMP and MSD, which approved the share repurchase program that enabled CCMP to offload close to $80.1 million (4.08 million shares) of stock at above-market prices in March 2022.  Hayward's Board likewise signed off on the May

---

[1]     The March 2021 offering documents designate Mr. Afraz as being "affiliated with our Sponsors" (defined to include CCMP, MSD, and AIMCo).

2022 secondary public offering ("SPO") in which CCMP sold over $245 million worth of Hayward stock while it traded at artificially inflated prices.

## IV.     BACKGROUND

### A.     Defendants CCMP and MSD Took Control of Hayward in 2017 and Installed the Individual Defendants as the Company's Lead Executives

35.     Hayward, a manufacturer of pool supplies, was founded in 1925 and run by two families for almost 100 years.  In June 2017, a consortium led by CCMP and MSD acquired the Company.

36.     After the acquisition, Hayward remained a tightly run company, with Defendants CCMP and MSD replacing management and installing hand-picked officers at the top of the Company.  They installed Defendant Holleran as the CEO in 2019, and Defendant Jones as the CFO in 2020—though neither man had a background in the pool industry.  Defendant Holleran previously worked for Textron in its Industrial Segment, which manufactures vehicles and designs and produces fuel systems for automobiles.  Defendant Jones previously worked for Cornerstone Holdings, a private investment company.

37.     Defendants CCMP and MSD, along with AIMCo, also installed a majority of the Company's directors.  They placed nine of their high-ranking executives or affiliates onto Hayward's Board, seven of whom served through the May 2022 SPO.[2]

38.     As Defendants acknowledged in Hayward's IPO Registration Statement, "immediately following this offering [in March 2021] we do not expect that the majority of our directors will be independent or that any committees of our Board of Directors, other than our audit committee, will be composed of independent directors."

---

[2]     Hayward's Annual Meeting of Stockholders was held on May 19, 2022.  The terms of Jason Peters, affiliated with AIMCo, and Ali Afraz, affiliated with one of CCMP/MSD/AIMCo, expired at that meeting.

10

39.     With their hand-picked officers and Board majority, Defendants CCMP and MSD controlled Hayward during the relevant time period.

### B.     The Pool Supplies Industry

40.     From before the time that CCMP and MSD acquired Hayward through March 2020, the business of pool supplies manufacturing was steady, if unremarkable.  Hayward and other manufacturers made such products as pool pumps, heaters, and filters.  About 80% of Hayward's business was in North America, with the remainder spread across Europe and the rest of the world.

41.     Most of Hayward's sales before and during the Class Period were to distributors in the "channel."  For example, in fiscal year ("FY") 2020, 76% of its sales were to channel distributors.  These distributors in turn sold the pool products to a variety of swimming pool builders, specialty retailers, and service companies that dealt with the pool owners—the end users of the products.

42.     Demand varies based on the amount of inventory that the businesses at each stage of the supply chain already have on hand.  Even if there is incremental demand and sales for builders and distributors that does not create incremental demand and sales for manufacturers, when, for example, distributors are already loaded up on inventory.

## V.     SUBSTANTIVE ALLEGATIONS

### A.     Following a Burst of End User Demand at the Start of the Covid Pandemic, CCMP and MSD Arranged for Hayward to Conduct an IPO in March 2021

43.     The start of the Covid pandemic created a burst of end user demand for pool supplies in the summer of 2020.  Pools were suddenly more attractive to people stuck in their homes, who had few other options for spending discretionary savings on recreation.

44.     Hayward's revenue for FY 2020 accordingly grew by about 20%.  It generated $875.4 million in net sales in FY 2020, compared to $733.4 million in FY 2019.

11

45.    Taking advantage of this surge of revenue in 2020, CCMP and MSD quickly arranged for Hayward to conduct an IPO on March 11, 2021.  The IPO offered 43,093,665 shares of Hayward common stock.  Notably, the shares sold by CCMP and MSD in the IPO accounted for about 38.6% of the total Hayward stock sold in the IPO.  With an IPO price of $17.00 per share, and after underwriting discounts and commissions, the net return to CCMP and MSD was $267,020,927.46.  Hayward's net return was $356,643,000.00.

46.    After these sales, CCMP and MSD each owned 71,538,085 shares, or 30.9% each of the total outstanding Hayward common stock.  AIMCo owned 36,776,695 shares, or 15.91% of the total outstanding Hayward common stock.

47.    CCMP, MSD, and AIMCo's ownership of Hayward before the IPO and after the foregoing sales, in terms of number of shares and percentage of total ownership, is set forth below:

|  | Shares Owned Before IPO | | Shares Owned After IPO[3] | |
| --- | --- | --- | --- | --- |
|  | # | % | # | % |
| CCMP | 79,848,727 | 38.1% | 71,538,085 | 30.96% |
| MSD | 79,848,727 | 38.1% | 71,538,085 | 30.96% |
| AIMCo | 41,049,076 | 19.6% | 36,776,695 | 15.91% |
| **Total** | **200,746,530** | **95.8%** | **179,852,865** | **77.83%** |

**B.    In Response to an End-User Demand Surge and Logistical Challenges at the Start of Covid, By Mid-2021 Hayward Had Supercharged Its Manufacturing Capacity, But Distributors Had Also Restored Their Inventory**

48.    The burst of end-user demand along with the tight supply chain and logistical challenges at the start of the pandemic led Hayward and its key distribution channel to respond with actions that soon combined to disadvantage Hayward.

49.    For its part, Hayward made several important and lasting changes that committed it to manufacturing substantially more pool products than it had before the pandemic.  First,

---

[3]    Hayward reported in its Form 10-Q for 1Q-2021 that it had 231,101,257 shares outstanding as of May 17, 2021.

Defendants increased the amount of raw materials and input parts Hayward was purchasing.  The capital Hayward invested in raw materials nearly tripled over a two-year period, going from $56.1 million of raw materials on its balance sheet as of 3Q-2020 near the start of the pandemic, to a peak of more than $142 million in raw materials as of 2Q-2022, roughly a month before the end of the Class Period:



50.    Second, at the same time, Hayward enlarged its manufacturing capacity. Defendants increased Hayward's manufacturing of finished goods by more than 80% in the first half of FY 2021 as compared to the prior year, and by 54% for the full FY 2021.  Hayward's finished goods inventory rose from $66.4 million in 2Q-2021, to $88.7 million in 3Q-2021, stayed at that elevated amount of $86.2 million in 4Q-2021, then rose again in 1Q-2022 to $108.7 million,

and reached as high as $148.5 million—more than double the value of the inventory in 2Q-2021—in 2Q-2022.  *See infra* ¶92 (chart).

51.    As discussed below, the Individual Defendants confirmed that Hayward's increased procurement of raw materials and finished goods was a company policy, and CWs described how that policy negatively impacted Hayward.

52.    For their part, distributors, who made up the bulk of Hayward's direct customers, responded to the surge in end-user demand and tight supply chain in FY 2020 by loading up their inventory of pool products during 2021—which, as discussed in the subsequent subsections, caused distributor demand to drop significantly and Hayward to have difficulty selling to distributors, even as Hayward's manufacturing skyrocketed.

53.    Multiple CWs confirmed that prior to the Class Period, by mid-2021, the channel's inventory levels had recovered, and the channel had already purchased and generally had on hand more than sufficient inventory to meet downstream demand—in the short and long term.  As further discussed below, the channel's saturated inventory level was part and parcel with a significant drop in channel demand and therefore Hayward was having difficulty selling to the channel.

54.    **CW1** worked at Hayward from 2016 to December 2022 as a Senior Product Marketing Manager.  CW1's job responsibilities included generating marketing materials and CW1's role involved a significant amount of "working between the product management and sales teams" at Hayward.  By the time CW1 left Hayward, CW1 was in a reporting line one level removed from the Company's VP of Marketing and Product Management.  Over the course of CW1's time at Hayward, CW1 worked in the Company's offices in New Jersey and in North Carolina.

14

55.     Starting in mid-2021, CW1 recalled that demand began to slow, and CW1 remembered hearing that "the channel was stuffed" and there were concerns about inventory. CW1 recalled that concerns about excess inventory were general knowledge around the company and were "water cooler talk."

56.     **CW2** worked in sales at Hayward from January 2016 to September 2022 and was a District Sales Manager from November 2020 to September 2022. CW2 worked in California and oversaw all of Northern California, from the greater Sacramento area to Reno, Nevada, all the way up to Oregon, Washington, Idaho and the west end of Montana. CW2's job entailed working with distributors to purchase products from Hayward and get equipment out into the marketplace.

57.     CW2 began to hear about excess inventory at distributors in May 2021. CW2 heard directly from distributors in 2021 that they simply had too much inventory already, about two years' worth, and they were not going to load up on any additional product.

58.     CW2 also learned in the course of CW2's duties that during Covid, distributors were told to stock up because of supply chain issues. That is, during 2021, Hayward was telling distributors to purchase more inventory than they needed, to ensure they had inventory in future periods.

59.     CW2 recalled that the overages in distributor inventory were often brought up among colleagues. CW2 noted that "everyone discussed it." CW2 was also convinced that C-suite executives like the CEO would have known that distributors had enough inventory based on the large increase in purchases the previous year, followed by limited early buy orders in 2021 (further discussed below).

60.     CW2, who currently works for one of the large pool products distributors that is a customer of Hayward, learned that post-Covid, CW2's current employer at one point had about

15

two-and-a-half years' worth of Hayward products. CW2 also made clear that this distributor had too much inventory "at the time" that Hayward was experiencing the problems with reduced demand and excess channel inventory that CW2 discussed above and as detailed herein. CW2 stated that this distributor currently still has much more inventory of Hayward products than they could sell in one year at CW2's location.

61. **CW3** was a Senior Business Intelligence Visualization Developer at Hayward from August 2021 to March 2023. CW3 reported to the Vice President of Analytics, and also worked with Hayward's then-Vice President of Sales and its then-Chief Supply Chain Officer. Further, as part of CW3's job duties, CW3 was asked to put several reports together for Defendant Jones, and CW3 also oversaw centralizing Hayward data into one reporting tool named Snowflake.

62. Similar to CW2, CW3 came to understand that due to delays in the supply chain, distributors began to place orders double the size of their typical orders. That is, after ordering the inventory they needed for the upcoming period, distributors would place an additional order for inventory they needed in the next period before the first set of orders even arrived. As a result, CW3 concluded that Hayward's "demand was increasing" during that time. However, almost from the moment CW3 started working at Hayward in August 2021, Hayward's then-Chief Supply Officer was concerned with this large bubble of orders that was occurring in 2021. CW3 saw that this ordering was occurring through mid-2021, around the time that the Ever Given container ship was stuck in the Suez Canal—the ship resumed moving in early July 2021—but that later in 2021 the supply chain bubble, or bottleneck, popped.

63. Consistent with the statements of the CWs, Defendants themselves acknowledged that the channel was loading up on safety stock in 2021. In the July 28, 2022, 2Q-2022 earnings call, Defendant Jones acknowledged that "[d]istributors started reducing safety stocks as a result

16

of improved supply chain and shorter lead times for specific products."  Similarly, in the same call, Defendant Holleran stated that "[w]ith distributors['] increased confidence in OEM [original equipment manufacturer] supply chains and shorter lead times, they don't require the same level of safety stock, resulting in a recalibration of 4 to 6 weeks less channel inventory."  Likewise, in the November 1, 2022, 3Q-2022 earnings call, Defendant Holleran stated:

> ***Distributors are reducing safety stocks built up during the period of strong demand and significant supply chain disruption***, and we estimate a reduction of approximately $80 million occurred in the third quarter and compared to a meaningful inventory build in the prior year period.

64.     In addition, all of this increased activity throughout the supply chain along with general conditions from the pandemic resulted in significant inflation for the price of pool products in 2020, 2021 and 2022.  That inflation began with manufacturers like Hayward, which then passed their own increased costs to their customers, and so on down the supply chain line.

65.     The inflation further incentivized distributors to fully stock their inventory in 2021, prior to the Class Period.  For example, since distributors knew that price increases would be coming in the future from Hayward and other manufacturers, they purchased more products than they needed in 2021 so that they could lock in a lower price on inventory.

66.     Meanwhile, for end users, the price of building and improving pools was increasing, even as pandemic restrictions and discretionary savings were decreasing, undermining the marginal value of pool supplies.

**C.     Part and Parcel with the Saturation of Distributor Inventory, Distributor Demand for Hayward's Products Dropped Significantly and Hayward Was Having Difficulty Selling to Distributors by Mid-2021, While Defendants Scrambled Unsuccessfully to Respond to This Problem**

67.     Part and parcel with the saturation of distributor inventory, distributor demand for Hayward's products dropped significantly and Hayward was therefore having difficulty selling to distributors by mid-2021, prior to the start of the Class Period.  Hayward grew concerned about

this, and pressured its sales team to nevertheless keep hitting high sales growth rates. To that end, Hayward also instructed its sales team to use a combination of incentives and pressure on customers reluctant to place additional orders, but this were largely unsuccessful. Instead, distributors reduced the amount of inventory they were holding, and stopped making new orders with Hayward to replace all of the inventory they sold downstream. At the same time, because Hayward was manufacturing more and more finished products that it could not sell, its own production costs and its own costs from holding all of that unwanted inventory rose.

