Peter S. Pearlman
Matthew F. Gately
**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
Park 80 West-Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, NJ 07663
Telephone: 201-845-9600
Facsimile: 201-845-9423
psp@njlawfirm.com

*Counsel for Lead Plaintiff*
*Fulton County Employees' Retirement System*

*[Additional Counsel Appear on Signature Page]*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CITY OF SOUTHFIELD FIRE AND POLICE RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>                     Plaintiff,<br><br>          v.<br><br>HAYWARD HOLDINGS, INC., KEVIN HOLLERAN, EIFION JONES, CCMP CAPITAL ADVISORS, LP, and MSD PARTNERS, L.P.,<br><br>                     Defendants. | Civil Action No. 2:23-cv-04146<br><br>Hon. William J. Martini<br><br>**PLAINTIFF'S OPPOSITION TO HAYWARD DEFENDANTS' MOTION TO DISMISS** |

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ....................................................................................1

STATEMENT OF FACTS ...........................................................................................2

    A.    Defendants CCMP and MSD Dominated Hayward ............................5

    B.    Defendants CCMP and MSD Directed Hayward's IPO in March 2021, Taking Advantage of a Burst of Sales at the Start of Covid ..................................................................................3

    C.    But by Mid-2021, Prior to the Class Period, Hayward's Demand Had Dropped Significantly Because the Channel Had Elevated Inventory from Their Large Bubble of Orders the Previous Quarters ..................................................................................4

    D.    The Stalling Channel Demand Led Defendants to Try to Prop Up Hayward's Sales Prior to and During the Class Period, Even As Significant Cancelled and Returned Orders Mounted ....................7

    E.    A Sharp Increase in Hayward's Own Stock of Unsold Products Prior to and During the Class Period Also Reflected Stalling Channel Demand ..................................................................................11

    F.    Defendants Concealed Hayward's Substantial Problems with Actionable Statements Just Long Enough to Unload $544 Million in Stock ..................................................................................12

    G.    The Truth Is Fully Revealed on July 28, 2022 ..................................12

LEGAL STANDARD ................................................................................................14

ARGUMENT .............................................................................................................15

    I.    DEFENDANTS VIOLATED §10(B) .......................................................15

    A.    The AC Pleads False and Misleading Statements ..............................15

        1.    Defendants' False and Misleading Statements of Present Fact Regarding Channel Inventory and Demand ..................................15

i

a.    Defendants Denied That Channel Inventory Was Elevated .......19

b.    Defendants Denied that Channel Demand Was Stalling ............20

c.    Defendants Denied That Cancellations Were Significant ..........23

d.    Defendants Denied Hayward's Large Stock of Unsold Products Reflected Stalling Demand ..........................................25

2.    Defendants' False and Misleading Risk Warnings ........................26

3.    Defendants' Remaining Arguments Regarding Falsity Fail ...........26

a.    The Statements Are Not Inactionable Opinions or Puffery........26

b.    Defendants' Impermissible, Misleading Factual Assertions ......28

c.    Defendants' Arguments Regarding the PSLRA Safe Harbor Are Largely Irrelevant, and Meritless ...........................29

1.    Defendants' Motive and Opportunity .............................................30

2.    Defendants' Conscious Misbehavior or Recklessness....................35

3.    A Holistic Analysis Defeats Any Non-Fraudulent Inference .........40

II.    DEFENDANTS VIOLATED SECTION 20(a) ....................................40

CONCLUSION....................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Anadigics, Inc., Sec. Litig.*,
  2011 WL 4594845 (D.N.J. Sept. 30, 2011)........................................................24

*In re Avon Sec. Litig.*,
  2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019)...............................................37, 38

*In re Campbell Soup Co. Sec. Litig.*,
  145 F. Supp. 2d 574 (D.N.J. 2001)......................................................................35

*City of Birmingham Firemen's and Policemen's Suppl. Pension Sys. v.
  Ryanair*,
  2020 WL 2834857 (S.D.N.Y. 2020)...............................................................35, 36

*Curran v. Freshpet, Inc.*,
  2018 WL 394878 (D.N.J. Jan. 12, 2018)..............................................................31

*In re Enzymotec Sec. Litig.*,
  2015 WL 8784065 (D.N.J. Dec. 15, 2015)................................................26, 31, 32

*EP Medsystems, Inc. v. EchoCath, Inc.*,
  235 F.3d 865 (3d Cir. 2000) ................................................................................19

*In re Finisar Corp. Sec. Litig.*,
  2017 WL 1549485 (N.D. Cal. May 1, 2017)...................................16, 17, 18, 19

*In re Finisar Corp. Sec. Litig.*,
  646 F. App'x 506 (9th Cir. 2016) ........................................................................15

*Frankfurt-Tr. Inv. Luxemburg AG v. United Tech. Corp.*,
  336 F. Supp. 3d 196 (S.D.N.Y. 2018) .................................................................28

*George v. China Auto. Sys., Inc.*,
  2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012).......................................................31

*Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v.
  Swanson*,
  2011 WL 2444675 (D. Del. June 14, 2011) ....................................................36, 37

iii

*In re NIU Sec. Litig.*,
314 F. Supp. 2d 388 (D.N.J. 2004)........................................................................32

*In re Nortel Networks Corp. Sec. Litig.*,
238 F. Supp. 2d 613 (S.D.N.Y. 2003) ...................................................................24

*Odeh v. Immunomedics, Inc.*,
2020 WL 4381924 (D.N.J. July 31, 2020) ............................................................26

*Oklahoma Firefighters Pension and Ret. Sys. v. Lexmark Int'l, Inc.*,
367 F. Supp. 3d 16 (S.D.N.Y. 2019) ...............................................15, 22, 26, 28

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015)..............................................................................................27

*In re Oxford Health Plans, Inc.*,
187 F.R.D. 133 (S.D.N.Y. 1999)..........................................................................31

*Pathfinder Mgmt. Inc. v. Mayne Pharma PTY.*,
2008 WL 3192563 (D.N.J., Aug. 5, 2008) (Martini, J.).....................................30

*Phillips v. Cnty. of Allegheny*,
515 F.3d 224 (3d Cir. 2008) .................................................................................15

*United States ex rel. Rahimi v. Zydus Pharms. (USA), Inc.*,
2017 WL 1503986 (D.N.J. Apr. 26, 2017)..........................................................14

*Ret. Sys. v. Chubb Corp.*,
394 F.3d 126 (3d Cir. 2004) .................................................................................15

*Ret. Sys. v. Dell Inc.*,
2016 WL 6075540 (W.D. Tex. Sept. 16, 2016) ...................................................25

*Roche v. Aetna, Inc.*,
2023 WL 3173394 (D.N.J. May 1, 2023)........................................................28, 29

*Set Cap. LLC v. Credit Suisse Grp., AG*,
996 F.3d 64 (2d Cir. 2021) ...................................................................................34

*Steamship Trade Ass'n of Baltimore-Int'l Longshoreman's Ass'n Pension Fund v. Olo Inc.*,
2023 WL 4744197 (S.D.N.Y. July 25, 2023)........................................................38

*Stevelman v. Alias Rsch. Inc.*,
  174 F.3d 79 (2d Cir. 1999) ...................................................................................34

*Stumpf v. Garvey*,
  2005 WL 2127674 (D.N.H. Sept. 2, 2005)..............................................19, 20, 30

*In re Suprema Specialties Inc. Sec. Litig.*,
  438 F.3d 256 (3d Cir. 2006) ............................................................................32, 33

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007)..........................................................................................14, 30

*In re Toronto-Dominion Bank Sec. Litig.*,
  2018 WL 6381882 (D.N.J. Dec. 6, 2018)..........................................................31, 39

*In re Upstart Holdings, Inc. Sec. Litig.*,
  2023 WL 6379810 (S.D. Ohio Sept. 29, 2023) ....................................................27

*In re Urb. Outfitters, Inc. Sec. Litig.*,
  103 F. Supp. 3d 635 (E.D. Pa. 2015)............................................................*passim*

*In re Viropharma Inc. Sec. Litig.*,
  21 F. Supp. 3d 458 (E.D. Pa. 2014).....................................................................31

*Weston v. DocuSign, Inc.*,
  669 F. Supp. 3d 849 (N.D. Cal. 2023).................................................................22

**Rules**

Fed. R. Civ. P. 9(b) ......................................................................................................14

v

## **PRELIMINARY STATEMENT**

This securities class action involves false and misleading statements made by Defendants to facilitate $544 million in insider sales.  Defendants are: Hayward, a manufacturer of pool products; CCMP and MSD, who jointly acquired and dominated Hayward through majority stock ownership, a majority of the Board, and close oversight; and Hayward CEO Kevin Holleran as well as CFO Eifion Jones, who CCMP and MSD appointed as their proxies, who had no prior pool industry experience, and whose income CCMP and MSD set.

