Peter S. Pearlman
Matthew F. Gately
**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
Park 80 West-Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, NJ 07663
Telephone: 201-845-9600
Facsimile: 201-845-9423
psp@njlawfirm.com

*Counsel for Lead Plaintiff*
*Fulton County Employees' Retirement System*

*[Additional Counsel Appear on Signature Page]*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CITY OF SOUTHFIELD FIRE AND POLICE RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | Civil Action No. 2:23-cv-04146 |
| Plaintiff, | Hon. William J. Martini |
| v. | **PLAINTIFF'S CONSOLIDATED OPPOSITION TO CCMP CAPITAL ADVISORS, LP'S MOTION TO DISMISS AND MSD PARTNERS, L.P.'S MOTION TO DISMISS** |
| HAYWARD HOLDINGS, INC., KEVIN HOLLERAN, EIFION JONES, CCMP CAPITAL ADVISORS, LP, and MSD PARTNERS, L.P., | |
| Defendants. | |

# TABLE OF CONTENTS

PRELIMINARY STATEMENT.........................................................................................1

STATEMENT OF FACTS .............................................................................................4

    A.    CCMP and MSD Led a Consortium that Controlled Hayward for CCMP's and MSD's Mutual Profit ........................................................4

    B.    CCMP and MSD Appointed Hayward's CEO and CFO, Controlled Its Board and Actively Managed Its Affairs........................6

    C.    CCMP, MSD, and Hayward Have All Admitted that CCMP and MSD Control Hayward as a Group ........................................................9

    D.    CCMP and MSD Directed Hayward's Board to Approve Massive Insider Sales During the Class Period While the Hayward Defendants Artificially Inflated the Price of Hayward Stock .............11

ARGUMENT ...............................................................................................................14

I.    MOTION TO DISMISS STANDARD.........................................................14

II.    PLAINTIFF ADEQUATELY ALLEGES LIABILITY UNDER §20(a).......14

    A.    Legal Standard.................................................................................14

    B.    Plaintiff Has Adequately Pled a Primary Violation by the Hayward Defendants ..................................................................16

    C.    Plaintiff Has Adequately Pled that CCMP and MSD Controlled the Hayward Defendants ...................................................16

        1.    CCMP and MSD Signed the Misleading SEC Filings at Issues in This Case..................................................................17

        2.    CCMP and MSD Controlled the Shareholder Vote and Controlled Hayward's Board ....................................................18

        3.    Hayward Has Admitted that CCMP and MSD "Controlled" the Company and "Effectively Control[led] Its Business and Affairs.........................................................22

i

4.    Defendants' Arguments Ignore All of Plaintiff's Well-Pled Allegations of Control..................................................22

5.    Culpable Participation is not an Element of a Control Claim, But the Allegations Here Would Adequately Support It.......................................................................28

III.    PLAINTIFF ADEQUATELY ALLEGES LIABILITY UNDER § 10(b) ..............................................................................29

A.    CCMP and MSD Made False and Misleading Statements in Hayward's 2021 Form 10-K and Form S-3.........................29

B.    Plaintiff Alleges a Strong Inference of Scienter.................32

1.    The Massive Insider Trades Support Defendants' Motive and Opportunity to Commit Fraud...........................33

2.    CCMP and MSD's Control Over Hayward's Entire Business and Management and the Significance of Hayward's Problems Support a Strong Inference of Scienter...............................................................38

IV.    CONCLUSION.......................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Able Lab'ys Sec. Litig.*,
  2008 WL 1967509 (D.N.J. Mar. 24, 2008) ..................................................15, 28

*In re Alstom SA Sec. Litig.*,
  406 F. Supp. 2d 433 (S.D.N.Y. 2005) .................................................................27

*In re Am. Apparel, Inc. Shareholder Litig.*,
  2013 WL 10914316 (C.D. Cal. Aug. 8, 2013) .............................................20, 22

*In re Amgen Inc. Sec. Litig.*,
  544 F. Supp. 2d 1009 (C.D. Cal. 2008) ..............................................................17

*Barbee v. Amira Nature Foods, Ltd.*,
  2023 WL 4627744 (D.N.J. July 19, 2023) ..........................................................31

*In re BioScrip, Inc. Sec. Lit.*,
  95 F. Supp. 3d 711 (S.D.N.Y. 2015) ...................................................................29

*Bondholder Comm. v. Sauk Valley Student Hous., LLC*,
  2020 WL 5995617 (D.N.J. Oct. 9, 2020) ............................................................31

*In re Cambrex Corp. Sec. Litig.*,
  2005 WL 2840336 (D.N.J. Oct. 27, 2005) (Martini, J.)......................................28

*Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*,
  496 F. Supp. 3d 952 (E.D. Va. 2020) ..................................................................19

*In re Campbell Soup Co. Sec. Litig.*,
  145 F. Supp. 2d 574 (D.N.J. 2001)................................................................28, 38

*In re Cendant Corp. Litig.*,
  264 F.3d 201 (3d Cir. 2001) ................................................................................18

*Curran v. Freshpet, Inc.*,
  2018 WL 394878 (D.N.J. Jan. 12, 2018)..................................................33, 34, 38

*Dudley v. Haub*,
  2013 WL 1845519 (D.N.J. Apr. 30, 2013) (Martini, J.) ......................15, 28, 30

*In re: Enzymotec Sec. Litig.*,
    2015 WL 8784065 (D.N.J. Dec. 15, 2015)......................................................*passim*

*In re Flag Telecom Holdings Ltd. Sec. Litig.*,
    308 F. Supp. 2d 249 (S.D.N.Y. 2004) ............................................................27

*Fouad v. Isilon Sys., Inc.*,
    2008 WL 5412397 (W.D. Wash. Dec. 29, 2008) ..................................21, 26, 27

*George v. China Auto. Sys., Inc.*,
    2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012)...............................................34, 36

*In re Gupta Corp. Sec. Litig.*,
    900 F. Supp. 1217 (N.D. Cal. 1994)...............................................................27

*Harriman v. E.I. DuPont De Nemours & Co.*,
    372 F. Supp. 101 (D. Del. 1974)....................................................................19

*Institutional Invs. Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009) ..........................................................................33

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011)................................................................................17, 31

*Jones v. Intelli-Check, Inc.*,
    274 F. Supp. 2d 615 (D.N.J. 2003)..................................................................28

*Laven v. Flanagan*,
    695 F. Supp. 800 (D.N.J. 1988)......................................................................26

*In re Leslie Fay Cos., Inc. Sec. Litig.*,
    918 F. Supp. 749 (S.D.N.Y. 1996) ..................................................................17

*LLDVF, L.P. v. Dinicola*,
    2010 WL 3210613 (D.N.J. Aug. 12, 2010) ......................................................26

*In re Loewen Grp. Inc. Sec. Litig.*,
    2004 WL 1853137 (E.D. Pa. Aug. 18, 2004) ....................................................15

*Masterson v. Commonwealth Bankshares, Inc.*,
    2 F. Supp. 3d 824 (E.D. Va. 2014) ...........................................................18, 21

*In re Metro. Sec. Litig.*,
  532 F. Supp. 2d 1260 (E.D. Wash. 2007)............................................................28

*In re MicroStrategy, Inc. Sec. Litig.*,
  115 F. Supp. 2d 620 (E.D. Va. 2000) ...........................................................15, 36

*In re MobileMedia Sec. Litig.*,
  28 F. Supp. 2d 910 (D.N.J. 1998).........................................................................16

*In re Nat'l Media Sec. Litig.*,
  1994 WL 397398 (E.D. Pa. July 27,1994) .........................................................15

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
  320 F.3d 920 (9th Cir. 2003) ...................................................................19, 24, 40

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) .................................................................................40

*O'Sullivan v. Trident Microsys., Inc.*,
  1994 WL 124453 (N.D. Cal. Jan. 31, 1994).......................................................27

*Odeh v. Immunomedics, Inc.*,
  2020 WL 4381924 (D.N.J. July 31, 2020) ..........................................................31

*In re Oppenheimer Rochester Funds Grp. Sec. Litig.*,
  838 F. Supp. 2d 1148 (D. Colo. 2012)..................................................................17

*In re Oxford Health Plans, Inc.*,
  187 F.R.D. 133 (S.D.N.Y. 1999)...........................................................................36

*P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*,
  142 F. Supp. 2d 589 (D.N.J. 2001).......................................................................15

*Palladin Partners v. Gaon*,
  2006 WL 2460650 (D.N.J. Aug. 22, 2006) (Martini, J.)............................*passim*

*In re Parmalat Sec. Litig.*,
  414 F. Supp. 2d 428 (S.D.N.Y. 2006) ..................................................................15

*Pathfinder Mgmt. Inc. v. Mayne Pharma Pty.*,
  2008 WL 3192563 (D.N.J., Aug. 5, 2008) (Martini, J.)......................................32

*In re Philip Servs. Corp. Sec. Litig.*,
  383 F. Supp. 2d 463 (S.D.N.Y. 2004) .................................................................17

*Phillips v. Cnty. of Allegheny*,
  515 F.3d 224 (3d Cir. 2008) ...............................................................................14

*Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*,
  2019 WL 2360942 (S.D.N.Y. Mar. 4, 2019)......................................................32

