## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **CITY OF SOUTHFIELD FIRE AND POLICE RETIREMENT SYSTEM, Individually and on Behalf of Others Similarly Situated,** | Civ. No. 2:23-CV-04146 (WJM) |
| **Plaintiff,** | |
| v. | OPINION |
| **HAYWARD HOLDINGS, INC., KEVIN HOLLERAN, EIFION JONES, CCMP CAPITAL ADVISORS, LP, and MSD PARTNERS, L.P.,** | |
| **Defendants.** | |

**WILLIAM J. MARTINI, U.S.D.J.:**

This is a putative securities fraud class action brought by Lead Plaintiff Fulton County Employees' Retirement System ("Plaintiff") on behalf of purchasers of Hayward Holdings, Inc., ("Hayward") common stock between October 27, 2021 and July 28, 2022, inclusive ("Class Period"). Hayward and individual Defendants Kevin Holleran ("Holleran") and Eifion Jones ("Jones") (together the "Hayward Defendants") move to dismiss the Consolidated Class Action Complaint ("CCC") pursuant to Fed. R. Civ. P. 12(b)(6). ECF No. 68. MSD Partners, L.P. ("MSD") and CCMP Capital Advisors, LP ("CCMP") each also separately move to dismiss pursuant to Rule 12(b)(6). ECF Nos. 66, 67. The Court decides the matter without oral argument. Fed. R. Civ. P. 78(b). For the reasons set forth below, each of the three motions by the Hayward Defendants, MSD, and CCMP (collectively "Defendants") is **granted**.

## I.    BACKGROUND[1]

### A.    Hayward's Business and Channel Inventory "Stuffing"

Hayward designs and manufactures pool products, such as pumps, heaters, and filters. CCC ¶ 40, ECF No. 41. Hayward was a family run company until a consortium led by Defendants CCMP and MSD acquired and took control of it in 2017. *Id.* at ¶ 4. CCMP is a New York-based private equity firm. *Id.* at ¶ 28. MSD is a New York-based investment

---

[1] The factual allegations are derived from the CCC and are taken as true for the purposes of this motion unless otherwise noted.

advisor. *Id.* at ¶ 29. CCMP and MSD together replaced management and installed Holleran as Chief Executive Officer ("CEO") in 2019 and Jones as Chief Financial Officer ("CFO") in 2020. *Id.* at ¶ 36-37. Holleran was also President and Jones was Senior Vice President at all relevant times. *Id.* at ¶¶ 23, 24.

The majority of Hayward's sales are generated through distributors in its "channel," who in turn sell to pool builders, retailers, and servicers. *Id.* at ¶ 41. Demand in the pool industry rose at the start of the Covid pandemic and Hayward's revenue grew by about 20% in 2020, from $733.4 million in 2019 to $875.4 million in 2020, prompting an initial public offering ("IPO") in early March 2021. *Id.* at ¶¶ 2, 5, 44. Immediately following the IPO, CCMP and MSD each owned 30.9% of Hayward's outstanding common stock and collectively had majority voting control during the Class Period. *Id.* at ¶ 29, 46. CCMP, MSD, and Alberta Investment Management ("AIMCo"), a Canadian institutional investment manager that owned 15.91% of Hayward common stock, entered into a March 16, 2021 Amended and Restated Stockholders' Agreement that Plaintiff claims was to coordinate the voting of their shares collectively. *Id.* at ¶¶ 30, 46. CCMP, MSD, and AIMCo installed a majority of Hayward's Board of Directors ("Board"), maintaining a 7-person majority of the 12-13 directors at all relevant times. *Id.* at ¶¶ 31, 32, 37.