68.     As noted above, CW1, who was a Product Marketing Manager at Hayward, recalled that demand began to slow starting in mid-2021. CW1 further remembered that in mid-2021, management began to apply pressure to the marketing team because the sales teams "weren't hitting their numbers." Management began to ask marketing teams to develop programs to "get product off the shelves." This is how CW1 began to realize that there was a surplus of inventory at Hayward.

69.     CW1 recalled that these marketing programs included "buy more to save more" programs—that is, offering discounts if the volume of an order increased. CW1 saw that, in late 2021, Hayward also resorted to a new measure called a "sales blitz," which were internal sales promotions for the sales team. CW1 observed that the sales blitzes were not "moving the needle," and did not appear to be significantly changing sales numbers from years prior.

70.     CW1 recalled that the product management team had access to large quantities of data at Hayward and was able to see both sales numbers and what was being purchased from Hayward's distributors and manufacturing sites. This information was stored in a database CW1 believed was called Cognos. Cognos also tracked all Hayward inventory. CW1 recalled that the product management team regularly generated reports from this database, and that the product

management team used these reports for both buying and selling decisions at Hayward—including to inform the marketing department of which products needed "sales blitzes."

71.    **CW4** was a Director of Shipping Operations at Hayward from September 2021 to April 2022.  CW4 reported up to "a few people," including a reporting line one level removed from Hayward's Director of Distribution.  CW4 was responsible for day-to-day output (shipping) of finished materials from Hayward's Mocksville, North Carolina warehouse to vendors.

72.    CW4 saw that during CW4's time at Hayward, there was "an overage of inventory," and "general concerns" that the Company was not "selling enough."  CW4 was given shipping levels and numbers to hit, and if those dollar amounts were not met, it was considered a failure.  If there were no orders to hit their goals, CW4 recalled that they were instructed to "pull ahead" future orders.  Pulling ahead or pulling forward means that a customer order for a future period was being filled in the current time period.  CW4 recalled "a lot of stress" around the finances at Hayward, stating, "[i]f we didn't pull ahead, numbers would not be where they expected and needed them to be."  CW4's general understanding was that a sale was recognized the minute the load was shipped.  Pulling ahead orders thereby increased Hayward's revenue for the current period, albeit to the detriment of later periods.

73.    CW4 recalled the first instruction to pull forward orders to ship came in October 2021 during a daily staff meeting.  CW4 relayed that this occurred at a daily meeting which included a review of what to expect from the day's shipping goals in dollar amounts and orders, and with discussion topics that included what products needed to be shipped, which orders were being processed already, and what future orders that needed to be processed.

74.    CW4 recalled that two weeks later, sometime between Halloween and Thanksgiving of 2021, the Site Manager at CW4's location informed CW4 that they "had to do

something about volume" because they did not "have enough volume with current orders to sustain what higher-ups needed."  The Site Manager explained to CW4 that they would have to pull ahead orders even if customers did not request or approve it.  When CW4 questioned this practice, the Site Manager said the Company would "deal with the aftermath."

75.    CW4 stated that pulling forward orders continued through Christmas of 2021. Employees at CW4's location worked overtime to keep up with pulling orders forward, but as CW4 looked at future orders, CW4 noticed the orders were dwindling.

76.    CW4 was personally concerned that Hayward was not "being accurate" by pulling forward orders.  Moreover, CW4 stated that Hayward was shipping orders "way ahead of schedule" and "customers were not happy."  CW4 was told by individuals on the customer service team that customers were receiving orders "six months ahead of time."

77.    Around December 2021, CW4 voiced concerns about pulling forward orders to the Site Manager and Hayward's Director of Distribution.  CW4 stated that they both became frustrated, and the Director of Distribution told CW4 that this would "benefit the Company and work out in the end."

78.    CW4 recalled that orders rejected by customers started to become an issue.  CW4 learned about this from key performance indicator ("KPI") meetings at the Clemmons, North Carolina location, which were held by a sales director, and customer frustration was also brought up "a couple of times" in the meetings.

79.    Hayward responded to reluctant customers with incentives and pressure.  As CW4 learned during the course of CW4's duties, Hayward employees were instructed to tell customers that if they kept unexpected orders, they would receive discounts on future orders.  In addition,

CW4 heard that the sales team would tell customers "behind the scenes" that if they placed orders a year in advance, they "won't have the price increasing."

80.     CW1 was also aware of pull forwards as a practice that Hayward used.  This practice occurred when Hayward wanted to improve its performance numbers.  Around 2018, CW1 recalled order pull forwards happening in order to make Hayward appear more profitable and attractive for a potential buyer or IPO.  CW1 heard from Hayward's then-VP of Marketing about these pull forwards.  CW1 also realized that "something similar was happening again" in 2021 around the time of the IPO, and "heard from the product management team" that Hayward was then engaging in pull forwards.

81.     Likewise, CW2, who was a District Sales Manager, recounted that CW2 was not hitting CW2's sales targets in 2021 up until CW2 left the Company in 2022.  CW2 recalled that CW2 was "not hitting those overall dollars on the sales end standpoint" because distribution had too much product.  As CW2 came to understand, while customers were still buying from distributors, distributors had what they needed from Hayward.  CW2 relayed that it became hard for district managers to hit their sales dollar targets.

82.     CW2 attended sales meetings that occurred either monthly or quarterly, which Hayward's VP of Sales and its Regional Sales Manager also attended.  At these meetings, the VP of Sales would discuss inventory issues in 2021.  CW2 also attended weekly meetings with other sales managers in Northern California about the difficulties moving product.

83.     CW2 recalled an instruction that "trickled down" to salespeople from superiors and involved the salespeople informing distributors that they should load up on inventory.  CW2 recalled there were internal discussions about telling distributors and customers that they "don't want to be the company that doesn't have [product]."  CW2 noticed around late 2020 and going

up through 2022 that salespeople were instructed to push and to "strongly encourage" distributors to make these orders. As a sales rep at the time, CW2 thought it was great because more money would be coming in, however, this started to impact bonuses because product sat there unsold for two years. In turn, CW2 stated that to encourage distributors to order products, salespeople offered them discounts and rebates.

84. The foregoing circumstances also reduced demand for Hayward's "early buy" program. As explained in Hayward's FY 2021 Form 10-K, "[i]n the fourth quarter, [Hayward] incentivize[d] trade customers to buy and stock up in preparation for next year's pool season under an 'early buy' program that offers a price discount and extended payment terms." For the 2021 early buy program, for example, Hayward "ship[ped] products from October through March and receive[d] payments for th[o]se shipments from February through July 2022." CW2 understood that distributors were not participating in the early buy program in 2021, because they had already made purchases in the previous calendar year and loaded up on inventory.

85. Consistent with the CWs' statements, Defendants acknowledged at the end of the Class Period that they were aware that demand from distributors was decreasing in 2021. As Defendant Holleran admitted after the fact on the July 28, 2022, 2Q-2022 earnings call (discussed further below):

> **We expected to sell less into the channel** versus sellout **due to the strategic positions that many of our channel partners took at the end of 2021**. . . .
>
> \*        \*        \*
>
> Overall, when we set coming into the year, with last year's retail pull-through in front of us, **we expected some moderation off a very, very high pull through the channel last year**.

86.    Hayward's attempts to maintain high sales growth in the face of dropping customer demand and a channel loaded with inventory were unsuccessful.  Instead, customers began cancelling orders.  Defendants tracked these circumstances.

87.    CW3, a Senior Business Intelligence Visualization Developer, was aware of customer cancellations because of the reports CW3 was tasked with running in CW3's role.  CW3 believed cancellations, and a lack of new orders, began around March 2022.  CW3 learned during the Course of CW3's duties that in early 2022, around the end of February, Defendant Jones began to ask for cancellation reports to be put together so he could access them.  CW3 published these reports on a Tableau dashboard that Jones could review (Tableau is a visual analytics platform).  CW3 also prepared reports for Defendant Jones to visualize inventory backlog and how much money was tied up in products that were made but not being distributed.  CW3 recalled, as an example, that there was a special order for heaters that someone required and then cancelled, and stated "[t]hat ended up being $11 million of inventory," which Hayward "was stuck with just from one order."

88.    As CW3 explained, Hayward was getting "hammered" by distributors who placed orders but then no longer wanted those orders anymore.  CW3 learned during the course of CW3's duties that, after the supply chain bubble popped, Hayward was producing and sending product out, but that distributors then had enough product on hand without increased customer orders, so the distributors began cancelling orders.  Vendors and distributors became overwhelmed with the product they already had, and "[e]veryone was like, I don't have room for all this stuff," CW3 recalled.

89.    Consistent with CW3's statements, as set forth herein, CW4 recalled orders rejected by customers, and CW6 recalled "talks" of large-scale returns of Hayward orders.

90.     CW3 recounted that Hayward's then-Chief Supply Officer, Donald Smith, "knew right away" that ordering would slow down once Covid ended.  CW3 recalled conversations with Smith who was concerned with how the Company would handle production once "things went back to normal."[4]

91.     The reduced sales to the channel combined with Hayward's increased manufacturing meant that Hayward's own inventory of raw materials and finished products was increasing precipitously during this time.  CW3 recalled in February or March 2022 hearing from Defendant Jones that there was a concern of excess inventory on-hand at Hayward in the amount of $100 million.  CW3 had visibility into how much inventory the Company had on hand through CW3's job duties, which included building out the system so that Jones could "look at it whenever he wanted."

92.     The following chart shows how bad Hayward's overproduction of finished products was in second half of 2021 and first half of 2022.  During that time, which overlaps with the Class Period, Hayward's inventory of finished products it had manufactured and that remained on hand in its inventory skyrocketed.

---

[4]     Notably, Smith was the only member of the C-suite remaining by the time of the IPO who had not been installed by CCMP and MSD.  He had served as Hayward's Senior Vice President, Chief Supply Chain Officer since January 2007.



93.     In recognition of this overproduction, Hayward sought to reduce its manufacturing capacity toward the end of 2021 and start of 2022, but, validating the Chief Supply Chain Officer's concern, it failed to actually do so for some time.  As a result, the decrease in Hayward's net sales rate effectively mirrored the increase in its rate of finished goods on hand:



94.    **CW5** worked at Hayward from September 2011 to July 2022 as a Quality Manager. CW5's primary job duties included overseeing and assisting with the manufacturing of Hayward inventory produced at the Nashville, Tennessee plant.

95.    Near the end of 2021 and beginning of 2022, CW5 recalled that the manufacturing team received a directive from corporate to "slow down operations." CW5 recounted that there was "absolutely" awareness that there was too much inventory on hand at Hayward, and that CW5 was concerned about this as well. However, CW5 recalled that Hayward did not seem to prioritize "lean manufacturing," and continued to purchase large quantities of raw materials even with the directive for a slower production rate.

96.    **CW6** was a Global Commodity Manager of Electronics at Hayward from February 2016 to December 2022 in the Rhode Island office.  CW6's main job duties included "sourcing in" products used in Hayward manufacturing.

97.    CW6 believed one of the largest factors with Hayward's excess inventory issues was the contracts they signed.  As CW6 recalled, Hayward signed multiple "hugely inflated," non-returnable, and non-cancellable contracts with suppliers in 2020 to 2021.  CW6 recalled that when Hayward signed the contracts it had double or triple the volume of normal sales, but when demand scaled back down, they were "stuck" with two-to-three-year long contracts they could not back out of.  For example, CW6 anticipated a crash in the availability of electronic supplies, so in 2020 and into 2021, CW6 had Hayward "stocked up and ordering extra from suppliers."  CW6 recalled that in some cases, Hayward was paying $90 for an item that regularly costs $5.  CW6 had direct insight into the electronics department, and believed this was happening in other departments as well, Hayward "was bringing in plastics, packaging, metals, everything was coming in at an accelerated rate."

98.    CW6 recalled that "all the evidence was there" for people at Hayward to see that the channel was full.  To that point, CW6 clarified that "product managers . . . anyone in operations management . . . and management definitely would have known."  CW6 also recalled "talks" of large-scale returns of Hayward orders.

99.    Additionally, with regard to the channel being full, CW6 stated that "if C-Suite did not know about it, it was gross incompetence . . . they had to know."  CW6 remembered that Hayward had monthly Sales, Inventory and Operations Planning meetings, which CW6 attended along with 40 to 60 managers representing every section of Hayward, and which lasted two or three hours.  CW6 recalled that these meetings were chaired by Defendant Holleran and attended

27

by Defendant Jones as well.  CW6 recounted that these meetings discussed forecasting and sales, including "what's selling good, what's not selling good."