Defendants undertook this fraud because they knew that Hayward's key customers—"channel" distributors that accounted for 76% of its business—had upwards of $150 million of excess inventory by mid-2021.  Distributors loaded up on this inventory from late 2020 through Spring 2021, following a burst of demand for home pools at the start of Covid.  This large bubble of orders spurred record performance for Hayward in the first half of 2021—during which time Defendants rushed out an IPO—but also decreased Hayward's sales thereafter, as distributors would not place more orders when they already had far too much inventory.

Holleran and Jones also knew in 2021, as they later admitted, that distributors' demand was stalling because they had too much inventory.  Multiple CWs confirmed that distributors had been telling this to Hayward since May 2021, that Hayward had substantial data showing as much that was widely available throughout the

1

Company, and that Defendants received this data during the Class Period. For example, Jones received reports showing that Hayward was getting "hammered" by cancelled orders from oversaturated distributors, and that Hayward had $100 million worth of unsold products, which was a dramatic increase and source of concern. Thus, to facilitate the insider sales, management responded with a campaign to prop up Hayward's short-run performance, using unauthorized pull ahead orders, discounts, and pressure, which just cannibalized later orders.

Defendants badly misrepresented these substantial problems—in statements they admit are of present fact. Holleran claimed that distributors did ***not "ha[ve] too much" inventory*** and that their inventory was ***not "elevated"*** when distributors then had $150 million of excess inventory. He also claimed that distributors had ***not*** "***slow[ed] the bookings***" and had at most "***negligible cancellations***," when distributors were then refusing to take orders and "hammering" Hayward with cancellations, forcing management to try to prop up sales.

The MTD has no response to and does not acknowledge the foregoing allegations. Instead, it presents alternate facts purportedly based on its many exhibits, thereby conceding that it cannot meet the R. 12(b)(6) dismissal standard.

## STATEMENT OF FACTS

### A.   Defendants CCMP and MSD Dominated Hayward

Defendants CCMP and MSD formed a consortium to acquire Hayward in

2

2017. ¶35. Prior to and throughout the Class Period, CCMP and MSD worked together to further their investment and maintained tight control of Hayward through their: (i) majority ownership of Hayward stock; (ii) appointment of a majority of the members of Hayward's Board of Directors;[1] (iii) oversight of the nominations to Hayward's other Directors; (iv) appointment of Hayward CEO Holleran and CFO Jones, who had no experience in the pool industry, as their proxies; (v) control over these executives' compensation through positions on Hayward's Compensation Committee; and (vi) oversight of Hayward's financial performance through their role on Hayward's Audit Committee. ¶¶29-33, 36-39.

   **B.    Defendants CCMP and MSD Directed Hayward's IPO in March 2021, Taking Advantage of a Burst of Sales at the Start of Covid**

Hayward manufactures pool supplies, like pumps and filters, and its key customers were the distributors in its "channel," which accounted for about 76% of sales. Distributors sell pool products to businesses like builders who deal with end users (pool owners), so, once distributors have purchased enough product to meet their customer's needs for the next period, they will not place orders from Hayward for additional inventory. ¶¶41-42, 52-53. The inventory level beyond which distributors do not place additional orders is when they have enough inventory to

---

[1]    AIMCo, the third consortium member and a large stockholder, appointed one of the seven Directors the ownership consortium directly controlled. ¶37 & n.2.

cover three to four months of sales.  ¶184.  Thus, in times when the channel ends up with more inventory than that, it significantly reduces Hayward's sales.

Hayward's business was historically stable until a burst of demand near the start of the Covid pandemic, when there was a rise in interest in home pools.  ¶¶40, 43. This resulted in substantial revenue growth for Hayward from the first summer of 2020 through Spring 2021.  Hayward's FY 2020 revenue increased by about 20% year-over-year ("YoY").  ¶44.  In 1Q and 2Q 2021 (January through June 2021), Hayward's YoY revenue increase was even higher.  ¶158.

Taking advantage, CCMP and MSD exercised their control of Hayward to begin monetizing their investment, by quickly arranging for an IPO in late Q1 2021. ¶45.  In the IPO, CCMP and MSD sold over $267 million in stock.  *Id.*

C.  **But by Mid-2021, Prior to the Class Period, Hayward's Demand Had Dropped Significantly Because the Channel Had Elevated Inventory from Their Large Bubble of Orders the Previous Quarters**

Undisclosed to investors, by late-Spring 2021, the Covid-related surge in demand was receding and Hayward faced a significant problem.  Its key distribution channel was holding an enormous amount of excess inventory built up from their bubble of large orders following the start of Covid—at least $120 to $150 million worth.  ¶¶52-53, 92.  The existence of such a large amount of excess inventory in Hayward's channel was highly problematic, because it directly undercut demand for Hayward's products as distributors used their own inventory rather than ordering

4

additional products and also cancelled unnecessary orders on backlog.  ¶¶52-53.

Multiple confidential witnesses ("CWs") from across Hayward's business, including CW1, confirmed that channel demand was slumping by mid-2021 because the "channel was stuffed" with inventory.  ¶¶55, 57, 68.[2]  CW1 stated that Hayward's management and sales teams had access to large quantities of data enabling them to see distributors' inventories, what products if any distributors needed, and Hayward's sales to distributors.  ¶70. This data was stored on a business analytics database called Cognos.  *Id*.  Hayward routinely generated reports from Cognos, which informed the marketing department of weak distributor demand.  *Id*.

Beginning in May 2021, distributors in Hayward's channel told CW2, a sales manager at Hayward, that they simply had too much Hayward inventory already—a staggering two years' worth—and so were not going buy additional product.  ¶57. CW2 attended weekly meetings with other Hayward sales managers during this time to address the difficulties they were having selling to the channel due to the high inventory levels.  ¶82.  Moreover, Hayward's VP of Sales discussed the Company's significant problems with channel inventory and demand at meetings held monthly or quarterly during 2021, which CW2 attended.  *Id*.

---

[2]     CW1 learned this through working with product management and sales teams to market Hayward's products, including to try to boost weak demand.  ¶¶54, 68-70.

5

The excess inventory distributors built-up through the first half of 2021 resulted in part from their placing "double orders"—ordering one set of products that met their current needs along with a second set to cover their future needs. ¶62. CW3 recounted that distributors did this out of caution in response to supply chain delays early in Covid. *Id.*[3] In addition, CW2 noted that distributors also placed large orders because Hayward was pressuring them to. ¶58.

While this double ordering accounted for Hayward's substantially "increasing" growth and demand in the first half of 2021, CW3 stated, it undermined Hayward's sales performance, and was a cause of concern for Hayward's C-Suite. ¶62. Moreover, CW3 continued, the supply chain issues that had contributed to the double ordering had substantially improved by July 2021, further eroding distributor demand for Hayward products when inventories were already oversaturated. *Id.* For these reasons, CW3 recounted, by August 2021 the Chief Supply Officer was concerned with this large bubble of double orders. *Id.*

Owing to the channel's inventory and order overhang, by mid-2021, multiple CWs recalled that Hayward's sales teams "weren't hitting their numbers" and management began pressuring the marketing team to "get product off the shelves."

---

[3]    CW3 learned of Hayward's problems with double orders while working on business intelligence as a senior developer, reporting to the Vice President of Analytics, working with the Vice President of Sales, the Chief Supply Chain Officer, Jones, and overseeing the centralization of Hayward's data. ¶61.