*United States ex rel. Rahimi v. Zydus Pharms. (USA), Inc.*,
  2017 WL 1503986 (D.N.J. Apr. 26, 2017)..........................................................30

*In re Reliance Sec. Litig.*,
  135 F. Supp. 2d 480 (D. Del. 2001).....................................................................21

*Ret. Sys. v. Chubb Corp.*,
  394 F.3d 126 (3d Cir. 2004) ...............................................................................30

*Ret. Sys. v. Energy Transfer LP*,
  532 F. Supp. 3d 189 (E.D. Pa. 2021).............................................................18, 30

*Ret. Sys. v. EnergySolutions, Inc.*,
  814 F. Supp. 2d 395 (S.D.N.Y. 2011) .................................................................31

*Rocker Mgmt., L.L.C. v. Lernout & Hauspie Speech Prod. N.V.*,
  2005 WL 1365465 (D.N.J. June 7, 2005).......................................................15, 16

*In re Royal Dutch/Shell Transp. Sec. Litig.*,
  380 F. Supp. 2d 509 (D.N.J. 2005)...................................................................8, 15

*Sheehan v. Little Switzerland, Inc.*,
  136 F. Supp. 2d 301 (D. Del. 2001)................................................................18, 29

*In re Smith Barney Transfer Agent Litig.*,
  884 F. Supp. 2d 152 (S.D.N.Y. 2012) .................................................................31

*Steamfitters Loc. 449 Pension Fund v. Alter*,
  2011 WL 4528385 (E.D. Pa. Sep. 30, 2011).......................................................30

*Stevelman v. Alias Rsch. Inc.*,
  174 F.3d 79 (2d Cir. 1999) .................................................................................34

*In re Tel–Save Sec. Litig.*,
  1999 WL 999427 (E.D. Pa. Oct. 19, 1999) ........................................................38

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007)...................................................................................14, 32, 33

*Thomas v. Magnachip Semiconductor Corp.*,
  167 F. Supp. 3d 1029 (N.D. Cal. 2016)........................................................22, 27

*In re Toronto-Dominion Bank Sec. Litig.*,
  2018 WL 6381882 (D.N.J. Dec. 6, 2018).....................................................34, 37

*In re U.S. Interactive, Inc. Sec. Litig.*,
  2002 WL 1971252 (E.D. Pa. Aug. 23, 2002) ....................................................15

*United States Sec. & Exch. Comm'n v. Place*,
  2019 WL 634638 (E.D. Pa. Feb. 14, 2019) ........................................................30

*Universal Am. Corp. v. Partners Healthcare Sols. Holdings, L.P.*,
  176 F. Supp. 3d 387 (D. Del. 2016)....................................................................31

*In re Urb. Outfitters, Inc. Sec. Litig.*,
  103 F. Supp. 3d 635 (E.D. Pa. 2015).............................................................36, 39

*In re UTStarcom, Inc. Sec. Litig.*,
  617 F. Supp. 2d 964 (N.D. Cal. 2009)..........................................................22, 27

*In re Viropharma Inc. Sec. Litig.*,
  21 F. Supp. 3d 458 (E.D. Pa. 2014).....................................................................34

*In re Xerox Corp. Sec. Litig.*,
  165 F. Supp. 2d 208 (D. Conn. 2001)..................................................................29

**Statutes**

15 U.S.C. §78t(a) .........................................................................................................15

**Rules**

17 C.F.R. §230.405 .....................................................................................................19

17 C.F.R. §240.10b-5...................................................................................................16

17 C.F.R. §240.13d-5(b)(1) .........................................................................................24

Fed. R. Civ. P. 9(b) ...............................................................................................30

**Other Authorities**

Modernization of Beneficial Ownership Reporting,
  80 Fed. Reg. 768896 (Nov. 7, 2023) ................................................................25

SEC Compliance and Disclosure Interpretations (Oct. 7, 2022),
  https://www.sec.gov/divisions/corpfin/guidance/reg13d-interp.htm ................24

Lead Plaintiff City of Southfield Fire and Police Retirement System ("Plaintiff") respectfully submits this Consolidated Opposition to the Motions to Dismiss and accompanying briefs in support thereof filed by Defendants CCMP Capital Advisors, LP ("CCMP") (ECF No. 67-1 ("CCMP Br.")) and MSD Partners, L.P. ("MSD") (ECF No. 66-1 ("MSD Br.")).

## PRELIMINARY STATEMENT

This securities class action involves false and misleading statements that were made by Hayward Holdings, Inc. ("Hayward" or the "Company"), its CEO Kevin Holleran and CFO Eifion Jones (collectively, the "Hayward Defendants"), and Hayward's controlling shareholders, CCMP and MSD, between October 27, 2021 and July 28, 2022 (the "Class Period").

CCMP and MSD are investment management firms that acquired Hayward together in order to cash out later at an enormous profit of hundreds of millions of dollars. Throughout the Class Period, CCMP and MSD wielded extraordinary power over Hayward and coordinated their actions to ensure that they had maximum control over the Company, its executive officers, its business affairs and decisions. CCMP and MSD replaced Hayward's CEO and CFO with their hand-picked officers, Kevin Holleran and Eifion Jones; led a small consortium of entities to maintain shareholder control over Hayward and majority control over Hayward's Board of Directors ("Board"); controlled the entire membership of Hayward's Board by

controlling director nominations and votes; and sat on committees that reviewed Hayward's annual and quarterly financial statements and oversaw compensation for its executive officers.  Further, Hayward has admitted in multiple SEC filings that CCMP and MSD had "significant influence" and "control of the Company."

During the Class Period and while under CCMP and MSD's control, the Hayward Defendants made a series of false and misleading statements to its investors concealing problems that were central to Hayward's business: Demand for Hayward's pool products was dropping significantly because Hayward's primary customers, its channel distributors, had saturated their inventory levels following the start of the Covid pandemic, and, by mid-2021, Hayward had substantial difficulty selling to the channel.  CCMP and MSD were well aware of these issues by virtue of their status as Hayward's largest shareholders and their positions of oversight over Hayward's entire business.  Nevertheless, CCMP sold $380 million worth of Hayward stock during the Class Period at prices inflated by the fraud.

Against CCMP and MSD, Plaintiff alleges "control person" claims under Section 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78a, et seq., for the misstatements made by the Hayward Defendants while under CCMP and MSD's control.  Not only were they the controlling shareholders of Hayward, CCMP and MSD controlled almost every aspect of Hayward's business and, furthermore, signed filings with the United States Securities and Exchange

2

Commission ("SEC") that contained allegedly misleading statements. CCMP and MSD also used their control to direct Hayward to conduct a secondary offering, enabling CCMP to dump millions of Hayward shares for proceeds of nearly $250 million. These allegations more than satisfy the pleading standard for control enunciated by this Court and courts across the country.

Plaintiff also alleges claims under Section 10(b) of the Exchange Act against CCMP and MSD for their own misleading statements and omissions in Hayward's 2021 SEC Form 10-K and in the registration statement used by CCMP to sell millions of shares of inflated Hayward stock in the secondary offering. These documents, which were signed by directors from both CCMP and MSD, were false and misleading because they discussed hypothetical risks that had already materialized into substantial problems negatively impacting Hayward's core business, and which were being monitored by Hayward's top executives. Given their significant level of control and involvement over Hayward's business and management, and their duties and responsibilities on Hayward's Board, CCMP and MSD knew these statements were false and misleading. In combination with CCMP's suspiciously-timed sales of massive amounts of Hayward stock shortly before the truth was revealed, these facts raise a strong inference of scienter.

For the reasons set forth herein, CCMP and MSD's motions to dismiss Plaintiff's claims should be denied in full.

3

**STATEMENT OF FACTS**

A.    **CCMP and MSD Led a Consortium that Controlled Hayward for CCMP's and MSD's Mutual Profit**

Before and during the Class Period, CCMP and MSD worked together to control Hayward. The goal of this alliance was to maximize CCMP's and MSD's profits on their investment in the Company.

CCMP[1] and MSD are investment management firms that acquire private companies and sell them later when they can get a mark-up. ¶¶27-28.[2] In 2017,

---

[1]    For purposes of this Opposition, "CCMP" refers to CCMP Capital Advisors, LP ("CCMP Advisors") and all affiliated CCMP entities that beneficially owned Hayward stock. CCMP Advisors argues that Plaintiff's claims against it should be dismissed because, purportedly, it merely advised the investment funds that purchased Hayward stock. *See* CCMP Br. at 7. But Plaintiff's allegations against it are entirely proper. When it suits their purposes, Defendants treat all CCMP entities as a single entity. For example, in its IPO Prospectus filed with the SEC, the only CCMP entity that Hayward identifies by name is CCMP Advisors. *See* IPO Prospectus at 18 ("We were acquired by entities affiliated with CCMP Capital Advisors, LP," MSD, and AIMCo). While additional CCMP entities are named as stockholders in a footnote, correspondence to each of these entities is directed to CCMP Advisors. *See id.* at 136. Plaintiff maintains that CCMP Advisors is a proper party to this action, but requests leave to amend the caption to add related CCMP entities if the Court deems it appropriate.