In 2021, distributors began to place double orders and "loaded up" on inventory to avoid logistics and supply chain challenges brought on by the pandemic. *Id.* at ¶ 7. By mid-2021, due to improvement of supply chain issues as well as Hayward's "stuffing" or saturation of distribution channel with inventory, there was a significant drop in the channel's demand for products and selling to distributors became difficult. *Id.* at ¶¶ 2, 8-9, 11, 52-53, 55. To counteract stalling channel demand and slumping sales, Hayward offered discounts and promotions, resorted to pressure tactics to prop up revenue, and fulfilled future orders "way ahead of schedule." *See id.* at ¶¶ 67-69, 76. Despite Defendants' tactics, customers were overwhelmed with inventory they already had on hand and began cancelling orders around March 2022. *Id.* at ¶¶ 86-88. Around the end of February 2022, Jones requested reports on cancelled orders. *Id.* at ¶ 87. Meanwhile, Hayward was locked into purchasing raw materials, *see id.* at ¶¶ 97, 110, and continued to manufacture at a high rate in excess of demand, which eventually resulted in over $100 million of excess unsold inventory. *Id.* at ¶ 13. Defendants knew about these issues, but tried to minimize or conceal them by making a series of material misrepresentations and omissions during the Class Period to create the false impression that business was strong thereby artificially inflating prices. *Id.* at ¶¶ 14-15, 101.

Plaintiff alleges that CCMP and MSD exercised control over Hayward's Board to direct the approval of stock sales at inflated prices including a share repurchase program that enabled CCMP to offload 4.08 million shares for $80.8 million at above-market prices in March 2022 and as well as a Secondary Public Offering ("SPO") where CCMP sold 17.6 million for $245.5 million of Hayward stock in May 2022. *Id.* at ¶ 34. Including sale of 2.7 million shares for $53.4 million in January 2022, Defendant CCMP sold nearly 24.4 million Hayward shares during the Class Period, which was more than 34% of its stock

following the IPO, netting over $379 million. *Id.* at ¶¶ 15, 101. In June 2022, Defendant Jones sold 44.5% of his Hayward stock for about $2 million. *Id.*

On July 28, 2022, Defendants issued a press release and held a conference call in connection with their 2Q-2022 results, finally disclosing that the channel was saturated with inventory, that channel demand had significantly dropped, that Hayward was having difficulty selling to the channel, and that Hayward was producing finished goods far in excess of demand. *Id.* at ¶¶ 15, 102.

## B. Alleged Misstatements and Omissions[2]

Plaintiff maintains that Defendants made materially false or misleading statements and omissions during Hayward's conference calls, press releases, presentations, and SEC filings during the Class Period, including:

### 1. Risk Factor Warnings

Hayward's IPO Prospectus filed on March 15, 2021 ("IPO Prospectus") cautioned that certain factors, such as "material cancellation, reduction, or delay in purchases" or ineffective management of operations or of product inventory might harm Hayward's long-term growth prospects. *Id.* at ¶ 109. Plaintiff alleges that these warnings purported to be hypothetical but at the time these statements were made, the channel was already saturated with inventory, demand was dropping, and Hayward was having difficulty selling to the channel. *Id.* at ¶ 110.

### 2. October 27, 2021, 3Q-2021 Earnings Call

On the 3Q-2021 earnings call, when an analyst asked about channel inventory levels in light of "significant uptick in inventories," Holleran responded:

> Yes. I mean I would say [Pool Corp.]'s comments last week represent the industry as a whole. Inventories are in a healthier position than they were a quarter or 2 ago. If you look at it from a days-on-hand standpoint, it's still in a -- ***it's an improving position, but certainly not too much by any means.*** Admittedly, ***the mix of that inventory may not be as ideal as any of us would like it.*** There's still some products that are in shorter supply. So we're working feverishly to address that. ***But in total, I think we're taking some extra shelf space right now. So we look at it really through 2 lenses: in absolute terms, what's -- what are the inventory levels looking like, but also then are [we] accounting for some additional shelf space through our share gains.***

*Id.* at ¶ 105. Holleran further represented that "***the backlog does stretch certainly into 2022. It's at elevated levels still despite some of our production capacity improvements.***" *Id.* at

---

[2] All emphases (bold and italics) supplied in quotes are in the original. Each alleged misstatement is not set forth herein as the CCC contains 30 pages of alleged misstatements, *see* ¶¶ 103-192, and as discussed below, it is unclear which statements Plaintiff is alleging are actionable.

¶ 106. He also stated, "*[w]e expect the current demand trends [to continue] through the end of the year and into 2022.*" *Id.* at ¶ 107.

The presentation that accompanied the earnings call included a slide titled "Updated 2021 Financial Outlook" which stated that the positive guidance for the year was based on, among other things, "[s]trong year-to-date results and increased visibility into 2022 order file" and "[t]rade customer backlogs continu[ing] to support healthy demand." *Id.* at ¶ 108. Another slide titled "Sustainability of Growth" represented: "[s]trong long-term secular trends continue" and "[r]emodeling activity poised to continue." *Id.* Form 10-Q for 3Q-2021 directed investors to "Risk Factors" enumerated in the IPO Prospectus.