> **D.** **Unable to Address the Serious Problems Impairing Hayward's Performance Set Forth Above, Defendants Made a Series of False Statements and Material Omissions During the Class Period, and Simultaneously Sold Substantial Amounts of Stock at Artificially Inflated Prices, Before Finally and Fully Disclosing the Truth**

100. Unable to stop the problems set forth above, which were impairing Hayward's performance, Defendants made a series of false statements and material omissions during the Class Period, detailed in the next Section.  Defendants thereby created the false and misleading impression that, among other things, channel demand and Hayward's businesses remained strong.

101. Meanwhile, under cover of the material misrepresentations and omissions, Defendants sold a substantial amount of stock at artificially inflated prices.  As detailed below, Defendants CCMP and Jones both took advantage of the inflated stock price to sell shares. Defendant CCMP sold approximately 2.7 million shares for $53.4 million in January 2022; 4.08 million shares (at a price that was $3 per share above market) for $80.8 million in March 2022; and 17.6 million shares for $245.5 million in May 2022 as part of an underwritten secondary public offering.  Defendant Jones, meanwhile, sold almost half of his stock (44.5%), 140,501 shares, outside of a 10b5-1 trading plan, for about $2 million on June 17, 2022—the month before Hayward finally and fully disclosed the truth.  Defendants CCMP and Jones thus both profited from the artificially inflated stock price at investors' expense.

102. Shortly after the last of those sales, as detailed below, Defendants finally and fully disclosed the truth, including that the channel was saturated with inventory, part and parcel with that channel demand for Hayward had dropped significantly and Hayward was having difficulty selling to the channel, and that Hayward was producing finished goods far in excess of its demand.

28

Although Plaintiff and the Class suffered enormous losses as the truth emerged, Defendants made millions of dollars by selling Hayward stock when it was still artificially inflated.

## VI.    FALSE AND MISLEADING STATEMENTS

103.    Throughout the Class Period, in conference calls, press releases, presentations, and SEC filings, Defendants made materially false and misleading statements and omissions that misrepresented and/or concealed from investors how much the channel had loaded up on inventory, part and parcel with that the channel's demand for Hayward's products had dropped significantly and Hayward was having difficulty selling to the channel, and that Hayward was manufacturing finished goods far in excess of its demand.  Instead, Defendants painted the opposite picture, including creating the false and misleading impression that demand from the channel and Hayward's business were strong and that the existing data showed they were positioned to remain strong.

104.    Defendants' material misrepresentations and omissions are separately enumerated below.

### A.    October 27, 2021, 3Q-2021 Earnings Call

105.    On October 27, 2021, Defendants held an earnings call in connection with their release of Hayward's results for 3Q-2021.  During the Q&A portion of the call, an analyst asked what Defendants were "seeing in the channel in terms of inventory levels and what your distributors are asking for," noting that Pool Corp., a major distributor and a public company, had reported "a significant uptick in inventories" in its own quarterly reporting the previous week. Defendant Holleran responded:

> Yes.  I mean I would say [Pool Corp.]'s comments last week represent the industry as a whole.  Inventories are in a healthier position than they were a quarter or 2 ago. If you look at it from a days-on-hand standpoint, it's still in a -- ***it's an improving position, but certainly not too much by any means***.

Admittedly, ***the mix of that inventory may not be as ideal as any of us would like it***. There's still some products that are in shorter supply. So we're working feverishly to address that. ***But in total, I think we're taking some extra shelf space right now. So we look at it really through 2 lenses: in absolute terms, what's -- what are the inventory levels looking like, but also then are [we] accounting for some additional shelf space through our share gains.***

106.    A different analyst, noting that Defendants had "talked about building visibility into 2022," asked for "some thoughts on backlog, how you see the lead time stretching and what gives you confidence when you look at the various components to your growth"—in short, "[w]hat are the factors that drive confidence in the volume side going into next year?" Defendant Holleran responded:

Yes. I mean ***the backlog does stretch certainly into 2022. It's at elevated levels still despite some of our production capacity improvements***.

***As you look at the levers of growth, I think they continue to be very -- we have high confidence in them***, certainly new construction. I know others have talked about this. The builders are quoting well out into 2022, some even beyond. I know they're working feverishly to add labor and increase their crews to be able to get more pools in the ground in 2022.

The remodeling segment of the market, I think, is another [ripe] opportunity. As I said in the prepared remarks, our pools are more aged now than ever. And there is an interest both with the homeowner who's doing a full-scale remodel or just looking to upgrade a piece or 2 on their pad that they're looking to digitize to take more control and automation over the pool or to increase the ambiance or to become more natural in the water treatment. ***So there's a number of different angles that are -- that continue to fuel our confidence into 2022. And we have a backlog right now that certainly supports volume growth in the early months of 2022 to start from***.

107.    Similarly, in the prepared remarks at the conference call, Defendant Holleran stated that "***[w]e expect the current demand trends [to continue] through the end of the year and into 2022*** driven by pool remodels, upgrades to SmartPad products and new pool construction returning to historical averages."

108.    The presentation that accompanied the earnings call included a slide titled "Updated 2021 Financial Outlook" which stated that the positive guidance for the year was based on, among

30

other things, "[s]trong year-to-date results and increased visibility into 2022 order file" and "[t]rade customer backlogs continu[ing] to support healthy demand."  Another slide titled Sustainability of Growth listed reasons why Hayward's growth was sustainable, including "[s]trong long-term secular trends continu[ing]," and "[r]emodeling activity poised to continue."

109.    Defendants' Form 10-Q for 3Q-2021 also incorporated several misleading risk warnings regarding risks that were purportedly only hypothetical.  The Form 10-Q directed investors to the "Risk Factors" enumerated in the IPO Prospectus filed on March 15, 2021, including:

**Our business depends on the performance of distributors, builders, buying groups, retailers and servicers.**

We distribute our products through our customers who are distributors, builders, buying groups, retailers and servicers, many of whom sell products of competing manufacturers.  We rely on our customers to stock, market and recommend our products to pool owners and our business depends on retaining good relationships with our customers.  However, the financial condition of these resellers could weaken, ***they could stop distributing our products or reduce sales of our products*** and prefer others, ***or uncertainty regarding demand for some or all of our products could cause them to reduce their ordering and marketing of our products***, and as a result our business, financial condition, results of operations and cash flows could be materially impacted.

We have invested and intend to continue to invest in programs designed to enhance sales to distributors, builders, buying groups, retailers and servicers, including through volume rebates with key distributors.  However, these programs may not be successful in retaining or increasing product purchases by these customers.

*        *        *

**A loss of, or material cancellation, reduction, or delay in purchases by, one or more of our largest customers could harm our business.**

A majority of our net sales is generated from sales to distributors, including our largest customer, Pool Corporation, who represented approximately 30% of our net sales in Fiscal Year 2020 and 35% of our accounts receivable on December 31, 2020.  While we do not have any other customers that accounted for 10% or more of our net sales in Fiscal Year 2020, we have other customers that are key to the success of our business.  Our top five customers accounted for approximately 43% of our net sales in Fiscal Year 2020.  Our concentration of sales to a relatively small

31

number of larger customers makes our relationship with each of these customers important to our business.  Our success is dependent on retaining these customers, which requires us to successfully manage relationships and anticipate the needs of our customers in the channels in which we sell our products.  We cannot provide assurance that we will be able to retain our largest customers. In addition, some of our customers may shift their purchases to our competitors in the future.  The loss of one or more of our largest customers, *any material cancellation, reduction, or delay in purchases by these customers, or our inability to successfully develop relationships with additional customers could have a material adverse effect on our business, financial condition, results of operations and cash flows*.

*        *        *

**Our operating results will be harmed if we are unable to effectively manage and sustain growth or scale our operations.**

*We may not be able to manage our future growth, if any, efficiently or profitably*. Our sales and operating margins, or sales and margin growth, may be less than expected. *If we are unable to scale our operations efficiently or maintain pricing without significant discounting, we may fail to achieve expected operating margins, which would have a material and adverse effect on our operating results*.  Growth may also stress our ability to adequately manage our operations, quality of products, safety, and regulatory compliance.  If growth significantly decreases, it will negatively impact our cash flows, and it may be necessary to refinance our existing indebtedness or obtain additional financing, which may increase indebtedness or result in dilution to shareholders.  Further, we may not be able to obtain additional financing on acceptable terms, if at all.

*        *        *

**If we do not manage product inventory in an effective and efficient manner, it could adversely affect profitability.**

Many factors affect the efficient use and planning of product inventory, such as effectiveness of predicting demand, preparing manufacturing to meet demand, meeting product mix and product demand requirements, and managing product expiration.  We build-up product inventory during the third quarter in anticipation of shipments of products purchased through our early buy program in the fourth quarter.  However, we may not accurately anticipate the level of customer participation in the early buy program or the amount of products that they may purchase. *We may be unable to manage our inventory efficiently, keep inventory within expected budget goals, keep our work-in-process inventory on hand or manage it efficiently, control expired product, or keep sufficient product on hand*

32

*to meet demand.  We may not be able to keep inventory costs within our target levels*.  Failure to do so may harm our long-term growth prospects.[5]

110.    Defendants' statements in ¶¶105-09 were materially and false and misleading and omitted material information because channel inventory had not made just negligible improvements, demand from the channel was not healthy, and the recent volume growth trends from the channel were not continuing.  In truth, when the foregoing statements were made, the channel was saturated with inventory, notwithstanding any purported market share gain by Hayward, with the channel having loaded up on inventory during the course of 2021, including making double orders for 2022.  Part and parcel with that demand from the channel was dropping significantly and Hayward was having difficulty selling to the channel.  In addition, the various factors that Defendants touted as supposedly supporting growth, including purported backlogs, painted a rosy picture for investors, but were false and misleading, because, at a minimum, those factors were not resulting in new upstream demand for Hayward as the distribution channel that made up the bulk of Hayward's sales was already saturated with inventory.  Hayward was instead forced to resort to incentives and pressure tactics to try to improve orders from the channel, but even that was having only a minimal effect on sales.  Moreover, Hayward was locked into purchasing raw materials and manufacturing finished products at a high rate, which resulted in production far above the reduced demand from the distribution channel, and increased Hayward's expenses.

111.    Additionally, the "Risk Factors" listed above in ¶109 were materially false and misleading because what they characterized as mere possibilities—for example, distributors "***could*** stop distributing our products or reduce sales of our products" or uncertainty "***could*** cause [distributors] to reduce their ordering" of Hayward products—where, as set forth above, problems

---

[5]    All italicized emphasis in documents is added, unless otherwise stated herein.

that were already then occurring and negatively impacting Hayward, due to distributors' saturation with Hayward inventory and dropping demand.

**B.    January 24, 2022, Press Release**

112.    Defendants issued a press release on January 24, 2022, entitled, "Hayward Holdings Announces Select Fiscal Fourth Quarter and Full Year 2021 Preliminary Financial Results and 4.08 million share repurchase as part of previously announced repurchase program." While the press release reported slowing growth in net sales (*see* §VII.A), Defendants obscured and minimized this information with a series of false and misleading statements and omissions.

113.    Defendants' press release reported preliminary net sales figures for 4Q-2021, and stated that "[t]he expected increase in Net sales was primarily driven by higher volumes mainly in residential pool equipment sales as we continued to see demand from aftermarket upgrades and new construction."

114.    Additionally, Defendants framed the stock repurchase program as a positive signal offsetting Hayward's performance, stating in the December 21, 2021, press release that announced the program's authorization that it demonstrated "our strong cash flow generation capability and significant deleveraging of our balance sheet since going public earlier this year."  Defendant Holleran was also quoted in the same December press release as justifying the repurchase program because, "[o]ur business is performing well and we remain confident in our ability to continue executing our growth initiatives in the years ahead."

115.    The January 24, 2022, press release also directed investors to the misleading "Risk Factors" in the IPO Prospectus set forth above at ¶109.

116.    Defendants' statements in ¶¶113-115 were materially and false and misleading and omitted material information because channel demand was not continuing, and Hayward was not well-positioned for a repurchase program or for strong cash flow.  In truth, when the foregoing

statements were made, the channel was saturated with inventory, notwithstanding any purported market share gain by Hayward, with the channel having loaded up on inventory during the course of 2021, including making double orders for 2022.  The channel was accordingly saturated with inventory.  Part and parcel with that demand from the channel was dropping significantly and Hayward was having difficulty selling to the channel.  Hayward was therefore forced to resort to incentives and pressure tactics to try to improve orders from the channel, but even that was having only a minimal effect on sales.  Moreover, Hayward was locked into purchasing raw materials and manufacturing finished products at a high rate, which resulted in production far above the reduced demand from the distribution channel, and increased Hayward's expenses.