6

¶68.  CW2 confirmed that in 2021 (and 2022) it was hard for sales teams to hit their targets, and CW2 for example was "not hitting those overall dollars on the sales end standpoint" because distributors had too much product.  ¶81.  CW4, a Director with responsibilities for shipping orders to distributors, also recounted that by September 2021 Hayward had "concerns" it was not "selling enough," and it had insufficient orders to meet its sales numbers due to the "overage of inventory."  ¶¶71-72.

With missed sales targets and stalling demand undermining Hayward's performance, Holleran chaired monthly Sales, Inventory and Operations Planning meetings.  ¶99.  CW6, a global commodity manager before and during the Class Period, also attended these meetings, along with Jones and 40 to 60 executives representing every part of the Company.  ¶¶96, 99.  As their name indicated, these meetings tracked issues like "what's not selling good" and lasted several hours, CW6 recalled.  ¶99.  Given that Hayward tracked the elevated channel inventory in mid-2021 that was causing substantial difficulty selling to distributors, and held meetings run by Defendants on this problem, CW6 stated "if C-Suite did not know about it, it was gross incompetence . . . they had to know."  ¶¶98-99.  CW1 confirmed this substantial problem was general knowledge regularly discussed throughout Hayward.  ¶¶55, 59.

  **D.  The Stalling Channel Demand Led Defendants to Try to Prop Up Hayward's Sales Prior to and During the Class Period, Even As Significant Cancelled and Returned Orders Mounted**

7

In response to the stalling channel demand and missed sales numbers, Hayward's management orchestrated several ploys to prop up its revenue. CW1 recounted that following management pressure to improve sales, by mid-2021 the marketing team was authorized to use discounts to induce customers to place more orders. ¶¶68-69. They did so even though, with frameworks like "buy more to save more," the discounting just incentivized distributors to load up on yet more excess inventory and cannibalized future sales. ¶69. Hayward also implemented a new program of "sales blitzes" at this time, which included internal promotions for the sales team, but CW1 stated that they did not "mov[e] the needle." *Id*.

In addition, CW4 recalled that when Hayward did not have sufficient customer orders in the current period to hit its sales numbers, management instructed the distribution teams to "pull ahead," or fill, orders from future periods as well because otherwise the "numbers would not be where they expected and needed them to be." ¶72. CW4 explained that Hayward was pulling ahead orders even absent customers' request or approval, resulting in customers receiving orders "six months ahead of time." ¶¶74, 76. This benefitted Hayward in the short term, as CW4 noted that Hayward recognized revenue when an order shipped, but again at the expense of future orders, and when CW4 raised such concerns to the head executive at CW4's office, he replied Hayward would "deal with the aftermath." ¶¶72, 74.

The first direction to pull ahead orders CW4 personally recalled was in

8

October 2021 during a daily staff meeting (¶73), while CW1 knew of Hayward issuing pull aheads as far back as March 2021, at another important time near its IPO.  ¶80.  In November 2021, the Hayward executive in charge of CW4's office reiterated that Hayward did not "have enough volume with current orders to sustain what higher-ups needed" and so "had to do something about volume," resulting in more directions to pull ahead orders.  ¶74.  Hayward's need to pull ahead orders continued, with CW4 recalling overtime work at Christmas 2021 to fulfill them.  ¶75.

These pull aheads further undercut demand by adding more channel inventory and reducing Hayward's order backlog, CW4 continued, such that by late 2021 orders were dwindling.  ¶75.  Moreover, CW4 stated that "customers were not happy" receiving pull aheads "way ahead of schedule," and to stop customers from returning them Hayward management gave discounts on future orders.  ¶¶76, 79.

On top of that, Hayward was pressuring distributors to place excess orders. CW2 recalled that, throughout 2021 and into 2022, Hayward salespeople were instructed to "strongly encourage" distributors to make excess orders, and to inform customers that otherwise they could be "the company that doesn't have [product]." ¶83.  While distributors caved in to such tactics earlier in that period, initially increasing Hayward's sales, CW2 noted that this hurt sales later in the period as distributors were loaded up with enough product to sit unsold for two years, eroding their demand.  *Id*.  Hayward nevertheless kept trying to induce those distributors to

9

load up even more, CW2 explained, by offering them discounts and rebates.  *Id*.

The channel's elevated inventory and stalling demand, made even worse by these short-run tactics, also resulted in significant order cancellations and rejections. Hayward and Defendants tracked these events, as they eroded the Company's order backlog, which was the source of its revenue.  ¶¶11, 78, 87-88.

CW3 recalled that in early 2022, around late February, Jones began to ask for reports on cancellations, which CW3 prepared and provided to him on an analytics platform called Tableau.  ¶87.  Hayward was getting "hammered" by distributors who placed orders but then cancelled them, CW3 explained, because after mid-2021 distributors were overwhelmed with the product they already had, and "[e]veryone was like, I don't have room for all this stuff."  ¶88.  Similarly, CW4, who described customers' poor response to pull aheads, recalled that customers rejecting shipped orders became a problem.  ¶78.   Hayward tracked rejections as well, which CW4 learned of by attending regular key performance indicator ("KPI") meetings led by a sales executive—customer frustration was also brought up at those meetings.  ¶78. CW6 heard of large-scale returns of Hayward orders too.  ¶89.

Beyond depleting its revenue, cancellations and rejections also harmed Hayward by saddling it with unsold products—so, along with the cancellation reports, CW3 also provided Jones with reports showing how much of Hayward's money was tied up in products it had manufactured but could not sell.  ¶87.  CW3

10

recalled, as an example, a cancelled order for heaters, leaving Hayward with "$11 million of inventory" it "was stuck with just from one order." *Id.*

**E.    A Sharp Increase in Hayward's Own Stock of Unsold Products Prior to and During the Class Period Also Reflected Stalling Channel Demand**

Hayward's surging growth in unsold products reached over $100 million, and closely mirrored and was caused by the reciprocal decline in Hayward's sales. ¶92 (chart); ¶50 (unsold products rose from $66.4 million in 2Q-2021 to $88.7 million in 3Q-2021 just before the Class Period, or 33%; stayed elevated at $86.2 million in 4Q-2021; sharply climbed in 1Q-2022 to $108.7 million, or 25%; and climbed more in 2Q-2022 to $148.5 million, or 37%). As Jones noted, Hayward took "strategic" positions to increase its manufacturing of finished products and purchasing of raw materials following the start of Covid, to address the initial surge of demand. ¶200. But after orders stalled in mid-2021, Hayward kept up the high manufacturing rate, resulting in an ever-growing stock of unsold products. CW6 explained that Hayward was locked in to multiple "hugely inflated" contracts with raw materials suppliers, so that when demand dropped Hayward was "stuck" with two-to-three-year long contracts it could not back out of. ¶97. Similarly, CW3 recalled the Chief Supply Officer was concerned that the Company would not reduce production once "things went back to normal" after the initial Covid surge, which proved accurate. ¶90.

Defendants were aware of and troubled by Hayward's ballooning stock of unsold products—CW3 recalled in February or March 2022 hearing from Jones that

11

there was concern that this excess stock had reached $100 million.  ¶91. That matches the amount of Hayward's unsold products in 1Q-2022 which ended in March 2022 (per the preceding paragraph), and occurred while CW3 was preparing reports for Jones on Hayward's unsold products and cancellations.  ¶87.

Even before that, Hayward management was scrambling, unsuccessfully, to address this problem.    CW5, whose responsibilities included overseeing manufacturing at Hayward's Nashville plant, recounted that near the end of 2021 and beginning of 2022, the manufacturing team received a directive from corporate to "slow down operations," because there was "absolutely" awareness that Hayward had too many unsold products.  ¶¶94-95.  But, CW5 continued, Hayward did not timely follow through on that directive.  ¶95.

F.    **Defendants Concealed Hayward's Substantial Problems with Actionable Statements Just Long Enough to Unload $544 Million in Stock**

Beginning on October 27, 2021, Defendants made a series of statements falsely denying that: channel inventory was then elevated, channel demand was then stalling, and Hayward's performance was propped up.  *Infra* §I.A.