[2]    Citations to "¶__" are to paragraphs of the Consolidated Class Action Complaint ("CAC") (ECF No. 41). Unless otherwise stated, all emphases in quoted materials are added; internal quotations and citations are omitted. Citations to "Ex. _" refer to exhibits attached to the Declaration of Matthew F. Gately in Support of Plaintiff's Opposition to CCMP and MSD's Motions to Dismiss. Citations to "Parker Ex. _" refer to exhibits attached to the Declaration of Scott W. Parker in Support of CCMP's Motion to Dismiss (ECF No. 67). Citations to "McDonough Ex. _" refer to exhibits attached to the Declaration of Kevin M. McDonough in Support of the Hayward Defendants' Motion to Dismiss (ECF No. 68).

CCMP and MSD formed a consortium that also included Alberta Investment Management ("AIMCo") to buy Hayward Industries Inc. ¶35. Led by CCMP and MSD, the consortium formed a holding company expressly for the acquisition. *See* Hayward Holdings, Inc. Amended and Restated Stockholders' Agreement ("ARSA"), Parker Ex. 8 (ECF No. 67-10) at 1 ("[T]he Company [Hayward] was formed by the Investors for the purpose of acquiring Hayward Industries, Inc. . . .").

From the day of the acquisition, CCMP and MSD controlled Hayward. The consortium owned 95.8% of the Company's shares, allowing it to dominate the Company's Board of Directors and dictate its policies. CCMP and MSD each owned 38.1% of the Company, or approximately 80 million shares. AIMCo, a minority shareholder with a subordinate role in the consortium, owned 19.6%, or approximately 41 million shares. ¶¶31, 47.

In March of 2021, after Hayward's revenue surged due to Covid-driven demand for pool supplies, CCMP and MSD arranged for Hayward to conduct an IPO. ¶¶43-45. CCMP, MSD, and AIMCo each sold 10.4% of their holdings in the IPO, with CCMP and MSD each selling over 8.3 million shares and AIMCo selling nearly 4.3 million shares. ¶¶45-47. Together, CCMP and MSD made over $267 million while AIMCo made over $72.6 million. *Id.* The shares sold by CCMP and MSD accounted for nearly 40% of the total amount of Hayward stock sold in the IPO. ¶45. After the IPO, the consortium continued to hold a 78% stake in Hayward.

5

¶47.  CCMP and MSD each held a 31% interest in the company with 71.5 million shares each, while AIMCo held a 15.9% interest with 36.7 million shares.  *Id.*

After the IPO, CCMP and MSD together held a majority 62% ownership stake in Hayward.  *Id.*  They agreed to coordinate voting to ensure majority shareholder control over Hayward, and maintained their majority voting control throughout the Class Period.  ¶¶29, 30.

As part of that coordination, CCMP and MSD entered into an Amended and Restated Stockholders' Agreement ("Stockholders' Agreement" or "Agreement") in which they and AIMCo "agreed" to "act together with respect to their Stockholder shares," and to "provide reasonable advance notice and consult with the other Investors prior to" any share sales.  ¶31; ARSA, Parker Ex. 8 at 14, 15.  In addition, the Agreement provided that CCMP and MSD would provide each other with notice of intent to sell any Hayward stock.  ARSA, Parker Ex. 8 at 14.

### B.    CCMP and MSD Appointed Hayward's CEO and CFO, Controlled Its Board and Actively Managed Its Affairs

CCMP and MSD exercised near-total control over Hayward during the Class Period.  ¶32.  To ensure their control, CCMP and MSD replaced Hayward's CEO and CFO with their own hand-picked agents, Kevin Holleran ("Holleran") and Eifion Jones ("Jones").  ¶¶32, 36.  CCMP and MSD also installed their own employees on Hayward's Board of Directors and director committees, securing their control over the Company's management and its decisions.  ¶37.

6

By Hayward's own admission, its Board did "not have a majority of independent directors."  ¶32; Hayward Holdings, Inc. IPO Prospectus ("IPO Prospectus"), Ex. 1 at 51.  The Board consisted of 12 to 13 directors, and the consortium led by CCMP and MSD maintained a seven-person majority at all relevant times, giving them control.  ¶¶31-32.  During the Class Period, nine consortium representatives served on Hayward's Board: Greg Brenneman (Executive Chairman of CCMP), Timothy Walsh (President and CEO of CCMP); Mark McFadden (Managing Director of CCMP); Christopher Stevenson (Principal of CCMP); Kevin Brown (Co-Head of MSD's Private Capital Group); Christopher Bertrand (Managing Director of MSD's Private Capital Group); Douglas Londal (Partner at MSD); Ali Afraz (Director of Private Equity at Mubadala Capital and affiliated with CCMP, MSD, and AIMCo), and Jason Peters (Director of Private Equity at AIMCo).  ¶¶32, 37 n.2; IPO Prospectus, Ex. 1 at 110, 112-13.  Further, CCMP and MSD also controlled the composition of the entire Board because CCMP President and CEO Timothy Walsh chaired Hayward's Nominating and Corporate Governance Committee, which selected director candidates, *see* IPO Prospectus, Ex. 1 at 116, and CCMP and MSD controlled the votes for director elections through its majority voting power.  *See infra* § SoF.C (admitting "more than 50% of the voting power in the election of our directors" was held by a group, *i.e.* CCMP and MSD).

Through Hayward's Board, CCMP and MSD oversaw and actively

7

participated in the Company's business and management decisions. The Board was directly "responsible" for the "supervision and oversight" of Hayward's "business affairs," and was also responsible for "oversee[ing] management." ¶33; IPO Prospectus, Ex. 1 at 51.[3] Executives from CCMP and MSD also served on three Board committees that oversaw many aspects of Hayward's business. *See* IPO Prospectus, Ex. 1 at 115-16. As noted above, the President and CEO of CCMP chaired Hayward's Nominating and Corporate Governance Committee. *Id.* Hayward's Compensation Committee, which was responsible for recommending and approving compensation plans for Holleran and Jones, was also controlled by Defendants, with CCMP's McFadden and MSD's Brown both serving on the three-person committee, and McFadden serving as chairperson. *See id*.[4] Through their membership on the Board and control over the Compensation Committee, CCMP and MSD wielded a significant amount of power over the corporate officers they selected to manage Hayward, including Holleran and Jones.

MSD Managing Director Christopher Bertrand sat on Hayward's Audit

---

[3] The Court may take judicial notice of "public documents quoted by, relied upon, incorporated by reference or otherwise integral to the complaint" in considering a motion to dismiss. *In re Royal Dutch/Shell Transp. Sec. Litig.*, 380 F. Supp. 2d 509, 552 (D.N.J. 2005).

[4] Hayward's Compensation Committee "reviews and recommends to our Board of Directors compensation plans, policies, and programs and approves specific compensation levels for all executive officers." IPO Prospectus, Ex. 1 at 116.

Committee, which was responsible for "review[ing] and discuss[ing] with management" the Company's audited and unaudited annual and quarterly financial statements, the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and "any significant financial reporting issues and judgments made in connection with the preparation of [Hayward's] financial statements." *Id.* at 115.

### C. CCMP, MSD, and Hayward Have All Admitted that CCMP and MSD Control Hayward as a Group

CCMP, MSD and Hayward have admitted multiple times in filings with the SEC and in their own Stockholders' Agreement that they are coordinating with each other as a stockholder "***group***." *See* ARSA, Parker Ex. 8 at 15 (stating agreement "to act together with respect to their Stockholder Shares"). CCMP, MSD, and Hayward have also all admitted in SEC filings that CCMP and MSD have majority shareholder control over Hayward.

For example, on February 9, 2022, CCMP admitted:

> By virtue of the Stockholders' Agreement, the CCMP Investors, MSD and AIMCo ***may be deemed to be members of a group*** for the purposes of 13(d) of the Securities Exchange Act of 1934. Based in part on information provided by the Issuer [Hayward], ***such a "group" would be deemed to beneficially own an aggregate of 179,852,865 shares of Common Stock, representing approximately 76.9% of the Common Stock*** of the Issuer outstanding, as of December 31, 2021.

Feb. 8, 2022, Schedule 13G filed by CCMP ("CCMP 13G/A"), Ex. 2 at 9. Likewise, MSD "acknowledge[d] and agree[d]" on March 21, 2022 that it was acting as a

9

single group with CCMP and AIMCo and had control of a majority of Hayward's shares. *See* Mar. 21, 2022, Schedule 13G filed by MSD ("MSD 13G"), Ex. 3 at 4. Similarly, Hayward has admitted that it was a "controlled company" under the New York Stock Exchange because "more than 50% of the voting power in the election of our directors" was held by a group, *i.e.*, CCMP and MSD. IPO Prospectus, Ex. 1 at 51 (explaining that after IPO, "***the Sponsors will collectively control a majority of the voting power of shares eligible to vote in the election of our directors***.").

Hayward has also admitted in *no less than three SEC filings* that CCMP and MSD had "significant influence" and "control of the Company" during the Class Period:

> ***For as long as affiliates of our Sponsors continue to beneficially own a substantial percentage of the voting power of our outstanding common stock, they will continue to have significant influence over us. For example, they will be able to strongly influence or effectively control the election of all of the members of our Board of Directors and our business and affairs,*** including any determinations with respect to mergers or other business combinations, the acquisition or disposition of assets, the incurrence of additional indebtedness, the issuance of any additional shares of common stock or other equity securities, the repurchase or redemption of shares of our common stock and the payment of dividends. ***This concentration of ownership may have the effect of deterring, delaying, or preventing a change of control of the Company,*** could deprive our stockholders of an opportunity to receive a premium for their common stock as part of a sale of the Company and might ultimately affect the market price of our common stock.