### 3. *December 21, 2021 Press Release and Stock Repurchase Program*

Hayward's stock repurchase program, announced in the December 2021 press release, was framed as demonstrating "strong cash flow generation capability and significant deleveraging of our balance sheet since going public earlier this year." *Id.* at ¶ 114. Holleran explained: "business is performing well and we remain confident in our ability to continue executing our growth initiatives in the years ahead." *Id.*

### 4. *January 24, 2022 Press Release*

In the January press release, Defendants stated that "[t]he expected increase in Net sales was primarily driven by higher volumes mainly in residential pool equipment sales as we continued to see demand from aftermarket upgrades and new construction." *Id.* at ¶ 113. Investors were directed to the "Risk Factors" in the IP Prospectus. *Id.* at ¶ 115.

Starting in January 2022, the truth began to emerge through several "partial corrective events" although Defendants continued to obscure and minimize with material misrepresentations and omissions. *Id.* at ¶¶ 157-192. For example, the January 2022 press release provided a range for Hayward's 4Q-2021 net sales that reflected slowing growth: net sales in 3Q-2021 had increased 56% YoY, but were down to about 33%-36% YoY in 4Q-2021. *Id.* at ¶ 158. On that news, Hayward's common stock dropped roughly 14.2% from a close of $21.13 on January 21, 2022 to $18.12 on January 26, 2022. *Id.* at ¶ 160.

### 5. *March 2, 2022 4Q-2021 Earnings Call*

During the 4Q-2021 earnings call, Holleran stated that Defendants "expect[ed] to grow net sales in the range of 9% to 12% compared to 2021," and to similarly grow adjusted EBITDA[3] by "9% to 13%," based on "combined price and volume growth" between "11% to 14%." *Id.* at ¶ 125. Holleran also explained:

> *I think it's a very credible order file.* There's been plenty of price increases that we've had to announce into the industry. We ran kind of a modest early buy last year. *If the channel was feeling as if they had too much or were unhappy with their inventory turns, I think there was opportunity for them to slow the bookings or even cancel and we've seen negligible cancellations*

---

[3] Earnings before interest, taxes, depreciation and amortization

> *through those time periods. So we feel very good about the credibility of that order file.*

*Id.* at ¶ 119. Jones echoed the "*very strong order file,*" the "*expect[ation of] a strong volume metric period in Q2,*" and that "sentiment remains strong." *Id.* at ¶ 120.

Concurrently, Defendants issued a press release that quoted Holleran as stating that he was "extremely proud of the strong quarter and year-end results" where Hayward saw "*continuation of robust organic growth in net sales*" and that "*entering 2022 with significant momentum, we remain encouraged by underlying industry demand levels supported by both new construction and aftermarket activity,* and an enhanced positioning within the pool industry as a result of recent acquisitions and additions to our team." *Id.* at ¶ 123. The press release further described Hayward as:

> *… well positioned to deliver continued net sales and adjusted EBITDA growth in 2022* following the tremendous success in 2021 *given the sustainable secular trends driving demand for pool products, specifically within our SmartPad conversion opportunities and environmentally conscious technology products.*
>
> For the full fiscal year 2022, Hayward expects net sales growth of 9% to 12% year-over-year and Adjusted EBITDA in the range of $460 million to $475 million, or a growth range of 9% to 13% year-over-year[.]

*Id.* at ¶ 127.

At a 4Q-2022 conference call, Plaintiff claims Holleran admitted to "some improvement" in the supply chain but downplayed the improvements by indicating that they were "*still fighting a good fight on some of the others.*" *Id.* at ¶ 162. He also stated that channel inventory was "getting back to more normal levels" but acknowledged "*it's not a perfectly balanced inventory from a SKU standpoint, but we're working hard to solve that.*" *Id.* at ¶ 163. After these partial corrections, Hayward's common stock dropped roughly 5.4% from a close of $17.60 on March 1, 2022 to a close of $16.65 on March 4, 2022. *Id.* at ¶ 167.