117.    Additionally, the "Risk Factors" contained material misrepresentations and omissions for the reasons set forth above at ¶111.

**C.    March 2, 2022, 4Q-2021 Earnings Call**

118.    On March 2, 2022, Defendants held an earnings call (accompanied by a press release) in connection with their release of Hayward's results for 4Q-2021.  Defendant Holleran concluded his prepared remarks by stating that "we continue to be confident about the underlying demand trends in the market, Hayward's position within the market and the opportunity for Hayward to expand upon its achievements in 2022 and the years to come."

119.    During the Q&A portion of the call, an analyst asked if Defendants could reconcile their statements that "inventory levels in the channel are at least a little closer to normal" while the "backlog [was] still at record levels," questioning "what do you think it means" and whether there was "a risk from a cancellation perspective," or whether they "look[ed] at this more as just really good visibility as you work through the year, and it says more about underlying demand." Defendant Holleran responded:

*I think it's more of the latter*, Mike. *I think it's a very credible order file.* There's been plenty of price increases that we've had to announce into the industry. We ran kind of a modest early buy last year. *If the channel was feeling as if they had too much or were unhappy with their inventory turns, I think there was opportunity for them to slow the bookings or even cancel and we've seen negligible cancellations through those time periods. So we feel very good about the credibility of that order file.*

120.    In response to an analyst question about "cadencing through the year," and "front half versus the back half," Defendant Jones stated:

Yes. We are beginning to see a somewhat of a return to normal seasonality as we step into '22. I mean typically, Q1 and Q3 are the lower season volume periods for the channel. *We've entered '22 with a very strong order file. We're concentrating in Q1 in our production units to fill out some of the hold on certain product lines that the channel is demanding right now. We do see and expect a strong volume metric period in Q2.* And then we'll see how the balance of the year develops as we get into that time period. But sentiment remains strong as we've started the year here.

121.    Defendant Jones also stated that Defendants felt "very positive about the start of the year" based on "the sort of very strong order file that we have on the business right now as we step into the primary season period of Q2." Defendant Holleran also stated that "the year's starting out pretty similar to 2021 with some elevated backlogs starting the year. And we're working hard to convert that backlog into product, in the channel and for our dealer networks."

122.    In addition, Defendant Holleran claimed that Hayward's small early-buy program in 2021was "very much curtailed from a historical standpoint because of the order file that already existed in our possession."

123.    Concurrent with the earnings call and the filing of their Form 10-Q for the quarter, Defendants issued a press release that quoted Defendant Holleran as stating:

"I am extremely proud of the strong quarter and year-end results Hayward employees delivered in our first year as a public company, where we saw a *continuation of robust organic growth in net sales* and significant margin expansion. . . . *We are entering 2022 with significant momentum, we remain encouraged by underlying industry demand levels supported by both new*

36

*construction and aftermarket activity*, and an enhanced positioning within the pool industry as a result of recent acquisitions and additions to our team."

124.    The press release attributed the increase in net sales "primarily [to] . . . continued demand in residential pool equipment sales, in particular aftermarket upgrades, service and new construction."

125.    During the conference call, Defendant Holleran also stated that Defendants "expect[ed] to grow net sales in the range of 9% to 12% compared to 2021," and to similarly grow adjusted EBITDA by "9% to 13%," based on "combined price and volume growth" between "11% to 14%." He further stated that "[t]his guidance reflects strong carryover demand, conversion of current order file, pricing benefits and ongoing product adoption."

126.    During the conference call, Defendant Jones even went so far as to say that "we've got a level of conservatism built into our forecast here. . . . it's fair to say that the guidance we've given right now does have an element of conservatism, and we don't want to get ahead of ourselves right out of the gate here."

127.    The press release likewise stated the following regarding Hayward's outlook:

Hayward is *well positioned to deliver continued net sales and adjusted EBITDA growth in 2022* following the tremendous success in 2021 *given the sustainable secular trends driving demand for pool products, specifically within our SmartPad conversion opportunities and environmentally conscious technology products*.

For the full fiscal year 2022, Hayward expects net sales growth of 9% to 12% year-over-year and Adjusted EBITDA in the range of $460 million to $475 million, or a growth range of 9% to 13% year-over-year[.]

128.    Defendants' presentation that accompanied the prepared remarks included a slide similar to that used in the 3Q-2021 earnings call, titled "2022 Financial Outlook," and which framed the guidance provided as reflecting "[s]trong carry over demand trends" and "[t]rade customer backlogs continu[ing] to support healthy demand." The presentation also included a

"Sustainability of Growth" slide similar to that used in the 3Q-2021 presentation, and which likewise listed reasons why Hayward's growth was sustainable, including "[s]trong long-term secular trends continu[ing]," "[k]ey economic indicators remain[ing] positive," "[r]emodeling activity [being] strong," a rise in new pool construction, and the "SmartPad Increasing Content/Mix & Margin."

129.    Additionally, the FY 2021 Form 10-K included misleading "Risk Factors" almost identical to those included in the IPO Prospectus and set forth above at ¶109.  While Defendants made statements in the earnings call and/or the press release indicating that the supply chain and channel inventory were improving somewhat, and announced guidance for FY 2022 that was below analyst expectations (*see* §VII.B), Defendants obscured and minimized this information with the series of false and misleading statements and omissions set forth above.

130.    Defendants' statements in ¶¶118-129 were materially and false and misleading and omitted material information because the channel did have too much inventory, the previous demand levels from the channel were not continuing, Hayward was not experiencing robust organic growth, it did not have a strong order file and it was not well-positioned.  In truth, when the foregoing statements were made, the channel was saturated with inventory, notwithstanding any purported market share gain by Hayward, with the channel having loaded up on inventory during the course of 2021, including making double orders for 2022.  Part and parcel with that demand from the channel was dropping significantly and Hayward was having difficulty selling to the channel.  In addition, the various factors that Defendants touted as supposedly supporting growth, including purported backlogs, painted a rosy picture for investors, but were false and misleading, because, at a minimum, those factors were not resulting in new upstream demand for Hayward as the distribution channel that made up the bulk of Hayward's sales was already

saturated with inventory.  Hayward was instead forced to resort to incentives and pressure tactics to try to improve orders from the channel, but even that was having only a minimal effect on sales. Moreover, Hayward was locked into purchasing raw materials and manufacturing finished products at a high rate, which resulted in production far above the reduced demand from the distribution channel, and increased Hayward's expenses.

131.    Defendants' claim that Hayward had negligible cancellations was materially false and misleading for the additional reason that the Company was in fact experiencing notable cancellations, such that Defendant Jones had asked to track them.

132.    Defendants' further claim that Hayward's 2021 early-buy program was small because of the order file that Hayward already had was materially false and misleading for the additional reason that this program was, in fact, small because the channel was already saturated with inventory and so there was little demand for it.

133.    Additionally, the "Risk Factors" contained material misrepresentations and omissions for the reasons set forth above at ¶111.

**D.    April 28, 2022, 1Q-2022 Earnings Call**

134.    On April 28, 2022, Defendants held the 1Q-2022 earnings call and issued an accompanying press release.  In the Q&A portion, an analyst asked about "any signs of consumer spending slowing down or cancellations in the order file."  Defendant Holleran responded:

> *We really haven't seen any kind of cancellations.  We're in pretty close contact with both channel partners and our dealers, and the work on the books and new lead generation both remain strong despite plenty of price increases.  And obviously, the channel inventory position has gotten better.  We're in a much better position going into the start of the season in 2022.*
>
> *So no, we're still seeing robust demand and the order file on the books is still very strong* and seems to be pressure tested, and product is going to be installed in the backyard.

135.    Subsequently, in response to another analyst's question, Defendant Jones stated:

I'd say *the underlying growth drivers remain very strong*. Secular trends remain strong, as Kevin mentioned, and everything is pointing to strength in the industry and strength for Hayward. *So in terms of our guidance, it really reflects just a cautionary view on how the second half may develop*. . . .

*[W]e feel good about where we're at*, and we'll update you guys as we come out of Q2.

136.    Defendant Holleran similarly stated that "*consumer demand and what's on the books is still incredibly strong and gives us strong optimism as a company and an industry*."

137.    A different analyst asked specifically about channel inventory, with Defendant Holleran responding:

[Q.]   And then on the inventory side, maybe just talk about how you guys are looking at channel inventory?  And obviously, we can hear some chatter public markets on how some of your channel partners are thinking about inventory and restocking, and just would like to get your sense for what your view of the channel partners is in terms of their inventory expectations and how they expect to build or not build as they work through the year?

[A. (Holleran)]  Yes.  *We do keep close tabs on it with our channel partners to make sure that we all feel comfortable with the amount of inventory staged closer to point of sale, and they are largely replenished and in a much better position starting the 2022 season than they were either in the last 2 years.*

*It's not a perfect balance.  There are SKUs and product categories based upon a material availability that we need more of.  They need more of for sale.  Maybe some solve then some sand filters, variable speed pumps, some controls, but it's much improved over the prior year.*

*In absolute dollars, as I said, it's higher at the end of Q1 2022 than the same period.  But I think there are a few things to keep in mind that as we look at it from a days on hand standpoint, obviously, that inventory value has a lot of price embedded in it.  The industry has also grown, so there needs to be additional inventory in there to support the overall industry growth, which has been 30-plus percent over the last few years.  And then from -- specifically to Hayward, some of our share gains, that would require some incremental inventory positions for the Hayward product in the channel*.

*So all that said, we feel comfortable with our inventory position from a days on hand standpoint here at the start of the season*.

138.    In response to an analyst question about seasonality, Defendant Jones stated:

. . . Q1 this year was slightly higher than we would have experienced in the normal year. We do see some seasonality reappearing into '22, but certainly, Q1 was a higher quarter than we think normally from a seasonal perspective. ***And that's really consequential to the fact that we were still working through and still continue to work through a large backlog***.

***We want to make sure that the channel is appropriately stocked as we mentioned in the previous call***.

139.    Another analyst asked for an update on Hayward's inventory, noting that "your own inventory has been growing faster than sales by quite a bit the last few quarters," to which Defendant Jones responded:

. . . . ***So 20% of our inventory climb has really come from that COGS [cost of goods sold] index increase, the inflation that's run through.***

[O]utside of the inflation, ***we have taken 2 strategic positions in the balance sheet. One is on certain finished goods that -- where we can get the raw materials. Knowing the demand curve that we see out in the future, we are manufacturing certain products in terms of finished goods to get in into inventory to be a -- an important position to be able to service the market***. And then I'd say the second strategic position we've taken is in raw materials. And again, ***where we can secure a position in raw materials, particularly in those hard to get areas, we have taken that position***.

140.    In a concurrent press release, Defendant Holleran stated:

"***We entered 2022 with significant momentum given the robust end market demand, strengthened product offering, and our enhanced operational capabilities***. I am pleased to report another quarter of strong financial performance as our team worked hard to continue to supply our customers with leading products and solutions. . . . The backdrop for the pool industry remains attractive and ***continues to be supported by sustainable secular demand trends*** across new construction and the aftermarket which represents approximately 80% of our business. . . . *Our momentum is being driven by our innovation and our ability to meet market demand and we are confident that we will be able to perform in the near-term while generating long-term value for all our stakeholders*."

141.    In addition, the press release stated:

***Hayward remains well positioned to achieve net sales and adjusted EBITDA growth for the full year*** following the strong start in the first quarter of 2022. ***Consumer demand for pool equipment products continues to be driven by healthy activity in the aftermarket as well as new construction. Having entered this year in a significantly stronger manufacturing position, we are continuing to see***

*increased market adoption of our products*, specifically within the SmartPad conversion opportunities facilitated by our Omni platform and environmentally conscious technologies. *While underlying market demand trends remain positive, we do continue to experience areas of supply chain and cost inflation challenges brought on by global market disruptions*, we will continue to leverage our vertical integration and pricing power to help substantially offset these challenges.

142.    The press release stated that "Hayward is reaffirming" the FY 2022 guidance it previously provided, as set forth above.  Defendant Jones elaborated in the Q&A:

*So in terms of our guidance, it really reflects just a cautionary view on how the second half may develop*.  As I said before, price is still in the high single-digit growth year-on-year before the continued implementation of the surcharge.  FX is a headwind.  But in terms of the structural margin on the EBITDA line in the second half, *it does represent a little bit of view of caution given the current climate*.  But we feel good about where we're at, and we'll update you guys as we come out of Q2.

143.    The presentation also included a "2022 Financial Outlook" slide similar to that used in the 3Q-2021 and 4Q-2021 presentations, and which likewise attributed the positive guidance to "[s]trong carry over consumer demand trends and expected conversion of 2022 order file," as well as "[t]rade customer backlogs continu[ing] to support healthy demand."  It further included a similar "Sustainability of Growth" slide which listed reasons why Hayward's growth was sustainable, including "[s]trong long-term secular trends continu[ing]," "[k]ey economic indicators remain[ing] positive," "[r]emodeling activity [being] strong," a rise in new pool construction, and the "SmartPad Increasing Content/Mix & Margin."