This enabled Defendants and an insider to unload $544 million in stock at inflated prices during the Class Period, including via a repurchase program that gave them favorable pricing as the stock dropped and a hastily arranged SPO.  *Infra* §I.B.

G.    **The Truth Is Fully Revealed on July 28, 2022**

On July 28, 2022, about a month after the final insider sales, Defendants finally disclosed the truth, in terms that matched the CWs' statements, with Holleran's admission that Hayward faced "*elevated channel inventories*" and that distributors "don't require the same level of safety stock." ¶183. The "result[]," he continued, was a reduction of "4 to 6 weeks less channel inventory," which required a drastic reduction of orders and exemplified the channel's stalling demand. *Id*. Thus Defendants also had to admit that Hayward was not continuing to grow while the channel was so oversaturated, and provided an updated guidance for FY 2022 which showed Hayward's sales decreasing by 2% to 6%, and replaced the guidance Defendants had issued in March and reaffirmed in April 2022 showing 9% to 12% sales growth in FY 2022. ¶183. Holleran further admitted that "more than half of the new guidance is related to channel inventory." ¶185.

Importantly, Defendants also conceded that they had long known of the channel's elevated inventory and concomitant stalling demand—Holleran admitted "*[w]e expected to sell less into the channel versus sellout due to the strategic positions that many of our channel partners took at the end of 2021*." ¶186. Likewise, Holleran conceded that "when we set coming into the year [2022], with last year's retail pull-through in front of us, we expected some moderation off a very, very high pull through the channel last year." ¶187. That is, channel distributors had already notified Defendants that they would be reducing their inventory and

13

purchasing less product in 2021.

After the Class Period, Jones quantified the staggering amount of excess inventory in the channel as between "$120 million to $150 million," and acknowledged it had been built up during the earlier "period of strong demand." ¶192.  He further admitted that corresponding amounts of sales were now dropping out of Hayward's performance—in 3Q-2022, Hayward's net sales decreased 30% YoY, primarily driven by a 44% reduction in volume "compared to last year. . . ***due entirely to channel inventory***" reductions.  *Id*.

Defendants' admissions on the last day of the Class Period drove Hayward's common stock down by 18.23%, or $2.50 per share, to close at $11.21 on July 28, 2022.  ¶191.  This was far below the prices at which insiders unloaded their stock. *Infra* §1.B.1.  To investors, these admissions were a shock, as analysts remarked that Hayward's "guidance change is rather abrupt."  ¶190.

## **LEGAL STANDARD**

The Court must consider the Complaint in its entirety, accept all well-pleaded allegations as true and draw all reasonable inferences in favor of plaintiff.  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-23 (2007).  Rule 9(b) requires pleading the circumstances constituting fraud with particularity, but courts are "sensitive to situations in which sophisticated defrauders may successfully conceal the details of their fraud."  *United States ex rel. Rahimi v. Zydus Pharms. (USA),*

14

*Inc.*, 2017 WL 1503986, at *11 (D.N.J. Apr. 26, 2017).  Where pleadings do so, dismissal is inappropriate even if "it appears unlikely that the plaintiff can prove those facts." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).

## ARGUMENT

## I.    DEFENDANTS VIOLATED §10(B)

### H.  The AC Pleads False and Misleading Statements

The AC alleges facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission," which satisfies the PSLRA. *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004).

#### 1.    Defendants' False and Misleading Statements of Present Fact Regarding Channel Inventory and Demand

Defendants made false and misleading statements denying that channel inventory was elevated and channel demand was stalling, and courts have found substantially similar statements "down-play[ing] concerns of a looming inventory bubble" actionable on analogous facts.  *E.g.*, *In re Finisar Corp. Sec. Litig.*, 646 F. App'x 506, 507 (9th Cir. 2016) ("*Finisar I*"); *Oklahoma Firefighters Pension and Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 31 (S.D.N.Y. 2019) (statements that inventory "flat," "neutral," or only increased "a bit" actionable); *see In re Urb. Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 644, 651 (E.D. Pa. 2015) (statements indicating "strong demand" when defendant propping up sales actionable).

For instance, in *Finisar*, the defendant company had grown for six quarters

15

but analysts "suspected that this growth was driven by customers building-up inventory rather than purchasing Finisar products for immediate use in productions." *In re Finisar Corp. Sec. Litig.*, 2017 WL 1549485, at *1 (N.D. Cal. May 1, 2017) ("*Finisar II*"). Meanwhile, the defendants took advantage with a "[secondary] stock offering that garnered over $118 million," including insider sales. *Id.* at *3, *8. When analysts questioned whether the company had "outgrown [its] end markets" due to the build-up of customer inventory, and how Finisar could sustain continued growth, the CEO, like here, falsely assured investors that "if you look at the market, you see the fundamentals for growth are there. . . . As far as we know we haven't seen any inventory issues with our product with our customers." *Id.* at *2 (also claiming "there can be one or two guys who try to build their own inventory," but it "d[id]n't look to us" like "the majority of the customers…[were] building any inventory"). These statements were actionable, because, as the defendants later disclosed, revenues would be lower than projected due to "inventory build-up at some of the Company's telecom customers." *Id.* at *2.

Just so, here, the root cause of Hayward's problems was the channel's enormous buildup of excess inventory through Spring 2021 that had compromised its demand for further orders, and which Defendants concealed. Analysts raised this topic on October 27, 2021, asking what Defendants were "seeing in the channel in terms of inventory levels" and what "distributors are asking for" in terms of orders,

16

noting a report of increased inventory at a large distributor. ¶105. Holleran responded that the increase was only relative to low inventory levels early in 2021 and the absolute amount of the increase was minor, and the channel still needed more inventory overall and a better mix of inventory too. *Id*. Specifically, he misrepresented that "compared to a quarter or [two] ago," when channel inventory was understood to be relatively low, "from a days-on-hand standpoint, . . . *it's an improving position, but certainly not too much by any means*," downplaying the report. *Id*. Holleran embellished the false picture of low channel inventory, adding, "*the mix of that inventory may not be as ideal as any of us would like*" either, and the channel was allocating "*some additional shelf space through our share gains*" too. *Id*. Based on that, he further misrepresented that the channel was then demanding much more inventory: "*we have a backlog right now that certainly supports volume growth*" and is "*at elevated levels still despite some of our production capacity improvements*." ¶106.

Defendants try to confuse the record of what Holleran said on October 27, 2021, by failing to acknowledge or quote the parts of that exchange where he clearly misrepresented the channel's inventory. Specifically, the MTD (at 26) argues that Holleran disclosed the full extent channel inventory had improved and never sought to minimize that improvement because he acknowledged the report of an inventory uptick. This is baseless—in the next part of the exchange, that Defendants

17

completely ignore, Holleran falsely downplayed that report and the level of channel inventory, stating "*it's an improving position, but certainly not too much by any means*," adding embellishments such as the problematic inventory "*mix*." ¶105.

A similar exchange and misrepresentation occurred on March 2, 2022, when an analyst raised whether the channel's inventory level was reducing its demand, asking if Hayward's order "backlog" faced a "risk from a cancellation perspective" given that "inventory levels in the channel are at least a little closer to normal". ¶119. Holleran again claimed that the channel did not have too much or elevated inventory and that its substantial demand continued, as the channel had purportedly not slowed new orders and cancellations of existing orders were negligible. He falsely stated, "*[i]f the channel was feeling as if they had too much or were unhappy with their inventory turns, I think there was opportunity for them to slow the bookings or even cancel and we've seen negligible cancellations through those time periods. So we feel very good about the credibility of that order file*." *Id*. Holleran then reinforced this, by once more falsely downplaying channel inventory as only "getting back to more normal levels" from their shortages in early 2021, insisting "*we don't think it's elevated*" and that the inventory "*balance*" was still not fixed either due to "*shortages*" of some products. ¶163.