2021 Form 10-K, McDonough Ex. 16 (ECF No. 68-21) at 36; *see also* Hayward Holdings, Inc. SPO Prospectus Supplement ("SPO Prospectus Supp."), *id.* Ex. 24

10

(ECF No. 68-29) at 19; IPO Prospectus, Ex. 1 at 46.

> **D.      CCMP and MSD Directed Hayward's Board to Approve Massive Insider Sales During the Class Period While the Hayward Defendants Artificially Inflated the Price of Hayward Stock**

During the Class Period, Hayward faced overwhelming problems due to a massive channel inventory overhang, double orders, cancellations that were undercutting sales, the Company's own ballooning stock of unsold products.[5]  As described *infra* in Section III.B.2, these problems were significant and went to the core of Hayward's business, and were well-known to Holleran and Jones as well as the rest of Hayward's management.  While the Company was experiencing stalling demand and struggling with large order cancellations, Holleran and Jones, who were installed by CCMP and MSD and whose compensation was set by CCMP and MSD, made a series of misstatements to the public that concealed the serious issues Hayward was facing.  *See* Opp. to Hayward's MTD §I.A.1.

CCMP and MSD also made misrepresentations concealing Hayward's problems in public disclosures filed with the SEC during the Class Period.  The filings included Hayward's 2021 annual financial report (the "2021 Form 10-K"), filed March 9, 2022, and a shelf registration form (the "Form S-3") filed in connection with a secondary public offering ("SPO") from Hayward on May 2,

---

[5]      Plaintiff incorporates by reference its Opposition to the Hayward Defendants' Motion to Dismiss ("Opp. to Hayward's MTD") as if set forth herein.

2022. ¶¶129, 148.  Both documents contained false and misleading "Risk Factors" regarding purportedly hypothetical risks that had already materialized.  ¶¶129, 150.

Five directors from CCMP and MSD and two directors affiliated with CCMP and MSD signed the false and misleading Form 10-K and Form S-3, including CCMP Executive Chairman Greg Brenneman; CCMP President and CEO Timothy Walsh; and MSD Managing Director Christopher Bertrand, who was a member of Hayward's Audit Committee.  *See* 2021 Form 10-K, McDonough Ex. 16 at 41-42; Form S-3, *id.* Ex. 22 (ECF No. 68-27) at 24-25.[6]  In addition, Bertrand reviewed and approved all other financial statements and disclosures containing alleged misstatements that were published during the Class Period.  These included, among others, Hayward's Form 10-Q for 3Q-2021, filed on October 27, 2021, containing false and misleading "Risk Factors," and Hayward's May 2, 2022 Prospectus Supplement, which falsely stated that Hayward had a "robust backlog" with current demand exceeding its ability to supply new products.  ¶¶109, 148-49.

Throughout the Class Period, while CCMP, MSD, and Hayward propped up the price of Hayward's stock with their misstatements, CCMP sold off more than

---

[6]    Kevin Brown of MSD, Mark McFadden of CCMP, Jason Peters of AIMCo, and Ali Afraz also signed both documents.  AIMCo was entitled to one Board seat, which Peters occupied, while CCMP and MSD were entitled to six.  ¶31.  While Afraz's specific affiliation was not disclosed in the IPO Prospectus, he occupied one of CCMP and MSD's Board seats.  *See id.*

12

34% of its holdings in Hayward, with full knowledge and coordination from MSD. ¶¶30, 214; ARSA, Parker Decl. (ECF No. 67-2) at 14, 15.

Using their control over Hayward, CCMP and MSD directed the Board to approve stock sales at inflated prices, making CCMP (as well as AIMCo) hundreds of millions of dollars in profits. ¶34. First, in January 2022, CCMP and MSD directed Hayward to repurchase 4.08 million shares from CCMP. ¶208. This transaction occurred on March 11, 2022, six days after CCMP and MSD signed Hayward's 2021 Form 10-K, and allowed CCMP to sell to Hayward at a share price $3 higher than the prevailing market price, netting CCMP $80.8 million. *Id.*

Second, CCMP and MSD directed Hayward to conduct an SPO, enabling CCMP and AIMCo to offload 27.3 million inflated shares. ¶¶209-13. In two days on May 5 and May 17, CCMP dumped 17.6 million shares pursuant to the SPO, making approximately $245.5 million. ¶¶211-12. In addition to the sales that required Board approval, CCMP sold 2.7 million shares for roughly $53.4 million. ¶¶205-06. The May 5th sale occurred just three days after CCMP and MSD signed the shelf registration statement, and about a week after Hayward confirmed its false and misleading guidance showing growth for FY 2022; but not long after the SPO, Hayward admitted its FY 2022 revenue would actually decrease. ¶¶141-42, 148, 182.

All told, CCMP made approximately $380 million by selling 25.1 million Hayward shares—about 34% of its holdings—at prices significantly above the

13

$11.21 share price at the end of the Class Period.  ¶101.  As discussed further below, through these sales, CCMP made more than $106 million in illicit profits.

**ARGUMENT**

## I.    MOTION TO DISMISS STANDARD

On a motion to dismiss, the Court must consider the Complaint in its entirety, accept all well-pleaded allegations as true and draw all reasonable inferences in favor of plaintiff.  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-23 (2007).  Dismissal is inappropriate even where "it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits."  *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).

## II.    PLAINTIFF ADEQUATELY ALLEGES LIABILITY UNDER §20(a)

During the Class Period, Hayward, its CEO and CFO made numerous misrepresentations concealing the Company's substantial problems.  *See* Opp. to Hayward's MTD, §I.A.  CCMP and MSD are liable under §20(a) of the Exchange Act for those violations, as they exercised control over the Hayward Defendants.

### A.    Legal Standard

Section 20(a) of the Exchange Act imposes liability on those who "directly or indirectly" control a primary violator of the federal securities laws.  15 U.S.C. §78t(a).  To state a claim under §20(a), a plaintiff must allege (1) a primary violation by a controlled person or entity; and (2) "circumstances establishing control" over

14

the primary violator.  *Dudley v. Haub*, 2013 WL 1845519, at *20 (D.N.J. Apr. 30, 2013) (Martini, J.).  So long as the allegations "support a reasonable inference that [defendants] had the potential to influence and direct the activities of the primary violator," Plaintiff's §20(a) claim will survive a motion to dismiss.  *Palladin Partners v. Gaon*, 2006 WL 2460650, at *16 (D.N.J. Aug. 22, 2006) (Martini, J.) (quoting *In re Loewen Grp. Inc. Sec. Litig.*, 2004 WL 1853137, at *26 (E.D. Pa. Aug. 18, 2004)).[7]

Whether defendants are controlling persons is a "question of fact which cannot ordinarily be resolved at the pleading stage," *In re Nat'l Media Sec. Litig.*, 1994 WL 397398, at *5 (E.D. Pa. July 27, 1994), and dismissal is appropriate only when "a plaintiff does not plead *any facts* from which it can be reasonably inferred the defendant was a control person."  *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 661 (E.D. Va. 2000). *See also P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*, 142 F. Supp. 2d 589 (D.N.J. 2001) ("[T]he ultimate determination of whether defendants were controlling persons involves questions of fact to be resolved by the factfinder.").

---

[7]    *See also In re Royal Dutch/Shell*, 380 F. Supp. 2d at 565; *In re Able Lab'ys Sec. Litig.*, 2008 WL 1967509, at *28 (D.N.J. Mar. 24, 2008); *Rocker Mgmt., L.L.C. v. Lernout & Hauspie Speech Prod. N.V.*, 2005 WL 1365465, at *14 (D.N.J. June 7, 2005); *In re U.S. Interactive, Inc. Sec. Litig.*, 2002 WL 1971252, at *20 (E.D. Pa. Aug. 23, 2002); *In re Parmalat Sec. Litig.*, 414 F. Supp. 2d 428, 440 (S.D.N.Y. 2006).

**B.    Plaintiff Has Adequately Pled a Primary Violation by the Hayward Defendants**

As set forth in Plaintiff's Opposition to the Hayward Defendants' Motion to Dismiss, Plaintiff has sufficiently alleged a primary violation of Rule 10b-5 by the Hayward Defendants.  Accordingly, Plaintiff satisfies the first element of its §20(a) claim.  *E.g. Rocker Mgmt., L.L.C.*, 2005 WL 1365465, at *15 (plaintiffs' §20(a) claims against individual defendants survived dismissal where plaintiffs alleged that defendants exercised control over a non-party company that was involved in fraud); *In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 910, 940 (D.N.J. 1998).