### 6. *April 28, 2022, 1Q-2022 Earnings Call*

During the 1Q-2022 earnings call and accompanying press release, Holleran stated: "*We really haven't seen any kind of cancellations. We're in pretty close contact with both channel partners and our dealers… [W]e're still seeing robust demand and the order file on the books is still very strong.*" *Id.* at ¶ 134; *see also* ¶ 172. He also expressed feeling "*comfortable with our inventory position from a days on hand standpoint here at the start of the season.*" *Id.* at ¶ 137; *see also* ¶ 172 ("we do keep close tabs on [channel inventory] with our channel partners … and they are "*largely replenished*" but not a "perfect balance."); ¶ 171 ("it feels like we're '*incrementally better*' [in supply chain improvements] than we were in second half of last year."). While Holleran acknowledged Hayward's higher inventory levels, he and Jones justified the need for additional inventory to "support the overall industry growth" and to "be able to service the market." *Id.* at ¶ 169.

Jones conveyed that "*the underlying growth drivers remain very strong*. Secular trends remain strong... and everything is pointing to strength in the industry and strength for Hayward." *Id.* at ¶ 135. The 1Q-2022 Form 10-Q directed investors to the FY 2021 Form 10-K "Risk Factors," which were nearly identical to those included in the IPO Prospectus. *Id.* at ¶ 144.

Due to partial disclosure of some improvement in channel inventory, Hayward's common stock dropped roughly 4.27% from a close of $16.61 on April 28, 2022 to a close of $15.90 on April 29, 2022. *Id.* at ¶¶ 175-76.

### 7. May 2, 2022 Automatic Shelf Registration (Form S-3ASR)

After close of the market, Defendants filed a Form S-3 Registration Statement on May 2, 2022 indicating they would be conducting an SPO on behalf of certain selling stockholders. *Id.* at ¶ 177. A Prospectus Supplement also filed that day stated:

> *[w]e believe the pool industry is poised for continued growth as industry tailwinds remain in place... [C]urrent demand exceeds the pool construction industry's ability to supply new pools, leading to a robust backlog as of April 2, 2022. Continued growth in new pool construction* is expected to be aided by a strong new housing market, rising home equity levels, migration trends to the Sun Belt and continued growth in outdoor living investment.

*Id.* at ¶ 149. The Prospectus Supplement, as well as the two other filings in connection with the SPO referenced the "Risk Factors" in the FY 2021 Form 10-K, which were almost identical to the language in the IPO Prospectus. *Id.* at ¶ 150.

The SPO was a partial correction and materialization of undisclosed risks, which caused Hayward's common stock to drop roughly 11.67% from a close of $16.88 on May 2, 2022 to a close of $14.91 on May 3, 2022. *Id.* at ¶ 179.

### 8. June 9, 2022 Conference Call

During the June conference call, when an analyst asked about product flow, Defendant Jones represented that Defendants had not "*seen demand destruction at the end of the channel right now*" and that he believed there to be "pent-up demand for new construction." *Id.* at ¶¶ 153-154.

### 9. July 28, 2022 Press Release

In the press release and conference call regarding Hayward's 2Q-2022 results, Hayward reported lower percentage increases of net sales for 2Q-2022 compared to previous quarters, and that it expected channel inventory to reduce in the second half of the year. *Id.* at ¶ 180. Accordingly, Hayward's updated guidance for FY 2022 indicated a decrease of sales by 2%-6% rather than an increase between 9%-12% as indicated in March and late April 2022. *Id.* at ¶¶ 182-183. In response to an analyst's questions regarding the "stark" decline, Holleran explained, "*[w]e expected to sell less into the channel versus sellout due to the strategic positions that many of our channel partners took at the end*

*of 2021. As Q2 occurred, inventories remain high,* and we're now actively working with the channel to try and reduce those inventories." *Id.* at ¶¶ 185-186.

After the press release and conference call, on the last day of the Class Period, July 28, 2022, Hayward's common stock declined $2.50 per share, or 18.23%, to close at $11.21 per share. *Id.* at ¶ 192.

C. Procedural History

On December 19, 2023, the Court consolidated two separately instituted suits (23-cv-4146 and 23-cv-20764) and appointed Lead Plaintiff. *See* ECF Nos. 29, 30. The consolidated amended complaint, filed on March 4, 2021, alleges: (1) Count I - violations of § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b–5, against all Defendants; and (2) Count II - violations of § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against the individual Defendants, MSD, and CCMP. *See* CCC, ECF No. 41.