144.    Additionally, the 1Q-2022 Form 10-Q directed investors to the FY 2021 Form 10-K "Risk Factors," which were almost identical to those included in the IPO Prospectus and set forth above at ¶109.  While the earnings call and press release reported slowing net sales growth, and modest supply chain and channel inventory improvement (*see* §VII.C), Defendants obscured and minimized this information with a series of false and misleading statements and omissions.

42

145.    Defendants' statements in ¶¶134-144 were materially and false and misleading and omitted material information because the channel inventory was not in a comfortable position, Hayward did have robust demand, Hayward did not have a strong order file, Hayward did not have strong growth drivers, and Hayward was not increasing its own inventory to service demand.  In truth, when the foregoing statements were made, the channel was saturated with inventory, notwithstanding any purported market share gain by Hayward, with the channel having loaded up on inventory during the course of 2021, including making double orders for 2022.  Part and parcel with that demand from the channel was dropping significantly and Hayward was having difficulty selling to the channel.  In addition, the various factors that Defendants touted as supposedly supporting growth, including purported backlogs, painted a rosy picture for investors, but were false and misleading, because, at a minimum, those factors were not resulting in new upstream demand for Hayward as the distribution channel that made up the bulk of Hayward's sales was already saturated with inventory.  Hayward was instead forced to resort to incentives and pressure tactics to try to improve orders from the channel, but even that was having only a minimal effect on sales.  Moreover, Hayward was locked into purchasing raw materials and manufacturing finished products at a high rate, which resulted in production far above the reduced demand from the distribution channel, and increased Hayward's expenses.

146.    Defendants' claim that they had not seen any kind of cancellations was materially false and misleading for the additional reason that the Company was in fact experiencing notable cancellations, such that the Defendant Jones had asked to track them.

147.    Additionally, the "Risk Factors" listed above contained material misrepresentations and omissions for the reasons set forth above at ¶111.

E.    **May 2, 2022, Automatic Shelf Registration (Form S-3ASR), Free Writing Prospectus, Prospectus Supplement (Form 424B7)**

148.    On May 2, 2022, Defendants made two filings in connection with an underwritten SPO initiated by CCMP, pursuant to which CCMP and AIMCo sold more than 24 million shares, as discussed in greater detail below in §VIII.B.   Those documents were: a Form S-3ASR Automatic Shelf Registration, and a Free Writing Prospectus ("Prospectus").   In addition, on May 2, Defendants filed a Prospectus Supplement in connection with the SPO, which they updated on May 4, 2022.

149.    The May 2, 2022, Prospectus Supplement contained the following statement:

*We believe the pool industry is poised for continued growth as industry tailwinds remain in place.*   The estimated 117,000 pools constructed in 2021 remains well below the median peak of approximately 153,000 pools from 1995-2008.   *While the post-Great Recession recovery of the new pool build market is still ongoing, current demand exceeds the pool construction industry's ability to supply new pools, leading to a robust backlog as of April 2, 2022. Continued growth in new pool construction* is expected to be aided by a strong new housing market, rising home equity levels, migration trends to the Sun Belt and continued growth in outdoor living investment.

150.    In addition, all three of Defendants' filings in connection with the SPO referenced the materially false and misleading "Risk Factors" in the FY 2021 Form 10-K which were almost identical to the language quoted above at ¶109.

151.    Defendants' statements in ¶¶149-50 were materially false and misleading and omitted material information because Hayward was not "poised for continued growth," Hayward's channel demand was plummeting, and Hayward did not have a "robust backlog."   In truth, when the foregoing statements were made, the channel was saturated with inventory, notwithstanding any purported market share gain by Hayward, with the channel having loaded up on inventory during the course of 2021, including making double orders for 2022.   Part and parcel with that demand from the channel was dropping significantly and Hayward was having difficulty selling

44

to the channel.  In addition, the various factors that Defendants touted as supposedly supporting growth, including purported backlogs, painted a rosy picture for investors, but were false and misleading, because, at a minimum, those factors were not resulting in new upstream demand for Hayward as the distribution channel that made up the bulk of Hayward's sales was already saturated with inventory.  Hayward was instead forced to resort to incentives and pressure tactics to try to improve orders from the channel, but even that was having only a minimal effect on sales. Moreover, Hayward was locked into purchasing raw materials and manufacturing finished products at a high rate, which resulted in production far above the reduced demand from the distribution channel, and increased Hayward's expenses.

152.    Additionally, the "Risk Factors" listed above contained material misrepresentations and omissions for the reasons set forth above at ¶111.

**F.    June 9, 2022, Conference Call**

153.    Defendants participated in a June 9, 2022, conference call which was part of William Blair's 42nd Annual Growth Stock Conference.

154.    In the Q&A portion of the conference call, an analyst asked Defendants to discuss a number of points including consumer sentiment and the supply chain, ending by asking, "how is product flowing?"  Defendant Jones responded, "***we haven't seen demand destruction at the end of the channel right now***.  I still think there's pent-up demand for new construction."

155.    Defendant Holleran also touted Hayward's "42% revenue growth LTM [last twelve months] through Q1 of this past year," which he said resulted from continuing "drivers," and Hayward's continued execution, including its creation of "specialization in our sales and commercial team where we have hunters and we have folks who manage the channel partnerships."

156.    Defendants' statements in ¶¶154-55 were materially and false and misleading and omitted material information because there was demand destruction in the channel and the

45

conditions for growth were not continuing.  In truth, when the foregoing statements were made, the channel was saturated with inventory, notwithstanding any purported market share gain by Hayward, with the channel having loaded up on inventory during the course of 2021, including making double orders for 2022.  Part and parcel with that demand from the channel was dropping significantly and Hayward was having difficulty selling to the channel.  In addition, the various factors that Defendants touted as supposedly supporting growth, including purported backlogs, painted a rosy picture for investors, but were false and misleading, because, at a minimum, those factors were not resulting in new upstream demand for Hayward as the distribution channel that made up the bulk of Hayward's sales was already saturated with inventory.  Hayward was instead forced to resort to incentives and pressure tactics to try to improve orders from the channel, but even that was having only a minimal effect on sales.  Moreover, Hayward was locked into purchasing raw materials and manufacturing finished products at a high rate, which resulted in production far above the reduced demand from the distribution channel, and increased Hayward's expenses.

## VII.    THE TRUTH BEGINS TO EMERGE

157.    The truth slowly emerged through several partial corrective events, which Defendants continued to obscure and minimize with a stream of material misrepresentations and omissions.

### A.    January 24, 2022, Press Release with Preliminary 4Q-2021 Results

158.    On January 24, 2022, Hayward issued a press release on its website with "Preliminary" results for 4Q-2021 and FY 2021.  Hayward subsequently filed a Form 8-K with the press release.  The press release provided a range for Hayward's 4Q-2021 net sales ($348 million to $354 million) and Adjusted EBITDA ($102 million to $107 million).  This reflected slowing demand for Hayward's products: net sales in the previous quarter, 3Q-2021, had increased

56% YoY, but were down to about 33% to 36% YoY in 4Q-2021; and Adjusted EBITDA had increased 61% YoY in 3Q-2021; but by only about 38% to 45% in 4Q-2021. Additionally, the net sales for 4Q-2021 were effectively flat when compared to 3Q-2021's net sales of $350.6 million— even though consistent with seasonality in the pool market, the fourth quarter (along with the second quarter) was typically Hayward's strongest, not the third quarter.

159. This partial correction was a materialization of the undisclosed risks set forth herein, including that the channel was already saturated with inventory, that demand from the channel was consequently dropping significantly and Hayward was having difficulty selling to the channel, and that Hayward's own inventory, along with the expense thereof, was increasing because Hayward was manufacturing far in excess of its demand. However, as detailed above, this was obscured by multiple misrepresentations and misleading statements that Defendants made in the past and concurrently, as well as by their concurrent announcement of a $450 million stock repurchase program that they framed as a positive signal offsetting Hayward's slowing performance.

160. On this news, Hayward's common stock price fell from a close of $21.13 on January 21, 2022, to $18.12 on January 26, 2022, a combined drop of roughly 14.2%. The drop reflected disappointment in the estimates: as Seeking Alpha reported, the 4Q-2021 net sales projections ($348 million to $354 million) were below the consensus of $364.46 million, and the net sales projections for FY 2021 ($1.39 billion to $1.4 billion) were below the consensus of $1.41 billion. Hayward's stock remained artificially inflated, however, as Defendants' misrepresentations and omissions continued to conceal the full truth regarding the problems Hayward was facing.

### B.    March 2, 2022, 4Q-2021 Conference Call

161.    On March 2, 2022, at 9:00 a.m. ET, Defendants held a conference call in connection with their final results for 4Q-2021 and FY 2021.  A press release from Defendants earlier that morning announced that those final results were in line with the preliminary results provided in January 2022.

162.    During the conference call, Defendants partially disclosed some improvement in the supply chain.  In response to an analyst's question about the status of the supply chain, Defendant Holleran stated, "Supply chain, I'd say we've seen some improvement, Jeff, around steel, some commodity resins, packaging, and we're starting to see a bit of relief on the freight side."  He then immediately downplayed the extent of the improvements, giving the misleading impression that the supply chain still had a long way to go, stating:

> Pressure is still pretty high on the broad base of electronic components. Some of the specialty metals, which go into some salt products for us.  And then there are still some resins that are bottlenecking.  So that's kind of the landscape from a commodity standpoint on where **we're seeing some improvements and still fighting a good fight on some of the others**.

163.    Defendants also partially disclosed some improvement in the channel's inventory. Defendant Holleran responded to an analyst's question by stating that "[a]s for [channel] inventory levels, they are getting back to more normal levels, good turns on it."  Again, he immediately downplayed this statement, adding:

> **We don't think it's elevated.  But what I will acknowledge is, I think that there's some shortages of some particular SKUs** that we'd like to be able to solve, and we're working hard here the beginning part of 2022 to try and rectify that, whether it's some salt or other products.  **We know that it's not a perfectly balanced inventory from a SKU standpoint, but we're working hard to solve that**.

164.    The statements in the two preceding paragraphs regarding supply chain and channel inventory did not disclose, however, the extent to which the channel had already loaded up on and was saturated with inventory, nor that part and parcel with that demand from the channel was

consequently dropping significantly and Hayward was having difficulty selling to the channel. Those statements also did not disclose the extent to which improvements in the supply chain had already enabled Hayward to restock the channel, nor that Hayward was continuing to procure raw materials and produce finished products at a rate far above demand because it was locked into long-term purchasing contracts and unable to execute on Defendants' instructions to slow down manufacturing. As a result, Hayward's own inventory, along with the expense thereof, was increasing because Hayward was manufacturing far in excess of its demand.

165.    In addition, this conference call and press release were the first time that Defendants announced their guidance for FY 2022. For that year, Defendants projected a YoY increase in net sales of 9% to 12%. Hayward's guidance was disappointing, with Wolfe Research noting that the net sales projections was "considerably below . . . peer KPIs," and lowering its price target for Hayward stock from $32 to $27 (a decrease of roughly 15.6%). Defendants once more backtracked, claiming that the guidance was "conservative," which analysts like Wolfe Research noted. The guidance was a partial correction and materialization of the undisclosed risks set forth herein, including that the channel was already saturated with inventory and that demand from the channel was consequently dropping significantly and Hayward was having difficulty selling to the channel.

166.    The partial corrections and materialization of the undisclosed risks in the foregoing paragraphs were also obscured by multiple misrepresentations and misleading statements that Defendants made in the past and concurrently, as detailed above.

167.    On this news, Hayward's common stock fell from a close of $17.60 on March 1, 2022, to a close of $16.65 on March 4, 2022, a combined drop of roughly 5.4%. But Hayward's

stock remained artificially inflated, as Defendants' misrepresentations and omissions continued to conceal the full truth regarding the problems Hayward was facing.

### C.     April 28, 2022, 1Q-2022 Conference Call

168.     Early on April 28, 2022, Defendants filed a Form 8-K with a press release attached entitled, "Hayward Holdings Announces First Quarter Fiscal Year 2022 Financial Results."  The press release reported net sales of $410.5 million (a 23% year-over-year increase) and Adjusted EBITDA of $126.2 million (an 18% year-over-year increase).  Though both net sales and Adjusted EBITDA were up year-over-year, Hayward's performance continued to slow.  For net sales, the year-over-year performance had dropped from 35% in 4Q-2021, to 23% in 1Q-2022; and for Adjusted EBITDA, that performance had dropped from 43% in 4Q-2021, to 18% in 1Q-2022.