Each statement discussed above in §I.A.1 is false and misleading for the reasons below, and Defendants concede that they are all statements of present fact

18

such that the PSLRA safe harbor, the "bespeaks caution" doctrine, and the bulk of the arguments in the MTD do not apply. *See* MTD at 15-21; *e.g.*, *Urb. Outfitters*, 103 F. Supp. 3d at 649-50; *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 874 (3d Cir. 2000) ("[T]he 'bespeaks caution' doctrine, like the safe harbor provision in the Reform Act, is directed only to forward-looking statements.").

### a. Defendants Denied That Channel Inventory Was Elevated

Directly contrary to the foregoing misrepresentations and others discussed herein—including that the channel did **not "ha[ve] too much" inventory**, that its inventory was **not "elevated,"** and that its inventory **"had not [improved] too much"** since low levels in early 2021 (¶105, 119, 163)—the channel was then saturated with two years' worth of inventory, and had been since mid-2021. *Supra* SoF.C; ¶¶52-53. That was far more than the channel needed, amounting to $120-$150 million of excess inventory. ¶192. The channel's inventory had skyrocketed to this level following a large "bubble" of double orders from later in 2020 through Spring of 2021, leaving the channel "stuffed." ¶¶52-53, 196. This excess inventory also caused channel demand for more orders from Hayward to stall. Defendants downplaying channel inventory and denying it was elevated was thus actionable, as courts have found under similar circumstances. *See Finisar II*, 646 Fed. App'x at 507; *Stumpf v. Garvey*, 2005 WL 2127674, at *8 (D.N.H. Sept. 2, 2005).

19

### *b. Defendants Denied that Channel Demand Was Stalling*

The misrepresentations detailed above and herein also denied that demand was then stalling. For example: Holleran claimed the channel had not "***slow[ed] the bookings***" at all and particularly not due to "***hav[ing] too much***" inventory, and responded to analysts asking whether customers had any "spending slowing down" by insisting "***no, we're still seeing robust demand and the order file on the books is still very strong***;" while Jones replied to a similar question about "how product is flowing" by maintaining "***we haven't seen demand destruction***." ¶¶119, 134, 154. In truth, channel demand was then stalling, and had been since mid-2021, when Hayward management had been forced to apply pressure in response to that problem to try to "get product off the shelves." *Supra* SoF.C; ¶198. In and after mid-2021, distributors had been telling Hayward they had too much inventory, and were not loading up with more product. ¶196. This caused the Vice President of Sales to hold regular meetings on Hayward's significant problems selling to distributors, and the Chief Supply Officer to express concern over the impact of the channel's large bubble of orders from earlier in the year. ¶¶55, 57; 58, 62. Further eroding demand, the supply chain issues that fueled the earlier double orders substantially improved after July 2021. ¶62. This dropping channel demand meant that from mid-2021 on, Hayward's sales team was no longer generating enough orders to "hit[] their numbers." ¶¶68, 71-72, 81. Accordingly, Defendants' statements touting ongoing

20

channel demand were actionable. *Stumpf*, 2005 WL 2127674, at \*8 (touting "demand" actionable given the "market's already-existing oversupply").

The statements touting demand were also false and misleading for a separate reason: they covered up that it was actually management's campaign to prop up sales that accounted in substantial part for Hayward's performance during the Class Period. *Supra* SoF.D. This happened, for example, when analysts questioned the source of Hayward's performance, as on April 28, 2022, when they asked how Hayward had increased sales in 1Q-2022 compared to 4Q-2021, notwithstanding that its first quarters are seasonally slower periods than its fourth quarters. ¶138. Jones gave the false and misleading reply that Hayward's unusual 1Q-2022 performance resulted from the channel's ongoing organic demand for inventory, which required Hayward "***to make sure that the channel is appropriately stocked***," and Hayward was increasing sales by "***still continu[ing] to work through a large backlog***" of orders. *Id*. In truth, these results stemmed from Defendants' sustained campaign of discounting, "sales blitzes," pull aheads and pressure, which they launched in mid-2021 in response to stalling channel demand. ¶¶68-69, 72, 83. For instance, when Hayward did not "have enough volume with current orders to sustain what higher-ups needed," management pulled ahead orders, often without approval, offering discounts if the customers agreed not to return them. ¶¶74, 76, 79, 83. Management was determined to boost sales during the Class Period, even though it

was exacerbating the channel's excess inventory and cannibalizing what future orders remained, stating they would "deal with the aftermath."  ¶74.  Defendants' statements attributing Hayward's growth and performance to channel demand were therefore false and misleading.  *See Lexmark*, 367 F. Supp. 3d 16, 33 (S.D.N.Y. 2019) ("strong" demand statements were false where revenues were not actually driven by "increased end-user demand").

Defendants argue that they satisfied their disclosure obligations simply by acknowledging that Hayward's environment in March 2022 was not the same as its environment closer to the start of Covid—but this is meritless.  MTD at 28.  For here, Defendants violated their obligations by failing to disclose that the channel was stuffed with an enormous $150 million of excess inventory, which caused channel demand to substantially drop and was negatively impacting Hayward prior to and throughout the Class Period.  That was a dramatic change that Defendants did not even begin to disclose.  *See Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 881 (N.D. Cal. 2023) (omitting decline in product usage as pandemic progressed made statements regarding ongoing customer demand misleading).

The cherry-picked, purported "disclosures" that the MTD (at 28) points to are therefore in fact additional actionable statements: the March 2, 2022, snippet downplaying channel inventory as merely "getting back to more normal levels" was itself false and misleading, and was part of misrepresentations that channel inventory

22

was *not "elevated"* because the channel was *not "slow[ing] bookings or even cancel[ling]" orders*. *Supra* §I.A.1.a; ¶¶119, 163.  Likewise, the April 28, 2022, snippet that channel "sell out" could outpace "sell in" was part of a statement that growth nevertheless remained considerable, and was downplayed by Defendants' preceding misrepresentation that based on "*keep[ing] close tabs on [inventory] with our channel partners*" they were "*comfortable*" with the inventory level because distributors could take on even more orders. ¶137.  Nor was the FY 2022 guidance "*conservative*," as Defendants claim, given that it still projected considerable growth when Hayward was already having to prop up its revenue with short-run tactics that cannibalized future revenue.  *Supra* SoF.D; ¶¶134, 138.

### c. Defendants Denied That Cancellations Were Significant

Defendants concede that they repeatedly claimed, "*we've seen negligible cancellations. . . we feel very good about the credibility of that order file*."  ¶119; ¶134 ("*[w]e really haven't seen any kind of cancellations*").  Moreover, contrary to Defendants' argument (MTD at 28-29), the allegations that Hayward was actually then facing significant cancellations are particularized; Defendants simply ignore them.  Those allegations include CW3's statement that Hayward was getting "hammered" by distributors cancelling orders because they were overwhelmed with inventory, and that this situation had become so problematic that Jones asked for reports on cancellations by late February 2022—before the statements above were

made. *Supra* SoF.D; ¶87. Further, CW3 specifically described including the cancellations then hammering Hayward in the reports, giving as an example a cancellation of heaters, which CW3 made clear was substantial, as it erased a staggering "$11 million. . . from just one order." *Id.* CW3 was also tasked with providing Jones with related reports showing Hayward's stock of unsold products, because it was by then substantially increasing to $100 million due in part to such cancelled orders. *Id.* Corroborating CW3's allegation, CW4 recalled that oversaturated distributors unhappy with the pull aheads Hayward had been imposing since at least October 2021 were rejecting orders, which was a cancellation that took place after an order shipped. ¶¶73, 76, 78. CW4 stated that rejections were another key performance indicator that Hayward tracked, and CW6 also recalled large scale distributor returns. ¶¶78, 89. These allegations are more than sufficient to show that Defendants' statements regarding "***negligible cancellations***," as well as their statements regarding the "***credibility of that order file***" and backlog, were false. *In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 630-31 (S.D.N.Y. 2003) (statements about "strong order backlog" actionable where "customers were cancelling orders and were planning to reduce orders in the coming years").[4]

---

[4]    *In re Anadigics, Inc., Sec. Litig.*, 2011 WL 4594845, at *25 (D.N.J. Sept. 30, 2011), is inapposite—there plaintiffs conceded defendants could not have known about cancellations until after the alleged misstatements were made. MTD at 29.