**C.    Plaintiff Has Adequately Pled that CCMP and MSD Controlled the Hayward Defendants**

CCMP and MSD's control over Hayward cannot be seriously disputed.  First, CCMP and MSD directors on Hayward's Board signed at least two false and misleading SEC filings, which qualifies CCMP and MSD as control persons under this Court's precedent.  Second, not only were CCMP and MSD Hayward's controlling shareholders, they controlled Hayward's Board and sat on subcommittees that supervised various aspects of Hayward's business and members of its management, including Holleran and Jones.  Finally, Hayward itself has admitted in numerous SEC filings that its controlling shareholders, CCMP and MSD, had "significant influence" and "control over the Company" and "effectively control[led]" Hayward's Board members and "our business affairs."  The case law

16

is absolutely clear that these allegations are more than sufficient to show CCMP and MSD's "potential to influence and direct" Hayward.

### 1. CCMP and MSD Signed the Misleading SEC Filings at Issues in This Case

*First*, this Court, and many other courts, have held that a plaintiff may plead control under §20(a) by alleging that an individual director signed SEC filings. *See Palladin,* 2006 WL 2460650, at *16 (finding control well-pled where plaintiff alleged that defendants served as directors and "signed SEC filings at issue in this case."); *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1037 (C.D. Cal. 2008) ("[A]n officer or director who has signed financial statements containing materially false or misleading statements qualifies as a control person."); *In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 485 (S.D.N.Y. 2004) (allegations that directors signed misleading registration statement were sufficient to show control).[8]

---

[8]     *See also In re Oppenheimer Rochester Funds Grp. Sec. Litig*., 838 F. Supp. 2d 1148, 1182 (D. Colo. 2012) ("Defendants' authority to sign or not sign the registration statements at issue is sufficient indicia of 'control' over the representations and disclosures that went out to potential investors to support 'control person' liability at the pleading stage"); *In re Leslie Fay Cos., Inc. Sec. Litig.*, 918 F. Supp. 749, 763–64 (S.D.N.Y. 1996) (signing of fraudulent SEC filings sufficient for "[actual] control"); *Masterson v. Commonwealth Bankshares, Inc.*, 2 F. Supp. 3d 824, 832-33 (E.D. Va. 2014) (control liability found where outside directors on board committees "signed at least two financial statements alleged to have been fraudulent"); *Sheehan v. Little Switzerland, Inc.*, 136 F. Supp. 2d 301, 315 (D. Del. 2001) (allegations sufficient where former officers and directors each signed an SEC filing containing alleged omissions).

17

Plaintiff has satisfied this test by alleging that seven directors affiliated with CCMP and MSD signed two of Hayward's misleading SEC filings at issue in this case: Hayward's 2021 10-K, and Hayward's Form S-3 filed in connection with its SPO—through which CCMP alone netted $245.5 million in profit from stock sales. ¶¶129, 150; 2021 Form 10-K, McDonough Ex. 16 at 41-42; Form S-3, *id.* Ex. 22 at 24-25; *see also infra* §III.B.1. As a member of the Audit Committee, MSD Managing Director Chris Bertrand also reviewed and approved other misleading SEC filings, including Hayward's Form 10Q for 3Q-2021 and the May 2, 2022 Prospectus Supplement. ¶¶109, 148-49. These allegations are all that is required to.[9] Defendants do not even attempt to explain why this Court's holding in *Palladin* or other similar holdings do not apply here.

### 2.    *CCMP and MSD Controlled the Shareholder Vote and Controlled Hayward's Board*

*Second*, CCMP and MSD's share ownership and membership on the Board gave them the "potential to influence and direct" Hayward. *See* 17 C.F.R. §230.405

---

[9]    Defendants do not dispute that the actions of CCMP and MSD executives on Hayward's Board are imputed to CCMP and MSD. *See In re Cendant Corp. Litig.*, 264 F.3d 201, 238 (3d Cir. 2001) ("[A] corporation can speak and act only through its agents and so must be accountable for any acts committed by one of its agents within his actual or apparent scope of authority and while transacting corporate business."); *Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 234 (E.D. Pa. 2021) (statements made by individuals may be imputed to the corporation because "a corporation is liable for statements by employees who have apparent authority to make them.").

18

(stating that "control" may be shown *through the ownership of voting securities*").

CCMP and MSD were Hayward's controlling shareholders and seven executives affiliated with CCMP or MSD sat on the Board, including both CCMP's President & CEO and its Executive Chairman.  ¶¶29-32.  Courts find these circumstances sufficient to plead control.  *See No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945–46 (9th Cir. 2003) ("*America West*") (allegations that two outside entities that together controlled approximately 57.4% of company's total voting power, had the power to elect a majority of company's directors and committees established by the Board, and had some of their own officers seated on the Board were sufficient to show that they were "controlling persons"); *Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*, 496 F. Supp. 3d 952, 973 (E.D. Va. 2020) (allegations that defendant was majority shareholder with two members on company's board were sufficient to plead liability under §20(a)); *Harriman v. E.I. DuPont De Nemours & Co.*, 372 F. Supp. 101, 106 (D. Del. 1974) (refusing to dismiss a §20(a) claim against company that owned over 50% of corporation's common stock).

But Plaintiff's allegations of control go further, describing in detail how CCMP and MSD controlled Hayward's entire business and management, including those who engaged in fraud, particularly through the positions they held on the Board.  Significantly, Hayward itself has admitted that CCMP and MSD were able

19

to "***effectively control the election of all of the members of our Board of Directors and our business and affairs***."  2021 Form 10-K, McDonough Ex. 16 at 36.  Not only did CCMP and MSD hold a majority of the Board seats, CCMP's Walsh chaired the Nominating and Corporate Governance Committee, which nominated directors to the Board, and CCMP and MSD controlled the shareholder vote, which voted on those nominations.  MSD's Bertrand also sat on the Audit Committee, which reviewed and approved all of Hayward's financial statements.  CCMP and MSD had particular control over Defendants Holleran and Jones: Not only did they install Holleran and Jones as CEO and CFO of Hayward, CCMP's McFadden and MSD's Brown controlled the committee that determined Holleran and Jones' compensation, while the Board was directly responsible for overseeing and supervising Hayward's management.  *See In re Am. Apparel, Inc. Shareholder Litig.*, 2013 WL 10914316, at *34 (C.D. Cal. Aug. 8, 2013) (noting the "crucial role that board membership plays in establishing control person liability.").

Where Defendants actively manage a company's activities and its officers through participation on the board and its committees, as set forth above, courts find they are controlling persons under §20(a).[10]  *See Fouad v. Isilon Sys., Inc.*, 2008 WL

---

[10]    MSD and CCMP wrongly contend that that the "Complaint includes no allegations regarding actual control."  MSD Br. at 16; *see also* CCMP Br. at 15-16.  On the contrary, the Complaint is replete with allegations showing how Defendants

5412397, at \*12 (W.D. Wash. Dec. 29, 2008) (allegations that outside directors were on Nominations and Governance Committee gave rise to inference that defendants had "direct engagement in and awareness of the management of the company," and allegations that other directors were members of company's Audit Committee gave rise to inference that defendants "had control over the very mechanisms intended to prevent the alleged fraud" sufficient to overcome dismissal); *In re Reliance Sec. Litig.*, 135 F. Supp. 2d 480, 518 (D. Del. 2001) (whether directors were control persons was "genuine issue of material fact" sufficient to defeat summary judgment because they "served on subcommittees related to the oversight of [the company's] accounting and reporting practices."); *Masterson v. Commonwealth Bankshares, Inc.*, 2 F. Supp.3d 824, 833 (E.D. Va. 2014) (allegations that director defendants signed two purportedly fraudulent documents, in connection with "membership on the Board and various sub-committees of the Board, particularly those on the audit committee, [were] sufficient to state control").

---

exercised their control over Hayward. For example, Plaintiff alleges that Defendants acquired Hayward; replaced the CEO and CFO with their own proxies; installed nine of their own executives onto Hayward's Board; arranged for Hayward to conduct an IPO; used their control over the Board to approve massive insider sales: The Board approved a repurchase of 12 million shares from CCMP and AIMCo (including a repurchase of 4 million CCMP shares at above-market prices); and approved an SPO that enabled CCMP and AIMCo to dump more than 27 million shares not long before Hayward's July 28, 2022, disclosure. ¶¶34, 36-37, 45, 208-14.

21

### 3. *Hayward Has Admitted that CCMP and MSD "Controlled" the Company and "Effectively Control[led] Its Business and Affairs*

Finally, Hayward has admitted in *multiple SEC filings* that it is a "**controlled company**" and that CCMP and MSD are able to "**strongly influence or effectively control . . . our business and affairs**." *See* IPO Prospectus, Ex. 1 at 1, 46, 51; SPO Prospectus Supp., McDonough Ex. 24 at 19; 2021 Form 10-K, *id.* Ex. 16 at 36; *see also supra* SoF.C. This admission is, by itself, sufficient to deny the motion to dismiss. *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 979 (N.D. Cal. 2009) (admission in Form 10-Ks that defendant minority shareholder and related entities "'have significant influence over our management and affairs'" raised "intensely factual questions" rendering dismissal inappropriate); *Am. Apparel*, 2013 WL 10914316, at *37 (statement in SEC filing that minority shareholder intended to "influence" corporation's "management or the [b]oard with respect to [its] business and affairs" was probative of control); *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1048-49 (N.D. Cal. 2016) (refusing to dismiss control person claim against minority shareholder where SEC filing stated shareholder "will continue to have significant influence over [Company's] affairs").