In moving to dismiss, the Hayward Defendants, joined by MSD and CCMP, argue that the securities fraud claim in Count One fails because Plaintiff has not pled with sufficient particularity and has not alleged two key elements - actionable material misstatements and scienter. MSD and CCMP claim that the CCC does not identify any material misstatements that they have made or are attributable to them. CCMP also moves to dismiss the § 10(b) claims arguing that it is not and never has been, a shareholder of Hayward stock. Finally, Defendants seek dismissal of Count Two for shareholder control liability. For the reasons explained below, Defendants' motions to dismiss are **granted**.

II.   **DISCUSSION**

A. Motion to Dismiss Standard

Rule 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if the plaintiff fails to state a claim upon which relief can be granted. The moving party bears the burden of showing that no claim has been stated. *Hedges v. United States,* 404 F.3d 744, 750 (3d Cir. 2005). Dismissal is appropriate only if, accepting all the facts alleged in the complaint as true, the plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007); *see also Umland v. PLANCO Fin. Serv., Inc.,* 542 F.3d 59, 64 (3d Cir. 2008). This assumption of truth is inapplicable, however, to legal conclusions couched as factual allegations or to "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal,* 556 U.S. 662 (2009). Although a complaint need not contain detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555. Thus, the factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, *see id.* at 570, such that the court may "draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 556). While "[t]he plausibility standard is not akin to a probability requirement' ... it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

While a court "may not consider matters extraneous to the pleadings," *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997), it may "consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). Here, Defendants attach SEC filings and other public documents as exhibits to their motion to dismiss, which the Court may consider as those documents contain the alleged misstatements.

B. Count I - §10(b), Rule 10b-5

Section 10(b) of the Exchange Act and Rule 10b–5 prohibits the "use or employ, in connection with the purchase or sale of any security ... [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). Rule 10b–5, which was promulgated under Section 10(b), makes it unlawful for any person "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading ... in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5(b). To state a claim for fraud under §10(b) and Rule 10b–5, a plaintiff must demonstrate that a defendant: (1) made a misstatement or omission of a material fact, (2) with scienter, (3) in connection with the purchase or sale of a security, (4) upon which the plaintiff reasonably relied, (5) economic loss; and (6) loss causation. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011) (internal quotations omitted).

1. *Pleading with Particularity Under PSLRA and Rule 9(b) (All Defendants)*

Securities fraud actions are subject to the pleading requirements of the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u–4, *et seq.*, which requires that when a plaintiff's claim is based on alleged misrepresentations or omissions of a material fact, "the complaint shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1). Plaintiffs must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Similarly, Rule 9(b)'s heightened pleading standards mandate that "a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "The particularity described in § 78u–4(b)(1) extends that of Rule 9(b) and requires plaintiffs to set forth the details of allegedly fraudulent statements or omissions, including who was involved, where the events took place, when the events took place, and why any statements were misleading." *In re Rockefeller Center Properties, Inc. v. Securities Litig.*, 311 F.3d 198, 217 (3d Cir. 2002) (citations omitted). In other respects, the normal Rule 12(b)(6) standards apply, in which the Court assumes factual allegations are correct and asks whether Plaintiff

has plausibly stated a claim on which relief can be granted. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

At the outset, the Court notes that many of the false and misleading statements alleged in the CCC are lengthy block quotes that are at places highlighted with bold and italics. This formatting leaves the Court and Defendants to guess whether Plaintiff is claiming that only the highlighted portions are actionable misstatements or the highlighting is merely for emphasis and the entire paragraph is false or misleading. *See Smith v. Antares Pharma, Inc.*, 2019 WL 2785600, at *10 (D.N.J. July 2, 2019) (finding that lack of consistent formatting by emphasizing only some phrases resulted in "ambiguity" that ran "afoul of the PSLRA's particularity requirements and inappropriately shifts Plaintiff's burden to the Court."). For example, Plaintiff does not emphasize the portion of the block quote reflecting Holleran's March 2, 2022 earnings call statement that Hayward expected 9%-12% net sales growth. CCC ¶ 127. While the lack of highlighting might indicate Plaintiff is not asserting that statement is actionable, Plaintiff separately identifies that same prediction in a non-block quote, which may mean Plaintiff is alleging it is actionable. *Id.* at ¶ 125. Later in ¶ 165, Plaintiff seemingly describes the 9-12% projection as a "partial correction." Identifying Plaintiff's claims should not be conjecture; it is Plaintiff's burden to plead its allegations with particularity. *See e.g., Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 284 (3d Cir. 1992), *as amended* (May 27, 1992) (concluding plaintiff's style of pleading made it difficult to parse complaint).