169.     In terms of Hayward's own inventory, on the April 28, 2022, earnings call, which took place at 9:00 a.m., Defendant Holleran stated that "[i]n absolute dollars . . . it [Hayward's own inventory]'s higher at the end of Q1 2022 than the same period."  However, he hastened to allay any concerns that Hayward might have too much inventory, adding that the "inventory value has a lot of price embedded in it" and "[t]he industry has also grown, so there needs to be additional inventory in there to support the overall industry growth" and, for Hayward specifically, "our share gains . . . require some incremental inventory positions for the Hayward product in the channel."  Defendant Holleran concluded that "we feel comfortable with our inventory position from a days on hand standpoint here at the start of the season."  Similarly, Defendant Jones stated that "20% of our inventory climb has really come from that COGS [cost of goods sold] index increase, the inflation that's run through," and that "outside of the inflation, we have taken 2 strategic positions in the balance sheet" (*i.e.*, in raw materials and finished goods) to ensure they were in a "position to be able to service the market."

170.    These partial corrections in the two preceding paragraphs regarding Hayward's 4Q-2021 Net Sales, Adjusted EBITDA, and inventory, were a materialization of the undisclosed risks set forth herein, including that the channel was already saturated with inventory, demand from the channel was consequently dropping significantly and Hayward was having difficulty selling to the channel, and that Hayward's own inventory, along with the expense thereof, was increasing because Hayward was manufacturing far in excess of its demand.

171.    Also on the earnings call, Defendant Holleran partially disclosed some improvement in the supply chain.  He again simultaneously downplayed the impact of any improvements:

> We were – it's a complex question because there's lots of moving parts, as you know.  ***I would say we were really seeing some nice improvement in material flow*** around some critical components.  We were seeing some improvement to some specialty metals that go into our sanitization product and even some components that go into our variable speed pumps.  They continue to be at elevated levels, but I'd say as the quarter progressed and even as we turned into Q2, the shutdowns, the quarantines in China, the port congestions in Shanghai and other ports ***have certainly increased pressure on material flow and some of the pricing dynamics***.
>
> So I'd say overall, it feels like we're ***incrementally better*** than we were in second half of last year. But this feels like it's a week-to-week or a month-to-month process right now, Jeff.

172.    Later in the call, Defendant Holleran partially disclosed some improvement in the channel's inventory.  He stated "obviously, the channel inventory position has gotten better.  We're in a much better position going into the start of the season in 2022."  But then he immediately downplayed that statement, adding, "***we're still seeing robust demand and the order file on the books is still very strong and seems to be pressure tested***, and product is going to be installed in the backyard."  Defendant Holleran made the same points later on the call as well, initially stating in response to an analyst's question about the status of channel inventory:

> Yes.  We do keep close tabs on it with our channel partners to make sure that we all feel comfortable with the amount of inventory staged closer to point of sale, and

51

they *[our channel partners] are largely replenished and in a much better position starting the 2022 season than they were [in] either [of] the last 2 years*.

Here too, he quickly downplayed the recovery, stating that "[i]t's not a perfect balance" and that "[t]here are SKUs and product categories based upon a material availability that . . . [t]hey need more of for sale," and again never indicated that this was having any negative impact on channel demand.

173.    With respect to Hayward's guidance for FY 2022, Defendant Holleran made the partial disclosure that "[o]ur guidance assumes that there will be greater sell out than sell into the channel during the 2022 season."  But, as set forth above, Defendants downplayed this by reiterating their prior FY 2022 guidance and explaining that the growth it projected took into account the factors discussed above, repeating that the guidance was "just cautionary," and stating that demand was still "incredibly strong."

174.    The statements in the three preceding paragraphs regarding the supply chain, channel inventory, and sell out did not disclose, however, the extent to which the channel had already loaded up on and was saturated with inventory, nor that, as a consequence, demand from the channel was consequently dropping significantly and Hayward was having difficulty selling to the channel.  Those statements also did not disclose the extent to which improvements in the supply chain had already enabled Hayward to restock the channel, nor that Hayward was continuing to procure raw materials and produce finished products at a rate far above demand because it was locked in long-term purchasing contracts and unable to execute on Defendants' instructions to slow down manufacturing, and that as a result Hayward's own inventory, along with the expense thereof, was increasing because Hayward was manufacturing far in excess of its demand.

175.    The partial corrections in the foregoing paragraphs were also obscured by multiple misrepresentations and misleading statements that Defendants made in the past and concurrently, as detailed above.

176.    On this news, Hayward's common stock fell from a close of $16.61 on April 28, 2022, to a close of $15.90 on April 29, 2022, a drop of 4.27%. But Hayward's stock remained artificially inflated, as Defendants' misrepresentations and omissions continued to conceal the full truth regarding the problems the Company was facing.

**D.      May 2, 2022, Registration Statement and Prospectus**

177.    After the market closed on May 2, 2022, Defendants filed a Form S-3 Registration Statement indicating that they would be conducting an SPO on behalf of certain selling stockholders. A Free Writing Prospectus ("Prospectus"), also filed after the market closed on May 2, 2022, stated, "Hayward Holdings Announces Secondary Offering of 22,500,000 Shares of Common Stock by Selling Stockholders and Repurchase of Common Stock," and disclosed that the selling stockholders were CCMP and AIMCo. As part of the SPO, the Prospectus further stated that Hayward would be repurchasing 7.5 million of the 22.5 million shares being sold by CCMP and AIMCo. Defendants subsequently adjusted these numbers, with the final prospectus stating that CCMP and AIMCo had increased their offering to a combined 24 million shares in the SPO (8 million of which were purchased by Hayward), with the underwriters having the option to purchase up to 3.6 million additional shares from them.

178.    The SPO was a partial correction and materialization of the undisclosed risks set forth herein, including that the channel was already saturated with inventory, that demand from the channel was consequently dropping significantly and Hayward was having difficulty selling to the channel, and that Hayward's own inventory, along with the expense thereof, was increasing because Hayward was manufacturing far in excess of its demand. CCMP had substantial

knowledge of, access to, and control over Hayward's operations and performance. This was part and parcel with CCMP's multiple representatives on Hayward's Board, and its appointment of Hayward's leading executives. Having long known, among other things, that demand for Hayward's product had dropped significantly and that Hayward could not hold off on fully disclosing the foregoing information or reducing its FY 2022 guidance much longer (as set forth below), CCMP took advantage of Defendants' material misrepresentations and omissions to sell a massive amount of Hayward stock while its price remained partially artificially inflated. While CCMP and AIMCo still retained Hayward stock and control over the Company, a large stock sale by controlling shareholders is not interpreted as a vote of confidence. This partial correction was obscured by multiple positive misrepresentations and misleading statements that Defendants had made, including recently in connection with the quarterly results released just two business days earlier.

179.    On this news, Hayward's common stock price fell from a close of $16.88 on May 2, 2022, to a close of $14.91 on May 3, 2022, a decrease of 11.67%. But Hayward's stock remained artificially inflated, as Defendants' misrepresentations and omissions just days before continued to conceal the full truth regarding the problems the Company was facing.

**E.    July 28, 2022, 2Q-2022 Conference Call**

180.    On July 28, 2022, Defendants issued a press release (filed with a Form 8-K at approximately 7:00 a.m. ET) and held a conference call at 9:00 a.m. ET in connection with their 2Q-2022 results. While Hayward's net sales and Adjusted EBITDA grew modestly YoY, the percentage increases were down compared to previous quarters: net sales for 2Q-2022 increased 10% YoY, compared to 23% for 1Q-2022, 35% for 4Q-2021, and 56% for 3Q-2021. Moreover, the small 2Q-2022 increase in net sales year-over-year "was the result of favorable pricing and acquisitions, partially offset by lower volumes," as Defendants stated on the conference call.

181.    Defendant Holleran was quoted in the press release as stating that given certain trends "and improving supply chain predictability, we expect our channel partners will reduce their Hayward inventory on hand by approximately 4 to 6 weeks in the second half of 2022." Accordingly, Defendant Holleran stated, "We are reducing our 2022 guidance to reflect this inventory reduction, and are taking the appropriate actions to manage our production and costs to maintain our industry leading margins."   The press release further stated that Hayward was "reducing its full fiscal year 2022 guidance to reflect its outlook for the expected channel inventory reduction in the second half of the year as well as continued impact of geopolitical events in Europe and unfavorable exchange rates."

182.    The reduction in Hayward's guidance was dramatic: Defendants went from guiding for an increase in sales for FY 2022 between 9% and 12% (which they had repeated in March and late April), to guiding for a **_decrease_** in sales between 2% and 6% for FY 2022.  This sharp downward revision was also in stark contrast to earlier and recent statements made by Defendants, including that demand and growth drivers were strong (as set forth above).

183.    On the earnings call, Defendant Holleran acknowledged that there were "elevated channel inventories at the end of Q2 2022," which "reduced the level of in-season restocking orders we would typically deliver in late second quarter and third quarter."  He elaborated:

> **_With distributors['] increased confidence in OEM [original equipment manufacturer] supply chains and shorter lead times, they don't require the same level of safety stock, resulting in a recalibration of 4 to 6 weeks less channel inventory. We are planning for reductions in channel inventory from over 4 months of inventory on hand to closer to 3 months by the end of the year_**.  We believe this will enable us and our channel partners to start 2023 with the right level and mix of product for the 2023 pool season.
>
> As a result of this and the lower sales forecast for Europe, the company now anticipates a consolidated sales decline of 2% to 6% and adjusted EBITDA of $385 million to $400 million.

184.    Later in the call, Defendant Jones likewise stated that the destock would consist of "a takedown of 4 to 6 weeks" of inventory by the channel.  He explained that "[t]he channel has the ability to hold between 4 to 4.5 [months] at the top end and can go down to 3 before it starts to feel short," and that Defendants had lowered "the channel inventory forecast down to the low end of the 3," estimating that the channel would have "around about 3.25 months on hand" after the four- to six-week destock was complete.

185.    When the Q&A portion of the conference call commenced, analysts expressed surprise.  The first analyst asked:

> So I just really want to hit on the destock and just understand -- ***it seems like the magnitude is quite stark, particularly given that price is going through and what you had in the first half***.  So just kind of level set us on how you got comfortable with the level of declines?  And do we -- it looks like Europe is a little more weak, do we hold flat for the year in North America?  Or is that also negative?

In response, Defendant Holleran explained that "more than half of the new guidance is related to channel inventory."

186.    Defendant Holleran further admitted that the switch in guidance, while blindsiding analysts, was ***not*** unforeseen by Defendants, saying:

> ***We expected to sell less into the channel versus sellout due to the strategic positions that many of our channel partners took at the end of 2021***.  ***As Q2 occurred, inventories remain high***, and we're now actively working with the channel to try and reduce those inventories.
>
> And as I said, supply chains have clearly improved.  Our published lead times have substantially improved, so there's that reduced need to hold these higher safety stock levels, and we'd like to work with our ***channel partners to destock and have fewer months of forward-looking sales in the channel*** so we can be more responsive.  So that's what's kind of gone into our thinking and what played out in Q2.

187.    In response to another question about potential moderation in demand, Defendant Holleran again acknowledged that the current state of affairs was not unexpected for Defendants:

> *Overall, when we set coming into the year, with last year's retail pull-through in front of us, we expected some moderation off a very, very high pull through the channel last year.* And at the halfway point, I would say, while there's still growth clearly year-over-year, *the volume has not quite been what we expected.* Lots of price. There are some areas where mix is contributing to it, but that's kind of the equation there, price and a little bit of mix, but not quite on the volume side.

Defendant Jones added:

> As you think about the balance of the year, Jeff, I would say both regions will have a restocking recalibration program. *It will be larger in North America. That's where the balance sheets were stronger for our channel partners.* We probably saw some destocking in the first half in Europe, but there will still be further destocking. *Both regions will take that correction in the second half. But the correction will be higher in North America than it will be in Europe.*

In other words, Defendants expected destocking in both North America and Europe, with some previously unannounced destocking already having occurred in Europe in the first half of the year (though not all of it), such that the remaining "correction" would "be higher in North America than it will be in Europe."

188.     The statements in the preceding paragraphs finally and fully disclosed that the channel was long saturated with inventory, that demand from the channel had consequently dropped significantly and Hayward was having difficulty selling to the channel, and that Hayward's own inventory, along with the expense thereof, was increasing because Hayward was manufacturing far in excess of its demand. The channel destocking was an integral part of the channel's saturation of inventory and the channel's consequent reduced demand, which conditions dated back to before the Class Period. Indeed, as Defendants acknowledged, they had already been expecting reduced channel demand and channel inventory destocking well before the July 28, 2022 disclosures. Defendants may have been able to delay the impact of the channel's saturated inventory and reduced demand for a limited period of time—until after CCMP had an opportunity to unload a large number of shares—with undisclosed instructions to the sales team to use incentives and pressure tactics with the channel distributors, but Defendants knew that was

only having a minimal effect (as set forth above).  Moreover, the fact that Defendants resorted to such tactics prior to and during the Class Period shows their awareness that the channel inventory was saturated, that channel demand was dropping significantly and Hayward was having difficulty selling to the channel, and that Hayward's manufacturing rate was far outstripping demand.