24

### d. Defendants Denied Hayward's Large Stock of Unsold Products Reflected Stalling Demand

Analysts also questioned Hayward's large stock of unsold products, but contrary to their internal assessment, Defendants replied with false and misleading statements that they needed to build up that stock to service continued channel demand. For instance, on April 28, 2022, in reply to a concerned analyst, Jones claimed that Hayward's unsold products were rising because, "*[k]nowing the demand curve that we see out in the future, we are manufacturing certain products in terms of finished goods to get in into inventory. . . to be able to service the market*." ¶139. In truth, Defendants had increased Hayward's procurement and manufacturing following the surge of demand at the start of Covid, but were unable to slow their production of finished goods to counter the stalling channel demand following mid-2021, which is what caused Hayward's stock of unsold products to soar. *Supra* SoF.E; ¶¶91-93. The CWs recounted that Hayward management had long been concerned by this problem, and by late 2021 its corporate office directed manufacturing to "slow down operations," because there was "absolutely" awareness that Hayward had too many unsold products. ¶95. But Hayward was unable to quickly implement that directive, and by February or March 2022, Jones was describing concern over Hayward's $100 million of unsold products. ¶91. Defendants' statements denying that those unsold products reflected stalling channel demand were therefore actionable. *City of Pontiac Gen. Empls.' Ret. Sys. v. Dell*

25

*Inc.*, 2016 WL 6075540, at *3-4 (W.D. Tex. Sept. 16, 2016).

## 2.    Defendants' False and Misleading Risk Warnings

Defendants' purported risk warnings were inadequate and actionable because

they warned of "a potential risk when such a risk had already materialized." *E.g.*

*Odeh v. Immunomedics, Inc.*, 2020 WL 4381924, at *6 (D.N.J. July 31, 2020).  For

example, such hypothetical warnings included:

- "*any material cancellation, reduction, or delay in purchases. . . could have a material adverse effect on our business*," when this problem was already occurring, with orders stalling since mid-2021 and significant rejections and cancellations thereafter (*supra* SoF.C-D; ¶¶109, 115, 129, 144, 150); and

- "*higher demand*" from the start of Covid "*may not be sustainable*," when this problem was already occurring, with demand and double orders at the start of Covid giving way to oversaturated distributors unwilling to take on additional inventory by mid-2021(*supra* SoF.C; ¶¶109, 115, 129, 144, 150).

As Defendants' only response is to repeat their flawed, conclusory argument that the

foregoing allegations are "not ple[]d with particularity" (MTD at 29-30), the risk

warnings are actionable.  Moreover, the risk warnings are statements of present fact.

*See In re Enzymotec Sec. Litig.*, 2015 WL 8784065, at *11 (D.N.J. Dec. 15, 2015).

## 3.    Defendants' Remaining Arguments Regarding Falsity Fail

### a.    *The Statements Are Not Inactionable Opinions or Puffery*

Defendants' assertion that many of the statements at issue, including the

majority discussed in §I.A.1, are inactionable "opinions," fails for multiple reasons.

To begin with, they are not opinions, as they "purport to state historical facts" or are

"objectively determinable." *Lexmark*, 367 F. Supp. 3d at 32.   For example,

26

Holleran's statement that, compared to previous quarters, channel inventory "from a days-on-hand standpoint it's still in a -- *it's an improving position, but certainly not too much*" is a false factual assertion regarding the degree to which the channel's inventory grew determined by an objective criteria, days on hand—the days on hand had exploded from too low to two years' worth. ¶105. Defendants' baseless position that those statements are "opinions" turns on the presence of the word "think" somewhere in the paragraphs they appear, without providing any analysis of the statements (MTD at 22-23). *In re Upstart Holdings, Inc. Sec. Litig.*, 2023 WL 6379810, at *14 (S.D. Ohio Sept. 29, 2023) (statements not opinion merely because [they are] prefaced…with 'we believe' or 'we feel.'"). Thus the statements Defendants appear to argue are opinions—including those contained in ¶¶105, 106, 119, 163, 154 (discussed in §I.A.1)—are statements of fact.

Even if they were opinions, they are still actionable. Take for instance Holleran's statement that if the channel "had too much" inventory "I think there was opportunity for them to slow the bookings or even cancel and we've seen negligible cancellations." ¶119. It is actionable under *Omnicare* because it contains embedded supporting facts that are false (*supra* §I.A.1)—namely, the assertions that distributors made only "negligible cancellations" and were not slowing bookings. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185 (2015). This statement also omits facts regarding its basis that conflict with

27

its plain meaning, and make it actionable under a separate *Omnicare* prong. *See Lexmark*, 367 F. Supp. 3d at 33. In particular, it omits Hayward was then tracking the channel's excess channel inventory along with the resulting rising cancellations and dwindling orders, which directly contradict it. *Supra* SoF.C. The MTD (at 23-24) offers no response to these allegations, demonstrating that they are actionable.

For the reasons above and in all of §1.A, the statements at issue are clearly not puffery. The MTD (at 21-22) neither quotes nor attempts to explain how most AC statements could even so qualify, and impermissibly lumps them into string cites for that proposition—including ¶¶105, 106, 119, 163, 134, 138 from §1.A.1.

### b.   *Defendants' Impermissible, Misleading Factual Assertions*

All of Defendants' falsity arguments are predicated on alternative facts they assert in the MTD's Factual Background (MTD at 5-11), which refuses to acknowledge a single one of the AC's allegations regarding saturated channel inventory, stalling channel demand, or Hayward's campaign to prop up sales. Moreover, Defendants rely heavily on exhibits, including impermissible third-party documents not referenced in the AC. *See Frankfurt-Tr. Inv. Luxemburg AG v. United Tech. Corp.*, 336 F. Supp. 3d 196, 205 (S.D.N.Y. 2018). This treats the MTD as a motion for summary judgment, and concedes that the AC cannot be dismissed under the R. 12(b)(6) standard, that takes the AC's allegations as true and draws inferences in its favor. *See Roche v. Aetna, Inc.*, 2023 WL 3173394, at *3-4 (D.N.J.

28

May 1, 2023). Indeed, Defendants mischaracterize what their exhibits say, which is precisely why they may not be noticed for their truth on a MTD. *Id.* For example, Defendants cherry pick a quote suggesting Holleran wrote off additional channel load by March 2022, when the full passage shows he was falsely claiming channel load could continue at the end of 2022 "[i]f retail demand and pull-through continue on the robust pace we've seen in the last 2 years." McDonough Ex. 14 at 14.

> ### c.  *Defendants' Arguments Regarding the PSLRA Safe Harbor Are Largely Irrelevant, and Meritless*

Defendants concede that numerous misrepresentations regarding channel inventory and demand are of present fact and not subject to the PSLRA safe harbor. *Supra* §I.A.1. The MTD's (at 15-21) argument that other statements are purportedly forward-looking and subject to the safe harbor is therefore practically irrelevant. Moreover, many of the statements Defendants claim are forward-looking are by their express terms statements of present fact. *E.g.* ¶137 ("we feel comfortable with our [channel] inventory position from a days on hand standpoint ***here at the start of the season***"). The MTD (at 16) never explains how these statements can be forward-looking, and unpersuasively includes them in string cites of paragraphs that it baldly alleges are assumptions underlying guidance. At most, they are "mixed" statements, with the present parts not subject to safe harbor. *See Urb. Outfitters,* 103 F. Supp. 3d at 650. The remaining statements involve projections (MTD at 15-16), but Defendants still may not invoke the safe harbor, as: (1) the purported risk warnings

29

were themselves materially misleading, and so not meaningful (*supra* §I.A.2); and (2), as discussed in connection with scienter (*infra* §I.B), Defendants had actual knowledge their statements were false. *See Stumpf*, 2005 WL 2127674, at *8.

## B.    The AC Pleads Scienter

The AC's "holistic" allegations establish Defendants' scienter.  *Tellabs,* 551 U.S. 308, 326 (2007).  Those allegations are "adduced inferentially" by "motive and opportunity to commit fraud"—here, facilitating $544 million in highly suspicious insider sales—together with alleged "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness"—Defendants admitted they knew, and CWs confirmed, that Defendants had substantial information showing that the channel was elevated and demand was stalling.  *Pathfinder Mgmt. Inc. v. Mayne Pharma PTY.*, 2008 WL 3192563, *12 (D.N.J., Aug. 5, 2008) (Martini, J.).