### 4. *Defendants' Arguments Ignore All of Plaintiff's Well-Pled Allegations of Control*

In light of the fact that there are three clear independent bases for control here, the sufficiency of Plaintiff's claims is clear. Indeed, CCMP and MSD do not cite a

22

single decision where control person allegations have been found insufficient under these circumstances and Plaintiff's counsel is not aware of any such authority.

In their motions to dismiss, CCMP and MSD nevertheless challenge the adequacy of Plaintiff's control allegations with a series of inapt arguments that are plainly insufficient to support dismissal. Notably, CCMP and MSD fail to address the line of decisions, including *Palladin*, finding directors who signed SEC filings to be control persons under Section 20(a), nor do they explain why it does not apply here—where directors affiliated with CCMP and MSD signed SEC filings containing alleged misrepresentations. CCMP and MSD also fail to mention Hayward's own admissions regarding their control, let alone square their arguments with these admissions. Therefore, even the arguments they make were not fundamentally flawed, CCMP's and MSD's motions would still not justify dismissal, because they do not address all of the pleaded bases for control.

CCMP and MSD focus almost exclusively on one of the three independent bases for control: share ownership. CCMP and MSD argue that share ownership must be considered separately, such that they are each only minority shareholders of Hayward. *See* CCMP Br. at 16; MSD Br. at 15. This argument fails because it misconstrues the law, utterly ignores Plaintiff's well-pled allegations regarding coordination which must be accepted as true on a motion to dismiss, and contradicts Defendants' own documents.

23

When shareholders are alleged to have acted together to exert control, they are evaluated as one. *See America West*, 320 F.3d at 945-46 (allegations that two large shareholders "allegedly joined forces to exert undue influence" on company, "taking advantage of their position as majority owners who controlled the Board of Directors and related committees" sufficient to plead that shareholders were controlling persons). This approach also follows with how the SEC determines group status: "[w]hen two or more persons agree to act together" as a group "for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer," the group is deemed to have beneficial ownership over equity securities owned by all persons in the group. *See* 17 C.F.R. §240.13d-5(b)(1); *see also* SEC Compliance and Disclosure Interpretations (Oct. 7, 2022), https://www.sec.gov/divisions/corpfin/guidance/reg13d-interp.htm (shareholders that enter into an agreement "in a collective attempt to gain influence over a management decision with respect to a rights offering" have formed a group under 13(d)(3)). And, as discussed below, Defendants' own cited cases involving multiple minority shareholders support this rule.

Just as in *America West*, the AC contains numerous allegations that CCMP and MSD "joined forces to exert undue influence" on Hayward, all of which CCMP and MSD ignore: CCMP and MSD purchased Hayward together; entered into an agreement with AIMCo *together* to coordinate votes; worked *together* to maintain

majority shareholder control during the Class Period; and coordinated *together* to exert control over Hayward's Board.  ¶¶29-30, 32, 36-38.  The AC points to the Stockholders' Agreement, which further supports Plaintiff's allegations of coordination.  *See* ¶¶29, 30.[11]

Moreover, Defendants' insistence on separate treatment cannot be squared with their own SEC filings in which CCMP and MSD voluntarily deem themselves a "group" with "*aggregate*" ownership over the "*majority*" of Hayward's shares." IPO Prospectus, Ex. 1 at 9; CCMP 13G/A, Ex. 2 at 9; MSD 13G, Ex. 3 at 4.  These documents further support Plaintiff's allegations, which must be accepted as true, that CCMP and MSD acted together to have "control of the Company."  2021 Form 10-K, McDonough Ex. 24 at 19; *see also supra* SoF.C.

None of the cases cited by CCMP and MSD require control allegations to be treated separately when the defendants are alleged to have acted together.  Even *LLDVF, L.P. v. Dinicola*, 2010 WL 3210613 (D.N.J. Aug. 12, 2010), which CCMP

---

[11]    CCMP argues that the Stockholder's agreement provides no evidence of coordination, *see* CCMP Br. at 17, but that is not the case.  The Agreement plainly states that CCMP and MSD "agreed . . . to act together with respect to their Stockholder Shares," *see* ARSA, Parker Ex. 8 at 15; nothing in the Agreement restricts their coordination to the selling of shares.  In any event, the SEC has made clear that coordinated voting does not depend "solely on the presence or absence of an express agreement, as two or more persons may take concerted action or agree informally."  Modernization of Beneficial Ownership Reporting, 80 Fed. Reg. 768896, 76933 (Nov. 7, 2023).

and MSD appear to believe is their best decision, acknowledges that two entities' share positions could be considered collectively if "there is some basis on which to consider their collective action" such as a "voting agreement." *LLDVF*, 2010 WL 3210613, at *12-13.[12]   Unlike the case here, there were no facts in *LLDVF* that supported coordination.  *Id.*  Moreover, in *LLDVF*, the two minority shareholders did not even have the "*potential* to influence and direct": Collectively, they owned only 30% of the company's shares; could only appoint a minority of the company's directors; and were expressly precluded by a management services agreement from taking part in management of the company.  *LLDVF*, 2010 WL 3210613, at *12; *see id.* ("[W]hen a defendant *does not clearly occupy control status*, the plaintiff must plead facts from which control status can be inferred.").

The remaining cases cited by CCMP and MSD are equally inapposite because they involve only single minority shareholders, not multiple shareholders alleged to have banded together for majority control.  *See*, *e.g.*, *Laven v. Flanagan*, 695 F. Supp. 800 (D.N.J. 1988) (largest minority shareholder was never "able to exercise control over" corporation due to standstill agreement restricting stock ownership and board

---

[12]     Likewise, in *Fouad*, 2008 WL 5412397 (W.D. Wash. Dec. 29, 2008), the court dismissed control person claims against three minority venture capital shareholders because plaintiff failed to plead that "the venture capital firms acted together."  *Id.* at *13.

26

seats and prohibiting shareholder from contesting other board seats).[13]

Moreover, even if CCMP and MSD were treated separately (they should not be), the specific allegations regarding each entity's individual influence create an "intensely factual question" making dismissal inappropriate. *Fouad*, 2008 WL 5412397, at *12. Here, CCMP and MSD were each Hayward's largest shareholders with more than 30% of Hayward's stock, CCMP controlled director nominations and executive compensation committee, MSD sat on the Audit Committee, and CCMP made massive stock sales shortly before Hayward revealed the truth. Further, both CCMP and MSD directors signed some of the misleading SEC filings in question. These allegations more than support a "reasonable inference" that CCMP and MSD individually "had the potential to influence and direct the activities of" and so to control Hayward. *Palladin*, 2006 WL 2460650, at *16; *USTarcom,*, 617 F. Supp.2d at 979 (control sufficiently pleaded where defendant was company's largest minority shareholder and its CEO served on company's board); *Magnachip*, 167 F. Supp. 3d at 1048-49 (minority shareholder had control because it placed its designees on the

---

[13]   *See also O'Sullivan v. Trident Microsys., Inc.*, 1994 WL 124453, at *18 (N.D. Cal. Jan. 31, 1994) (dismissing claims against outside directors and underwriters because plaintiffs failed to allege any facts demonstrating their control through its 9.5% stock ownership); *In re Gupta Corp. Sec. Litig.*, 900 F. Supp. 1217, 1243 (N.D. Cal. 1994); *In re Flag Telecom Holdings Ltd. Sec. Litig.*, 308 F. Supp. 2d 249, 273 (S.D.N.Y. 2004); *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 493 (S.D.N.Y. 2005).

Board of Directors, had substantial holdings, and "used its control of Magnachip to cash out its investments in the Company at enormous profits."); *In re Metro. Sec. Litig.*, 532 F. Supp. 2d 1260, 1297 (E.D. Wash. 2007) ("[A]udit committee members, including outside directors, who sign SEC filings qualify as control persons.").

### 5. *Culpable Participation is not an Element of a Control Claim, But the Allegations Here Would Adequately Support It*

Defendants' argument, that Plaintiff has not alleged that CCMP and MSD culpably participated in the alleged fraud fails, because, as Defendants concede (MSD Br. At 18; CCMP Br. At 17 n.7), this Court along with most others does not require that plaintiffs plead culpable participation on a motion to dismiss. *See Dudley*, 2013 WL 1845519, at *20 n.5 ("This Court follows the 'overwhelming trend in this circuit' by holding that 'culpable participation does not have to be pled in order to survive a motion to dismiss.'"); *Palladin*, 2006 WL 2460650, at *16 (same); *In re Cambrex Corp. Sec. Litig.*, 2005 WL 2840336, at *16 (D.N.J. Oct. 27, 2005) (Martini, J.) (same). The "majority of the judges in the District of New Jersey" agree that "culpable participation need not be pled in order to state a claim for controlling person liability." *In re Able Lab'ys*, 2008 WL 1967509, at *29; *see, e.g.*, *Jones v. Intelli-Check, Inc.*, 274 F. Supp. 2d 615, 645 (D.N.J. 2003); *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 600 (D.N.J. 2001).