Indeed, in addition to lack of clarity regarding *which* statements are purportedly actionable, it is also unclear *why* each statement is false or misleading. *See Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, No. 16-112, 2017 WL 3891676, at *3 (D. Del. Sept. 6, 2017) ("in contravention of the PSLRA, Plaintiffs have failed to craft a complaint in such a way that a reader can determine precisely which statements (or portions of statements) are alleged to be false or misleading, and the reason why each statement is false or misleading."); *In re Wilmington Trust Sec. Litig.*, 852 F. Supp. 2d 477, 490 (D. Del. 2012) ("Until plaintiffs specifically identify the statements on which they would like to proceed and the reasons why these statements are false or misleading, neither the defendants nor the court can address these allegations with the degree of particularity required by the PSLRA."). Here, each grouping of lengthy block quotes and shorter statements are followed by the same or substantially similar blanket conclusion that Defendants' statements were "materially false and misleading and omitted material information":

> In truth, when the foregoing statements were made, the channel was saturated with inventory, notwithstanding any purported market share gain by Hayward, with the channel having loaded up on inventory during the course of 2021, including making double orders for 2022. Part and parcel with that demand from the channel was dropping significantly and Hayward was having difficulty selling to the channel. In addition, the various factors that Defendants touted as supposedly supporting growth, including purported backlogs, painted a rosy picture for investors, but were false and misleading, because, at a minimum, those

factors were not resulting in new upstream demand for Hayward as the distribution channel that made up the bulk of Hayward's sales was already saturated with inventory. Hayward was instead forced to resort to incentives and pressure tactics to try to improve orders from the channel, but even that was having only a minimal effect on sales. Moreover, Hayward was locked into purchasing raw materials and manufacturing finished products at a high rate, which resulted in production far above the reduced demand from the distribution channel, and increased Hayward's expenses.

*See id.* at ¶¶ 110, 130, 145, 151; *see also id.* at ¶ 116. These general and conclusory claims do not explain why or how each statement is false or misleading. *See Smith,* 2019 WL 2785600, at *11 (ruling that complaint repeated same conclusory allegations as to why actionable statements were false did not satisfy PSLRA's particularity requirement). For example, if Plaintiff is claiming the prediction of 9-12% net sales growth is actionable, Plaintiff fails to explain why it is "materially and false and misleading." Factors such as drop in channel demand or saturation of channel inventory, even if true, do not explain why the predicted growth was false; in fact, Plaintiff describes the guidance as "materialization of the undisclosed risks" of channel inventory saturation, dropping channel demand, and difficulty selling into the channel. *Id.* at ¶ 65. The Court should not be forced "to play connect-the-dots in order to identify the facts and trends upon which plaintiffs base their claim." *See Lord Abbett Affiliated Fund, Inc.,* 2017 WL 3891676, at *3.

The Court also agrees with Defendants that the CCC employs impermissible group pleading, which is no longer viable after enactment of the PSLRA. *See Winer Family Trust v. Queen,* 503 F.3d 319, 337 (3d Cir. 2007). "The PSLRA requires plaintiffs to specify the role of each defendant, demonstrating each defendant's involvement in misstatements and omissions." *Id.* at 335–36. Here, the CCC attributes misstatements to all Defendants without showing each Defendant's involvement in those misstatements. *See e.g.,* CCC ¶¶ 105, 110 (attributing Holleran's responses during the October 27, 20201, 3Q-2021 earnings call to all "Defendants" without specifying MSD or CCMP's involvement in alleged misstatements); *see also e.g., id.* at ¶¶ 112-114 (claiming all "Defendants" issued Hayward's January 2022 press release). Moreover, Plaintiff improperly alleges scienter by group pleading. *See e.g.,* ¶ 197 (alleging "Defendants" knew of the channel's saturated inventory, dropping demand, and Hayward's difficulties selling into the channel); ¶ 200 (alleging "Defendants" knew of Hayward's excess inventory). The PSLRA requires a plaintiff to specify scienter either directly or indirectly with respect to each defendant. *See Winer Family Trust,* 503 F.3d at 335.