189.    Also, though Defendants attempted to deflect these belated disclosures by claiming that macro factors like poor weather and events in Ukraine also played a role in Hayward's reduced guidance, when pressed they made clear that these purported factors were a sideshow.  Consistent with Defendants' other statements, and with the information provided by the CWs, as Defendant Jones acknowledged on the call, "more than half of the reduction in the guidance of the top line is related to channel inventory reduction."

190.    Analysts were not shy in expressing their surprise at the new guidance.  On the earnings call, one analyst even said, "[s]o this guidance change is rather abrupt."  The focus on the guidance change is also evident in an analysis performed by Credit Suisse after the quarter's results came out: Credit Suisse (which lowered its price target for Hayward shares by $3 or about 14.3%) stated, "[o]f more significance than the 2Q results, HAYW reduced its 2022 guidance for sales."  Similarly, BMO Capital, which had previously given the shares a price target of $27.00 per share on March 2, 2022, slashed their price target to $14.00—just over half of their most recent price target.

191.    After disclosing the foregoing information, the price of Hayward's common stock declined $2.50 per share, or 18.23%, to close at $11.21 per share on July 28, 2022.

### F.    Subsequent Developments

192.    As Defendants subsequently disclosed, the amount of the channel destocking, Hayward's reduced sales, and Hayward's own inventory overload were even greater than Defendants had indicated on July 28, 2022.  For example, in 3Q-2022, net sales decreased 30%

YoY, primarily driven by a 44% reduction in volume. Defendant Jones explained that "the volume reductions we experienced compared to last year are due entirely to channel inventory movements." According to Defendant Holleran, "Distributors are reducing safety stocks built up during the period of strong demand and significant supply chain disruption, and we estimate a reduction of approximately $80 million occurred in the third quarter. . . compared to a meaningful inventory build in the prior year period." As a result, Hayward "now expect[ed] full year 2022 net sales to decline approximately 6%"—*i.e.*, the bottom end of the revised guidance announced the prior quarter. Defendant Jones clarified that they expected the total correction to be between "$120 million to $150 million" of Hayward's inventory and that they were "kind of trending up in about midrange right now, $130 million to $135 million is the channel correction." As for Hayward's own inventory, Defendant Jones reported that they were still holding approximately six weeks of extra inventory. Hayward's poor performance and the channel inventory destocking continued thereafter.

## VIII.    ADDITIONAL SCIENTER ALLEGATIONS

193.    Defendants intentionally or recklessly made the material misrepresentations and omitted the material information set forth above, as they had both knowledge of that material undisclosed information and a motive and opportunity to withhold it.

### A.    Defendants' Knowledge of the Undisclosed Information

194.    Defendants knew of and had access to the material information they failed to disclose prior to and during the Class Period.

195.    To begin with, by their own admission, Defendants consistently knew of and tracked the high level of inventory in the channel, as it was critical to Hayward's business. Such admissions include:

- On the October 27, 2021, 3Q-2021 earnings call, an analyst asked for "a bit more color in terms of what you're seeing in the channel in terms of inventory levels and what your distributors are asking for." Defendant Holleran responded that "we keep close tabs on it [inventory]. *We have good insight from our large distributor partners*." Moreover, he stated that Defendants were having "conversations" with these large distributor partners to "understand[] what they need."

- On the April 28, 2022, 1Q-2022 earnings call, Defendant Holleran stated that "[w]e're in pretty close contact with both channel partners and our dealers. . . And obviously, the channel inventory position has gotten better." When an analyst asked "how you guys are looking at channel inventory," Defendant Holleran responded that *"[w]e do keep close tabs on it with our channel partners to make sure that we all feel comfortable with the amount of inventory* staged closer to point of sale," adding that "they are largely replenished and in a much better position starting the 2022 season than they were either in the last 2 years."

- During a presentation at the Jefferies Global Industrials Conference on August 9, 2022, Defendant Jones stated that "we have good -- not excellent, but *we have good channel inventory knowledge*. We do get inventory positions reported to us by predominantly our U.S. distributors. We do get good sell-through information as well from a cohort of our distributors. So we have decent good information there."

196. Consistent with Defendants' admissions, as well as its central role in Hayward's operations and business, the channel's saturated inventory level was widely known throughout Hayward prior to and during the Class Period, as set forth above. CW1, who worked with product management and sales teams, stated that in mid-2021 demand at Hayward began to slow, heard

that "the channel was stuffed" and there were concerns about inventory. CW1 also recounted that concerns about excess inventory were general knowledge around the company and were "water cooler talk." Similarly, CW2, who was a sales manager, stated that in 2021 the overages in distributor inventory were often brought up amongst colleagues, and that "everyone discussed it." These concerns reached the C-Suite, with CW3, who worked in analytics, stating that almost from the moment CW3 started working at Hayward in August 2021, Hayward's then-Chief Supply Officer was concerned with this large bubble of orders that was occurring in 2021.

197.    Likewise, by their own admission at the end of the Class Period, Defendants had also long known that, part and parcel with the channel's saturated inventory, the channel's demand was dropping significantly and Hayward was having difficulty selling to the channel. As Defendant Holleran admitted on the July 28, 2022, 2Q-2022 earnings call, "[w]e *expected* to sell less into the channel versus sellout due to the strategic positions that many of our channel partners took at the end of 2021," and "we *expected* some moderation off a very, very high pull through the channel last year." Similarly, on the November 1, 2022, 3Q-2022 earnings call, Defendant Holleran acknowledged how the excess channel inventory caused demand to drop, stating "[d]istributors are reducing *safety stocks built up during the period of strong demand and significant supply chain disruption*" – *i.e.*, inventory that was built up in 2021 prior to the Class Period.

198.    Actions that Hayward took, and statements from the CWs, again confirm that Defendants knew of and were taking steps to try to respond to the dropping channel demand prior to and during the Class Period with incentives and pressure tactics, as set forth above. CW1 recalled that in mid-2021, management began to apply pressure to the marketing team because the sales teams "weren't hitting their numbers" and management began to ask marketing teams to

develop programs to "get product off the shelves."  Similarly, CW4, who worked in shipping, recounted that from October to December 2021, CW4 was given instructions to pull forward orders in order to try to meet sales targets, and CW4 discussed this practice with, among others, Hayward's Director of Distribution, who said it would "benefit the Company and work out in the end."  Likewise, CW2 attended regular sales meetings in 2021 at which Hayward's VP of Sales discussed inventory issues in the channel, and in response CW2 recalled that superiors instructed salespeople to, among other things, inform distributors that they should load up on inventory, as they "don't want to be the company that doesn't have [product]."

199.    However, Hayward's organized effort to counter dropping channel demand was largely unsuccessful, a troubling situation that Defendants knew of and tracked, as set forth above. CW3 relayed that in early 2022, around the end of February, Defendant Jones began to ask for cancellation reports to be put together so he could access them.  Further, CW3 prepared reports for Defendant Jones to visualize inventory backlog and how much money was tied up in products that were made but not being distributed.  CW3 believed cancellations, and a lack of new orders, began around March 2022, which is consistent with the recollection of other CWs.

200.    In addition, Defendants knew that due to the channel's reduced demand and their policy of increasing Hayward's procurement of raw materials and manufacturing of finished products, Hayward was producing finished products far in excess of its demand, and that as a result, the Company's own inventory was increasing dramatically prior to and during the Class Period, as set forth above.  Again, Defendants acknowledged their decision to increase Hayward's procurement of raw materials and its manufacturing capacity.  In the May 5, 2021, earnings call for 1Q-2021, Defendant Jones stated that "[y]ou'll see from the end of 2020 to the end of Q1, [Hayward's] absolute inventory values have gone up, and that's really centric around raw material

investments, again, to ensure supply is there for production." Similarly, on the April 28, 2022, earnings call for 1Q-2022, Defendant Jones noted that Hayward had taken "strategic positions" to increase its finished products and raw materials. The raw materials and finished products charts above also detail the dramatic increase in Hayward's own inventory, and that information was prepared by Hayward and available to Defendants.

201.    Here, too, the CWs confirmed that Defendants knew of, tracked, were concerned by and attempted to respond to Hayward's problem with increasing inventory, which was a considerable expense. CW3 recalled in February or March 2022 hearing from Defendant Jones that there was a concern of excess inventory on-hand at Hayward in the amount of $100 million. In addition, near the end of 2021 and beginning of 2022, in response to Hayward's growing inventory, CW5, who was a Quality Manager at one of Hayward's plants, recalled that the manufacturing team received a directive from corporate to "slow down operations." CW5 continued that there was "absolutely" awareness that there was too much inventory on hand at Hayward. However, CW5 recalled that Hayward continued to purchase large quantities of raw materials even with the directive for a slower production rate, echoing the statements of other CWs.

202.    In addition to the foregoing allegations, the CWs also described other relevant data that Defendants had access to and meetings that Defendants attended which provided Defendants with knowledge of the channel's saturated inventory and significant drop in demand. CW6, who was a Global Commodities Manager, recounted Hayward's monthly Sales, Inventory & Operations Planning meetings, chaired by Defendant Holleran and attended by Defendant Jones, which discussed sales, including "what's selling good, what's not selling good." The discussion of what was not selling covers reduced channel demand. Moreover, CW1 recalled that Hayward

had large quantities of data and was able to see both sales numbers and what was being purchased from Hayward's distributors and manufacturing sites. This data covers the channel's inventory saturation and demand.

203. In sum, by their own admission, Defendants kept "close tabs on" and had good "knowledge" of the undisclosed information, which was central to Hayward's business and confirmed by the CW statements. The sheer size of Hayward's problems—channel distributors with approximately $150 million of unneeded Hayward products in their inventory, a corresponding drop in demand for Hayward's products that was at least as big and that Defendants could not effectively counteract with incentives or pressure tactics, and as a result $100 million of excess inventory in Hayward's own stocks—also shows that Defendants were aware of the problems.

**B.    Motive and Opportunity: Defendants Monetized the Misrepresentations and Omissions by Concurrently Making Substantial Stock Sales at Artificially Inflated Prices**

204. Defendants sold large amounts of stock during the Class Period when it was artificially inflated by their material misrepresentations and omissions.

205. First, this selling began with Defendant CCMP (and its affiliates) on January 24, 2022. On that day, Defendant CCMP sold approximately 2.7 million shares in a block trade for roughly $53.4 million at a price of $19.80 per share, liquidating 3.77% of its total shares.

206. On the same day, and as part of the same block trade, AIMCo (and its affiliates) sold approximately 1.4 million shares for roughly $27.4 million at a price of $19.80 per share, likewise liquidating 3.77% of its total shares.

207. Defendant CCMP's sale was coordinated with AIMCo because, as controlling shareholders, they were parties to an agreement that restricted their transfers of stock (the

Amended and Restated Stockholders' Agreement or "AARSA"). Pursuant to that agreement, all controlling stockholders agreed:

> [To] use commercially reasonable efforts to coordinate with respect to the timing and manner of disposition by any Investor [i.e., CCMP, MSD, and AIMCo] of any Stockholder Shares held by the Investors until the earlier of (i) the third (3rd) anniversary of the Company IPO, (ii) such time as either the CCMP Investors or the MSD Investors own less than five percent (5%) of the then outstanding shares of Common Stock, or (iii) such coordination is abandoned with the consent of the CCMP Investors and the MSD Investors (the "Coordination Period").

In addition, this agreement prohibited AIMCo from transferring shares post-IPO until after CCMP made its first post-IPO sale.

208.    Second, later on January 24, 2022 (the same day as the block trade), Defendants announced that Hayward would also repurchase 4.08 million shares from one of its "Sponsors" (ultimately revealed to be Defendant CCMP) as part of a $450 million stock repurchase program, pursuant to which Defendant CCMP received uniquely favorable pricing. This additional sale by Defendant CCMP occurred on March 11, 2022, when Defendant CCMP sold 4.08 million shares for about $80.8 million at a price of $19.80 per share, liquidating 5.93% of its total shares. Notably, by the time Defendant CCMP sold these shares, Hayward's stock price had dropped by about $3 per share—it closed on March 11, 2022, at a price per share of just $16.80. But Hayward had agreed to buy Defendant CCMP's stock at a price of $19.80 per share despite the Company's declining stock price, an enormous and unjustified benefit to Defendant CCMP. In contrast, the other repurchases under the program were conducted in open market trading at the prevailing and substantially lower market price. By arranging to avoid the lower market price, which was dropping with Hayward's slowing performance, Defendant CCMP made about $12 million more on this sale than it otherwise would have.