### 1. Defendants' Motive and Opportunity

All Defendants concealed Hayward's problems with misrepresentations and propped up its performance with short-run tactics to enable huge insider sales:

(1) CCMP sold $80.8 million of stock to Hayward through a repurchase program announced on January 24, 2022 and executed on March 11, 2022, that gave CCMP a favorable price $3 higher than the price at which Hayward repurchased shares from non-insiders on the open market. ¶208. CCMP also sold $53.4 million of stock to Hayward in a block trade on January 24, 2022, while AIMCo sold $27.4 million of stock.  ¶¶ 205-06.

(2) CCMP sold off $245.5 million of stock on May 5 and May 17, 2022, through an SPO conducted by Hayward that consisted exclusively of stock owned by CCMP and AIMCO, and which was made pursuant to the false

30

and misleading May 2, 2022 Prospectus Supplement. AIMCo also sold 9.7 million shares of stock in the SPO. ¶213.

(3) Jones sold 44.5% of his stock for about $2 million—*outside* of his 10b5-1 trading plan—on June 17, 2022, after CCMP and AIMCo had the opportunity to unload stock, but a month before revealing the truth. ¶215.

The MTD does not mention *any* of the foregoing trades by CCMP and AIMCo.

Courts find a strong inference of scienter where, as here, "[d]efendants were motivated to commit fraud in order to inflate the Company's stock price," including "for purposes of profiting through [an] SPO." *E.g. Enzymotec*, 2015 WL 8784065, at *17; *Curran v. Freshpet, Inc.*, 2018 WL 394878 (D.N.J. Jan. 12, 2018) (motive to sell shares through an offering reaping $131 million supported scienter).

To assess whether insider sales are "unusual in scope or timing" and support scienter, courts consider: "the amount of profit made, the amount of stock traded, the portion of stockholdings sold, [and] the number of insiders involved." *E.g. In re Toronto-Dominion Bank Sec. Litig.*, 2018 WL 6381882, at *15 (D.N.J. Dec. 6, 2018). In applying these factors, all of which support scienter here, courts take into account sales by all Defendants and "insiders involved." *Id.*; *see e.g., In re Viropharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 473–74 (E.D. Pa. 2014) (scienter supported against all defendants based on insider sales from two insiders); *George v. China Auto. Sys., Inc.*, 2012 WL 3205062, at *10 (S.D.N.Y. Aug. 8, 2012) (insiders' "collective net profit" supported scienter).

***First***, the insider sales during the Class Period were enormous—totaling

31

nearly $544 million, with nearly $148.5 million in profits (¶¶)—and easily fall into the range that courts have deemed "massive by any measure." *E.g. In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 139-140 (S.D.N.Y. 1999) ($78 million in insider sales was "massive by any measure"); *Urb. Outfitters*, 103 F. Supp. 3d at 654 (profit of over $50 million from stock sale supported strong inference of scienter); *In re NIU Sec. Litig.*, 314 F. Supp. 2d 388, 411-12 (D.N.J. 2004) (motive and opportunity where insiders sold $37 million.)  Defendant CCMP's sales alone—$380 million, with over $106 million in illicit profits—are "massive" by themselves.  ¶214.  So too are the sales of $161.5 million, with $40 million in profits, for insider AIMCO, the smaller member of Hayward's ownership consortium with a seat on its Board. *Id.*  Jones' sale—$2 million in gross proceeds, with $425,000 in profits (¶215)—is also well above the level that courts find support scienter, particularly under the suspicious circumstance here.  *E.g., Ezymotec*, 2015 WL 8784065, at *19 (gross proceeds of $1.45 million supported scienter).

**Second,** CCMP, AIMCo, and Jones all sold a large percentage of their holdings, further supporting scienter.  *E.g. Enzymotec*, 2015 WL 8784065, at *19 (sales of 35% of holdings support scienter); *In re Suprema*, 438 F.3d 256, 278 (3d Cir. 2006) (sales of 31% of holdings).  Defendant CCMP's and AIMCo's sales set forth above accounted for 34% and 30% of their holdings respectively.  ¶214.  Further, after exercising an option to purchase Hayward shares at a pittance, Jones

32

immediately sold 45% of his holdings the month before revealing the truth. ¶215. (The impermissible factual assertion that Jones thereby made a tax sale is not supported by a shred of evidence, particularly not the general third-party handbook the MTD (at 32) submits as a prohibited exhibit). Further, CCMP and AIMCo's sales were unusually high compared to their earlier sales—during the Class Period, CCMP more than tripled it sales over the previous year, and AIMCo's sales more than doubled (¶¶45-47, 206, 208, 211-15)—evidencing their effort to trade at artificially inflated prices and supporting scienter. *E.g. In re Suprema*, 438 F.3d at 278 (scienter pled where insider sales "nearly doubled" profits from prior period).

*Third*, three insiders made these massive sales, they were among Hayward's most powerful operators, and they were only able to do so by utilizing Hayward's machinery to execute self-interested transactions like the favorable repurchases and the bespoke SPO, further establishing a concerted effort by and motive for all Defendants to artificially inflate Hayward's stock. Not only did all Defendants facilitate those transactions, but they all made misrepresentations that enabled the profitable outcome of those transactions. This included CCMP and MSD, whose executives were Hayward Directors, and who, along with the other Defendants, signed or approved multiple Hayward SEC filings containing misrepresentations, such as the registration statement that enabled CCMP to unload millions of Hayward shares at inflated prices in the SPO. *See* Plaintiff's Opp. to CCMP and MSD's MTD,

33

SoF.D. (incorporated herein by reference). Moreover, Holleran and Jones made the misrepresentations set forth above at §I.A while controlled by CCMP and MSD, which owned the vast bulk of Hayward's shares, dominated its Board, dominated the Compensation Committee that determined Holleran's and Jones' income, and placed both men as their proxies in the C-suite though neither had any experience in the pool industry. *Supra* SoF.A. Thus, Holleran and Jones were deeply beholden to CCMP and the consortium, motivated to support their hugely profitable insider trades, and compensated to do so. *See Set Cap. LLC v. Credit Suisse Grp., AG*, 996 F.3d 64, 81-82 (2d Cir. 2021) (motive and opportunity found where CEO was under "pressure" from company to allow manipulative securities transactions); *Stevelman v. Alias Rsch. Inc.*, 174 F.3d 79, 86 (2d Cir. 1999) (scienter pled based on all insider sales, including by defendants and non-defendants).

*Fourth*, the timing of the insider sales could not be more suspicious. The self-interested repurchase program locked in favorable prices for CCMP in March 2022, right after Defendants had to announce growth that they knew was declining and they were struggling to prop up. ¶¶125-27, 208. Likewise, Defendants arranged for the SPO to occur in May 2022, enabling CCMP and AIMCO to sell just days after Hayward announced unseasonably strong revenue due to those short run sales tactics, but not long before Hayward revealed massive performance declines when 2Q-2022 ended and Hayward's stock plummeted far below the price the insider sales

34

took place at.  ¶¶141-42, 209-10.  Jones's large sale outside his 10(b)(5)-1 trading plan took place in June 2022, after the consortium had a chance to unload, but one month before Hayward revealed its massive performance declines.  ¶¶180-81, 215.

### 2.    Defendants' Conscious Misbehavior or Recklessness

Numerous interlocking allegations confirm that Holleran and Jones knew of or had access to information contradicting their misrepresentations regarding channel inventory and demand, which is sufficient to establish scienter.  *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 599 (D.N.J. 2001).