In any event, Plaintiff has sufficiently alleged culpable participation because CCMP and MSD signed SEC filings containing the alleged misstatements; MSD

28

reviewed and approved all misleading financial disclosures filed by Hayward during the Class Period; and CCMP illegally made hundreds of millions of dollars from insider trades. *See Sheehan v. Little Switzerland, Inc.*, 136 F. Supp. 2d 301, 315 (D. Del. 2001) (culpable participation where directors "each signed an SEC filing knowing that the filing contained an omission that would likely mislead the market"); *In re BioScrip, Inc. Sec. Lit.*, 95 F. Supp. 3d 711, 741 (S.D.N.Y. 2015) (culpable participation met where plaintiffs alleged that defendants were responsible for reviewing allegedly fraudulent SEC filings); *In re Xerox Corp. Sec. Litig.*, 165 F. Supp. 2d 208, 220 (D. Conn. 2001) (culpable participation met where insiders sold $31.4 million of stock shortly after making false and misleading statements).

## III.    PLAINTIFF ADEQUATELY ALLEGES CLAIMS UNDER §10(b)

CCMP and MSD argue that Plaintiff's §10(b) claims against them fail because (1) Plaintiff has not alleged that Defendants made a false statement or omission, and (2) Plaintiff has not alleged facts giving rise to a strong inference of scienter. These arguments fail for the reasons set forth below.

### A.    CCMP and MSD Made False and Misleading Statements in Hayward's 2021 Form 10-K and Form S-3

To plead a false or misleading statement under the PSLRA, a complaint need only allege facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission," as Plaintiff has done here. *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004); *see United States ex rel. Rahimi*

29

*v. Zydus Pharms. (USA), Inc.*, 2017 WL 1503986, at *11 (D.N.J. Apr. 26, 2017) (in applying Rule 9(b) "courts should be sensitive to situations in which sophisticated defrauders may successfully conceal the details of their fraud.").

The risk disclosures contained in the 2021 Form 10-K and Form S-3 are attributable to MSD and CCMP because their designees signed those forms. *See supra* § II.C.1 n.9. *United States Sec. & Exch. Comm'n v. Place*, 2019 WL 634638, at *6 (E.D. Pa. Feb. 14, 2019) ("A person is the 'maker' of a statement if he signed the statement."); *Energy Transfer LP*, 532 F. Supp. 3d at 228 (defendant was "one of the alleged speakers in the 10-K filings with the SEC, as he signed those documents."); *Steamfitters Loc. 449 Pension Fund v. Alter*, 2011 WL 4528385, at *9 (E.D. Pa. Sep. 30, 2011) ("Courts assume that corporate officers have read the SEC filings they sign, and in signing attest to their accuracy and accept responsibility for the contents.").[14]

---

[14]    Because the SEC filings are directly attributable to CCMP and MSD, the group pleading doctrine is not implicated here. *See Dudley*, 2013 WL 1845519, at *16 n.3 (no group pleading where "Defendant signed the SEC filing in question"); *Universal Am. Corp. v. Partners Healthcare Sols. Holdings, L.P.*, 176 F. Supp. 3d 387, 396 (D. Del. 2016) (group pleading doctrine not implicated where alleged written misstatements contained defendant's signature). CCMP and MSD's attempt to argue otherwise, *see* CCMP Br. at 10-11; MSD Br. at 8-10, is wholly unsupported by their cited cases, as none involve documents that were actually signed by the defendant. *See, e.g., Barbee v. Amira Nature Foods, Ltd.*, 2023 WL 4627744, at *12 (D.N.J. July 19, 2023) (defendant did not sign SEC statement); *Bondholder Comm. v. Sauk Valley Student Hous., LLC*, 2020 WL 5995617, at *5 (D.N.J. Oct. 9, 2020)

The risk disclosures in Hayward's 2021 Form 10-K and Form S-3 registering shares for sale in connection with the SPO were false and misleading because they warned of hypothetical risks that had already materialized.  *Odeh v. Immunomedics, Inc.*, 2020 WL 4381924, at \*6 (D.N.J. July 31, 2020) (risk disclosures that warn of "a potential risk when such a risk ha[s] already materialized" qualify as material misrepresentations); *In re: Enzymotec Sec. Litig.*, 2015 WL 8784065, at \*11 (D.N.J. Dec. 15, 2015).  The risk disclosures stated, for example, that:

- "*[A]ny material cancellation, reduction, or delay in purchases. . . could have a material adverse effect on our business*," when this problem was already occurring, with orders stalling since mid-2021 and significant rejections and cancellations thereafter (¶109; ¶129; McDonough Ex. 16 at 18; *id*. Ex. 22 at 8); and

- "*[H]igher demand*" from the start of Covid "*may not be sustainable*," when this problem was already occurring, with demand and double orders at the start of Covid giving way to oversaturated distributors unwilling to take on additional inventory by mid-2021 (¶109; ¶129; McDonough Ex. 16 at 21; *id*. Ex. 22 at 8).

For these reasons and those discussed in the Opposition to the Hayward

_____

(defendant was not drafter of misleading statement).  Contrary to CCMP's contention, and as the cases above demonstrate, CCMP remains liable as the "maker" of documents after *Janus*.  *See* CCMP Br. at 10 n.5 (citing *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011)).  *See, e.g.*, City *of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 417 (S.D.N.Y. 2011) (finding that all defendants that signed SEC filings (including director defendants) "made" the statements under *Janus*); *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 164-65 (S.D.N.Y. 2012) ("[C]ourts in this district and across the country have rejected" defendants' argument that they did not possess "ultimate authority" over documents they signed after *Janus*).

Defendants' Brief (*see* Opp. to Hayward's MTD SoF.C-D; *id.* I.A.2), these risk disclosures are actionable. *See*, *e.g.*, *Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*, 2019 WL 2360942, at *2, 4 (S.D.N.Y. Mar. 4, 2019) (risk warnings that "[i]f our customers do not purchase additional licenses or capabilities, our revenues may grow more slowly than expected, may not grow at all, or may decline" were misleading because they "present[ed] these issues as potential problems" when "the company was already experiencing significant setbacks with licensing sales.").

### B.    Plaintiff Alleges a Strong Inference of Scienter

"Scienter can be adduced inferentially" by allegations concerning defendants' "motive and opportunity to commit fraud" and through alleged "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Pathfinder Mgmt. Inc. v. Mayne Pharma Pty.*, 2008 WL 3192563, *12 (D.N.J., Aug. 5, 2008) (Martini, J.). The inquiry is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter," *Tellabs*, 551 U.S. 308, 323. Thus, motive and opportunity, along with allegations of defendants' knowledge of adverse facts, should be considered collectively. *Curran v. Freshpet, Inc.*, 2018 WL 394878, at *5 (D.N.J. Jan. 12, 2018). A scienter inference need only be at least as strong as any opposing inference. *Tellabs*, 551 U.S. at 328.

Plaintiff has alleged that CCMP and MSD were Hayward's largest

32

shareholders and had significant investments in the Company; that Defendants controlled the Company, its management, and its Board, and "strongly influence[d]" its "business and affairs"; that CCMP and MSD made misstatements that concealed severe sales and inventory issues that went to the core of Hayward's business; and that at the same time they made those misstatements, CCMP and MSD approved hundreds millions of dollars of insider sales, which occurred just months before the truth was revealed.  Collectively, these facts support a strong inference of CCMP and MSD's misbehavior or recklessness.[15]

### 1. The Massive Insider Trades Support Defendants' Motive and Opportunity to Commit Fraud

To assess whether insider sales support scienter and are "unusual in scope or timing," courts consider "the amount of profit made, the amount of stock traded, the portion of stockholdings sold, [and] the number of insiders involved." *In re Toronto-Dominion Bank Sec. Litig.*, 2018 WL 6381882, at *15 (D.N.J. Dec. 6, 2018).  The analysis looks at the amount of sales made by all insiders.  *See, e.g., Stevelman v.*

---

[15]    CCMP and MSD argue that Plaintiff has not provided any evidence from confidential witnesses of CCMP or MSD's involvement or identified any documents showing CCMP and MSD's knowledge or intent.  CCMP Br. at 12; MSD Br. at 12. But a strong inference of scienter does not require a "smoking gun," *Tellabs*, 551 U.S. at 324, and circumstantial evidence is enough.  *See Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 268-69 (3d Cir. 2009) (finding scienter based on circumstantial evidence even though plaintiffs did "not point to any particular document or conversation that would have informed" defendants of unusual discounting).

*Alias Rsch. Inc.*, 174 F.3d 79, 86 (2d Cir. 1999) (fact that non-defendant insiders made large stock sales supported strong inference of scienter against defendant); *In re Viropharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 473-74 (E.D. Pa. 2014); *George v. China Auto. Sys., Inc.*, 2012 WL 3205062, at *10 (S.D.N.Y. Aug. 8, 2012). Courts find a strong inference of scienter where, as here, "[d]efendants were motivated to commit fraud in order to inflate the Company's stock price," including "for purposes of profiting through [an] SPO." *Enzymotec*, 2015 WL 8784065, at *17, 19; *Curran*, 2018 WL 394878 (D.N.J. Jan. 12, 2018) (motive to sell shares through an offering reaping $131 million supported scienter). In this case, the massive volume and profit of the insider trades, combined with their unusual timing, support a strong inference of scienter.