Because Plaintiff has not pled its securities fraud claims with sufficient particularity as required under the PSLRA and Fed. R. Civ. P. Rule 9(b), Defendants' motion to dismiss the § 10(b) and Rule 10b-5 claims is granted. Count I is **dismissed without prejudice** against the Hayward Defendants, but for the reasons discussed below, is **dismissed with prejudice** against MSD and CCMP.

### 2. *Maker of Statement (MSD and CCMP)*

Alternatively, MSD and CCMP move to dismiss contending that none of the statements in Hayward's SEC filings were made by or can be imputed to either of them and that there is no evidence that they acted with scienter. Plaintiff, however, summarily concludes that Hayward's filings are directly attributable to MSD and CCMP solely because certain of the Hayward directors who signed the risk disclosures in the 2021 Form 10-K and Form S-3 are affiliated with CCMP and MSD. Specifically, the 2021 Form 10-K was signed by Holleran, Jones (both installed by MSD and CCMP), Ali Afraz (affiliated with CCMP, MSD and AIMCo), Christopher Bertrand (Managing Director of MSD's Private Capital Group), and Kevin Brown (Co-Head of MSD's Private Capital Group). *See* Decl. of Kevin M. McDonough, Ex. 16, ECF No. 68-21. Form S-3 was signed by Holleran, Jones, Bertrand, and Brown. *Id.* at Ex. 22, ECF No. 68-27. *See also* CCC ¶¶ 32, 36.

To be liable for false statements under § 10(b) or Rule 10b-5, a defendant "must have 'made'" the material misstatements alleged in the CCC. *See Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 141 (2011). For purposes of Rule 10b–5,

> the maker of a statement is the person or entity with *ultimate authority* over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not "make" a statement in its own right. ... Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it. And it is the speaker who takes credit—or blame—for what is ultimately said.

*Id.* (emphasis added). In this case, Plaintiff does not allege that MSD or CCMP filed Hayward's SEC filings, had ultimate authority to do so, or were responsible for their issuance. Hence neither MSD nor CCMP are the "makers" of the material misstatements at issue. *See Janus*, 564 U.S. at 146-47 (holding that Janus Capital Management was not liable as a "maker" of the alleged misstatements because Janus Investment Fund, a separate legal entity, filed the prospectuses and was statutorily obligated to do so); *see e.g., In re Optimal U.S. Litig.*, 2011 WL 4908745, at *5 (S.D.N.Y Aug. 15, 2012) (finding that statement was "made" by entity that delivered the "EMs"[4] and had "ultimate authority" over its contents and issuance, rather than as plaintiffs had argued, the 100% shareholder with authority to select entity's board) (footnote added).

Nonetheless, Plaintiff seeks to attribute Hayward's statements to MSD and CCMP based on its assumption that affiliated Hayward directors signed the risk disclosures as MSD and CCMP "designees." While a person may be the "maker" of a statement that he signed, *see United States Sec. & Exch. Comm'n v. Place*, 2019 WL 634638, at *6 (E.D. Pa. Feb. 14, 2019), no factual allegations suggest that the affiliated Hayward directors signed Hayward's risk disclosures as agents of or on behalf of MSD or CCMP. Nor has Plaintiff identified any authority to support its position that statements made by Hayward's board

---

[4] "EMs" are the Bahamian equivalents of prospectuses. *In re Optimal U.S. Litig.*, 2011 WL 4908745, at *4.

members in an SEC filing are imputed to MSD or CCMP solely based on the allegation that certain board members are affiliated with MSD or CCMP. *See e.g., In re Optimal U.S. Litig.*, 2011 WL 4908745, at *5 (S.D.N.Y Aug. 15, 2012) ("although the CEO of OIS issued certain statements in his capacity as a director at Multiadvisors, it does not follow that those statements are imputed to OIS").