209.    Third, in May 2022, Defendants conducted an underwritten SPO comprised entirely of Hayward stock owned by Defendant CCMP and AIMCo. Tellingly, the AARSA requires

Hayward to "use its best efforts to promptly effect the registration of Registrable Shares under the Securities Act" at "any time" after Defendants CCMP or MSD requests that it do so, and further states that the registration "shall be effected as a Shelf Registration if so requested by the Requesting Stockholder and the Company is eligible to use a Form S-3"—which is what happened here on May 2, 2022.

210.    The same day, after the Form S-3 was filed, Hayward issued a Free Writing Prospectus ("FWP") announcing that Defendant CCMP and AIMCo would be offering for sale 22.5 million shares, and would grant the underwriters a 30-day option to purchase up to an aggregate of 3.375 million additional shares.  The FWP also stated that "[s]ubject to the completion of the Offering, the Company intends to repurchase from the underwriters 7,500,000 shares of the common stock being sold in the Offering at a price per share equal to the price per share paid by the underwriters" to Defendant CCMP and AIMCo.  The next day, May 3, 2022, Hayward issued another press release increasing the amount of shares in the SPO: Defendant CCMP and AIMCo would in fact be selling 24 million shares, the underwriters could purchase up to 3.6 million additional shares, and Hayward would be repurchasing 8 million shares.

211.    On May 5, 2022, Defendant CCMP sold approximately 15.5 million shares for roughly $215.5 million as part of the SPO, liquidating 24% of its total shares.

212.    Then, on May 17, 2022, just two days before the annual meeting of stockholders at which CCMP/MSD/AIMCo lost their board majority, Defendant CCMP sold approximately 2.1 million more shares for roughly $30 million as part of the SPO (in connection with the underwriters' exercise of their option to purchase up to an additional 3.6 million shares of Hayward common stock).  Through this sale, Defendant CCMP liquidated another 4.39% of its total shares.

213.    Also, as part of the May 5, 2022, SPO, AIMCo sold approximately 8.5 million shares, liquidating 24% of its total shares.  It then sold approximately 1.2 million shares for roughly $16.4 million at a price of $13.88 per share on May 17, 2022 (in connection with the underwriters' option), thereby liquidating 4.39% of its total shares.

214.    The chart below provides one illustration of how Defendant CCMP, and AIMCo following it, conducted these substantial insider sales before Defendants fully and finally disclosed that, among other things, channel demand had dropped significantly:



All of these sales are significant, and it is notable that the May sales took place just after the April 28, 2022, earnings announcement for 1Q-2022—the last quarterly announcement before Defendants were forced to disclose the extent of Hayward's problems on July 28, 2022, which

drove the stock down another 23%. In total, Defendant CCMP sold nearly 24.5 million shares during the Class Period—more than 34% of the stock it held, netting $379,634,832 in the process. AIMCo sold more than 11 million shares during the Class Period (nearly 30% of the stock it held), netting $161,585,665.

215.   Fourth, Defendant Jones made a substantial stock sale during the Class Period that was **_not_** pursuant to a 10b5-1 trading plan. On June 17, 2022—about one month before Defendants' July 28, 2022, announcement—Defendant Jones sold approximately 140,500 shares, or 44.5% of his Hayward stock, for roughly $2 million on the open market at a price of $13.89 per share. More specifically, he exercised an option to purchase 280,000 shares of stock for $1.40 per share (18.12% of his stock options at that price), and then sold 140,501 shares of that stock. This transaction was unusual for Defendant Jones, in terms of its timing, amount, and coming outside of a 10b-5 trading plan. By comparison, at the start of the Class Period, he made a few small sales pursuant to a 10b-5 plan. The chart below illustrates this point:



216.     The sales set forth above, separately and taken together, demonstrate Defendants'
motive and opportunity to defraud investors in violation of the Exchange Act, and show their
scienter.

### C.    The Totality of Defendants' Knowledge, Motive and Actions

217.     To summarize, through their control of and positions at Hayward, Defendants had
access to and knew of undisclosed, negative information that was critical to Hayward's
performance and operations.  This information—including that the channel was already saturated
with inventory, that demand from the channel was consequently dropping significantly and
Hayward was having difficulty selling to the channel, and that Hayward's own inventory, along
with the expense thereof, was increasing because Hayward was manufacturing far in excess of its

demand—was self-evidently material to investors.  It would, and did, negatively impact Hayward's stock price as it was disclosed.

218.    Defendants accordingly concealed this information, and they also had a strong motive to do so—the large positions of Hayward stock that the controlling shareholders like Defendant CCMP and the Individual Defendants had not unloaded in the IPO.  They also had an opportunity to conceal that information their control of Hayward.  Thus, taking advantage of Defendants' material misrepresentations and omissions, controlling shareholders Defendant CCMP with AIMCo following it and Defendant Jones sold large amounts of Hayward stocks at artificially inflated prices under extremely dubious circumstances and timing.

219.    All of this individually and collectively demonstrates Defendants' scienter.

## IX.    LOSS CAUSATION / ECONOMIC LOSS

220.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiff and members of the Class.  During the Class Period, Plaintiff and Class Members purchased or otherwise acquired Hayward's common stock at artificially inflated prices caused by Defendants' misconduct, as alleged herein.  The price of the Company's common stock declined significantly when the substantial problems and risks concealed by Defendants were disclosed and/or materialized, and Defendants' material misrepresentations and omissions were revealed to the market, causing investors' losses.

221.    Before the end of the Class Period, on July 28, 2022, investors had been unaware of the following material facts about Hayward that had been known to Defendants:

    a.    the extent to which and that the channel was saturated with inventory;

    b.    part and parcel with that, the extent to which and that the channel demand was dropping significantly and Hayward was therefore having difficulty selling to the channel;

c.     that Hayward's own inventory, along with the expense thereof, was increasing because Hayward was manufacturing far in excess of its demand; and

d.     the negative impact of the foregoing conditions on Hayward's net sales, manufacturing rate, and inventory.

222.     Defendants' misrepresentations and omissions and fraudulent statements, as alleged herein, misrepresented and concealed the true adverse material facts from the market during the Class Period, misleading investors about the true state of Hayward's business and the obstacles it was facing.

223.     As alleged in §VII, *supra*, these material facts were gradually revealed to investors via a series of partial corrective disclosures and materializations of the undisclosed risks.

224.     The market reacted swiftly and negatively to each of these disclosures, resulting in significant losses for investors.

## X.     NO SAFE HARBOR

225.     The federal statutory safe harbor is provided for forward-looking statements under certain circumstances and does not apply to any of the allegedly false statements pled herein, as the statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent any of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and were unaccompanied by meaningful cautionary statements that identified important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

226.     Alternatively, to the extent that the statutory safe harbor is found to apply to any forward-looking statements pled herein, Defendants are nonetheless liable for such statements because, at the time each such statement was made, the speaker had actual knowledge that it was

materially false or misleading, and/or the statement was authorized or approved by an executive officer of Hayward who knew that the statement was materially false or misleading when made.

## XI.    CLASS ACTION ALLEGATIONS

227.    Plaintiff brings this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all those who purchased or otherwise acquired Hayward common stock during the Class Period and were damaged thereby (the "Class").  Excluded from the Class are the Defendants named herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

228.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Hayward common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time, and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Hayward or its transfer agent and/or the NYSE, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

229.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal laws that are complained of herein.

230.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

231.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.    whether the Exchange Act was violated by Defendants as alleged herein;

b.    whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts about the business, operations, and management of Hayward;

c.    whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

d.    whether the prices of Hayward common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

e.    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

232.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

233.    Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XII.    APPLICABILITY OF THE FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS OF RELIANCE

234.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a.    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.    the omissions and misrepresentations were material;

c.    Hayward common stock is traded in an efficient market;

d.    the Company's common stock is liquid and traded with moderate to heavy volume during the Class Period;

e.    the Company's common stock traded on the NYSE in the United States;

f.    the Company was covered by securities analysts;

g.    the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

h.    Plaintiff and members of the Class purchased or acquired Hayward common stock between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed without knowledge of the omitted or misrepresented facts.

235.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

236.    In addition, and alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

### <u>CLAIMS FOR RELIEF</u>

### COUNT I
### Violations of §10(b) of the Exchange Act and Rule 10b-5
### (Against All Defendants)

237. Plaintiff repeats and realleges each and every allegation contained in ¶¶1–236 above as if fully set forth herein.

238. This Count is asserted against Defendants and is based upon §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

239. During the Class Period, Defendants engaged in a plan, scheme, conspiracy, and course of conduct pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Hayward common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Hayward common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

240. Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Defendants participated, directly or indirectly, in the preparation and/or issuance of the annual reports, SEC filings, press releases, and other statements and documents, as described above, including statements made to securities analysts and the media, that were designed to influence the market for Hayward common stock. Such reports, filings, releases, and statements were

materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Hayward's business and operations.

241.    By virtue of their positions at Hayward, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted, as described above.

242.    The Individual Defendants, CCMP, and MSD are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants, CCMP, and MSD were able to, and did, directly or indirectly, control the content of the statements of Hayward. As officers and/or directors of a publicly held company, and controlling shareholders, the Individual Defendants, CCMP, and MSD had a duty to disseminate timely, accurate, truthful, and complete information with respect to Hayward's business. As a result of the dissemination of the aforementioned false and misleading public statements, the market price of Hayward common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Hayward's business, which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Hayward common stock at artificially inflated prices and relied upon the price of the

securities, integrity of the market for the securities, and/or statements disseminated by Defendants and were damaged thereby.

243.    During the Class Period, Hayward common stock was traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein—which the Defendants made, issued, or caused to be disseminated—or relying upon the integrity of the market, purchased, or otherwise acquired Hayward stock at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Hayward common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Hayward common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

244.    By reason of the conduct alleged herein, Defendants have knowingly or recklessly—directly or indirectly—violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

245.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's stock during the Class Period, upon the materializations of the undisclosed risk and disclosure of the omitted material information.

**COUNT II**
**Violations of §20(a) of the Exchange Act**
**(Against the Individual Defendants, CCMP, and MSD)**

246.    Plaintiff repeats and realleges each and every allegation contained in ¶¶1–245 above as if fully set forth herein.

77

247.    This Count is brought against the Individual Defendants, CCMP, and MSD for control person liability under §20(a) of the Exchange Act.

248.    During the Class Period, the Individual Defendants participated in the operation and management of Hayward and conducted and participated, directly and indirectly, in the conduct of Hayward's business affairs.  Because of their senior positions at and/or control of the Company, the Individual Defendants knew the truth about Hayward's business and the scheme to artificially inflate the Company's stock price.

249.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, with respect to Hayward's business, and promptly correct any public statements issued by Hayward that had become materially false or misleading.

250.    Because of their position of control and authority, as senior directors or officers, the Individual Defendants were able to, and did, control the contents of the various press releases and public filings that Hayward disseminated in the marketplace during the Class Period concerning the Company's business.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Hayward to engage in the wrongful acts complained of herein.  The Individual Defendants, therefore, were "controlling persons" of Hayward within the meaning of §20(a) of the Exchange Act.  In these capacities, the Individual Defendants participated in the unlawful conduct alleged herein, which artificially inflated the market price of Hayward's common stock.

251.    CCMP and MSD controlled Hayward and the Individual Defendants for the reasons detailed herein, including their ownership of a majority of Hayward voting stock, control of the Board, influence over Hayward management, historical relationship with the Company, and the

various agreements that these Defendants had caused the Company to enter into.  CCMP and MSD, therefore, were "controlling persons" of Hayward within the meaning of §20(a) of the Exchange Act.  In these capacities, CCMP and MSD participated in the unlawful conduct alleged herein, which artificially inflated the market price of Hayward's common stock.

252.    By reason of the above conduct, the Individual Defendants, CCMP, and MSD are liable pursuant to §20(a) of the Exchange Act for the violations committed by Hayward.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.    Determining that this action is a proper class action;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the other members of the Class pre- and post-judgment interest, as well as reasonable attorneys' fees, expert fees, and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  March 4, 2024                COHN LIFLAND PEARLMAN
                                     HERMANN & KNOPF LLP

                                     /s/ Peter S. Pearlman
                                     _____
                                     Peter S. Pearlman
                                     Matthew F. Gately
                                     Park 80 West-Plaza One
                                     250 Pehle Avenue, Suite 401
                                     Saddle Brook, NJ 07663
                                     Telephone: 201-845-9600
                                     Facsimile: 201-845-9423
                                     psp@njlawfirm.com

*Liaison Counsel*

SCOTT+SCOTT
ATTORNEYS AT LAW LLP
Max R. Schwartz (*pro hac vice pending*)
Donald A. Broggi
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile: 212-223-6334
mschwartz@scott-scott.com
dbroggi@scott-scott.com

SCOTT+SCOTT
ATTORNEYS AT LAW LLP
Cornelia Gordon (*pro hac vice pending*)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile: 619-233-0508
cgordon@scott-scott.com

*Lead Counsel for Lead Plaintiff and the Class*