***First***, at the end of the Class Period, Holleran admitted knowing that "***[w]e expected to sell less into the channel versus sellout***" in FY 2022 and that this was "***due to the strategic positions that many of our channel partners took at the end of 2021***."  ¶187 (July 28, 2022).  That is, Defendants knew the channel had adopted a deliberate strategy to reduce its inventory, indicated their position that it was too high, and conveyed this to Defendants in 2021.  *Id*.  Holleran also knew, in 2021, that channel demand was consequently dropping, and admitted that "when we set coming into the year, with last year's retail pull-through in front of us, ***we expected some moderation*** off a very, very high pull through the channel last year."  *Id*.  These admissions of knowledge show scienter.  *See City of Birmingham Firemen's and Policemen's Suppl. Pension Sys. v. Ryanair*, 2020 WL 2834857, at *3 (S.D.N.Y. 2020) (scienter pled where statement that unionization was no threat was

35

"impossible to reconcile" with later admission it was "long anticipated").

***Second***, Defendants admitted that they acquired this knowledge of the channel's deteriorating performance by personally tracking it. Holleran stated throughout the Class Period that he kept "***close tabs on***" channel inventory, had "***good insight from our large distributor partners***," and that Defendants had "***conversations***" with those partners to "***understand[] what they need[ed]***." ¶195. Jones, for his part, confirmed that "***we have good channel inventory knowledge***." *Id*. That Defendants tracked and acquired the foregoing knowledge is entirely logical, given that the channel accounted for 76% of Hayward's business. ¶41. *See e.g.*, *Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Swanson*, 2011 WL 2444675, at *12 (D. Del. June 14, 2011) (defendants' "'monitor[ing] [of] why advertisers reduce or cancel their programs'" supported scienter).

***Third***, the CWs corroborated that Hayward had data regarding the channel's deteriorating performance and its negative impact during the Class Period, that this data was conveyed to Defendants, and formed a basis for their knowledge and concern. For example, by late February 2022, channel cancellations had become so bad that Jones asked for reports on them, which CW3 prepared and provided to him, and which conveyed Hayward getting "hammered" by cancellations. ¶¶87-88. As cancellations drove up Hayward's stock of unsold products, CW3 provided Jones with related reports, showing that stock was ballooning. ¶91. Concurrently, in

36

February or March 2022, CW3 recounted that Jones raised concerns that Hayward's excess unsold products had reached $100 million. *Id.*

**Fourth**, Defendants also gained knowledge of the channel's poor performance from regular monthly meeting on Sales, Inventory and Operations Planning, which lasted several hours and covered those topics in depth, were chaired by Holleran, and were attended by Jones along with executives from across Hayward, including CW6. ¶¶99. CW6 recounted that topics like sales and inventory included what was "not selling" (*id.*), and during the Class Period Hayward was missing sales targets which concerned management, while the VP of Sales was regularly discussing Hayward's significant difficulties selling to oversaturated distributors. *Supra* SoF.C. On top of that, by August 2021, the Chief Supply Officer was expressing concern with the impact of the channel's large bubble of double orders from earlier in 2021, as CW3 recalled. ¶62. Accordingly, with regard to elevated channel inventory and stalling, CW6 stated that "if C-Suite did not know about it, it was gross incompetence . . . they had to know." ¶¶98-99. Courts have found scienter under identical circumstances. *In re Avon Sec. Litig.,* 2019 WL 6115349, at *20 (S.D.N.Y. Nov. 18, 2019) ("[e]ither Defendants received reports detailing the rising delinquency rate. . . [or] deliberately ignored" them).

**Fifth**, Defendants and management had access to large quantities of data enabling them to see how high the channel's inventory had grown and the negative

37

effect on sales to the channel, as CW1 and others recounted. ¶70. This data was stored on a business analytics database called Cognos, which from mid-2021 Hayward used to generate management-driven reports on what products were not selling and needed propping up with short-run tactics. *Id*. Hayward tracked other relevant key performance indicators too, including rejected orders (¶78), all of which support scienter. *Steamship Trade Ass'n of Baltimore-Int'l Longshoreman's Ass'n Pension Fund v. Olo Inc*., 2023 WL 4744197, at *6 (S.D.N.Y. July 25, 2023) ("information from confidential witnesses, that [defendants] had access to a particular software that 'track[ed]. . . key metrics'" pled scienter).

**Sixth**, the magnitude of the problem was so huge on issues Defendants tracked—$150 million in excess channel inventory and Hayward's own stock of unsold products skyrocketing—that it prompted a management-led, Company-wide response, evidencing their scienter. *E.g.*, *Urb. Outfitters*, 103 F. Supp. 3d at 653-54 (scienter pled where brand's "financial performance [wa]s critical" to company and "[a]s such, defendants would have been alerted" to its significant decline in sales). From mid-2021 on, management began applying pressure to "get product off the shelves" with a campaign of short-run sales tactics that involved sales, marketing and distribution; it directed pull aheads when Hayward was missing sales numbers; and it tried to have manufacturing slow down production due to dropping demand. *Supra* SoF.C. These significant problems and management's response reverberated

38

through the Company, where it was widely known during the Class Period that the "channel was stuffed," as CWs 1, 2, 4, 5 and 6 stated. ¶¶55, 59, 76, 95, 98-99.

*Seventh*, some of "the most powerful evidence of scienter" comes from "the content and context of the statements made by" Defendants. *Urb. Outfitters*, 103 F. Supp. 3d at 653. As an initial matter, here, the fact that Defendants addressed questions involving channel inventory and demand shows that they had knowledge of those topics (*supra* §1.A.1). *Id*. Further, that Defendants responded to those questions with "omission[s] of actual circumstances that were contrary to [Defendant's] answers"—including that the channel's inventory was highly elevated and demand stalling—"present[ed] an obvious risk of misleading investors," showing their intent to conceal Hayward's problems from investors. *Id*.

*In addition*, all of the CW statements are based on information received in the course of performing their duties, establishing their reliability. *E.g.*, *Toronto-Dominion*, 2018 WL 6381882, at *7; ¶91 (CW3 prepared reports for and spoke to Jones); ¶70 (CW1 used database with channel data available to Defendants to determine where to prop up sales); ¶99 (CW6 regularly attended sales and inventory meeting with Holleran and Jones). Further, the CWs observed the same facts, corroborated by Defendants' eventual admissions: Hayward had data and knew in 2021 that the channel was reducing demand due to excess inventory. *Id*. Nor do

39

CWs need to personally interact with Defendants to support scienter. *Id*. The MTD (at 35) tries to isolate each CW, and thereby sweep aside these determinative points.

### 3. A Holistic Analysis Defeats Any Non-Fraudulent Inference

During the Class Period, Defendants and a leading insider unloaded $544 million worth of stock through bespoke, self-interested transactions that were highly suspicious in their timing and compared to previous periods. They did so because Hayward was facing a crisis, still undisclosed to the market, and they had not yet had the opportunity to unload the bulk of their stock following Hayward's IPO the previous year. Specifically, as they eventually admitted and CWs confirmed, Defendants closely tracked the channel and knew in 2021 that it was saturated with enormous excess inventory, which was causing orders from the channel to stall. Thus Defendants propped up Hayward's revenue with pull aheads, misrepresented the channel's inventory and demand, and downplayed concerns regarding Hayward's business, long enough to enable the massive insider sales. Taken holistically, these allegations plead scienter, and there is no stronger allegation.

## II. DEFENDANTS VIOLATED SECTION 20(A)

As Jones and Holleran violated §10(b), they also violated §20(a).

### CONCLUSION

For the foregoing reasons, the MTD should be denied in full.

Dated:  July 2, 2024                         COHN LIFLAND PEARLMAN
                                             HERMAN & KNOPF LLP

40

 s/ *Matthew F. Gately*
Peter S. Pearlman
Matthew F. Gately
Park 80 West-Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, NJ  07663
Telephone: 201-845-9600
Facsimile:  201-845-9423
psp@njlawfirm.com

*Liaison Counsel*

SCOTT+SCOTT
ATTORNEYS AT LAW LLP
Max R. Schwartz
Donald A. Broggi
Susan Hu (*pro hac pending*)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY  10169
Telephone: 212-233-6444
Facsimile:  212-233-6334

SCOTT+SCOTT
ATTORNEYS AT LAW LLP
Cornelia Gordon
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile:  619-233-0508

*Lead Counsel for Lead Plaintiff and the Class*

41