During the Class Period, CCMP, AIMCo, and Jones collectively sold more than 35 million shares for a total of ***$544 million***. Each of these sales occurred at a price far above Hayward's share price of $11.21 at the end of the Class Period, ¶191. Specifically:

- CCMP sold $80.8 million of stock to Hayward through a repurchase program announced on January 24, 2022 and executed on March 11, 2022, that gave CCMP a favorable price $3 higher than the price at which Hayward repurchased shares from non-insiders on the open market. ¶208. CCMP also sold $53.4 million of stock to Hayward in a block trade on January 24, 2022, while AIMCo sold $27.4 million of stock. ¶¶ 205-06.

- CCMP sold off $245.5 million of stock on May 5 and May 17, 2022, through an SPO conducted by Hayward that consisted exclusively

34

of stock owned by CCMP and AIMCO, and which was made pursuant to the false and misleading May 2, 2022 Prospectus Supplement. AIMCo also sold 9.7 million shares of stock in the SPO. ¶213.

- Jones sold 44.5% of his stock for about $2 million—*outside* of his 10b5-1 trading plan—on June 17, 2022, after CCMP and AIMCo had the opportunity to unload stock, but a month before revealing the truth. ¶215.

Pursuant to the Stockholders' Agreement, MSD received "reasonable advance notice" and was "consult[ed]" prior to each sale by CCMP and AIMCo. ARSA, Parker Ex. 8 at 14. With the exception of the January sales, all of CCMP and AIMCO's sales were approved by the Board, which was under CCMP and MSD's control. ¶34.

CCMP alone made approximately ***$380 million*** by selling more than 24 million shares. Likewise, AIMCo made nearly $162 million while Jones made approximately $2 million. ¶¶214-15. By selling at a price significantly above Hayward's share price when the truth was revealed, CCMP made more than ***$106 million*** in illicit profit, while AIMCo made approximately $40 million and Jones made $425,000. These gains from insider trades were "massive by any measure," and well over amounts courts have found sufficient to support motive and opportunity for fraud. *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 139-140 (S.D.N.Y. 1999) ($78 million in insider sales supported motive and opportunity). *See also In re Urb. Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 654 (E.D. Pa.

2015) (profit of over $50 million from stock sale supported strong inference of scienter); *George*, 2012 WL 3205062, at *10 ($42 million profit supported motive and opportunity).

The fact that all three insiders sold a large percentage of their holdings during the Class Period also supports a strong inference of scienter. CCMP and AIMCo liquidated approximately 34% and 30% of their Hayward holdings respectively, while Jones sold nearly half of his shares. ¶¶214-215. CCMP's argument that it "retained holdings" after the sale, *see* CCMP Br. at 13, has been squarely rejected by the Third Circuit and does not defeat the strong inference of scienter raised by such a significant sale. *See Suprema*, 438 F.3d at 278 (defendant's sale of 38% of his shares raised strong inference of scienter even though defendant "retained large stock holdings after the sales"); *Enzymotec*, 2015 WL 8784065, at *19 (insider sale of 35% of shares owned supported motive and opportunity); *see also MicroStrategy*, 115 F. Supp. 2d at 646–47 ("[A]n insider may not always trade all his shares in the company for which he possesses the inside information; the trader may hold on to a portion of his shares to hedge against the unforeseen").

In comparison to trading activity that occurred outside the Class Period, the amount sold during the Class Period was also highly unusual. During the Class Period, CCMP more than tripled the amount in stock sales that it made in the previous year, while AIMCo's Class Period sales more than doubled compared to

the previous year. *Compare* ¶¶45-47 *with* ¶¶206, 208, 211-15. *See Toronto-Dominion Bank*, 2018 WL 6381882, at *15 (fact that individual defendants sold shares during class period "as opposed to the previous year where none" supported scienter).

The sales were also opportunistically timed. CCMP's Board-approved, March 11, 2022 resale of 4.08 million shares back to Hayward occurred right after Defendants had to announce growth that they knew was declining and they were struggling to prop up—but CCMP was able to sell at favorable prices locked in back in January. ¶¶125-27, 208. CCMP and MSD also signed the misleading Form S-3 registering millions of shares for sale to the public on May 2, 2022, one week after Hayward confirmed its false and misleading guidance, and, three days later, CCMP and AIMCo offloaded 24 million shares. ¶¶141-42, 209-10. This further supports an inference of scienter. *See Toronto-Dominion Bank*, 2018 WL 6381882, at *15 (timing of share sales was unusual and supported scienter where "many were sold in close proximity to allegedly false or misleading statements"); *Enzymotec*, 2015 WL 8784065, at *19 (insider sales made in connection with SPO which occurred within months of announcement of favorable guidance gave rise to inference of scienter).

37

### 2. CCMP and MSD's Control Over Hayward's Entire Business and Management and the Significance of Hayward's Problems Support a Strong Inference of Scienter

Circumstantial evidence of reckless or conscious misbehavior also supports an inference of scienter. *Curran*, 2018 WL 394878, at \*5. "Where fraud involves a company's core business, knowledge or recklessness can be inferred from a defendant's position in the company and related exposure and access to information revealing the fraud." *Palladin*, 2006 WL 2460650, at \*12; *Campbell Soup*, 145 F. Supp. 2d at 599 ("[K]nowledge may be imputed to individual defendants" who approve public disclosures "when the disclosures involve the company's core business"); *see also In re Tel–Save Sec. Litig.*, 1999 WL 999427, at \*5 (E.D. Pa. Oct. 19, 1999) ("Knowledge concerning a company's key businesses or transactions may be attributable to the company, its officers *and directors*.").

The problems that plagued Hayward's core business were on a massive scale, and the Hayward Defendants knew of or had access to information contradicting the statements they made regarding channel inventory and demand. As set forth in detail in Plaintiff's Opposition to the Hayward Defendants' Motion to Dismiss, Holleran admitted that Defendants knew in 2021 that channel demand was dropping because distributors had adopted a deliberate strategy to reduce their inventory. *See* Opp. to Hayward's MTD, § I.B.2. In addition, statements made by both Holleran and Jones throughout the Class Period showed that Defendants tracked the channel's inventory,

38

which was upwards of $150 million. *See id.* Corroborating statements from multiple confidential witnesses ("CWs") confirmed that Hayward had detailed information and data regarding the channel's deteriorating performance; multiple CWs also confirmed that such data was being tracked closely by management and conveyed, for example, to Jones in the form of cancellation reports; and that concerns regarding Hayward's stock of unsold products, which had ballooned to over $100 million, had reached the highest levels of the Company. *See id.*

CCMP and MSD had direct involvement in and supervision over Hayward through its many Directors, committee seats, and proxies who worked for and were beholden to them, including Holleran and Jones. Thus, Hayward, management and CCMP and MSD had substantial information regarding the channel's elevated inventory and declining demand, and were closely monitoring these substantial problems. *See Urb. Outfitters*, 103 F. Supp. 3d at 654; *see, e.g.*, ¶99 (Holleran); ¶¶ 87, 91 (Jones); ¶90 (Chief Supply Officer); ¶77 (Director of Distribution); ¶72 (Director of Shipping Operations); ¶68 (Product Marketing Manager); Opp. to Hayward's MTD, SoF.

CCMP and MSD, by signing Hayward's misleading risk disclosures in March and May of 2022, the context and content of which addressed these issues, further confirmed their awareness of channel inventory and demand. *See* Opp. to Hayward's MTD, § I.B.2.

39

Taken together, these allegations, in combination with the massive Board-approved stock sales that insiders (including CCMP) made at the height of Hayward's sales and inventory crisis, create a strong inference of scienter. *See Enzymotec*, 2015 WL 8784065, at \*18-\*19 (scienter found where "matter at issue [was] central to the core business of the Company" and defendants sold "large amounts of shares for significant personal financial gain" in connection with "suspiciously-timed" SPO); *America West*, 320 F.3d at 943 (allegations that minority shareholder had two officers on company's 15-person board of directors, attended board meetings, and served on subcommittee meetings were sufficient to show scienter where company's problems were severe); *cf. Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (failure to "review or check information" that defendants had duty to monitor gave rise to inference of recklessness).

## IV.    CONCLUSION

For the above reasons, Plaintiff respectfully request that this Court deny the Motions to Dismiss filed by CCMP and MSD.

Dated:  July 2, 2024

**COHN LIFLAND PEARLMAN HERMANN & KNOPF LLP**

/s/ Matthew F. Gately
Peter S. Pearlman
Matthew F. Gately
Park 80 West-Plaza One
250 Pehle Avenue, Suite 401

40

Saddle Brook, NJ 07663
Telephone: 201-845-9600
Facsimile: 201-845-9423
psp@njlawfirm.com

*Liaison Counsel*

**SCOTT+SCOTT
ATTORNEYS AT LAW LLP**
Max R. Schwartz (*pro hac vice*)
Susan Hu (*pro hac vice forthcoming*)
Donald A. Broggi
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile: 212-223-6334
mschwartz@scott-scott.com
dbroggi@scott-scott.com

**SCOTT+SCOTT
ATTORNEYS AT LAW LLP**
Cornelia Gordon (*pro hac vice*)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile: 619-233-0508
cgordon@scott-scott.com

*Lead Counsel for Lead Plaintiff and the Class*

41