Finally, that certain Hayward officers or directors are alleged to also be affiliated with MSD or CCMP is not, as a matter of law, grounds to hold MSD and CCMP liable under § 10(b) for material misstatements. The issue of "ultimate authority" to make a statement is distinct from the analysis for shareholder control under § 20(a), which establishes liability for "[e]very person who, directly or indirectly, controls any person liable" for violations of the securities laws." *See Janus*, 564 U.S. at 146 (declining to read into Rule 10b-5 a theory of liability based on a "relationship of influence" as that resembled liability for control "already created expressly elsewhere" in § 20(a)). Hence, any liability theory alleging that MSD and CCMP exercised control over Hayward due to Board member affiliations is based on a "relationship of influence" that is governed by § 20(a). *Janus*, 564 U.S. at 146.

MSD and CCMP's motion to dismiss the § 10(b) and Rule 10b-5 claims (Count I) is **granted**. Because repleading Count I claims against MSD and CCMP would be futile, Count I is **dismissed with prejudice** against MSD and CCMP.

### 3. Improper Party (CCMP)

Defendant CCMP Capital Advisors, LP, in addition to not being the "maker" of any of Hayward's statements, also moves to dismiss on the grounds that it is an improper party because it is a registered investment adviser that does not, and never has, owned any Hayward stock. *See* Decl. of Scott Parker ("Parker Decl."), Ex. 3-7, ECF No. 67-5 through 67-9. In June 2017, it was CCMP's affiliated funds CCMP Capital Investors III, L.P. and CCMP Capital Investors III (Employee), L.P. (together, the "Funds") that invested in Hayward, owned and sold Hayward stock during the Class Period, as well as participated in Hayward's stock repurchase program in March 2022 and in a secondary public offering in May 2022. *See id.* at ¶ 4, Ex. 2 at 18, ECF No. 67-4 (IPO Prospectus stating Hayward was acquired by "entities affiliated" with CCMP); *id.* at ¶ 10, Ex. 8, ECF No. 67-10 (March 16, 2021 Amended and Restated Stockholders Agreement containing signature lines for "CCMP Investors: CCMP Capital Investors III, L.P." and "CCMP Capital Investors (Employee) III, L.P.").

Plaintiff does not dispute that CCMP never bought, sold, or owned any Hayward stock. *See* Decl. of Matthew Gately ("Gately Decl.") ¶ 3, Ex. 1 at 135-36, ECF No. 81-2 (IPO Prospectus listing CCMP entities that held common stock). Instead, Plaintiff insists Defendants treated all CCMP entities as a single entity. For example, the IPO Prospectus states "Hayward was acquired by 'entities affiliated'" with CCMP. *See id.* at 18; Pl.'s Opp'n to CCMP, n.1. While additional CCMP entities are named as stockholders in a footnote, each of those entities has an address of "c/o CCMP Capital Advisors." *Id.* at 136. That correspondence is directed to the care of CCMP does not justify disregarding

corporate structure and treating all CCMP entities as one. Nor does Plaintiff provide any authority or other facts to justify doing so. Because allegations in the CCC directed at CCMP as a stockholder are attributable to the Funds, CCMP's motion to dismiss Count I is **granted**. Count I against CCMP is **dismissed with prejudice** because CCMP is an improper party. Plaintiff may amend its 10(b) and 10b-5 claims to add the proper CCMP affiliated parties.

    C. Section 20(a) of the Exchange Act

    "Section 20(a) imposes joint and several liability on any person who 'controls a person liable under any provision of' the Securities Exchange Act of 1934. The text of the statute plainly requires the plaintiff to prove not only that one person controlled another person, but also that the 'controlled person' is liable under the Act. If no controlled person is liable, there can be no controlling person liability." *Shapiro*, 964 F.2d at 279 (footnoted omitted). Because the underlying unlawful conduct is not plead with particularity, the motion is also granted as to the § 20(a) claims. *See id.* (agreeing that "once all predicate § 10(b) claims are dismissed, there are no allegations upon which § 20(a) liability can be based"). Count II is **dismissed without prejudice** against all Defendants.

## III.   CONCLUSION

    For the reasons set forth above, Defendants' motions to dismiss are **granted**. Count I is **dismissed without prejudice** against the Hayward Defendants. Count I is **dismissed with prejudice** against MSD and CCMP. Count II is **dismissed without prejudice** against the individual Defendants, CCMP, and MSD. Plaintiff may file an amended complaint curing the deficiencies discussed herein within 30 days of the date of this Opinion. An appropriate order follows.

WILLIAM J. MARTINI, U.S.D.J.

Date: October 2, 2024