Peter S. Pearlman
Matthew F. Gately
**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
Park 80 West-Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, NJ 07663
Telephone: 201-845-9600
Facsimile: 201-845-9423
psp@njlawfirm.com
mfg@njlawfirm.com

*Counsel for Lead Plaintiff*
*Fulton County Employees' Retirement System*

[*Additional Counsel Appear on Signature Page*]

<div align="center">

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

</div>

| | |
|---|---|
| CITY OF SOUTHFIELD FIRE AND POLICE RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | Civil Action No. 2:23-cv-04146 |
| Plaintiff, | Hon. William J. Martini |
| v. | CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| HAYWARD HOLDINGS, INC., KEVIN HOLLERAN, EIFION JONES, CCMP CAPITAL ADVISORS, LP, CMP CAPITAL INVESTORS III, L.P., CCMP CAPITAL INVESTORS III (EMPLOYEE), L.P., CCMP CAPITAL ASSOCIATES III, L.P., CCMP CAPITAL ASSOCIATES III GP, LLC, CCMP CAPITAL, LP, AND CCMP CAPITAL GP, LLC, MSD AQUA PARTNERS, LLC, MSD PARTNERS, L.P., MSD PARTNERS (GP), LLC, MARK MCFADDEN, GREG BRENNEMAN, TIMOTHY WALSH, CHRISTOPHER BERTRAND, and KEVIN BROWN, | |
| Defendants. | |

I.   SUMMARY OF THE ACTION ................................................................. 1

II.  JURISDICTION AND VENUE ............................................................... 7

III. PARTIES ................................................................................................ 8

   A. Plaintiff .............................................................................................. 8

   B. The Hayward Defendants .................................................................. 8

   C. The Control Defendants..................................................................... 9

      1.   The CCMP Defendants and AIMCo..................................... 9

      2.   The MSD Defendants ......................................................... 12

IV.  SUBSTANTIVE ALLEGATIONS ...................................................... 14

   A. The Pool Supplies Industry and Hayward's Role as a Manufacturer ............................... 14

   B. The CCMP and MSD Entities Bought Hayward in 2017 and Installed the Company's
      Lead Executives, Including Defendants Holleran and Jones............................ 15

   C. Following a Burst of End User Demand at the Start of the Covid Pandemic, the CCMP
      and MSD Entities Arranged for Hayward to Conduct an IPO in March 2021 ................ 16

   D. In Response to an End-User Demand Surge and Logistical Challenges at the Start of
      Covid, by Mid-2021 Distributors Had Loaded Up on Safety Stock and Restored Their
      Inventory, to the Point That It Was Substantially Elevated............................ 17

   E. Due to Distributors' Elevated Inventory, by Mid-2021 Distributor Demand for
      Hayward's Products Had Dropped Significantly, and Hayward's Management Resorted
      to Discounts, Pull Aheads and Threats to Try to Overcome Their Missed Sales Targets
      and Difficulties Selling to the Channel ............................................ 21

   F. Owing to the Channel's Elevated Inventory and Stalling Demand, Hayward Suffered
      from High Numbers of Cancelled and Returned Orders .................................. 26

   G. In Addition, Hayward's Own Inventory Was Ballooning, Due to and Reflecting Its
      Difficulty Selling Products to the Oversaturated Channel............................. 28

   H.   Unable to Address the Serious Problems Impairing Hayward's Performance,
      Defendants Hayward, Holleran and Jones Made a Series of False Statements and Material

i

Omissions, While Hayward's Senior Leadership Simultaneously Sold Substantial Amounts of Stock at Artificially Inflated Prices.................................................. 33

I. Soon After the Last Insider Sales, Defendants Hayward, Holleran and Jones Admitted the Full Extent of the Problems Negatively Impacting the Company ..................................... 34

V.    FALSE AND MISLEADING STATEMENTS.................................................. 34

A. October 27, 2021: Hayward's 3Q-2021 Earnings Call.................................... 35

B. October 27, 2021: Hayward's Press Release Regarding 3Q-2021 .................. 38

C.    October 27, 2021: Hayward's Form 10-Q for 3Q-2021 ............................. 39

D. December 20, 2021: Hayward's Press Release Regarding Repurchase Program ........... 42

E. January 24, 2022: Hayward Press Release Regarding Preliminary 1Q-2021 Results...... 44

F. March 2, 2022: 4Q-2021 Earnings Call.................................................. 45

G. March 2, 2022: Hayward's Press Release Regarding Final 4Q-2021 and FY 2021 Results .................................................................................................. 51

H.  March 9, 2022: Hayward Form 10-K FY 2021……………………………… 53

I.  April 28, 2022: Hayward's 1Q-2022 Earnings Call ...................................... 54

J.  April 28, 2022: Hayward's Press Release Regarding 1Q-2022 Results......................... 59

K. April 29, 2022: Hayward's Form 10-Q for 1Q-2022................................... 60

L. May 2 and 3, 2022: Hayward's Automatic Shelf Registration (Form S-3), and Hayward's Prospectus Supplement .......................................................................... 61

M. June 9, 2022: Conference Call.............................................................. 62

VI.   THE TRUTH BEGINS TO EMERGE .......................................................... 63

A. January 24, 2022: Press Release with Preliminary 4Q-2021 Results ................. 63

B. April 28, 2022: 1Q-2022 Press Release and Earnings Call .............................. 64

C. May 2, 2022: Registration Statement and Prospectus ................................... 65

D. July 28, 2022: 2Q-2022 Press Release and Earnings Call ............................... 66

E. Subsequent Developments .................................................................. 70

VII.    ADDITIONAL SCIENTER ALLEGATIONS ................................................. 71

    A. Defendant Holleran Knew Or Recklessly Disregarded the Material Undisclosed Information ................................................................................................... 71

    B. Defendant Jones Knew Or Recklessly Disregarded the Material Undisclosed Information ................................................................................................... 76

    C. Motive and Opportunity: Most of Hayward's Highly Placed Insiders, Including Several Defendants, Used the Misrepresentations and Omissions To Generate Enormous Profits by Selling Stock at Artificially Inflated Prices During the Class Period ......................... 78

    D. The Totality of Knowledge, Motive and Actions, Supports Scienter............................... 94

VIII.    ADDITIONAL CONTROL ALLEGATIONS ................................................ 95

    A. The CCMP and MSD Entities Agreed to Act as a Group with Beneficial Ownership Over Shares, Giving Them Majority Shareholder Control Over Hayward ............................... 96

    B. CCMP and MSD Controlled Hayward Throughout the Class Period ............................. 97

        1.    Hayward Had the Status of a Controlled Company Because CCMP and MSD Controlled the Majority of Its Voting Shares ................................................. 97

        2.    Hayward Admitted That the CCMP and MSD Entities Had Significant Influence and Control Over Its Business Affairs ................................................. 98

        3.    The CCMP and MSD Entities Installed a Majority of Hayward's Board and Controlled the Composition of the Entire Board ............................................. 99

        4.    Walsh, McFadden, Bertrand, and Brown Held Key Committee Positions on Hayward's Board ........................................................................................ 100

    D. McFadden, Walsh, Brenneman, Bertrand, and Brown Approved Misleading SEC Filings........................................................................... 101

        6.    The CCMP and MSD Entities Exercised Their Power Over Hayward to Sell Their Shares at Artificially Inflated Prices ........................................................ 102

IX.    LOSS CAUSATION / ECONOMIC LOSS ................................................. 102

X.    NO SAFE HARBOR ................................................................................ 103

XI.    CLASS ACTION ALLEGATIONS ............................................................ 104

XII.    APPLICABILITY OF THE FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS OF RELIANCE.............................................................. 106

  CLAIMS FOR RELIEF .................................................................................. 107

COUNT I Violations of §10(b) of the Exchange Act and Rule 10b-5(Against Hayward, Holleran and Jones)........................................................................................ 107

COUNT II Violations of §20(a) of the Exchange Act (Against the CCMP Entities, the MSD Entities, Holleran, Jones, McFadden, Walsh, Brenneman, Bertrand, and Brown)..................... 110

PRAYER FOR RELIEF.......................................................................................................... 113

DEMAND FOR TRIAL BY JURY ........................................................................................... 113

Lead Plaintiff Fulton County Employees' Retirement System ("Plaintiff"), maintaining its principal place of business at Fulton County Retirement System Department of Finance, 141 Pryor Street, Suite 7001, Atlanta, GA 30303, by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, *inter alia*, counsel's investigation, which includes review and analysis of: (a) regulatory filings made by Hayward Holdings, Inc. ("Hayward" or the "Company"), with the U.S. Securities and Exchange Commission ("SEC"); (b) press releases and media reports issued and disseminated by the Company; (c) analyst reports concerning Hayward; (d) other public information regarding the Company, including transcripts of earnings calls and conferences held and/or attended by the Company; and (e) interviews with former Hayward employees. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     SUMMARY OF THE ACTION

1.     This securities class action is brought on behalf of all persons or entities that purchased Hayward common stock between October 27, 2021, and July 28, 2022, inclusive (the "Class Period"). Plaintiff and the Class bring claims under §10(b) the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder against Defendants Hayward, its CEO Kevin Holleran, and its CFO Eifion Jones. In addition, Plaintiff and the Class bring claims under §20(a) of the Exchange Act against Defendant Holleran, Defendant Jones, the CCMP Defendants, and the MSD Defendants, the latter of which are investment firms that took control of and dominated Hayward. The CCMP Defendants are defined below to include related entities that owned shares of Hayward ("CCMP Entities") as well their own executives placed on

Hayward's Board of Directors (the "Board"), and the MSD Defendants are defined to include such entities ("MSD Entities") and executives as well.

2.      Hayward manufactures pool products, and had long been a family-run company until a consortium led by Defendants the CCMP and MSD Entities acquired and took control of it in 2017.  Defendants CCMP and MSD maintained tight control of Hayward through stock ownership, board seats, and appointing executives like Defendants Holleran and Jones, who had no prior experience in the pool industry.

3.      Pool product manufacturing was steady, if unremarkable, from the time that Defendants the CCMP and MSD Entities acquired Hayward until the summer of 2020, when the Covid-19 pandemic created a burst of demand, with outdoor and home-based activities at a premium.  Hayward's revenue grew by about 20% year-over-year ("YoY") in 2020, prompting the CCMP Entities and MSD Entities to quickly conduct an IPO in early March 2021, through which the CCMP and MSD Entities sold over $260 million in Hayward stock.  Even after that sale, however, Hayward remained a controlled company, with the CCMP and MSD Entities continuing to hold most of their stock and to dominate the Company.

4.      The burst of high demand that drove Hayward's growth and performance leading up to the March 2021 initial public offering ("IPO") also created substantial problems, and they overtook Hayward soon after the IPO.  As detailed herein, Defendants Hayward, Holleran, and Jones made a series of false and misleading statements and omissions beginning in October 2021 and throughout the Class Period that concealed those problems from investors.

5.      First, as detailed below and described by confidential witnesses ("CWs"), Hayward's primary obstacle was that the bubble of demand in late 2020 and early 2021 left its primary customers with elevated inventory.  Those customers were the distributors who formed

Hayward's channel and that accounted for over 75% of its revenue.  (The terms "distributors" and "channel" have the same meaning herein).  Distributors serve as middlemen or wholesalers, who sell the products they purchase from manufacturers like Hayward to pool servicers, contractors, and others who work on behalf of the end users (pool owners).

6.      Several months before the Class Period began, Hayward's channel was saturated with two years' worth of inventory.  That followed several quarters in which the channel purchased significant amounts of "safety stock" – *i.e.*, inventory that the channel did not need at the time, but kept on hand to ensure that it had product to meet end user demand in later periods – after its inventory dipped earlier in the pandemic.  By mid-2021, the channel had up to $150 million of excess inventory, far more than it required, and this persisted throughout the Class Period.  This was a substantial obstacle for Hayward, because channel demand drops when its inventory is elevated, and the channel had indeed been informing Hayward that it already had too much product and did not need additional orders.

7.      When confronted with questions on conference calls regarding the channel's inventory level, Defendant Holleran nevertheless repeatedly denied that it was elevated.  For example, in response to an analyst concerned about whether channel inventory was rising too much, Defendant Holleran claimed that it "certainly had not [improved] too much by any means." When another analyst later asked a similar question about channel inventory, Defendant Holleran reiterated that "we don't think it's elevated."  These and other similar statements were false and misleading because the channel then had significant excess inventory, which was reducing its demand for Hayward products.

8.      In turn, Hayward's second obstacle was that, owing to the channel's highly elevated inventory, the channel's stalling demand was also significant and was negatively impacting

Hayward prior to and throughout the Class Period.  By mid-2021, Hayward sales teams were regularly missing their targets due to stalling channel demand, and the VP of Sales held regular meetings discussing the inventory issues.  Hayward's management responded with a sustained campaign to artificially prop up sales, and attempt to hit its targets.  This included discounting, sales blitzes, pull aheads, and pressure tactics, all of which were necessary to try to "get products off the shelves."  Such tactics, taken from a position of weakness, were self-defeating, because though they increased Hayward's current revenue—and as described below bought insiders time to unload substantial amounts of stock—they did so by cannibalizing revenue and orders from later periods, which further stifled channel demand.

9.    Accordingly, during the Class Period, the stalling channel demand resulted in large numbers of cancelled and returned orders, and in Hayward's own stock of unsold products ballooning.  By February 2022, Defendant Jones was receiving reports on cancellations, because Hayward was getting "hammered" by them from channel distributors which already had too much inventory.  At the same time, Defendant Jones was also receiving reports showing that those cancellations had contributed to Hayward's own inventory, which had reached $100 million, and was concerning.  In late 2021 or early 2022, Hayward's management had therefore ordered a slowdown in production, to bring it in line with stalling channel demand and halt the Company's inventory growth.

10.    Here too, when confronted with questions on conference calls, Defendant Holleran repeatedly denied that Hayward was experiencing significant cancellation and that channel demand was stalling.  As an example, Defendant Holleran claimed, "[i]f the channel was feeling as if they had too much or were unhappy with their inventory turns, I think there was opportunity for them to slow the bookings or even cancel and we've seen negligible cancellations through

those time periods." This was false and misleading, because Hayward was then getting "hammered" by cancellations, and was missing sales targets to reduced demand and orders from the channel. Similarly, in response to an analyst asking why Hayward's inventory was growing faster than its sales, Defendant Holleran claimed that, "[k]nowing the demand curve that we see out in the future, we are manufacturing certain products in terms of finished goods to get in into inventory to be a -- an important position to be able to service the market." This was also false and misleading, because Hayward was then actually concerned about its skyrocketing inventory of unsold products, and to address that problem was reducing its manufacturing output to reflect stalling channel demand.

11.     Under cover of those and other misrepresentations and omissions, Hayward's leading insiders sold a massive amount of Hayward stock at artificially inflated prices during the Class Period. Those sales totaled nearly $558 million, and generated nearly $150 million in illicit profits. Notably, the inside sellers cover four of Hayward's five top executives, and two of Hayward's three corporate owners, including Defendants the CCMP Entities—the largest seller—Jones and Holleran. The sales were all highly suspicious in terms of their timing, in comparison to previous periods, and in light of the percentage of holdings that were loaded

12.     It is also noteworthy that the one member of Hayward's top five executives who did not sell, its Chief Supply Officer ("CSO") resigned from the Company during the middle of the Class Period and the insider selling. The CSO, who was the only member of Hayward's C-Suite that predated the CCMP and MSD Entities' acquisition of Hayward, and had expressed concern regarding the impact of the channel's large bubble of orders on demand as well regarding the difficulty of slowing down Hayward's production to match reduced channel demand.

13.     Along with the substantial insider selling, which created a motive and opportunity to perpetrate the fraud, Defendant Holleran also knew of or recklessly disregarded the undisclosed information that his false and misleading statements concealed.  Defendant Holleran admitted that he "ke[pt] close tabs" on channel inventory and demand, which was critical to Hayward's performance.  Further, at the end of the Class Period, he admitted that by late 2021, he knew that the channel had taken "strategic positions" to reduce its elevated inventory, and that demand was "moderati[ng]."   Further, a CW confirmed that Defendant Holleran chaired monthly "Sales, Inventory and Operations Planning" attended by Hayward executives, which covered sales performance, such that the C-Suite, including Defendant Holleran "had to know" that channel inventory was elevated.  These and other bases of Defendant Holleran's knowledge are detailed below.

14.     Likewise, Defendant Jones knew of or recklessly disregarded the undisclosed information he concealed.   He also admitted having "good channel inventory knowledge." Further, a CW confirmed that during the Class Period Defendant Jones received reports on cancellations, because Hayward getting "hammered" by cancelled orders from distributors with too much inventory, as well as reports showing that as result of such stalling channel demand Hayward's own stock of unsold products was ballooning.  Defendant Jones raised concerns that Hayward's inventory had reached $100 million.  Defendant Jones also attended the monthly meetings chaired by Defendant Holleran that covered Hayward's sales performance and inventory. These and other bases of Defendant Jones' knowledge are detailed below.

15.     The truth gradually emerged through a series of partial corrective disclosures and materializations of the undisclosed risks, with Defendants Hayward, Holleran, and Jones

withholding the full extent of the problems negatively impacting the Company until shortly after the last of the insider sales.

16.    On the last day of the Class Period, not long after the last of the insider sales, Defendants Hayward, Holleran, and Jones finally admitted that, as they had long known and the CWs described, Hayward was suffering from "elevated channel inventories" and significant "reductions in channel inventory."  They later revealed that channel was reducing an enormous "120 million to $150 million" of Hayward products from its inventory.  As a result, Hayward conceded that its nets sales for FY 2022 would decline by about 6% as compared to 2021, a far cry from the sustained demand and growth Defendants Holleran and Jones had been touting during the Class Period.

17.    With this news, Hayward's stock dropped 18.23%, and it overall fell from $22.73 per share at the start of the Class Period to $11.21 at the close.  In this manner, and in contrast to the insider sellers, Plaintiff and the Class suffered substantial damages.

## II.    JURISDICTION AND VENUE

18.    The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5.

19.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

20.    Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and §27 of the Exchange Act.  Hayward was headquartered in this District at the start of the Class Period and many of the acts and practices complained of herein occurred in substantial part in this District.

21.    In connection with the acts and omissions alleged in this amended complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including, but not limited to, the mails, interstate telephone and wire communication, and the facilities of the national securities markets.

## III.    PARTIES

### A.  Plaintiff

22.    Lead Plaintiff Fulton County Employees' Retirement System, as set forth in its previously filed certification (ECF No. 2-6), purchased Hayward's common stock during the Class Period and suffered damages as a result of the federal securities law violations and actionable misstatements and material omissions alleged herein.

### B.  The Hayward Defendants

23.    Defendant Hayward was headquartered in Berkeley Heights, New Jersey, for much of the Class Period, and subsequently completed a relocation of its headquarters to Charlotte, North Carolina, in July 2022.   The Company is a U.S.-based designer and manufacturer of pool equipment.  Hayward's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "HAYW."

24.    Defendant Kevin Holleran ("Holleran") was at all relevant times Hayward's CEO and President.

25.    Defendant Eifion Jones ("Jones") was at all relevant times Hayward's CFO and Senior Vice President.  During the Class Period, Defendant Jones sold 189,945 personally held Hayward shares for proceeds of $3,292,353.

26.    Holleran and Jones possessed the power and authority to control the contents of Hayward's SEC filings, press releases, and other market communications.  Holleran and Jones were provided with copies of Hayward's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions within Hayward, and

their access to material information available to them but not to the public, Holleran and Jones knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. Holleran and Jones are liable for the false statements and omissions pleaded herein.

## C. The Control Defendants

### 1. The CCMP Defendants and AIMCo

27.    CCMP is an investment firm that, among other things, acquires and sells companies, and operates through various related entities. During the Class Period, Hayward was controlled by the seven affiliated CCMP entities named as Defendants below (collectively, the "CCMP Entities"). The CCMP Entities were one of Hayward's two largest shareholders. Prior to the March 2021 IPO, the CCMP Entities owned approximately 38.1% of Hayward's outstanding common stock; following the IPO, they continued to own approximately 31% of Hayward's shares. In addition, three executives of the CCMP Entities, Mark McFadden, Timothy Walsh, and Greg Brenneman, sat on Hayward's Board as non-independent directors. Those three executives are also named as Defendants below. The CCMP Entities, together with McFadden, Walsh, and Brenneman are collectively referred to herein as "CCMP." CCMP had the power and/or potential power to control Hayward, and exercised actual control over Hayward through various means detailed below.

28.    Defendant **CCMP Capital Advisors, LP** ("CCMP Capital"), is a New York-based private equity firm specializing in buyouts and growth equity investments. According to CCMP Capital, it "primarily seeks to make control investments" in privately-owned companies in the consumer, industrial, and healthcare sector, and acts "primarily as the lead investor" in those companies.

29.     Defendant **CCMP Capital Investors III, L.P.**, is a New York-based investment fund affiliated with CCMP Capital that directly held Hayward common stock during the Class Period.

30.     Defendant **CCMP Capital Investors III (Employee), L.P.**, is a New York-based investment fund affiliated with CCMP Capital that directly held Hayward common stock during the Class Period.

31.     Defendant **CCMP Capital Associates III, L.P.,** is the New York-based general partner of CCMP Capital Investors III, L.P., and CCMP Capital Investors III (Employee), L.P. (the "CCMP Funds"), and an affiliate of CCMP Capital.  During the Class Period, CCMP Capital Associates III, L.P., was the beneficial owner of Hayward common stock held by the CCMP Funds.

32.     Defendant **CCMP Capital Associates III GP, LLC**, is the New York-based general partner of CCMP Capital Associates III, L.P., and an affiliate of CCMP Capital.  During the Class Period, CCMP Capital Associates III, GP, LLC, was the beneficial owner of Hayward common stock directly held by the CCMP Funds.

33.     Defendant **CCMP Capital, LP**, is a New York-based entity that owns CCMP Capital Associates III, GP, LLC, and an affiliate of CCMP Capital.  During the Class Period, CCMP Capital, LP, was the beneficial owner of Hayward common stock directly held by the CCMP Funds.

34.     Defendant **CCMP Capital GP, LLC**, is the New York-based general partner of CCMP Capital, LP, and an affiliate of CCMP Capital.  During the Class Period, CCMP Capital GP, LLC, was the beneficial owner of Hayward common stock directly held by the CCMP Funds.

35.     Defendant **Mark McFadden** ("McFadden") was a non-independent member of Hayward's Board during the Class Period.  He served on Hayward's Board from 2017 to 2023 and

was the Chairperson of Hayward's three-person Compensation Committee at all relevant times, serving alongside Defendant Brown.  During that time, McFadden was also a principal owner of Defendant CCMP Capital, LP, and was Managing Partner and co-Managing Director of CCMP Capital Advisors, LP.  McFadden signed Hayward's false and misleading March 9, 2022 Form 10-K for fiscal year 2021 ("FY 2021") and May 2, 2022 Form S-3 Registration Statement.

36.    Defendant **Timothy Walsh** ("Walsh") was a non-independent member of Hayward's Board during the Class Period.  He served on Hayward's Board from 2017 to 2023 and was the Chairperson of Hayward's three-person Nominating and Corporate Governance Committee.  During that time, Walsh was also a principal owner of Defendant CCMP Capital, LP, and served on the investment committee of Defendant CCMP Capital GP, LLC, with respect to shares of Hayward's common stock; he also served as the President and CEO of CCMP Capital Advisors, LP.  Defendant Walsh signed Hayward's false and misleading March 9, 2022 Form 10-K for FY 2021 and May 2, 2022 Form S-3 Registration Statement.

37.    Defendant **Greg Brenneman** ("Brenneman") was a non-independent member of Hayward's Board of Directors during the Class Period, and served on Hayward's Board from 2017 to 2023.  During that time, Brenneman was also a principal owner of Defendant CCMP Capital, LP, and served on the investment committee of Defendant CCMP Capital GP, LLC, with respect to shares of Hayward's common stock; he also served as the Executive Chairman of CCMP Capital Advisors, LP.  Brenneman signed Hayward's false and misleading March 9, 2022 Form 10-K for FY 2021 and May 2, 2022 Form S-3 Registration Statement.

38.    Non-party **AIMCo** is a Canadian institutional investment manager that sometimes works with private equity firms targeting companies for buyout by acting as a minority investor.  According to AIMCo's website, it "invests selectively with the world's leading private equity

firms," and its strategy "focuses on co-control and minority investment positions in private companies, alongside our Private Equity Fund partners." AIMCo's website lists CCMP Capital as a Fund Partner, and it has previously partnered with the entities affiliated with CCMP Capital to back other companies, including the company Milacron, which entities affiliated with CCMP Capital acquired in 2012 and took public in 2015, also with AIMCo as a minority shareholder. During the Class Period, AIMCo relied upon the CCMP Entities to advise it and to manage AIMCo's investment in Hayward. As a result of this relationship, the CCMP Entities had the ability to direct and/or substantially influence the way AIMCo voted its Hayward shares. The CCMP Entities also had the ability to direct and/or substantially influence the timing and amount of AIMCo's sales of Hayward stock.

39.    AIMCo was Hayward's third-largest shareholder (behind the CCMP Entities and the MSD Entities). It held 19.6% of Hayward's outstanding stock before Hayward's IPO in March 2021, or about half as many shares as the CCMP and MSD Entities each owned. Immediately following the IPO, after selling the same percentage of its shares as the CCMP Entities, AIMCo continued to own 15.9% of Hayward's shares while the CCMP and MSD Entities held approximately 31% each. Throughout the Class Period, AIMCo acted in coordination with the CCMP Entities in selling its shares. In addition, AIMCo held a non-independent director seat on Hayward's Board.

### 2. The MSD Defendants

40.    MSD is an investment firm that, among other things, acquires and sells companies, and operates through various related entities. During the Class Period, Hayward was also controlled by the three affiliated MSD entities named as Defendants below (collectively, "MSD Entities"). Along with the CCMP Entities, the MSD Entities were Hayward's largest shareholder.

Prior to the March 2021 IPO, the MSD Entities owned approximately 38.1% of Hayward's outstanding common stock; following the IPO, they continued to own approximately 31% of Hayward's shares. In addition, two executives of the MSD Entities, Christopher Bertrand and Kevin Brown, sat on Hayward's Board of Directors as non-independent directors. Those two executives are also named as Defendants below. The MSD Entities, together with Bertrand and Brown are collectively referred to herein as "MSD." MSD had the power and/or potential power to control Hayward, and exercised actual control over Hayward through various means that are described in more detail below.

41.    Defendant **MSD Aqua Partners, LLC**, is a New York-based investment fund that directly held Hayward common stock during the Class Period (the "MSD Fund").

42.    Defendant **MSD Partners, L.P.**, is the New York-based investment manager of MSD Aqua Partners, LLC. During the Class Period, MSD Partners, L.P. was the beneficial owner of Hayward common stock directly held by the MSD Fund.

43.    Defendant **MSD Partners (GP), LLC**, is the general partner of MSD Partners, L.P. During the Class Period, MSD Partners (GP), LLC, was the beneficial owner of Hayward common stock directly held by the MSD Fund.

44.    Defendant **Christopher Bertrand** ("Bertrand") was a non-independent member of Hayward's Board during the Class Period. He served on Hayward's Board beginning in 2020 and was a member of Hayward's three-person Audit Committee during Fiscal Year 2021 until February 2022. During the Class Period, Bertrand was also the Managing Director of Defendant MSD Partners, L.P.'s Private Capital Group. Defendant Bertrand signed Hayward's false and misleading March 9, 2022 Form 10-K for FY 2021 and May 2, 2022 Form S-3 Registration Statement. Additionally, Defendant Bertrand reviewed and approved all financial statements and

disclosures published by Hayward during his tenure on the Audit Committee, including Hayward's false and misleading quarterly financial statement (Form 10-Q) for the third quarter of 2021 ("3Q-21").

45.     Defendant **Kevin Brown** ("Brown") was a non-independent member of Hayward's Board during the Class Period.  He served on Hayward's Board beginning in 2017 and was a member of Hayward's three-person Compensation Committee along with Defendant McFadden. During the Class Period, Brown was also Co-Head of Defendant MSD Partners, L.P.'s Private Capital Group.  He signed Hayward's false and misleading March 9, 2022 Form 10-K for FY 2021 and May 2, 2022 Form S-3 Registration Statement.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    The Pool Supplies Industry and Hayward's Role as a Manufacturer

46.     Hayward Industries, Inc. ("Hayward Industries"), a manufacturer of pool supplies, was founded in 1925 and run by two families for almost 100 years.

47.     Before March 2020, the business of pool supplies manufacturing was steady, if unremarkable.  Hayward Industries and other manufacturers made such products as pool pumps, heaters, and filters.  About 80% of Hayward Industries' business was in North America, with the remainder spread across Europe and the rest of the world.

48.     Most of Hayward Industries' sales before and during the Class Period were to distributors in the "channel."  For example, in fiscal year ("FY") 2020, 76% of its sales were to channel distributors.

49.     Distributors are similar to middlemen or wholesalers.  After purchasing products from Hayward, distributors sell them to a variety of swimming pool builders, specialty retailers, and service companies that work with the end users of the products (that is, the pool owners).

Hayward Industries' channel consists of all of its distributor customers. The terms "channel" and "distributors" are accordingly used interchangeably herein.

50.    Demand varies based on the amount of inventory that the businesses at each stage of the supply chain already have on hand. Even if there is incremental demand and sales for builders and distributors that does not create incremental demand and sales for manufacturers, when, for example, distributors are already loaded up on inventory.

**B. The CCMP and MSD Entities Bought Hayward in 2017 and Installed the Company's Lead Executives, Including Defendants Holleran and Jones**

51.    The CCMP and MSD Entities are investment management firms that acquire private companies, operate them for several years, and then sell them, attempting to cash out at a profit. In June 2017, the CCMP Entities, the MSD Entities, and AIMCo formed a consortium to buy Hayward Industries, and formed a holding company, Defendant Hayward Holdings, Inc. ("Hayward"), expressly for that purpose.

52.    The acquisition brought the pool supply manufacturer under the full control of the CCMP Entities, the MSD Entities, and AIMCo. Together, they beneficially owned approximately 96% of Hayward's outstanding shares, with the CCMP and MSD Entities each owning 38.1% of Hayward's shares and AIMCo owning approximately 19.6%. As set forth in more detail below, after selling a percentage of their shares following Hayward's IPO in March 2021, the CCMP and MSD Entities and AIMCo continued to own nearly 78% of Hayward's total outstanding stock: the CCMP and MSD Entities each continued to hold approximately 31% of Hayward's stock, while AIMCo owned approximately 15.9%.

53.    Because the majority of its voting shares were beneficially owned by a single shareholder group, Hayward was deemed a "controlled company" under the New York Stock Exchange (NYSE) rules. The majority of Hayward's Board members were affiliated with the

CCMP or MSD Entities or AIMCo, and at least one member of the consortium was on every committee. Through its majority control over Hayward's shareholder votes and its control over Hayward's Board, the CCMP and MSD Entities had significant influence and effective control over the Company's business, its executives and directors, and its financial affairs. Hayward referred to the CCMP Entities, the MSD Entities, and AIMCo as its "Sponsors" and acknowledged that they had "effective[] control" and "significant influence" over the Company.

54.     After taking over, the CCMP and MSD Entities installed the majority of Hayward's Board and replaced Hayward's senior management with their hand-picked executives to run the Company. They also installed Defendant Holleran as the CEO in 2019, and Defendant Jones as the CFO in 2020 – though neither man had any background in the pool industry. Defendant Holleran previously worked for Textron in its Industrial Segment, which manufactures vehicles and designs and produces fuel systems for automobiles. Defendant Jones previously worked for Cornerstone Holdings, a private investment company.

**C.     Following a Burst of End User Demand at the Start of the Covid Pandemic, the CCMP and MSD Entities Arranged for Hayward to Conduct an IPO in March 2021**

55.     The start of the Covid-19 pandemic created a burst of end-user demand for pool supplies in the summer of 2020. Pools were suddenly more attractive to people stuck in their homes, who had few other options for spending discretionary savings on recreation.

56.     Hayward's revenue for FY 2020 accordingly grew by about 20%. It generated $875.4 million in net sales in FY 2020, compared to $733.4 million in FY 2019. Net sales for the third quarter of 2020 increased 38.3% to $224.5 million from the third quarter of 2019. For the fourth quarter of 2020, net sales increased 12.2% to $260.7 million from the fourth quarter of 2019. Thus most of Hayward's net sales and growth came in the second half of 2020, after the bubble of demand from the pandemic began.

57.    Taking advantage of this surge of revenue in 2020, the CCMP and MSD Entities quickly arranged for Hayward to conduct an IPO on March 11, 2021. The IPO offered 43,093,665 shares of Hayward common stock. Notably, the shares sold by the CCMP and MSD Entities in the IPO accounted for about 38.6% of the total Hayward stock sold in the IPO. With an IPO price of $17.00 per share, and after underwriting discounts and commissions, the net return to the CCMP and MSD Entities was $267,020,927.46. Hayward's net return was $356,643,000.00.

58.    After these sales, the CCMP and MSD Entities each owned 71,538,085 shares, or 30.9% each of the total outstanding Hayward common stock. AIMCo owned 36,776,695 shares, or 15.91% of the total outstanding Hayward common stock.

59.    Ownership of Hayward's shares by the CCMP Entities, the MSD Entities, and AIMCo before the IPO and after the foregoing sales, in terms of number of shares and percentage of total ownership, is set forth below:

|  | Shares Owned Before IPO | | Shares Owned After IPO[1] | |
|---|---|---|---|---|
|  | # | % | # | % |
| CCMP Entities | 79,848,727 | 38.1% | 71,538,085 | 30.96% |
| MSD Entities | 79,848,727 | 38.1% | 71,538,085 | 30.96% |
| AIMCo | 41,049,076 | 19.6% | 36,776,695 | 15.91% |
| **Total** | **200,746,530** | **95.8%** | **179,852,865** | **77.83%** |

**D.  In Response to an End-User Demand Surge and Logistical Challenges at the Start of Covid, by Mid-2021 Distributors Had Loaded Up on Safety Stock and Restored Their Inventory, to the Point That It Was Substantially Elevated**

60.    For their part, distributors, who made up the bulk of Hayward's direct customers, responded to the surge in end-user demand and tight supply chain in FY 2020 by loading up their inventory of pool products during later in 2020 and the first half of 2021 – which, as discussed in the subsequent subsections, caused distributor demand to drop significantly and Hayward to have

---

[1]    Hayward reported in its Form 10-Q for 1Q-2021 that it had 231,101,257 shares outstanding as of May 17, 2021.

difficulty selling to distributors, even as Hayward's manufacturing skyrocketed. Net sales increased 96% YoY to $334.4 million for the first quarter of 2021 and increased 66% YoY to $364.4 million for the second quarter of 2021 as distributors loaded up on inventory. These results in the first half of 2021 continued to reflect the bubble of demand from the start of the pandemic.

61.     Multiple CWs confirmed that prior to the Class Period, by mid-2021, the channel's inventory levels had recovered, and the channel had already purchased and generally had on hand more than sufficient inventory to meet downstream demand – in the short and long term. As set forth below, the channel had two years' worth of inventory, or up to $150 million of excess product. The channel's saturated inventory level caused a significant drop in channel demand, and difficulties for Hayward selling to the channel.

62.     **CW1** worked at Hayward from 2016 to December 2022 as a Senior Product Marketing Manager. CW1's job responsibilities included generating marketing materials and CW1's role involved a significant amount of "working between the product management and sales teams" at Hayward. By the time CW1 left Hayward, CW1 was in a reporting line one level removed from the Company's VP of Marketing and Product Management. Over the course of CW1's time at Hayward, CW1 worked in the Company's offices in New Jersey and in North Carolina.

63.     Starting in mid-2021, CW1 recalled that demand began to slow, and CW1 remembered hearing that "the channel was stuffed" and there were concerns about inventory. CW1 recalled that concerns about excess inventory were general knowledge around the Company and were "water cooler talk."

64.     **CW2** worked in sales at Hayward from January 2016 to September 2022 and was a District Sales Manager from November 2020 to September 2022. CW2 worked in California

and oversaw all of Northern California, from the greater Sacramento area to Reno, Nevada, all the way up to Oregon, Washington, Idaho, and the west end of Montana. CW2's job entailed working with distributors to purchase products from Hayward and get equipment out into the marketplace.

65.     CW2 began to hear about excess inventory at distributors in May 2021. CW2 heard directly from distributors in 2021 that they simply had too much inventory already, about two years' worth, and they were not going to load up on any additional product.

66.     CW2 also learned in the course of CW2's duties that during Covid, distributors were told to stock up because of supply chain issues. That is, during 2021, Hayward was telling distributors to purchase more inventory than they needed, to ensure they had inventory in future periods.

67.     CW2 recalled that the overages in distributor inventory were often brought up among colleagues. CW2 noted that "everyone discussed it." CW2 was also convinced that C-Suite executives like the CEO would have known that distributors had enough inventory based on the large increase in purchases the previous year, followed by limited early buy orders in 2021 (further discussed below).

68.     CW2, who currently works for one of the large pool products distributors that is a customer of Hayward, learned that post-Covid, CW2's current employer at one point had about two-and-a-half years' worth of Hayward products. CW2 also made clear that this distributor had too much inventory "at the time" that Hayward was experiencing the problems with reduced demand and excess channel inventory that CW2 discussed above and as detailed herein. CW2 stated that this distributor currently as of the Consolidated Complaint still has much more inventory of Hayward products than they could sell in one year at CW2's location.

69.    **CW3** was a Senior Business Intelligence Visualization Developer at Hayward from August 2021 to March 2023.  CW3 reported to the Vice President of Analytics, and also worked with Hayward's then-VP of Sales and its then-Chief Supply Chain Officer.  Further, as part of CW3's job duties, CW3 was asked to put several reports together for Defendant Jones, and CW3 also oversaw centralizing Hayward data into one reporting tool named Snowflake.

70.    Similar to CW2, CW3 came to understand that due to delays in the supply chain, distributors began to place orders double the size of their typical orders.  That is, after ordering the inventory they needed for the upcoming period, distributors would place an additional order for inventory they needed in the next period before the first set of orders even arrived.  As a result, CW3 concluded that Hayward's "demand was increasing" during that time.  However, almost from the moment CW3 started working at Hayward in August 2021, Hayward's then-Chief Supply Officer was concerned with this large bubble of orders that was occurring in 2021.  CW3 saw that this ordering was occurring through mid-2021, around the time that the Ever Given container ship was stuck in the Suez Canal – the ship resumed moving in early July 2021 – but that later in 2021 the supply chain bubble, or bottleneck, popped.

71.    At the end of the Class Period, Defendants Holleran and Jones admitted that the channel was loading up on safety stock early in 2021 and that it was oversaturated with inventory, confirming the CWs' statements set forth above.  In the July 28, 2022 2Q-2022 earnings call, Defendant Jones acknowledged that "[d]istributors started reducing safety stocks as a result of improved supply chain and shorter lead times for specific products."  Similarly, in the same call, Defendant Holleran stated that "[w]ith distributors['] increased confidence in OEM [original equipment manufacturer] supply chains and shorter lead times, they don't require the same level of safety stock, resulting in a recalibration of 4 to 6 weeks less channel inventory."  Likewise, in

the November 1, 2022 3Q-2022 earnings call, Defendant Holleran stated "[d]istributors are reducing safety stocks built up during the period of strong demand and significant supply chain disruption, and we estimate a reduction of approximately $80 million occurred in the third quarter and compared to a meaningful inventory build in the prior year period."

72.    In addition, all of this increased activity throughout the supply chain along with general conditions from the pandemic resulted in significant price inflation for pool products in 2020, 2021, and 2022.  That inflation began with manufacturers like Hayward, which then passed their own increased costs to their customers, the distributors, and so on down the supply chain line.

73.    The inflation further incentivized distributors to fully stock their inventory in 2021, prior to the Class Period.  For example, since distributors knew that price increases would be coming in the future from Hayward and other manufacturers, they purchased more products than they needed in 2021 so that they could lock in a lower price on inventory.

74.    Meanwhile, for end users, the price of building and improving pools was increasing, even as pandemic restrictions and discretionary savings were decreasing, undermining the marginal value of pool supplies.

**E.  Due to Distributors' Elevated Inventory, by Mid-2021 Distributor Demand for Hayward's Products Had Dropped Significantly, and Hayward's Management Resorted to Discounts, Pull Aheads and Threats to Try to Overcome Their Missed Sales Targets and Difficulties Selling to the Channel**

75.    Part and parcel with the saturation of distributor inventory, distributor demand for Hayward's products dropped significantly and Hayward was therefore having difficulty selling to distributors by mid-2021, prior to the start of the Class Period.  Hayward grew concerned about this, and pressured its sales team to nevertheless keep hitting high sales growth rates.  To that end, Hayward also instructed its sales team to use a combination of incentives and pressure on customers reluctant to place additional orders.  These tactics were largely unsuccessful, because,

even when they resulted in a sale, they did so by accelerating a sale which otherwise would have occurred later, and thereby cannibalized future revenue.

76.    As noted above, CW1, who was a Product Marketing Manager at Hayward, recalled that demand began to slow starting in mid-2021.  CW1 further remembered that in mid-2021, management began to apply pressure to the marketing team because the sales teams "weren't hitting their numbers."  Management began to ask marketing teams to develop programs to "get product off the shelves."  This is how CW1 began to realize that there was a surplus of inventory at Hayward.

77.    CW1 recalled that these marketing programs included "buy more to save more" programs – that is, offering discounts if the volume of an order increased.  CW1 saw that, in late 2021, Hayward also resorted to a new measure called a "sales blitz," which were internal sales promotions for the sales team.  CW1 observed that the sales blitzes were not "moving the needle," and did not appear to be significantly changing sales numbers from years prior.

78.    CW1 recalled that the product management team had access to large quantities of data at Hayward and was able to see both sales numbers and what was being purchased from Hayward's distributors and manufacturing sites.  This information was stored in a database CW1 believed was called Cognos.  Cognos also tracked all Hayward inventory.  CW1 recalled that the product management team regularly generated reports from this database, and that the product management team used these reports for both buying and selling decisions at Hayward – including to inform the marketing department of which products needed "sales blitzes."

79.    **CW4** was a Director of Shipping Operations at Hayward from September 2021 to April 2022.  CW4 reported up to "a few people," including a reporting line one level removed

from Hayward's Director of Distribution.  CW4 was responsible for day-to-day output (shipping) of finished materials from Hayward's Mocksville, North Carolina, warehouse to vendors.

80.     CW4 saw that during CW4's time at Hayward, there was "an overage of inventory," and "general concerns" that the Company was not "selling enough."  CW4 was given shipping levels and numbers to hit, and if those dollar amounts were not met, it was considered a failure.  If there were no orders to hit their goals, CW4 recalled that they were instructed to "pull ahead" future orders.  Pulling ahead or pulling forward means that a customer order for a future period was being filled in the current time period.  CW4 recalled "a lot of stress" around the finances at Hayward, stating, "[i]f we didn't pull ahead, numbers would not be where they expected and needed them to be."  CW4's general understanding was that a sale was recognized the minute the load was shipped.  Pulling ahead orders thereby increased Hayward's revenue for the current period, albeit to the detriment of later periods.

81.     CW4 recalled the first instruction to pull forward orders to ship came in October 2021 during a daily staff meeting.  CW4 relayed that this occurred at a daily meeting which included a review of what to expect from the day's shipping goals in dollar amounts and orders, and with discussion topics that included what products needed to be shipped, which orders were being processed already, and what future orders that needed to be processed.

82.     CW4 recalled that two weeks later, sometime between Halloween and Thanksgiving of 2021, the Site Manager at CW4's location informed CW4 that they "had to do something about volume" because they did not "have enough volume with current orders to sustain what higher-ups needed."  The Site Manager explained to CW4 that they would have to pull ahead orders even if customers did not request or approve it.  When CW4 questioned this practice, the Site Manager said the Company would "deal with the aftermath."

23

83.     CW4 stated that pulling forward orders continued through Christmas of 2021. Employees at CW4's location worked overtime to keep up with pulling orders forward, but as CW4 looked at future orders, CW4 noticed the orders were dwindling.

84.     CW4 was personally concerned that Hayward was not "being accurate" by pulling forward orders.  Moreover, CW4 stated that Hayward was shipping orders "way ahead of schedule" and "customers were not happy."  CW4 was told by individuals on the customer service team that customers were receiving orders "six months ahead of time."

85.     Around December 2021, CW4 voiced concerns about pulling forward orders to the Site Manager and Hayward's Director of Distribution.  CW4 stated that they both became frustrated, and the Director of Distribution told CW4 that this would "benefit the Company and work out in the end."

86.     CW4 recalled that orders rejected by customers started to become an issue.  CW4 learned about this from key performance indicator ("KPI") meetings at the Clemmons, North Carolina, location, which were held by a sales director, and customer frustration was also brought up "a couple of times" in the meetings.

87.     Hayward responded to reluctant customers with incentives and pressure.  As CW4 learned during the course of CW4's duties, Hayward employees were instructed to tell customers that if they kept unexpected orders, they would receive discounts on future orders.  In addition, CW4 heard that the sales team would tell customers "behind the scenes" that if they placed orders a year in advance, they "won't have the price increasing."

88.     CW1 was also aware of pull forwards as a practice that Hayward used.  This practice occurred when Hayward wanted to improve its performance numbers.  Around 2018, CW1 recalled order pull forwards happening in order to make Hayward appear more profitable

and attractive for a potential buyer or IPO. CW1 heard from Hayward's then-VP of Marketing about these pull forwards. CW1 also realized that "something similar was happening again" in 2021 around the time of the IPO, and "heard from the product management team" that Hayward was then engaging in pull forwards.

89.     Likewise, CW2, who was a District Sales Manager, recounted that CW2 was not hitting CW2's sales targets in 2021 up until CW2 left the Company in 2022. CW2 recalled that CW2 was "not hitting those overall dollars on the sales end standpoint" because distribution had too much product. As CW2 came to understand, while customers were still buying from distributors, distributors had what they needed from Hayward. CW2 relayed that it became hard for district managers to hit their sales dollar targets.

90.     CW2 attended sales meetings that occurred either monthly or quarterly, which Hayward's VP of Sales and its Regional Sales Manager also attended. At these meetings, the VP of Sales would discuss inventory issues in 2021. CW2 also attended weekly meetings with other sales managers in Northern California about the difficulties moving product.

91.     CW2 recalled an instruction that "trickled down" to salespeople from superiors and involved the salespeople informing distributors that they should load up on inventory. CW2 recalled there were internal discussions about telling distributors and customers that they "don't want to be the company that doesn't have [product]." CW2 noticed around late 2020 and going up through 2022 that salespeople were instructed to push and to "strongly encourage" distributors to make these orders. As a sales rep at the time, CW2 thought it was great because more money would be coming in, however, this started to impact bonuses because product sat there unsold for two years. In turn, CW2 stated that to encourage distributors to order products, salespeople offered them discounts and rebates.

92.    The foregoing circumstances also reduced demand for Hayward's "early buy" program.  As explained in Hayward's FY 2021 Form 10-K, "[i]n the fourth quarter, [Hayward] incentivize[d] trade customers to buy and stock up in preparation for next year's pool season under an 'early buy' program that offers a price discount and extended payment terms."  For the 2021 early buy program, for example, Hayward "ship[ped] products from October through March and receive[d] payments for th[o]se shipments from February through July 2022."  CW2 understood that distributors were not participating in the early buy program in 2021, because they had already made purchases in the previous calendar year and loaded up on inventory.

93.    At the end of the Class Period, Defendants Holleran admitted that in 2021 Hayward knew that distributor demand was dropping, confirming the CWs' statements set forth above.  As he admitted after the fact on the July 28, 2022, 2Q-2022 earnings call (discussed further below), "[w]e expected to sell less into the channel versus sellout due to the strategic positions that many of our channel partners took at the end of 2021."  He further admitted that "[o]verall, when we set coming into the year, with last year's retail pull-through in front of us, we expected some moderation off a very, very high pull through the channel last year."

**F.  Owing to the Channel's Elevated Inventory and Stalling Demand, Hayward Suffered from High Numbers of Cancelled and Returned Orders**

94.    Hayward's attempts to maintain high sales growth in the face of dropping customer demand and a channel loaded with inventory were unsuccessful.  Instead, distributors began cancelling orders because they already had too much inventory.  Defendants tracked these circumstances.

95.    CW3, a Senior Business Intelligence Visualization Developer, was aware of customer cancellations because of the reports CW3 was tasked with running in CW3's role.  CW3 believed cancellations, and a lack of new orders, began around March 2022.  CW3 learned during

the course of CW3's duties that in early 2022, around the end of February, Defendant Jones began to ask for cancellation reports to be put together so he could access them. CW3 published these reports on a Tableau dashboard that Jones could review (Tableau is a visual analytics platform). CW3 also prepared reports for Defendant Jones to visualize inventory backlog and how much money was tied up in products that were made but not being distributed. CW3 recalled, as an example, that there was a special order for heaters that someone required and then cancelled, and stated "[t]hat ended up being $11 million of inventory," which Hayward "was stuck with just from one order."

96. As CW3 explained, Hayward was getting "hammered" by distributors who placed orders but then no longer wanted those orders anymore. CW3 learned during the course of CW3's duties that, after the supply chain bubble popped, Hayward was producing and sending product out, but that distributors then had enough product on hand without increased customer orders, so the distributors began cancelling orders. Vendors and distributors became overwhelmed with the product they already had, and "[e]veryone was like, I don't have room for all this stuff," CW3 recalled.

97. Consistent with CW3's statements, as set forth herein, CW4 recalled orders rejected by customers, and CW6 recalled "talks" of large-scale returns of Hayward orders.

98. CW3 recounted that Hayward's then-Chief Supply Officer, Donald Smith, "knew right away" that ordering would slow down once Covid ended. CW3 recalled conversations with Smith who was concerned with how the Company would handle production once "things went back to normal."

99.     Notably, Smith was the only member of the C-suite remaining by the time of the IPO who had not been installed by CCMP and/or MSD.  He had served as Hayward's Senior Vice President, Chief Supply Chain Officer since January 2007.

**G. In Addition, Hayward's Own Inventory Was Ballooning, Due to and Reflecting Its Difficulty Selling Products to the Oversaturated Channel**

100.     By early 2021, Hayward made several important and lasting changes that committed it to manufacturing substantially more pool products than it had before the pandemic. First, Hayward increased the amount of raw materials and input parts it was purchasing.  The capital Hayward invested in raw materials nearly tripled over a two-year period, going from $56.1 million of raw materials on its balance sheet as of 3Q-2020 near the start of the pandemic, to a peak of more than $142 million in raw materials as of 2Q-2022, roughly a month before the end of the Class Period:



101.    Second, at the same time, Hayward enlarged its manufacturing output.    Its manufacturing of finished goods increased by more than 80% in the first half of FY 2021 as compared to the prior year, and by 54% for the full FY 2021.  Hayward's finished goods inventory rose from $66.4 million in 2Q-2021, to $88.7 million in 3Q-2021, stayed at that elevated amount of $86.2 million in 4Q-2021, then rose again in 1Q-2022 to $108.7 million, and reached as high as $148.5 million - more than double the value of the inventory in 2Q-2021 - in 2Q-2022.  *See infra* ¶104 (chart).

102.    Importantly, when combined with Hayward's reduced sales to the channel, Hayward's increased manufacturing meant that its own inventory of raw materials and finished products was increasing precipitously leading up to and during the Class Period, because the channel was not buying those additional products Hayward was manufacturing.

103.    CW3 recalled in February or March 2022 hearing from Defendant Jones that there was a concern of excess inventory on-hand at Hayward in the amount of $100 million. CW3 had visibility into how much inventory the Company had on hand through CW3's job duties, which included building out the system so that Jones could "look at it whenever he wanted."

104.    The following chart shows how bad Hayward's overproduction of finished products was in second half of 2021 and first half of 2022. During that time, which overlaps with the Class Period, Hayward's inventory of finished products it had manufactured and that remained on hand in its inventory skyrocketed.



105.    Recognizing this overproduction, Hayward sought to reduce its manufacturing output toward the end of 2021 and start of 2022, but—validating the Chief Supply Chain Officer's concern regarding how Hayward would handle production once things got back to normal—it

failed to actually do so for some time.  As a result, the decrease in Hayward's net sales rate effectively mirrored the increase in its rate of finished goods on hand:



106.    **CW5** worked at Hayward from September 2011 to July 2022 as a Quality Manager. CW5's primary job duties included overseeing and assisting with the manufacturing of Hayward inventory produced at the Nashville, Tennessee plant.

107.    Near the end of 2021 and beginning of 2022, CW5 recalled that the manufacturing team received a directive from corporate to "slow down operations."  CW5 recounted that there was "absolutely" awareness that there was too much inventory on hand at Hayward, and that CW5 was concerned about this as well.  However, CW5 recalled that Hayward did not seem to prioritize

"lean manufacturing," and continued to purchase large quantities of raw materials even with the directive for a slower production rate.

108.   **CW6** was a Global Commodity Manager of Electronics at Hayward from February 2016 to December 2022 in the Rhode Island office.  CW6's main job duties included "sourcing in" products used in Hayward manufacturing.

109.   CW6 believed one of the largest factors with Hayward's excess inventory issues was the contracts they signed.  As CW6 recalled, Hayward signed multiple "hugely inflated," non-returnable, and non-cancellable contracts with suppliers in 2020 to 2021.  CW6 recalled that when Hayward signed the contracts it had double or triple the volume of normal sales, but when demand scaled back down, they were "stuck" with two-to-three-year long contracts they could not back out of.  For example, CW6 anticipated a crash in the availability of electronic supplies, so in 2020 and into 2021, CW6 had Hayward "stocked up and ordering extra from suppliers."  CW6 recalled that in some cases, Hayward was paying $90 for an item that regularly costs $5.  CW6 had direct insight into the electronics department, and believed this was happening in other departments as well, Hayward "was bringing in plastics, packaging, metals, everything was coming in at an accelerated rate."

110.   CW6 recalled that "all the evidence was there" for people at Hayward to see that the channel was full.  To that point, CW6 clarified that "product managers . . . anyone in operations management . . . and management definitely would have known."  CW6 also recalled "talks" of large-scale returns of Hayward orders.

111.   Additionally, with regard to the channel being full, CW6 stated that "if C-Suite did not know about it, it was gross incompetence . . . they had to know."  CW6 remembered that Hayward had monthly Sales, Inventory and Operations Planning meetings, which CW6 attended

along with 40 to 60 managers representing every section of Hayward, and which lasted two or three hours. CW6 recalled that these meetings were chaired by Defendant Holleran and attended by Defendant Jones. CW6 recounted that these meetings discussed forecasting and sales, including "what's selling good, what's not selling good."

112.    Thus, whatever issues may have existed with Hayward's supply chain, those issues and Hayward's ability to procure materials and manufacture products were not stopping it from meeting channel demand. Hayward had more than sufficient products to sell, but lacked enough channel demand to do so.

### H.    Unable to Address the Serious Problems Impairing Hayward's Performance, Defendants Hayward, Holleran and Jones Made a Series of False Statements and Material Omissions, While Hayward's Senior Leadership Simultaneously Sold Substantial Amounts of Stock at Artificially Inflated Prices

113.    Unable to stop the problems set forth above which were impairing Hayward's performance, Defendants Hayward, Holleran and Jones made a series of false statements and material omissions during the Class Period, as detailed below. They thereby created the false and misleading impression that, among other things, channel inventory was not elevated, channel demand was not stalling, and Hayward's businesses remained strong.

114.    Meanwhile, under cover of the material misrepresentations and omissions, multiple insiders who comprised the bulk of Hayward's senior leadership sold an enormous amount of Hayward stock under unusual circumstances and at artificially inflated prices, as detailed below. It totaled nearly $558 million, with nearly $150 million in illicit profits, across six insiders. These insider sales were made by two of Hayward's three sponsors, along with four of Hayward's five most senior officers, and included several Defendants.

115.    In addition, Hayward's other top-five officer, CSO Don Smith, who had predated the Control Defendants' acquisition of Hayward and expressed concern regarding the channel's

elevated inventory and Hayward's own ballooning inventory, resigned in the middle of the Class Period.

I. **Soon After the Last Insider Sales, Defendants Hayward, Holleran and Jones Admitted the Full Extent of the Problems Negatively Impacting the Company**

116.    The truth gradually emerged through a series of partial corrective disclosures and materializations of the undisclosed risks, with Defendants Hayward, Holleran and Jones withholding the full extent of the problems negatively impacting the Company until shortly after the last of the insider sales, as detailed below.

117.    On July 28, 2022, Defendants Hayward, Holleran and Jones finally admitted that, as they had long known and the CWs described, Hayward was suffering from "elevated channel inventories" and significant "reductions in channel inventory."  They later revealed that channel was reducing an enormous "120 million to $150 million" of Hayward products from its inventory. As a result, Hayward conceded that its nets sales for FY 2022 would decline by about 6% as compared to 2021, a far cry from the sustained demand and growth Defendants Holleran and Jones had been touting during the Class Period.

118.    Although Plaintiff and the Class suffered enormous losses as the truth emerged, Defendants made millions of dollars by unloading Hayward stock when it was still artificially inflated.

V.    **FALSE AND MISLEADING STATEMENTS**

119.    Throughout the Class Period, in earnings calls, press releases, presentations, and SEC filings, Defendants Hayward, Holleran and Jones made materially false and misleading statements and omissions that misrepresented and/or concealed from investors that: (i)  channel inventory was elevated; (ii)  channel demand was stalling; (iii)  Hayward was having difficulty selling to the channel and was resorting to tactics like discounts, pull aheads and threats to prop

up sales; (iv) Hayward was suffering from significant order cancellations and returns were hammering Hayward; (v) Hayward was purchasing raw materials and manufacturing finished goods far in excess of its demand which was causing Hayward's own inventory to balloon; and (vi) information Hayward received from the channel directly contradicted the FY 2022 guidance Hayward provided to investors.

120.    The material misrepresentations and omissions are separately enumerated below. They are also set forth in the accompanying Appendix A.

A.    **October 27, 2021: Hayward's 3Q-2021 Earnings Call**

121.    On October 27, 2021, Hayward held an earnings call in connection with its results for 3Q-2021, during which Defendant Holleran made several actionable statements and omissions.

122.    *First*, during the earnings call Defendant Holleran made false and misleading statements denying that channel inventory was then elevated.  An analyst asked Defendant Holleran what he was "seeing in the channel in terms of inventory levels and what your distributors are asking for," because Pool Corp., a major distributor, had reported "a significant uptick in inventories" in its own quarterly reporting the previous week.  Defendant Holleran responded by briefly noting that Pool Corp.'s "comments last week represent the industry as a whole. Inventories are in a healthier position than they were a quarter or 2 ago," which he immediately downplayed with the claim regarding channel inventory that, "if you look at it from a days-on-hand standpoint, it's still in a -- it's an improving position, but certainly not too much by any means."

123.    The claim in the preceding paragraph was false and misleading because, as detailed above and described by CWs, channel inventory had drastically increased following early 2021, and since the middle of 2021 had been saturated with two years' worth of inventory.  That elevated level was far more than the channel needed, amounting to $120-$150 million of excess inventory.

124.     Defendant Holleran then sought to bolster the impression that channel inventory was not elevated and that the channel was asking for more inventory by assuring investors that "we keep close tabs" and "have good insight from our large distributor partners" on channel inventory, before claiming "these are conversations that we have with them in understanding what they need more of."

125.     The claim in the preceding paragraph was false and misleading, because, as detailed above and described by CWs, since mid-2021 the channel had been communicating to Hayward that it already had elevated inventory and did not need more.  Hayward understood that clearly, because the elevated channel inventory was resulting, among other things, in the Company missing sales targets, its VP of Sales was having meetings discussing the inventory issues, and the Company's management resorting to discounting and similar tactics to prop up sales.  Moreover, Hayward's sales in the first of half of 2021 were fueled by the channel placing double orders and building up safety stock, all of which significantly elevated its inventory. This prompted, for example, Hayward's CSO to worry about the effect that bubble of orders earlier in 2021 would have on channel demand.

126.     Defendant Holleran also sought to bolster the impression that channel inventory was not elevated by painting a picture of the channel still seeking more inventory, with the statement:

> Admittedly, the mix of that inventory may not be as ideal as any of us would like it.  There's still some products that are in shorter supply.  So we're working feverishly to address that.  But in total, I think we're taking some extra shelf space right now.  So we look at it really through 2 lenses: in absolute terms, what's -- what are the inventory levels looking like, but also then are [we] accounting for some additional shelf space through our share gains.

127.     Again, the statement in the preceding was false and misleading because, as set forth above, the actual import of the channel's communications and actions, which were negatively

36

impacting Hayward, was that it had too much inventory and was reducing its demand and orders of Hayward products.

128. **Second,** during the conference call Defendant Holleran made false and misleading statements denying that demand was stalling. He portrayed demand as so strong that Hayward had a large backlog of orders piling up despite Hayward's increased production levels, claiming that "backlog does stretch certainly into 2022. It's at elevated levels still despite some of our production capacity improvements," and further that this backlog "certainly supports volume growth" for Hayward orders. Similarly, Defendant Holleran also claimed that "[g]iven the demand levels and backlog growth" Hayward was "improving production levels."

129. The claims were false and misleading because, as set forth above and described by CWs, Hayward had been having difficulty selling to the channel since mid-2021, and far from a strong "backlog" that supported organic "volume growth," the channel had actually been informing Hayward that it did not need orders of additional products, causing Hayward to miss its sales targets, and management to resort to discounting and other sales tactics just to prop up sales. Moreover, those claims were false and misleading because, as set forth above and described by CWs, Hayward was not increasing its "production" to meet strong demand, rather Hayward's management had long been concerned by the Company's excessive production level, and by late 2021 was attempting to reduce its production, which was far outstripping demand and causing Hayward's own inventory to balloon with products it was unable to sell.

130. In addition, during the conference call, Defendant Holleran used and referred to a presentation provided by Hayward to amplify certain of his remarks ("October 2021 Presentation"). Reinforcing and echoing Defendant Holleran's statements that were set forth in the preceding paragraphs, Hayward claimed in the October 2021 Presentation that its "backlogs

continue to support healthy demand" and that it had "[i]ncreased production levels to meet sustained demand." Those claims are also false and misleading for the reasons set forth in the preceding paragraph.

### B.    October 27, 2021: Hayward's Press Release Regarding 3Q-2021

131.    Hayward issued a press release on October 27, 2021 ("October 2021 Press Release"), in connection with the earnings call that day and its 3Q-2021 results. That Press Release was also incorporated in a Form 8-K, signed by Defendant Jones, that was filed the same day.

132.    The October 2021 Press Release reported financial results for 3Q-2021, including that Hayward had net sales of $350.6 million, representing a 56% year-over-year net sales increase, and an Adjusted EBITDA of $98.3 million, representing a 61% year-over-year increase. It also contained actionable statements and omissions reinforcing and echoing several of those made by Defendant Holleran during the conference call the same day.

133.    *First,* Hayward's October 2021 Press Release made false and misleading statements denying that demand was stalling. It claimed that the Company's "current demand levels and Hayward's production capabilities remain strong."

134.    The claim in the preceding paragraph was false and misleading because, as set forth above and described by CWs, Hayward's demand had not "remained strong." In truth, demand in the channel, which made up 76% of Hayward's sales, had been stalling since mid-2021, with the oversaturated channel informing Hayward that it did not need additional products. This was causing Hayward to miss its sales targets, and management to resort to discounting and other sales tactics just to try to prop up sales. Moreover, Hayward's claim created the false and misleading impression that it had to maintain high "production" levels to meet the strong demand for its products. In truth, as set forth above and described by CWs, Hayward's had been concerned by the Company's excessive production level, which was far outstripping demand and causing

Hayward's own inventory to balloon with products it was unable to sell.  Thus, by late 2021, Hayward management was directing its production to slow down, reflecting stalling demand.

135.  **Second,** the October 2021 Press Release also quoted a false and misleading statement from Defendant Holleran denying that channel demand was stalling and that Hayward had resorted to actively propping up its sales.  It quoted Defendant Holleran as claiming, *"*[o]ur third quarter results were driven by our team's ability to execute and capture the sustained demand for Hayward products as we continue to see strength in the pool market."

136.  The claim in the preceding paragraph was false and misleading because, as set forth above and described by CWs, Hayward's 3Q-2021 results were not driven by "sustained demand," rather, with channel demand stalling and Hayward missing sales targets since mid-2021, Hayward had been substantially manufacturing its sales results with a management-driven campaign to "get products off the shelves" that included discounts, sales blitzes, and pressure tactics.

    **C.**    **October 27, 2021: Hayward's Form 10-Q for 3Q-2021**

137.  On October 27, 2021, Hayward filed its Form 10-Q for 3Q-2021, which also contained its financial results for the quarter, as well as actionable statements and omissions reinforcing and echoing several of those made by Defendant Holleran during the conference call and Press Release the same day.

138.  **First,** in the Form 10-Q for 3Q-2021 Hayward made false and misleading statements denying that channel demand was stalling and that it had resorted to actively propping up its sales.  Hayward claimed, for example, that its net sales results for 3Q-2021 in North America were "mostly due to higher sales of residential pool equipment as demand for more efficient, environmentally friendly and automated pool products remains robust," and made other substantially similar claims as well.

139.    The claim in the preceding paragraph was false and misleading because, as set forth above and described by CWs, Hayward's 3Q-2021 results were not driven by "demand" that "remains robust."  To the contrary, demand from the oversaturated channel, which made up 76% of Hayward's sales, had been stalling and Hayward had been missing sales targets since mid-2021, and Hayward's management resorted to a campaign to "get products off the shelves" that included discounts, sales blitzes, and pressure tactics, which substantially accounted for and propped up the Company's 3Q-2021 sales.

140.    ***Second,*** in the Form 10-Q for 3Q-2021, Hayward used and incorporated risk warnings that were false and misleading, because they characterized events that were then having an actual negative impact on Hayward as mere possibilities that could hypothetically occur.

141.    Two such risk warnings in the Form 10-Q for 3Q-2021 involved distributors and sales.  One of them began, "[o]ur business depends on the performance of distributors, builders, buying groups, retailers and servicers."  It added that these customers "could stop distributing our products or reduce sales of our products and prefer others, or uncertainty regarding demand for some or all of our products could cause them to reduce their ordering and marketing of our products, and as a result our business, financial condition, results of operations and cash flows could be materially impacted."

142.    A second similar risk warning began "[a] loss of, or material cancellation, reduction, or delay in purchases by, one or more of our largest customers could harm our business."  It added that "any material cancellation, reduction, or delay in purchases by these customers . . . could have a material adverse effect on our business, financial condition, results of operations and cash flows."

143.    The statements in the two preceding paragraphs were false and misleading, because, as set forth above, it was not just a possibility that Hayward's resellers and largest customers, which included the channel that made up about 76% of the Company's sales, *could* "reduce sales" or "reduce their ordering" and "purchases" of Hayward products.  Rather, that had *actually* been occurring since mid-2021, with demand from the oversaturated channel stalling, and it was *already* "having a material adverse effect" on Hayward's "business."

144.    Also, three false and misleading risk warnings involved Hayward's growth and inventory.  One began, "[o]ur operating results will be harmed if we are unable to effectively manage and sustain growth or scale our operations."  It added, that if Hayward was unable to "maintain pricing without significant discounting" that "would have a material and adverse effect on our operating results."  Further, it stated, "[g]rowth may also stress our ability to adequately manage our operations" and "[i]f growth significantly decreases, it will negatively impact our cash flows . . ."

145.    A second similar risk warning began "[i]f we do not manage product inventory in an effective and efficient manner, it could adversely affect profitability."  It added, "[w]e may be unable to manage our inventory efficiently, keep inventory within expected budget goals, keep our work-in-process inventory on hand or manage it efficiently. . . . We may not be able to keep inventory costs within our target levels.  Failure to do so may harm our long-term growth prospects."

146.    A third similar risk warning stated, "[w]hile we have experienced higher demand in our pool business as pool owners sheltered-in-place and have spent more time at home as a result of the COVID-19 pandemic, such growth may not be sustainable and may not be repeated in future periods."

147.    The risk warnings in the three preceding paragraphs were false and misleading because, as set forth above, it was not just a possibility that Hayward *could* be "unable to effectively manage and sustain growth or scale our operations," that Hayward *could* be "unable to manage our inventory efficiently," and that Hayward's "growth *may* not be sustainable." Rather, each of those conditions had *actually* been occurring leading up to and during the Class Period, with Hayward's own inventory ballooning far beyond demand and Hayward's own growth stalling due to the channel's saturated inventory leaving Hayward dependent on self-defeating tactics like discounting, since Hayward was struggling to effectively manage its ballooning inventory in the face of dropping distributor demand. Thus, those conditions were *already* having a "material and adverse effect" on Hayward and "harm[ing] [its] long-term growth prospects."

**D.    December 20, 2021: Hayward's Press Release Regarding Repurchase Program**

148.    Hayward issued a Press Release on December 20, 2021, when its 4Q-2021 results were close to final ("December 2021 Press Release"). That Press Release was also included in a Form 8-K, signed by Defendant Jones and filed the next day.

149.    The December 2021 Press Release announced a $450 million stock repurchase program, that included Hayward repurchasing 4.08 million shares from its sponsors, later revealed to be CCMP and its client and minority partner AIMCo. The Press Release also contained actionable statements and omissions.

150.    ***First,*** the December 2021 Press Release contained a false and misleading quote from Defendant Holleran denying that Hayward's business and growth were impaired, owing to stalling channel demand, and denying that the repurchase program was designed for the CCMP Entities and their client and minority partner AIMCo to sell a large amount of stock at artificially inflated prices. The Press Release quoted Holleran as claiming that Hayward undertook the

repurchase program because "[o]ur business is performing well and we remain confident in our ability to continue executing our growth initiatives in the years ahead."

151.    The claim in the preceding paragraph was false and misleading, for, as detailed above and described by CWs, Hayward's "growth initiatives" were exhausted and its business "perform[ance]" was impaired by stalling demand from the channel, which made up 76% of Hayward's sales.  Following a bubble of high demand and growth at the start of the pandemic, the channel was already oversaturated with two years of inventory by mid-2021, which resulted in the channel reducing its demand and Hayward management resorting to a campaign of discounts, sales blitzes, and other pressure tactics to try to prop up growth, which simply cannibalized future revenue.  As such, Hayward management was then seeking to shrink the Company's production output, to match reduced demand and performance.  The repurchase program simply enabled the CCMP Entities and their client and minority partner AIMCo to unload a substantial amount of stock before the facts set forth above emerged, as part of a large wave of stock sales during the Class Period by insiders and Hayward's senior leadership.

152.    In addition, the December 2021 Press Release contained a false and misleading quote from Defendant Jones that made similar denials as the statement discussed in the preceding paragraph.  It quoted Defendant Jones as claiming that the repurchase program was undertaken due to and reflected Hayward's "strong cash flow generation capability."

153.    For the reasons set forth above, the claim in the preceding paragraph was false and misleading: Hayward's business was saddled with an oversaturated channel, declining demand, discounted sales, excess production, and its own ballooning inventory, all of which substantially undercut its "cash flow generation capability," and the repurchase program allowed insiders to sell large amounts of stock before that truth fully emerged.

154.    **Second,** the December 2021 Press Release incorporated the same risk warnings as the Form 10-Q for 3Q-2021, and those risk warnings were false and misleading for the reasons set forth above, including in ¶¶140-47.

**E.    January 24, 2022: Hayward Press Release Regarding Preliminary 1Q-2021 Results**

155.    On January 24, 2022, Hayward issued a press release ("January 2022 Press Release"), which was also incorporated into a Hayward 8-K filed the next day, and signed by Defendant Jones.

156.    The January 2022 Press Release announced Hayward's preliminary results for 4Q-2021, and gave a brief update on the previously announced repurchase program.  It contained actionable statements and omissions as well.

157.    **First,** in the January 2022 Press Release, Hayward made false and misleading statements denying that channel demand was stalling and that Hayward had resorted to actively propping up its sales.  Hayward claimed that the 4Q-2021 net sales and growth it announced primarily occurred because "we continued to see demand from aftermarket upgrades and new construction."

158.    The claim in the preceding paragraph was actually false and misleading because, as set forth above and described by CWs, Hayward's 4Q-2021 results were not driven by "continued" demand.  In truth, demand from the oversaturated channel, which made up 76% of Hayward's sales, had been stalling and Hayward had been missing sales targets since mid-2021. Hayward's management had therefore resorted to manufacturing results with a campaign to "get products off the shelves" that included discounts, pull aheads, sales blitzes, and pressure tactics, all of which cannibalized future revenue, an outcome that management was willing to accept to hit

its targets.  This substantially accounted for and propped up the Company's 4Q-2021 net sales growth.

159.    In the January 2022 Press Release, Hayward made additional statements denying that channel demand was stalling and the Company's production was far outstripping demand. Hayward claimed that its sales growth "continues to benefit from the demand environment for outdoor living products" and from "our production capabilities," which enable it to meet that demand.

160.    The claim in the preceding paragraph was false and misleading because, as set forth above and described by CWs, Hayward management was then attempting to reduce its production levels to bring them into line with the stalling channel demand.

161.    *Second,* the January 2022 Press Release incorporated the same risk warnings as the Form 10-Q for 3Q-2021, and those risk warnings were false and misleading for the reasons set forth, including in ¶¶140-147.

F.      **March 2, 2022: 4Q-2021 Earnings Call**

162.    On March 2, 2022, Hayward held an earnings call in connection with its final results for 4Q-2021 and FY 2021, in which Defendant Holleran and Defendant Jones made several actionable statements and omissions.

163.    *First*, during the earnings call, Defendant Holleran made false and misleading statements denying that channel inventory was elevated, denying that channel demand was stalling, and denying that Hayward was suffering substantial cancelled orders.  An analyst pointed out a potential contradiction between claims Holleran had previously made that "inventory levels in the channel are at least a little closer to normal" and at the same time that Hayward's "backlog [is] still at record levels."  The analyst asked, "what do you think it means," and whether, on the one hand, those statements meant there was "a risk from a cancellation perspective" for backlog

orders given some improvement in channel inventory, or, on the other hand, those statements meant that Hayward had "really good visibility as you work through the year, and it says more about underlying demand" still requiring additional backlog orders?

164.    Defendant Holleran responded by claiming: "I think it's more of the latter, Mike. I think it's a very credible order file. . . .  If the channel was feeling as if they had too much or were unhappy with their inventory turns, I think there was opportunity for them to slow the bookings or even cancel and we've seen negligible cancellations through those time periods.  So we feel very good about the credibility of that order file."

165.    The claim in the preceding paragraph was false and misleading for multiple reasons. To begin with, as detailed above and described by CWs, rather than seeing "negligible cancellation," Hayward was then being hammered by large numbers of cancellations and returned orders, which was so dire the Company created a regular report just to track those cancellations. Moreover, in truth, the channel had taken the opportunity to "slow the bookings," and since mid-2021 had informed Hayward that it had too much inventory and was reducing its demand as well as its orders, resulting in Hayward missing its sales targets.  Further, for both of those reasons Hayward's "order file" was eroding and weak, not "very credible," which had prompted Hayward's management to resort to discounting, pull aheads and pressure tactics to try to get product off the shelves and prop up sales.

166.    Next, Defendant Holleran downplayed his brief note that "[channel] inventory levels, they are getting back to more normal levels," by adding claim that "[w]e don't think it's elevated."

167.    The claim in the preceding paragraph was false and misleading because, as detailed above, channel inventory was then and had long been elevated.  Owing to a bubble of double

orders and safety stock purchases in 1H 2021, by mid-2021 channel inventory had drastically improved as compared to earlier in the pandemic, and was in fact far above normal levels.  The channel had two years' worth of inventory, amounting to up to $150 million of excess product.  This resulted, among other things, in the channel telling Hayward it could not take more product and cancelling orders, and in Hayward's own inventory of unsold products ballooning.

168.    Once again, Defendant Holleran also sought to bolster the impression that channel inventory was not elevated by then painting a picture of the channel still seeking more inventory.  He emphasized purported "shortages of some particular SKUs" and claimed "it's not a perfectly balanced [channel] inventory from a SKU standpoint, but we're working hard to solve that."

169.    The statements in the preceding paragraph were false misleading because, as set forth above, the actual import of the channel's communications and actions, which were negatively impacting Hayward, was that it had too much inventory and was reducing its demand and orders of Hayward products.

170.    Defendant Holleran made other actionable statements and omissions during the conference call that were similar to those detailed above.  For example, he claimed that Hayward's FY 2022 is "starting out pretty similar to 2021 with some elevated backlogs starting the year."  Defendant Holleran likewise portrayed Hayward's early-buy discount program in late 2021 as "very much curtailed from a historical standpoint because of the order file that already existed in our possession."

171.    The claims in the preceding paragraph were false and misleading because, as detailed above and described by CWs, Hayward's backlog was not starting 2022 "pretty similar to 2021."  Rather, at the start of 2022 its backlog was weak and eroding due to significant cancellations, stalling channel demand and elevated channel inventory, whereas at the start of 2021

the channel had high demand for more inventory and was loading up with double orders and orders of safety stock. Likewise, Hayward's late 2021 early buy program was small because customers already had too much inventory and were reluctant to place additional orders, and not because their orders outside of the early buy program were so substantial.

172.    In addition, during the conference call, Defendant Jones made actionable statements and omissions denying that channel demand was stalling, denying the actual substantial source of Hayward's performance, and denying that channel inventory was elevated. Defendant Jones claimed that though: "typically, Q1 and Q3 are the lower season volume periods for the channel. We've entered '22 with a very strong order file. We're concentrating in Q1 in our production units to fill out some of the hold on certain product lines that the channel is demanding right now." Defendant Jones also claimed that this order file was so substantial that it already supported "a strong volume metric period in Q2."

173.    The claims in the preceding paragraph were false and misleading for multiple reasons, as detailed above and described by CWs. To begin with, Hayward's order file at the start of 2022 was not "very strong," rather it was weak and eroding due to significant cancellations, stalling channel demand and elevated channel inventory. Moreover, the source of Hayward's atypically high performance that season was not the order file, but was instead Hayward's resort to discounting, pull aheads and pressure tactics to try to get product off the shelves and prop up sales. Further, contrary to the impression that the "channel is demanding right now" more inventory, channel inventory had been elevated since mid-2021 and the channel had been telling Hayward that it did not need to add more product to its already excessive store.

174.    ***Second,*** during the conference call, Defendant Holleran made actionable statements and omissions regarding Hayward's guidance for FY 2022. He stated that for FY 2022,

Hayward would "grow net sales in the range of 9% to 12% compared to 2021," which included "volume" growth in terms of the number of orders it placed.

175.    The FY 2022 guidance was itself false and misleading, because, based on events that already happened and information that Defendants Holleran and Hayward already had, Hayward's "volume" was set to decrease in 2022 as compared to the previous year.  In particular, as detailed above, after having been oversaturated with inventory since mid-2021, the channel informed Defendants Holleran and Hayward by late 2021 that it was taking strategic positions to reduce its inventory and would order fewer products from Hayward in 2022 than it sold to end users—i.e., channel "sell out" would be greater than channel "sell in."  On top of that, Defendant Holleran knew that by late 2021, given the bubble of demand that had run through early 2021, there would be some "moderation" of end user demand in 2022, which determined and reduced the channel's sales as compared to the "very high pull through the channel last year."  Taken together, this meant that: in 2022, the channel was selling fewer products than it had in 2021, and the channel was also reducing its inventory and ordering even less product from Hayward than it sold; whereas, in 2021, due to the demand bubble, the channel had higher sales, and was building up its inventory of safety stock and ordering far more product from Hayward than sold; meaning that Hayward's order volume was necessarily set to decrease in 2022.  Decreased order volume was significant for Hayward, because it showed that Hayward's demand was decreasing, and that Hayward's net profits were challenged as well.

176.    Defendant Holleran made false and misleading statements regarding the basis for the FY 2022 guidance as well.  He claimed that it "reflects strong carryover demand" and "conversion of current order file."

177.    The claim in the preceding paragraph was false and misleading because, as detailed above and described by CWs, already at that time, demand was dropping, the order file was suffering substantial cancellations, and Hayward was propping up its sales with discounting, pull aheads and similar tactics that were actually cannibalizing its future orders.  In addition, those facts, which Defendant Holleran knew of, undermined the guidance, and further showed that Hayward's order volume was set to decrease in 2022 as compared to 2021.

178.    Defendant Holleran also created the impression that volume growth could be even larger in 2022 than the guidance was already calling for.  He claimed that while the guidance did not assume "assum[e] additional channel load" at the end of 2022, "[i]f retail demand and pull-through continue on the robust pace we've seen in the last 2 years in absolute terms, there could be some increase" in channel load "to support the forward-looking days on hand."

179.    The claim in the preceding paragraph was false and misleading because, as set forth above, Defendant Holleran already knew that retail demand was already moderating, and that the oversaturated channel, which then had up to $150 million of excess product, had already taken the strategic position to reduce its extremely elevated inventory, rather than to load up with more product orders.

180.    During the conference call, Defendant Jones made actionable statements and regarding the FY 2022 guidance as well.  He reiterated the guidance and affirmed multiple times that it included "volume growth," which was false and misleading for the reasons set forth above in ¶175.

181.    Defendant Jones also reinforced the impression that volume growth could be even larger in 2022 than the guidance was already calling for, and that any uncertainty in guidance was for how much additional upside Hayward had.  An analyst asked whether the guidance was

"conservative," and why it was not higher given Hayward's purported "order file, mix being positive, share gains," which all indicated even more robust volume growth than the guidance provided. Defendant Jones replied affirmatively, claiming that "we've got a level of conservatism built into our forecast here. . . . it's fair to say that the guidance we've given right now does have an element of conservatism."

182. The claim in the preceding paragraph was false and misleading because, as set forth above, far from presenting a "conservati[ve]" picture of volume growth, it was already substantially inflating volume growth in 2022, which was actually set to decrease.

183. In addition, during the conference call, Defendant Holleran and Defendant Jones used and referred to a presentation provided by Hayward to amplify certain of their remarks ("March 2022 Presentation"). Reinforcing and echoing their statements regarding the FY 2022 guidance, Hayward's March 2022 Presentation likewise claimed that the guidance was based on "[t]rade customer backlogs continu[ing] to support healthy demand." This was false and misleading for the reasons set forth above in ¶¶174-182.

**G.    March 2, 2022: Hayward's Press Release Regarding Final 4Q-2021 and FY 2021 Results**

184. Hayward issued a press release on March 2, 2022 ("March 2022 Press Release"), in connection with the earnings call that day and its final 4Q-2021 and FY 2021 results. That Press Release was also incorporated in a Form 8-K, signed by Defendant Jones, and filed the same day.

185. The March 2022 Press Release reported 4Q-2021 net sales of $352.4 million representing 35% YoY growth and Adjusted EBITDA of $105.7 million representing a 43% YoY growth, which were in line with the preliminary numbers announced in January 2022. It also contained actionable statements and omissions reinforcing and echoing several of those made by Defendant Holleran and Defendant Jones during the conference call the same day.

51

186.    **First,** the March 2022 Press Release contained false and misleading statements denying that demand was stalling.  It quoted Defendant Holleran as claiming that he "saw a continuation of robust organic growth in net sales," and that the Company was "entering 2022 with significant momentum, we remain encouraged by underlying industry demand levels supported by both new construction and aftermarket activity . . . ."

187.    The claim in the preceding paragraph was false and misleading, because, as set forth above, rather than a "continuation of robust organic growth in net sales," Hayward was then resorting to discounts, pull aheads and similar tactics to prop up its sales, owing to the fact that the oversaturated channel's "demand levels" were dropping.

188.    The March 2022 Press Release also contained false and misleading statements denying that channel demand was stalling and the actual source of the Company's performance. Hayward claimed that its increase in net sales for 4Q-2021 was "primarily" due to "continued demand in residential pool equipment sales," and stated that "[n]et sales growth continues to benefit from a robust demand environment for outdoor living products" as well as from the "increased capacity and capabilities leading to higher output" of Hayward's production.

189.    The claim in the preceding paragraph was false and misleading, because, as set forth above, Hayward's 4Q-2021 nets sales substantially resulted from its campaign of discounting, pull aheads and similar tactics, not from "robust demand."  Moreover, given that channel demand was then dropping, Hayward's management had actually directed a reduction in its production "output," as its own inventory was ballooning with unsold products.

190.    **Second,** the March 2022 Press Release contained actionable statements and omissions regarding the FY 2022 guidance.  In particular, Hayward reiterated that guidance, and claimed that the Company is "well positioned to deliver continued net sales and adjusted EBITDA

growth in 2022 following the tremendous success in 2021 given the sustainable secular trends driving demand for pool products."

191.    The FY 2022 guidance was false and misleading for the reasons set forth above in ¶175.  Likewise, the claim in the preceding paragraph that Hayward was then "well positioned" for growth in 2022 was false and misleading because, as set forth above in ¶¶177, 179, it actually set for a reduction of volume in 2022 due to "demand" that was decreasing and not "sustainable."

**H.    March 9, 2022: Hayward's Form 10-K for FY 2021**

192.    On March 9, 2022, Hayward filed its Form 10-K for FY 2021.  The 10-K for FY 2021 was signed by Defendants Holleran, Jones, Bertrand, Brenneman, Brown, McFadden, and Walsh.

193.    The 10-K for FY 2021 contained Hayward's financial results for FY 2021.  Further, it contained actionable statements and omissions reinforcing and echoing several of those made during the March 2, 2022, earnings call and in Hayward's March 2022 Press Release.

194.    ***First,*** the 10-K for FY 2021 made false and misleading statements denying that demand was stalling and the actual source of its net sales.  Thus, Hayward claimed that, for FY 2021, "[t]he increase in net sales was primarily the result of higher volumes, mainly in residential pool equipment sales from continued demand for pool upgrades and increasing new pool construction . . . ."  Hayward likewise attributed its increase in net sales in North America primarily to "demand" that "remained robust," and its increase in net sales in Europe primarily to "continuing strong customer demand. . . . "

195.    The statements in the preceding paragraph were false and misleading, because, as set forth above, Hayward's net sales in FY 2021, especially by the second half of the year, resulted

from its campaign of discounting, pull aheads and similar tactics, owing to the fact that demand in the channel that made up 76% of its sales was stalling, and was not "robust" or "continu[ing]."

196.    **Second,** the 10-K for FY 2021 included substantially similar risk warnings as those discussed above, and they were false and misleading for the reasons set forth above, including in ¶¶140-47.

I.    **April 28, 2022: Hayward's 1Q-2022 Earnings Call**

197.    On April 28, 2022, Hayward held an earnings call in connection with its results for 1Q-2022, during which Defendant Holleran and Defendant Jones made several actionable statements and omissions.

198.    **First,** during the earnings call, Defendant Holleran made false and misleading statements denying that Hayward was suffering significant cancellations, denying that channel demand was stalling, and denying that channel inventory was elevated. An analyst asked if there were "any signs of consumer spending slowing down or cancellations in the order file"? Defendant Holleran responded by claiming, "[w]e really haven't seen any kind of cancellations."

199.    The claim in the preceding paragraph was false and misleading because, as detailed above and described by CWs, Hayward was then "see[ing]" large amounts of "cancellations" and returned orders, which were so dire that the Company created a regular report just to track the cancellations hammering it.

200.    Doubling down, Defendant Holleran then assured investors that "we're in pretty close contact with both channel partners and our dealers," and claimed that "the work on the books and new lead generation both remain strong despite plenty of price increases."

201.    The claim in the preceding paragraph was false and misleading because, as detailed above and described by CWs, far from "remain[ing] strong," the backlog of orders on the books was weak and eroding due to heavy cancellations and stalling demand from the channel which

already had substantial excess inventory.  New lead generation had not "remain[ed] strong" either, as the channel was seeking to reduce its inventory level, and Hayward had to resort to discounting, pull aheads and pressure tactics just to try to get new orders placed and products off the shelf.

202.    Owing to the absence of cancellations and the contacts with the channel, Defendant Holleran claimed that though channel inventory was "in a much better position going into the start of the season in 2022," channel inventory was not a problem, as "we're still seeing robust demand and the order file on the books is still very strong and seems to be pressure tested, and product is going to be installed in the backyard."

203.    The statements in the preceding paragraph created the false and misleading impression that channel inventory was not elevated, when, as detailed above and described by CWs, channel inventory had actually been elevated since mid-2021 and the channel then had up to $150 million in excess inventory.  Moreover, rather than "robust" channel demand, the channel had in truth been informing Hayward that it did not need additional product and wanted to reduce its inventory, leaving the "order file" weak and shrinking from significant cancellations, while Hayward missed sales targets and resorted to discounting, pull aheads and other tactics to prop up sales.

204.    Later in the conference call, Defendant Holleran again claimed that "consumer demand and what's on the books is still incredibly strong," which was false and misleading for the reasons set forth in the preceding paragraph.

205.    Defendant Holleran also reiterated the foregoing claims in an exchange with another analyst who was concerned about channel "restocking," and asked "what your view of the channel partners is in terms of their inventory?"  In reply, Defendant Holleran stated, "we do keep close tabs on it with our channel partners to make sure we all feel comfortable with the amount of

inventory," and claimed that "we feel comfortable with our [channel] inventory position from a days on hand standpoint here at the start of the season."

206.    The claim in the preceding paragraph reinforced the false and misleading impression that channel inventory was not elevated, when, as detailed above, the channel in fact had substantial excess inventory, up to $150 million worth.  Further, the channel had been working to reduce its inventory, as it had informed Hayward, which resulted in dropping channel demand and substantial cancellations.

207.    Once again, Defendant Holleran continued by briefly noting that channel inventory was "largely replenished and in a much better position" than at the start of the last two years, then promptly downplayed that by claiming that this inventory, "[i]n absolute dollars, as I said, it's higher at the end of Q1 2022 than the same period [previously].  But I think there are a few things to keep in mind that as we look at it from a days on standpoint."  Specifically, he claimed that the actual increase in the amount of products the channel had on hand was smaller than it seemed, because:

> that inventory value has a lot of price embedded in it. The industry has also grown, so there needs to be additional inventory in there to support the overall industry growth, which has been 30-plus percent over the last few years. And then from -- specifically to Hayward, some of our share gains, that would require some incremental inventory positions for the Hayward product in the channel.

Moreover, he claimed that channel inventory is "not a perfect balance.  There are SKUs and product categories based upon a material availability that we need more of.  They need more of for sale."

208.    The claims in the preceding paragraph reinforced the false and misleading impression that channel inventory was not elevated, and characterized channel inventory as far lower than was actually the case.  Notwithstanding any purported effect of "embedded price,"

"industry growth," "share gains," or "imperfect balance," the channel had been oversaturated with inventory since mid-2021, and, as it informed Hayward, had been working to reduce its inventory, which reached up to $150 million of excess product. Furthermore, this elevated inventory was negatively impacting Hayward through stalled channel demand, substantial cancellations and Hayward having to fall back on self-defeating measures just to prop up sales.

209.    In addition, Defendant Jones made actionable statements and omissions during the conference call, similar to those set forth above, denying that channel demand was stalling and that channel inventory was elevated. He claimed that "Q1 was a higher quarter than we think normally from a seasonal perspective. And that's really consequential to the fact that we were still working through and still continue to work through a large backlog." Defendant Jones added that Hayward made those sales in Q1 because "[w]e want to make sure that the channel is appropriately stocked as we mentioned in the previous call."

210.    The claims in the preceding paragraph were false and misleading for multiple reasons, as detailed above and described by CWs. To begin with, Hayward was not making sales in 1Q-2022 to "make sure that the channel is appropriately stocked," rather the channel already had up to $150 million of excess inventory and was telling Hayward that it wanted to reduce its inventory, not take on more product. To that point, Hayward's so called "large backlog" was actually weak and eroding, due to substantial cancellations from the oversaturated channel. Thus the true reason that Hayward had an abnormally "higher" quarter was because management was resorting to a campaign of discounting, pull aheads and similar tactics to prop up sales.

211.    Defendant Jones also made false and misleading statements and omissions denying that the increase in Hayward's own inventory reflected stalling channel demand. A concerned

analyst asked for an explanation of why Hayward's inventory was increasing, noting that "your own inventory has been growing faster than sales by quite a bit the last few quarters."

212.    Defendant Jones responded by claiming that 80% of the increase in Hayward's inventory was necessary to meet channel demand:

> we have taken 2 strategic position in the balance sheet.  Knowing the demand curve that we see out in the future, we are manufacturing certain products in terms of finished goods to get in into inventory to be a -- an important position to be able to service the market.

Defendant Jones then added that the second position Hayward was taking was to increase its purchase of raw materials so that "where we can secure a position in raw materials, particularly in those hard to get areas, we have taken that position."  He then claimed that the remaining "20% of our inventory climb has really come from that COGS [cost of goods sold] index increase, the inflation that's run through."

213.    The statements in the preceding paragraphs were false and misleading because, as detailed above and described by CWs, Hayward was not still increasing its manufacturing to "meet the demand curve" and "service the market."  Rather, Hayward's management, aware that it had too much inventory, had been directing a reduction in manufacturing to bring it in line with reduced demand.  To that point, Defendant Jones had also been receiving reports on Hayward's ballooning inventory, and expressed concern that it had grown to $100 million, reflecting products that it was unable to sell.

214.    *Second,* during the conference call, Defendant Holleran affirmed the FY 2022 guidance, which was false and misleading for the reasons set forth above in ¶175.

215.    Also, during the conference call, Defendant Jones created the impression that volume growth could be even larger in 2022 than the guidance was already calling for, and that any uncertainty in guidance was for how much additional upside Hayward had.  He claimed with

respect to the FY 2022 guidance that "the underlying growth drivers remain very strong," and "everything is pointing to strength in the industry and strength for Hayward. So in terms of our guidance, it really reflects just a cautionary view on how the second half may develop. . . ."

216. The statements in the preceding paragraph were false and misleading for the reasons set forth above. To begin with, Hayward's "underlying growth drivers" were already weak, with Hayward set for reduced volume in 2022, reduced channel demand, and a backlog eroding from substantial cancellations. As such, Hayward's guidance, which called for volume growth was deceitful, not "cautionary."

217. In addition, during the conference call, Defendant Holleran and Defendant Jones used and referred to a presentation provided by Hayward to amplify certain of their remarks ("April 2022 Presentation"). Reinforcing and echoing their statements regarding the FY 2022 guidance, Hayward's April 2022 Presentation likewise claimed that the guidance was based on "[s]trong carry over consumer demand trends and expected conversion of 2022 order file," as well as "[t]rade customer backlogs continu[ing] to support healthy demand." This was false and misleading for the reasons set forth above in ¶¶174-182, 216.

**J.      April 28, 2022: Hayward's Press Release Regarding 1Q-2022 Results**

218. Hayward issued a press release on April 28, 2022 ("April 2022 Press Release"), in connection with the earnings call that day and its 1Q-2022 results. That Press Release was also incorporated in a Form 8-K, signed by Defendant Jones, that was filed the same day.

219. The April 2022 Press Release reported Hayward's results for 1Q-2022, and also contained actionable statements and omissions reinforcing and echoing several of those made by Defendant Holleran and Defendant Jones during the conference call the same day.

220. *First,* the April 2022 Press Release contained false and misleading statements denying that channel demand was stalling and the source of its actual performance. Hayward

claimed that "[n]et sales continue to be driven by trends in aftermarket upgrades and consumer investments in outdoor living spaces," and that "[n]et sales growth during the quarter was the result of higher volumes driven by production capabilities."

221.    The claims in the preceding paragraph were false and misleading because, as set forth above, Hayward's net sales were then substantially "driven by" management's campaign of discounting, pull aheads and similar tactics to prop up net sales.    Moreover, Hayward's management was directing a reduction in its "production," to bring it in line with stalling channel demand, and attempt to halt Hayward's ballooning inventory of unsold products.

222.    **Second,** in the April 2022 Press Release, Hayward reaffirmed its guidance for FY 2022.  That was false and misleading for the reasons set forth above in ¶175.

223.    Hayward also claimed in the April 2022 Press Release that it "remains well positioned to achieve net sales and adjusted EBITDA growth for the full year following the strong start in the first quarter of 2022," that "underlying market trends remain positive," and that both of those points support the FY 2022 guidance.

224.    The claims in the preceding paragraph were false and misleading because, as set forth above, Hayward was not at all "positioned to achieve net sales growth."  Rather, its order volume was already set to shrink in 2022, because the actual "market trends," including a channel reducing its inventory and demand, were substantially negative, and Hayward had only managed growth in Q1-2022 through management's campaign of discounting, pull aheads and similar tactics that propped up sales by cannibalizing future revenue.

**K.    April 29, 2022: Hayward's Form 10-Q for 1Q-2022**

225.    On April 29, 2022, Hayward filed its Form 10-Q for Q1-2022, which contained its financial results for FY 2021, as well as actionable statements and omissions reinforcing and

echoing several of those made during its April 28, 2022, conference call and in its April 2022 Press Release. The 10-Q for 1Q-2022 was signed by Defendant Jones.

226. **First,** the 10-Q for Q1-2021 made false and misleading statements denying that demand was stalling and the true source of its net sales. Hayward claimed that for the quarter its volume growth in net sales was mainly driven by demand for "new products."

227. The claim in the preceding paragraph was false and misleading because, as set forth above, Hayward's net sales for the quarter substantially resulted from management's campaign of discounting, pull aheads and similar tactics, not from demand for new products.

228. **Second,** the 10-Q for 1Q-2022 included substantially similar risk warning as those discussed above, and they were false and misleading for the reasons set forth above, including in ¶¶140-47.

L. **May 2 and 3, 2022: Hayward's Automatic Shelf Registration (Form S-3), and Hayward's Prospectus Supplement**

229. On May 2, 2022, in connection with an underwritten SPO initiated by the CCMP Entities, Hayward filed several documents, including a Form S-3 Registration Statement ("Form S-3"), which was signed by Defendants Holleran, Jones, McFadden, Walsh, Brenneman, Betrand, and Brown.

230. Hayward's S-3 provided certain information regarding the SPO, and also contained actionable statements and omissions.

231. **First,** the S-3 incorporated by reference Hayward's 10-K for 2021, and also its 10-Q for 1Q-2022. Hayward's S-3 thereby incorporated the false and misleading statements in those two documents, as set forth above in ¶¶194-95, 226-27.

232. **Second,** the S-3 incorporated substantially similar risk warning as those discussed above, and they were false and misleading for the reasons set forth above, including in ¶¶140-47.

233.    In addition, on May 3, 2022, Hayward also filed a Prospectus Supplement in connection with the SPO, which was updated on May 4, 2022 ("Prospectus Supplement"). Hayward's Prospectus Supplement incorporated the same statements from the S-3 noted in the two preceding paragraphs, and those statements are false and misleading for the reasons set forth above.

**M.    June 9, 2022: Conference Call**

234.    On June 9, 2022, Defendants Holleran and Jones spoke at conference call which was part of William Blair's 42nd Annual Growth Stock Conference.

235.    During the conference call, Defendant Holleran made false and misleading statements denying that channel demand was stalling and the true source of Hayward's performance.  He touted Hayward's "42% revenue growth LTM [last twelve months] through Q1 of this past year," which he claimed resulted from continuing "drivers," and Hayward's continued execution, including its creation of "specialization in our sales and commercial team where we have hunters and we have folks who manage the channel partnerships."

236.    The claims in the preceding paragraph were false and misleading because, as set forth above and described by CWs, Hayward's revenue growth did not result from continuing "drivers" or Hayward's execution, but rather was the result of numerous tactics to artificially prop up sales in the absence of organic channel demand, including discounting, pull aheads and other machinations.  For the same reason, it was false and misleading to attribute revenue growth to sales force "specialization" or the "manage[ment]" of "channel partnerships," when that growth was fueled by the sales tactics described above, and the channel was reducing its demand and inventory.

237.    Defendant Jones also made false and misleading statements during the conference call denying stalling demand.  An analyst asked about consumer sentiment and the supply chain, and questioned "how is product flowing?"  Defendant Jones responded, "***we haven't seen demand***

*destruction at the end of the channel right now*.  I still think there's pent-up demand for new construction."

238.    This was false and misleading because, as set forth above, even assuming that there was "pent-up" end user demand for pool products, Hayward's channel was oversaturated with inventory and the Company was resorting to the various sales tactics described above to artificially increase its sales, none of which was disclosed by Defendant Jones, despite the analyst question being focused on product flow.

## VI.    THE TRUTH BEGINS TO EMERGE

239.    The truth slowly emerged through several partial corrective events, which Defendants continued to obscure and minimize with a continuous stream of material misrepresentations and omissions.

### A.    January 24, 2022: Press Release with Preliminary 4Q-2021 Results

240.    Hayward's January 24, 2022, Press Release, which was issued about three weeks after 4Q-2021 closed, provided a range for that quarter's net sales—$348 million to $354 million— and Adjusted EBITDA—$102 million to $107 million.  This reflected slowing demand for Hayward's products: net sales in the previous quarter, 3Q-2021, had increased 56% YoY, but were down to about 33% to 36% YoY in 4Q-2021; and Adjusted EBITDA had increased 61% YoY in 3Q-2021; but by only about 38% to 45% in 4Q-2021.  Additionally, the net sales for 4Q-2021 were effectively flat when compared to 3Q-2021's net sales of $350.6 million, even though consistent with seasonality in the pool market, the fourth quarter (along with the second quarter) was typically Hayward's strongest, not the third quarter.

241.    This partial correction was a materialization of the undisclosed risks set forth herein, including that the channel was already saturated with inventory, that demand from the channel was consequently dropping significantly and Hayward was having difficulty selling to the

channel, and that Hayward's own inventory, along with the expense thereof, was increasing because Hayward was manufacturing far in excess of its demand. However, as detailed above, this was obscured by multiple false and misleading statements made previously, and by other false and misleading statements in the January 24, 2022 Press Release.

242. On this news, Hayward's common stock price fell from a close of $21.13 on January 21, 2022, to $18.12 on January 26, 2022, a combined drop of roughly 14.2%. The drop reflected disappointment in the estimates: as Seeking Alpha reported, the 4Q-2021 net sales projections ($348 million to $354 million) were below the consensus of $364.46 million, and the net sales projections for FY 2021 ($1.39 billion to $1.4 billion) were below the consensus of $1.41 billion. Hayward's stock remained artificially inflated, however, as the false and misleading statements and omissions continued to conceal the full truth regarding the problems Hayward was facing.

**B.  April 28, 2022: 1Q-2022 Press Release and Earnings Call**

243. Hayward's April 28, 2022, Press Release reported for 1Q-2021 net sales of $410.5 million (a 23% year-over-year increase) and Adjusted EBITDA of $126.2 million (an 18% year-over-year increase). Though both net sales and Adjusted EBITDA were up year-over-year, Hayward's performance continued to slow. For net sales, the year-over-year performance had dropped from 35% in 4Q-2021, to 23% in 1Q-2022; and for Adjusted EBITDA, that performance had dropped from 43% in 4Q-2021, to 18% in 1Q-2022.

244. Hayward's 4Q-2021 Net Sales and Adjusted EBITDA were a materialization of the undisclosed risks set forth herein: including that the channel was already saturated with inventory, demand from the channel was consequently dropping significantly, Hayward was having difficulty selling to the channel, and that Hayward's own inventory, along with the expense thereof, was increasing because Hayward was manufacturing far in excess of its demand.

245.    During the April 28, 2022, earnings call on those results, Defendant Holleran added the partial disclosure that Hayward's FY 2022 "guidance assumes that there will be greater sell out than sell into the channel during the 2022 season."

246.    But Hayward downplayed the information in ¶243 and ¶245 through multiple false and misleading statements on the same day and earlier, including reaffirming the false and misleading guidance and false and misleading inputs therein.

247.    On this news, Hayward's common stock fell from a close of $16.61 on April 28, 2022, to a close of $15.90 on April 29, 2022, a drop of 4.27%.  But Hayward's stock remained artificially inflated, as the false and misleading statements and omissions continued to conceal the full truth regarding the problems the Company was facing.

## C.  May 2, 2022: Registration Statement and Prospectus

248.    After the market closed on May 2, 2022, Hayward filed a Form S-3 registering securities for sale from an unknown stockholder; the next day, Hayward filed a Prospectus Supplement revealing the selling stockholders to be the CCMP Entities and their client and minority partner AIMCo, and that they were selling a total of 22.5 million shares in a secondary offering.

249.    The SPO was a partial correction and materialization of the undisclosed risks set forth herein, including that the channel was already saturated with inventory, that demand from the channel was consequently dropping significantly and Hayward was having difficulty selling to the channel, and that Hayward's own inventory, along with the expense thereof, was increasing because Hayward was manufacturing far in excess of its demand.  The CCMP Entities had substantial knowledge of, access to, and control over Hayward's operations and performance.  This was part and parcel with the CCMP  Entities' representatives on Hayward's Board, and its appointment of Hayward's leading executives.  The CCMP Entities and AIMCo took advantage

of Defendants' material misrepresentations and omissions to unload a massive amount of Hayward stock while its price remained partially artificially inflated. While the CCMP Entities and AIMCo still retained Hayward stock and control over the Company, a large stock sale by controlling shareholders is not interpreted by the market as a vote of confidence. However, as detailed above, this was obscured by multiple false and misleading statements made previously, including in connection with Hayward's 1Q-2022 earnings two business days earlier, and by other false and misleading statements in the May 2, 2022, S-3.

250.    On this news, Hayward's common stock price fell from a close of $16.88 on May 2, 2022, to a close of $14.91 on May 3, 2022, a decrease of 11.67%. But Hayward's stock remained artificially inflated, as Defendants' misrepresentations and omissions continued to conceal the full truth regarding the problems the Company was facing.

**D.  July 28, 2022: 2Q-2022 Press Release and Earnings Call**

251.    On July 28, 2022, Defendants issued a press release (filed with a Form 8-K at approximately 7:00 a.m. ET) and held a conference call at 9:00 a.m. ET in connection with their 2Q-2022 results. While Hayward's net sales and Adjusted EBITDA grew modestly YoY for the quarter, the percentage increases were down compared to previous quarters: net sales for 2Q-2022 increased 10% YoY, compared to 23% for 1Q-2022, 35% for 4Q-2021, and 56% for 3Q-2021. Moreover, the small 2Q-2022 increase in net sales year-over-year "was the result of favorable pricing and acquisitions, partially offset by lower volumes," as disclosed during the earnings call.

252.    Defendant Holleran was quoted in the press release as stating that given certain trends "and improving supply chain predictability, we expect our channel partners will reduce their Hayward inventory on hand by approximately 4 to 6 weeks in the second half of 2022." Accordingly, Defendant Holleran stated, "We are reducing our 2022 guidance to reflect this inventory reduction, and are taking the appropriate actions to manage our production and costs to

maintain our industry leading margins."  The press release further stated that Hayward was "reducing its full fiscal year 2022 guidance to reflect its outlook for the expected channel inventory reduction in the second half of the year as well as continued impact of geopolitical events in Europe and unfavorable exchange rates."

253.    The reduction in Hayward's guidance was dramatic: Defendants went from guiding for an increase in sales for FY 2022 between 9% and 12% (which they had repeated in March and late April), to guiding for a *decrease* in sales between 2% and 6% for FY 2022.  This sharp downward revision was also in stark contrast to earlier and recent statements made by Defendants, including that demand and growth drivers were strong, as set forth above.

254.    On the earnings call, Defendant Holleran acknowledged that there were "elevated channel inventories at the end of Q2 2022," which "reduced the level of in-season restocking orders we would typically deliver in late second quarter and third quarter."  He elaborated:

> With distributors['] increased confidence in OEM [original equipment manufacturer] supply chains and shorter lead times, they don't require the same level of safety stock, resulting in a recalibration of 4 to 6 weeks less channel inventory. We are planning for reductions in channel inventory from over 4 months of inventory on hand to closer to 3 months by the end of the year.  We believe this will enable us and our channel partners to start 2023 with the right level and mix of product for the 2023 pool season.
>
> As a result of this and the lower sales forecast for Europe, the company now anticipates a consolidated sales decline of 2% to 6% and adjusted EBITDA of $385 million to $400 million.

255.    Later in the call, Defendant Jones likewise stated that the destock would consist of "a takedown of 4 to 6 weeks" of inventory by the channel.  He explained that "[t]he channel has the ability to hold between 4 to 4.5 [months] at the top end and can go down to 3 before it starts to feel short," and that Defendants had lowered "the channel inventory forecast down to the low end of the 3," estimating that the channel would have "around about 3.25 months on hand" after the four- to six-week destock was complete.

256.    When the Q&A portion of the conference call commenced, analysts expressed surprise.  The first analyst asked:

> So I just really want to hit on the destock and just understand -- it seems like the magnitude is quite stark, particularly given that price is going through and what you had in the first half.  So just kind of level set us on how you got comfortable with the level of declines?  And do we -- it looks like Europe is a little more weak, do we hold flat for the year in North America?  Or is that also negative?

In response, Defendant Holleran explained that "more than half of the new guidance is related to channel inventory."

257.    In response to another question about potential moderation in demand, Defendant Holleran again acknowledged that the current state of affairs was not unexpected for Hayward:

> Overall, when we set coming into the year, with last year's retail pull through in front of us, we expected some moderation off a very, very high pull through the channel last year.  And at the halfway point, I would say, while there's still growth clearly year-over-year, the volume has not quite been what we expected.  Lots of price.  There are some areas where mix is contributing to it, but that's kind of the equation there, price and a little bit of mix, but not quite on the volume side.

Defendant Jones added:

> As you think about the balance of the year, Jeff, I would say both regions will have a restocking recalibration program.  It will be larger in North America.  That's where the balance sheets were stronger for our channel partners.  We probably saw some destocking in the first half in Europe, but there will still be further destocking.  Both regions will take that correction in the second half.  But the correction will be higher in North America than it will be in Europe.

In other words, Hayward expected destocking in both North America and Europe, with some previously unannounced destocking already having occurred in Europe in the first half of the year (though not all of it), such that the remaining "correction" would "be higher in North America than it will be in Europe."

258.    Defendant Holleran further admitted that the switch in guidance, while blindsiding analysts, was *not* unforeseen by Hayward.  Expanding on earlier comment, that Hayward expected to sell less into the channel than channel sellout in 2022, he explained that this was "due to the

strategic positions that many of our channel partners took at the end of 2021." That is, the channel had already informed Hayward it was reducing its inventory by later in 2021.

259.    The statements in the preceding paragraphs finally and fully disclosed that the channel was long saturated with inventory, that demand from the channel had consequently dropped significantly and Hayward was having difficulty selling to the channel, and that Hayward's own inventory, along with the expense thereof, was increasing because Hayward was manufacturing far in excess of its demand. The channel destocking, which Defendant Holleran admitted Hayward knew of by later in 2021, was an integral part of and response to the channel's oversaturation of inventory and reduced demand, conditions that dated back to before the Class Period. That is, Hayward had already been expecting reduced channel demand and channel inventory destocking well before the July 28, 2022 disclosures. Defendants may have been able to delay the impact of the channel's saturated inventory and reduced demand for a limited period of time—until after insiders had an opportunity to unload a large number of shares—with discounting, pull aheads and similar tactics, but they could not change the fundamental dynamics and actually harmed overall performance by further increasing channel inventory and cannibalizing future revenue.

260.    Also, though Defendants Holleran and Jones attempted to deflect these belated disclosures by claiming that macro factors like poor weather and events in Ukraine also played a role in Hayward's reduced guidance, when pressed they made clear that these purported factors were a sideshow. Defendant Jones candidly acknowledged on the call, "more than half of the reduction in the guidance of the top line is related to channel inventory reduction"—which is also consistent with the CWs' descriptions above.

261.    Analysts were not shy in expressing their surprise at the new guidance.  On the earnings call, one analyst bluntly stated, "[s]o this guidance change is rather abrupt."  The focus on the guidance change is also evident in an analysis performed by Credit Suisse after the quarter's results came out: Credit Suisse (which lowered its price target for Hayward shares by $3 or about 14.3%) stated, "[o]f more significance than the 2Q results, HAYW reduced its 2022 guidance for sales."  Similarly, BMO Capital, which had previously given the shares a price target of $27.00 per share on March 2, 2022, slashed their price target for Hayward shares to $14.00—just over half of their most recent price target.

262.    After disclosing the foregoing information, the price of Hayward's common stock declined $2.50 per share, or 18.23%, from the previous day's close, to close on July 28, 2022, at $11.21 per share.

### E.  Subsequent Developments

263.    As Defendants subsequently disclosed, the amount of the channel destocking, Hayward's reduced sales, and Hayward's own inventory overload were even greater than Defendants had indicated on July 28, 2022.

264.    For example, in 3Q-2022, Hayward's net sales decreased 30% YoY, primarily driven by a 44% reduction in volume, and Defendant Jones explained that "the volume reductions we experienced compared to last year are due entirely to channel inventory movements." According to Defendant Holleran, "[d]istributors are reducing safety stocks built up during the period of strong demand and significant supply chain disruption, and we estimate a reduction of approximately $80 million occurred in the third quarter. . . compared to a meaningful inventory build in the prior year period."  As a result, Hayward "now expect[ed] full year 2022 net sales to decline approximately 6%"—*i.e.*, the bottom end of the revised guidance announced the prior quarter.

265.    Defendant Jones clarified that they expected the total channel inventory correction to be between "$120 million to $150 million" of Hayward products and that they were "kind of trending up in about midrange right now, $130 million to $135 million is the channel correction." As for Hayward's own inventory, Defendant Jones reported that it was still holding approximately six weeks of extra inventory.

266.    Hayward's poor performance and the channel inventory destocking continued thereafter.

## VII.    ADDITIONAL SCIENTER ALLEGATIONS

267.    Defendants Hayward, Holleran and Jones intentionally or recklessly made the material misrepresentations and omitted the material information set forth above, as they had both knowledge of that material undisclosed information and a motive and opportunity to withhold it.

### A.    Defendant Holleran Knew Or Recklessly Disregarded the Material Undisclosed Information

268.    Defendant Holleran knew of or recklessly disregarded the problems negatively impacting Hayward during the Class Period, which he failed to disclose in his false and misleading statements set forth above.

269.    *First*, Defendant Holleran knew of or recklessly disregarded that the channel had substantial excess inventory and falling demand when he made representations to the contrary, because, as he admitted, he personally tracked those issues.  For example:

> a.    On the October 27, 2021, conference call, an analyst asked for "a bit more color in terms of what you're seeing in the channel in terms of inventory levels and what your distributors are asking for."  Defendant Holleran responded that "we keep close tabs on it [inventory].  We have good insight from our large distributor

71

partners."  Moreover, he stated that Hayward was having "conversations" with these large distributor partners to "understand[] what they need."

b.      On the April 28, 2022, 1Q-2022 conference call, when an analyst asked about "how you guys are looking at channel inventory," Defendant Holleran responded that "[w]e do keep close tabs on it with our channel partners to make sure that we all feel comfortable with the amount of inventory staged closer to point of sale."  He also stated that "[w]e're in pretty close contact with both channel partners and our dealers. . . ."

270.    Further, Defendant Holleran later admitted that, in 2021, he became aware of the problematically high levels of channel inventory and its negative effect on channel demand.  For example:

a.      On the July 28, 2022, 2Q-2022 conference call, Defendant Holleran stated that for 2022 "[w]e expected to sell less into the channel versus sellout," and that this was "due to the strategic positions that many of our channel partners took at the end of 2021."  That is, Holleran "expected" less channel demand because he had already been informed that Hayward's channel partners were reducing inventory, which would reduce orders.

b.      Also on the July 28, 2022, 2Q-2022 conference call, Defendant Holleran stated that, in 2021, "when we set coming into the year [FY 2022], with last year's retail pull-through in front of us, we expected some moderation off a very, very high pull through the channel last year."  That is, by later in 2021, Hayward had been informed and knew that demand from the channel was dropping and would be lower in 2022 than it had been in 2021.

271.    **_Second,_** the CWs have confirmed that throughout the Class Period, Hayward collected and tracked the data showing the massive increase in channel inventory and resulting deterioration in channel demand, and that Defendant Holleran received that information.  For example, as CW1 described above, Hayward maintained a database called Cognos with large quantities of data.  That data included what products Hayward was or was not selling to its customers including distributors, and also what distributors were selling from their own inventory of Hayward products.  So, that data tracked and provided Hayward with knowledge of the channel's demand and inventory levels.  Hayward regularly generated reports from this database, including reports that its product management and marketing teams used to determine where support was needed to try to improve sales.  Cognos tracked Hayward's own inventory levels as well.  Also, as CW3 described above, Hayward was centralizing its data and reporting in an additional program called Snowflake.  Further, as CW3 described above, Hayward used an analytics platform called Tableau, which published reports detailing to channel cancellations, and in turn reports on Hayward's own inventory, both of which were substantial problems.

272.    Defendant Holleran knew of or recklessly disregarded the information that Hayward collected and tracked.  For example, Defendant Holleran chaired monthly Sales, Inventory and Operations Planning meetings, which were attended by Defendant Jones, along with executives from across Hayward, including CW6, as set forth above.  These meeting addressed sales and inventory in depth over several hours, and, as multiple CWs stated, leading up to and during the Class Period, Hayward was missing sales targets badly, Hayward's VP of Sales was discussing Hayward's problems due to inventory, Hayward's own inventory was consequently ballooning, and management was directing the company to engage in sales gimmickry in an

unsuccessful effort to prop up sales.  CW6 thus stated with regard to elevated channel inventory, "if C-Suite did not know about it, it was gross incompetence . . . they had to know."

273.    Holleran also learned about the channel's elevated inventory and stalling demand from Hayward's other top officers, who were his direct subordinates.  Knowledge of those problems was prevalent throughout Hayward's C-Suite prior to and during the Class Period.  CSO Smith express concerned by them regarding them, while Defendant Jones was concerned with Hayward's inventory, which ballooned in turn.  CW3 stated that CSO Smith "knew" that ordering would slow down when the conditions caused by Covid ended, that Smith was expressing concern by August 2021 with how the channel's large bubble of double orders from earlier in 2021 would affect demand, and that he was concerned with how the Company would handle its ramped up manufacturing of products once "things went back to normal."  Notably, CSO Smith, who was the only C-Suite member who worked at Hayward prior to the Control Defendants acquiring the Company, announced that he was leaving Hayward in March 2022 while Hayward was imploding and Defendant Holleran was covering that up with a stream of false and misleading statements.  As detailed below, Jones was fully aware of the foregoing problems as well.

274.    *Third*, Holleran evidenced his knowledge of the problems facing Hayward by serving as CEO when management led a calculated, top-down response to them.  In response to stalling demand from the oversaturated channel, as set forth above, CWs described: that by mid-2021, management was applying pressure to the marketing team because the sales teams "weren't hitting their numbers" and having the marketing team develop programs to "get product off the shelves;" that by October 2021, shipping team was given instructions to pull forward orders in order to try to meet sales targets; and in 2021 sales teams were instructed by superiors to, among

other things, inform distributors that they should load up on inventory, as they "don't want to be the company that doesn't have [product]."

275.    In addition, in response to Hayward's ballooning inventory, CW5 recalled that the manufacturing team received a directive from corporate to "slow down operations" near the end of 2021 and beginning of 2022, and that there was "absolutely" awareness that Hayward had too much inventory, as set forth above.

276.    *Fourth*, Defendant Holleran knew of or recklessly disregarded the channel's elevated inventory and stalling demand due to the magnitude of those undisclosed problems  and their critical importance to Hayward's business.  The channel, which accounted for 76% of Hayward's revenue, had built up $150 million in excess inventory prior to the Class Period, and channel demand was consequently stalling, causing Hayward's sales teams to regularly miss targets.  The channel's saturated inventory level was so substantial and important that it was widely known throughout Hayward prior to and during the Class Period, as set forth above.  CW1 recounted that concerns about excess inventory were general knowledge around the company and were "water cooler talk."  Similarly, CW2, who was a sales manager, stated that in 2021, the overages in distributor inventory were often brought up amongst colleagues, and that "everyone discussed it."

277.    *Fifth,* the content and context of Holleran's false and misleading statements demonstrates his knowledge of the undisclosed information.  As set forth above, Holleran addressed questions and provided responses that directly addressed whether channel inventory was elevated, whether channel demand was stalling, and whether Hayward was suffering significant cancellations, and in each case he concealed the truth—that these were all problems then impacting Hayward.

278.   **Sixth**, Hayward's most senior leadership, including Defendant Holleran and other Defendants to whom he was beholden, took actions which showed they knew the Company was performing poorly.  With respect to its five most senior officers: four made suspicious sales of Hayward stock during the Class Period (Defendant Holleran, Defendant Jones, Hayward's Head of NA, and its Head of EU/RoW); while the fifth left the company in the middle of the Class Period (CSO Smith).  Likewise, with respect to Hayward's three controlling shareholders: two sold enormous amounts of stock through self-interested transactions during the Class Period (the CCMP Entities and their client and minority partner AIMCo); and the third acquiesced in a series of self-interested transactions for their co-sponsors (the MSD Defendants).

## B. Defendant Jones Knew Or Recklessly Disregarded the Material Undisclosed Information

279.   Defendant Jones knew of or recklessly disregarded the problems negatively impacting Hayward during the Class Period, which he failed to disclose in his false and misleading statements as set forth above.

280.   **First**, Jones knew or recklessly disregarded that the channel had massively inflated channel inventory and falling demand when he represented otherwise because, as he admitted,  he personally tracked those issues.  For example, on August 9, 2022, during a presentation at the Jefferies Global Industrials Conference, Defendant Jones stated that "we have good -- not excellent, but we have good channel inventory knowledge.  We do get inventory positions reported to us by predominantly our U.S. distributors.  We do get good sell-through information as well from a cohort of our distributors.  So we have decent good information there."

281.   **Second**, the CWs have confirmed that throughout the Class Period, Hayward collected the data showing the channel's massive increase in inventory and resulting deterioration in demand, and that Jones received that information or recklessly disregarded it.  For example, and

as discussed above, CW3 stated that by late February 2022 Defendant Jones was receiving reports on the order cancellations, which had been hammering Hayward.  Indeed, Defendant Jones asked for those reports because cancellations were so bad.  In addition, during the same period, under strain from cancellations, CW3 provided Jones with related reports showing that Hayward's inventory was ballooning.  In February or March 2022, Jones raised concerns that Hayward' excess inventory of unsold products had reached $100 million.  Jones also attended the monthly meetings chaired by Defendant Holleran regarding sales and inventory noted above.

282.     ***Third***, Jones evidenced his knowledge of the problems facing Hayward by serving as its second ranking officer while management undertook a calculated, top-down response to them.  As set forth above, that included implementing programs to try to improve Hayward's net sales figures, and to reduce Hayward's own excess inventory which was a drag on its balance sheet.

283.     ***Fourth***, as discussed above, the magnitude of the problems at Hayward meant that anyone in Jones' positions, receiving the information Jones received, would have to have known about the channel's elevated inventory and stalling demand.

284.     ***Fifth,*** the content and context of Jones' false and misleading statements demonstrates their knowledge of the undisclosed information.   As set forth above, Holleran also addressed questions and provided responses that directly addressed, among other things, whether channel inventory was elevated and whether channel demand was stalling, while in each case concealing that these problems then impacting Hayward.

285.     ***Sixth,*** as further detailed below, along with the other insiders who led Hayward, Jones' suspicious sales of Hayward stock evidence his knowledge of the problems at Hayward and determination to monetize large portions of his stock prior to disclosure of the truth.

**C. Motive and Opportunity: Most of Hayward's Highly Placed Insiders, Including Several Defendants, Used the Misrepresentations and Omissions To Generate Enormous Profits by Selling Stock at Artificially Inflated Prices During the Class Period**

286.     Insiders repeatedly sold large amounts of stock under suspicious circumstances during the Class Period, when the price of Hayward shares was artificially inflated by material misrepresentations and omissions, which further supports scienter.

### 1.     The Insider Sales During the Class Period

287.     *First*, during the Class Period, the CCMP Entities sold: a total of 24,456,876 Hayward shares, which amounted to 34.19% of their holdings, thereby securing $379,634,831.48 in proceeds.  Had these shares been sold on July 28, 2022, the close of the Class Period when the truth had been revealed and the price of Hayward shares was only $11.21, these shares would have only garnered $274,161,580.  Therefore, the CCMP Entities gained $105,473,251 in illicit profits as result of their sales.  The CCMP Entities' specific sales during the Class Period are enumerated below.

288.     On January 24, 2022, the CCMP Entities' selling began.  To start with, on that day, they liquidated 3.77% of their total Hayward shares, selling approximately 2.7 million shares in a block trade, at a price of $19.80 per share.  This generated $53.4 million in proceeds.  The CCMP Entities sold those shares to Hayward as part of a repurchase program that Hayward initiated primarily to benefit its controlling shareholders—in particular the CCMP Entities and their minority investment partner AIMCo.

289.     Also on January 24, 2022, Hayward announced that as part of its repurchase program, it would acquire millions of more shares from its "Sponsors"—which was later revealed to be a sale by the CCMP Entities, under terms that were uniquely favorable to them.  This sale occurred on March 11, 2022, when the CCMP Entities sold 4.08 million shares, or 5.93% of their

total Hayward shares, at a price of $19.80 per share.  The CCMP Entities thereby generated $80.8 million in proceeds.  Notably, by the time they sold these shares on March 11, 2022, Hayward's stock price had dropped to $16.80, which was about $3 per share less than the price on January 24, 2022, when the transaction was announced.  But Hayward had agreed to repurchase the CCMP Entities' shares at a price of $19.80 per share despite the Company's declining performance and stock price, giving an enormous and unjustified benefit to the CCMP Entities.  In contrast, other repurchases under the program were conducted in open market trading at the prevailing and substantially lower market price.  By arranging to avoid the lower market price, the CCMP Entities made about $12 million more on this sale than they otherwise would have.

290.    Next, the CCMP Entities made even larger sales in May 2022, through an underwritten SPO conducted by Hayward.  Tellingly, the AARSA requires Hayward to "use its best efforts to promptly effect the registration of Registrable Shares under the Securities Act" at "any time" after the CCMP Entities request that they do so.  (The AARSA further states that the registration "shall be effected as a Shelf Registration if so requested by the Requesting Stockholder and the Company is eligible to use a Form S-3"—which is what happened here).  As set forth in Hayward's Free Writing Prospectus ("FWP") dated May 2, 2022, the SPO consisted entirely of 22.5 million shares owned and sold by the CCMP Entities and their client and minority partner AIMCo.  The underwriters were also granted a 30-day option to purchase up to an aggregate of 3.375 million additional shares from the CCMP Entities and AIMCo to sell as part of the SPO.  Further, the FWP stated that "[s]ubject to the completion of the Offering, the Company intends to repurchase from the underwriters" – who were purchasing the shares from the CCMP Entities and AIMCo – "7,500,000 shares of the common stock being sold in the Offering at a price per share equal to the price per share paid by the underwriters."  The next day, May 3, 2022, Hayward issued

another press release increasing the amount of shares in the SPO: the CCMP Entities and AIMCo would in fact be selling 24 million shares, the underwriters could purchase up to 3.6 million additional shares, and Hayward would be repurchasing 8 million shares.

291.    Thus, on May 5, 2022, as part of the SPO, the CCMP Entities sold approximately 15.5 million shares, or 23.96% of their total Hayward shares, at a price of $13.8838 per share net of underwriting discounts and commissions.  The CCMP Entities thereby generated $215.5 million in proceeds.

292.    Then, on May 17, 2022, in connection with the underwriters' exercise of their option to purchase additional shares, the CCMP Entities sold approximately 2.2 million shares, or 4.39% of their total Hayward shares, at a price of $13.8838 per share net of underwriting discounts and commissions.  The CCMP Entities thereby generated $30.0 million in proceeds.  This occurred just two days before the annual meeting of stockholders at which the CCMP and MSD lost their board majority.

293.    *Second,* the CCMP Entities' client and minority partner, AIMCo, made parallel sales as those set forth above.  Specifically, on January 24, 2022, AIMCo sold approximately 1.4 million Hayward shares in a block trade, at the same price as the CCMP Entities ($19.80 per share), thereby generating $27.4 million in proceeds.  Like the CCMP Entities, AIMCo sold 3.77% of its total shares in Hayward, the maximum allowable under the Shareholders' Agreement.

294.    Also, on May 5, 2022, as part of the SPO, AIMCo sold approximately 8.5 million shares, or 23.96% of its total Hayward shares, at a price of $13.8838 per share net of underwriting discounts and commissions.  AIMCo thereby generated $117.7 million in proceeds.  Further, on May 17, 2022, as part of the partial exercise by the underwriters of their option to purchase additional shares in the May SPO, AIMCo sold approximately 1.2 million shares, or 4.39% of its

total Hayward shares, at a price of $13.8838 per share net of underwriting discounts and commissions. AIMCo thereby generated $16.4 million in proceeds. In both cases, AIMCo sold the exact same percentage of its shares as the CCMP Entities did.

295.    During the Class Period, AIMCo sold: a total of 11,048,123 shares, for $161,585,655.64 in proceeds. Had these shares been sold on July 28, 2022, the close of the Class Period when the truth had been revealed and the price of Hayward shares was only $11.21, these shares would have only garnered $123,849,459. Therefore, AIMCo gained $37,736,185 in illicit profits as result of its sales.

296.    ***Third***, during the Class Period, Defendant Jones sold: a total of 189,945 Hayward shares, which amounted to 52.0% percent of his holdings at the start of and acquired during the Class Period, thereby securing approximately $3.3 million in proceeds. As detailed below, most of those shares were ***not*** sold pursuant to a 10b5-1 trading plan, and to the extent other sales were made pursuant to such a plan, Defendant Jones has not disclosed the date that he adopted such plan. Had these shares been sold on July 28, 2022, the close of the Class Period when the truth had been revealed and the price of Hayward shares was only $11.21, these shares would have only garnered $2,129,283. Therefore, Jones gained $1,170,717 in illicit profits as result of his sales.

297.    On June 17, 2022, Defendant Jones exercised an option to purchase 280,000 shares at a pittance—$1.40 per share—and then sold 140,501 of them on the open market, at a weighted average price of $13.8895 per share. This was not pursuant to a 10b5-1 trading plan. He thereby generated $1.95 million in proceeds, and liquidated 44.49% of his Hayward shares, after exercising the option essentially for free.

298.    The options that Defendant Jones exercised to purchase (at a price of $1.40 per share) and sell shares during the Class Period were not part of his contemporaneous compensation.

Rather, they were time-restricted options with a vesting schedule that he was awarded in April 2020, well before the start of the Class Period, and which did not expire until April 2030. Accordingly, Defendant Jones's exercise of these options and the corresponding sale of the shares were not simply a means of taking equity-based compensation, but were deliberately timed to take advantage of Defendants' misrepresentations.

299.    In addition, Defendant Jones made several sales in November 2021.  On November 16, 2021, he sold 25,000 shares on the open market, at a weighted average price of $26.1225 per share, thereby generating approximately $650,000 in proceeds, and liquidating 29.33% of his Hayward shares.  On November 17, 2021, he sold 8,410 shares on the open market, at a weighted average price of $28.0091 per share, thereby generating approximately $240,000 in proceeds, and liquidating 13.96% of his Hayward shares.  On November 18, 2021, he sold 13,483 shares on the open market at a weighted average price of $28.243 per share, thereby generating approximately $380,000 in proceeds and liquidating 26.02% of his Hayward shares.  On November 19, 2021, he sold 2,551 shares on the open market at a weighted average price of $28.0061 per share, thereby generating approximately $71,000 in proceeds and liquidating 6.65% of his Hayward shares. Defendant Jones has claimed that these sales were pursuant to a 10b5-1 trading plan, but has not disclosed the date that plan was adopted.

300.    ***Fourth,*** during the Class Period Defendant Holleran sold 50,272 shares for approximately $1.18 million in proceeds.  On November 4, 2021, Defendant Holleran sold 12,772 shares on the open market at a weighted average price of $23.9194 per share, thereby generating approximately $305,000 in proceeds and liquidating 2.81% of his Hayward shares.  On December 20, 2021, Defendant Holleran sold 19,709 shares on the open market at a weighted average price of $23.2291 per share, thereby generating approximately $460,000 in proceeds and liquidating

4.46% of his Hayward shares.  On December 21, 2021, Defendant Holleran sold 17,791 shares on the open market at a weighted average price of $23.3162 per share, thereby generating approximately $400,000 in proceeds and liquidating 4.22% of his Hayward shares.  Defendant Holleran has claimed that these sales were pursuant to a 10b5-1 trading plan, but has not disclosed the date that plan was adopted. Had these shares been sold on July 28, 2022, the close of the Class Period when the truth had been revealed and the price of Hayward shares was only $11.21, these shares would have only garnered $564,549.  Therefore, Holleran gained $615,451 in illicit profits as result of his sales.

301.    *Fifth*, Richard Roetken ("Roetken"), Hayward's President, North America since August 2018 and one of its top-five ranking officers, also made substantial stock sales during the Class Period.  Roetken sold a total of 353,195 Hayward shares, which amounted to 68.15% percent of his holdings at the start of and acquired during the Class Period, thereby securing approximately $8.72 million in proceeds.  Roetken claimed that these option exercises and sales were pursuant to a 10b5-1 trading plan, but had not disclosed the date that plan was adopted.  Had these shares been sold on July 28, 2022, the close of the Class Period when the truth had been revealed and the price of Hayward shares was only $11.21, these shares would have only garnered $3,959,315. Therefore, Roetken gained $4,760,685 in illicit profits as result of his sales.

302.    Roetken's specific sales are as follows.  On November 1, 2021, Roetken sold 12,000 shares on the open market at a weighted average price of $23.2317 per share, thereby generating approximately $280,000 in proceeds and liquidating 6.36% of his Hayward shares.  On November 9, 2021, Roetken exercised an option to purchase 133,400 shares at a price of $0.50 per share (at a cost of approximately $68,000) and then sold those shares on the open market at a weighted average price of $25.0106 per share, thereby generating approximately $3.34 million in

proceeds (a $3.27 million profit) and liquidating 43.03% of his Hayward shares.  On November 10, 2021, Roetken exercised an option to purchase 64,282 shares at a price of $0.50 per share (at a cost of approximately $32,000) and then sold those shares on the open market at a weighted average price of $25.2024 per share, thereby generating approximately $1.62 million in proceeds (a $1.59 million profit) and liquidating 26.69% of his Hayward shares.  On December 1, 2021, Roetken sold 11,513 shares on the open market at a weighted average price of $24.3376 per share, thereby generating approximately $280,000 in proceeds and liquidating 6.52% of his Hayward shares.  On December 6, 2021, Roetken exercised an option to purchase 300 shares at a price of $0.50 per share (at a cost of $150) and then sold those shares on the open market at a weighted average price of $25.005 per share, thereby generating approximately $7,500 in proceeds (a $7,350 profit) and liquidating 0.18% of his Hayward shares.  On December 7, 2021, Roetken exercised an option to purchase 65,700 shares at a price of $0.50 per share (at a cost of approximately $33,900) and then sold those shares on the open market at a weighted average price of $23.358 per share, thereby generating approximately $1.53 million in proceeds (a $1.5 million profit) and liquidating 28.47% of his Hayward shares.  On January 3, 2022, Roetken exercised an option to purchase 66,000 shares at a price of $0.50 per share (at a cost of $33,000) and then sold those shares on the open market in two tranches the same day: 64,488 shares at a weighted average price of $25.1861 per share and 1,512 shares at a weighted average price of $26.1174 per share, thereby generating approximately $1.66 million in total proceeds (a $1.63 million profit) and liquidating 28.56% of his Hayward shares.

303.    Though Roetken was awarded more than 120,000 stock options on March 11, 2021 under the 2021 Plan, those options only began to vest *after* his Class Period sales and option exercises, the last of which occurred in January 2022 (the 2021 Plan options only began to vest in

March 2022).  The options that Roetken exercised during the Class Period were thus awarded in earlier periods prior to the IPO.  Accordingly, Roetken's exercise of the options and the corresponding sale of the shares set forth above were not simply a means of taking equity-based compensation, but were deliberately timed to take advantage of Defendants' misrepresentations.

304.  **_Sixth_**, Fernando Blasco ("Blasco"), Hayward's Vice President, General Manager, Europe & Rest of World since May 2019 and also one of its top-five officers, sold large amounts of stock during the Class Period as well.  Blasco sold a total of 234,000 Hayward shares, which amounted to 95.5% percent of his holdings at the start of and acquired during the Class Period, thereby securing approximately $3.45 million in proceeds.  Blasco claimed that these option exercises and sales were pursuant to a 10b5-1 trading plan, but has not disclosed the date that plan was adopted.  Had these shares been sold on July 28, 2022, the close of the Class Period when the truth had been revealed and the price of Hayward shares was only $11.21, these shares would have only garnered $2,623,140.  Therefore, Blasco gained $826,860 in illicit profits as result of his sales.

305.  Blasco's specific sales are as follows.  On May 13, 2022, Blasco exercised an option to purchase 78,000 shares at a price of $1.80 per share (at a cost of $140,400) and then sold those shares on the open market at a weighted average price of $14.6622 per share, thereby generating approximately $1.14 million in proceeds (a $1 million profit) and liquidating 87.71% of his Hayward shares.  On May 16, 2022, Blasco exercised an option to purchase 1,477 shares at a price of $1.80 per share (at a cost of approximately $2,700) and then sold those shares on the open market at a weighted average price of $14.5032 per share, thereby generating approximately $21,400 in proceeds (a $18,800 profit) and liquidating 11.91% of his Hayward shares.  On May 17, 2022, Blasco exercised an option to purchase 76,523 shares at a price of $1.80 per share (at a cost of approximately $138,000) and then sold those shares on the open market at a weighted

average price of $14.8064 per share, thereby generating approximately $1.13 million in proceeds (a $1 million profit) and liquidating 87.50% of his Hayward shares.  On May 23, 2022, Blasco exercised an option to purchase 5 shares at a price of $1.80 per share (at a cost of $9) and then sold those shares on the open market at a price of $14.59 per share, thereby generating approximately $73 in proceeds (a $64 profit) and liquidating 0.05% of his Hayward shares.  On May 25, 2022, Blasco exercised an option to purchase 45,050 shares at a price of $1.80 per share (at a cost of approximately $81,000) and then sold those shares on the open market at a weighted average price of $14.511 per share, thereby generating approximately $650,000 in proceeds (a $572,000 profit) and liquidating 80.48% of his Hayward shares.  On May 26, 2022, Blasco exercised an option to purchase 32,945 shares at a price of $1.80 per share (at a cost of approximately $59,000) and then sold those shares on the open market at a weighted average price of $15.1724 per share, thereby generating approximately $500,000 in proceeds (a $440,000 profit) and liquidating 75.09% of his Hayward shares.

306.    None of the options that Blasco exercised, as set forth above, were awarded under his 2021 compensation plan.    Accordingly, Blasco's exercise of these options and the corresponding sale of the shares were not simply a means of taking equity-based compensation, but were deliberately timed to take advantage of Defendants' misrepresentations.

## 2.    The Insider Sales During the Class Period Support Scienter

307.    *First*, the insider sales during the Class Period were enormous—totaling nearly $558 million, with nearly $150 million in illicit profits.  The CCMP Entities' sales alone—$380 million, with approximately $105 million in illicit profits—are "massive" by themselves.  So too are the sales of $161.5 million, with $38 million in profits, for their client minority partner AIMCo.  For his part, Defendant Jones had $3.3 million in proceeds, with $1.1 million in profits.  Holleran

sold 50,272 shares for approximately $1.18 million in proceeds. Roetken had $8.7 million in proceeds, with $4.7 million in profits. Blasco had $3.5 million in proceeds, with almost $1 million in profits.

308. **Second,** the insiders all sold a large percentage of their holdings, further supporting scienter. During the Class Period, the CCMP Entities sold 34.19% of the shares they held at the start of the Class Period; and AIMCo sold 30.04% of its shares. Defendant Jones sold 52.05% of his holdings at the start of and acquired during the Class Period; Roetken sold 68.1% and Blasco sold 95.5%.

309. **Third**, the insiders' class period sales were unusually high compared to their earlier sales. The CCMP Entities sold 8,310,642 shares between Hayward's IPO on March 16, 2021, and the start of the Class Period on October 27, 2021 (the "Comparison Period") for proceeds of approximately $133.5 million (10.41% of their holdings), far less than the 24,456,876 shares sold during the Class Period for proceeds of approximately $380 million (34.19% of their holdings). AIMCo sold 4,272,381 shares during the Comparison Period for proceeds of approximately $72.6 million (10.41% of its holdings), far less than the 11,048,123 shares sold during the Class Period for proceeds of approximately $161.6 million (30.04% of its holdings). Defendant Jones sold 83,000 shares during the Comparison Period for proceeds of approximately $1.8 million (26.46% of his holdings, far less than the 189,945 shares sold during the Class Period for proceeds of approximately $3.3 million (52.05% of his holdings). Defendant Holleran sold 24,528 shares during the Comparison Period for proceeds of approximately $540,000 (5.12% of his holdings at the time of the sale), far less than the 50,272 shares sold during the Class Period for proceeds of approximately $1.18 million (11.07% of his holdings). Roetken sold 20,132 shares during the Comparison Period for proceeds of approximately $450,000 (6.44% of his holdings), far less than

the 353,195 shares sold during the Class Period for proceeds of approximately $8.7 million (68.1% of his holdings).  Blasco sold no shares during the Comparison Period, compared to 234,000 shares sold during the Class Period for proceeds of approximately $3.45 million (95.5% of his holdings).

310.    **Fourth**, the timing of the insider sales could not be more suspicious.  They were either toward the start of the Class Period, generally before or near the first partial corrective disclosure, or toward the end of the Class Period, just before the full truth was finally revealed.  For example, Defendants arranged for the SPO to occur in May 2022, enabling the CCMP Entities and AIMCo to sell just days after Hayward announced unseasonably strong revenue due to those short run sales tactics, but not long before Hayward revealed massive performance declines when 2Q-2022 ended and Hayward's stock plummeted another 23%, far below the price the insider sales took place at.  ¶¶141-42, 209-10.  Jones's large sale outside his 10b5-1 trading plan took place in June 2022, after the CCMP Entities and AIMCo had a chance to unload, but one month before Hayward revealed its massive performance declines.  There is no indication in Jones's SEC filings that this sale was tax-related, or anything other than naked self-interest.  Holleran and Roetken, for their part, sold at highly inflated prices in late 2021 or early 2022.  Blasco sold in May 2022, shortly before the truth was revealed.

311.    The charts below provide illustrations of the insiders' highly suspicious Class Period sales.  First, the chart below shows how the CCMP Entities and AIMCo conducted these substantial insider sales before Defendants fully and finally disclosed that, among other things, channel demand had dropped significantly:



312.    As for Defendant Jones, his transaction was unusual in terms of its timing, amount, and coming outside of a 10b-5 trading plan.  By comparison, at the start of the Class Period, he made a few small sales pursuant to a 10b5-1 plan.  The chart below illustrates this point:



313.    Defendant Holleran sold nearly twice as much stock during the Class Period as before it, and he sold in November and December 2021 at prices more than double the stock price after the truth was revealed:



314.    Roetken likewise sold substantially more stock during the Class Period than before it, and like Defendant Holleran, his sales occurred at high prices at the end of 2021 and very beginning of 2022:



315.    Finally, all of Blasco's sales occurred during the Class Period, and in May 2022, just after the SPO and before the truth was revealed:



316.    ***Fifth***, the insiders making these massive sales, were among Hayward's most powerful operators, and they were only able to do so by utilizing Hayward's machinery, including the assistance and acquiescence of the Defendants here, to execute self-interested transactions like the favorable repurchases and the bespoke SPO, further establishing a concerted effort by and motive to artificially inflate Hayward's stock.

317.    The sales set forth above, separately and taken together, demonstrate  motive and opportunity to defraud investors in violation of the Exchange Act, and support scienter.

**D.  The Totality of Knowledge, Motive and Actions, Supports Scienter**

318.    Taken together, §§XIII-A, B and C above allege that Defendant Holleran and Defendant Jones had access to and admitted to knowing of undisclosed, negative information— elevated channel inventory and stalling channel demand—that was critical to Hayward's performance and operations and negatively impacting Hayward during the Class Period. Defendant Holleran and Defendant Jones made repeated false and misleading statements that directly addressed channel inventory and demand, and flat-out denied that channel inventory was elevated, channel demand was stalling, and even that the channel was cancelling orders.  At the same time, Defendant Holleran and Defendant Jones were Hayward's two most senior executive while management was leading a campaign to try to conceal these problems, by resorting to discounts, pull aheads and similar tactics that temporarily forestalled the full impact of those problems by cannibalizing future revenue.

319.    Defendant Holleran and Defendant Jones also had a strong motive to conceal the serious problems Hayward was facing and to forestall their full impact: the large positions of Hayward stock and options that the Company's leading insiders still held after the hasty IPO.  This included Defendants Holleran and Jones, as well as the CCMP Entities to which they were beholden.  Taking advantage of the material misrepresentations and omissions, reaped enormous profits by selling stock at artificially inflated prices, under extremely suspicious circumstances, before the truth fully emerged.

320.    These allegations demonstrate Defendant Holleran's and Defendant Jones' scienter.

## VIII.  ADDITIONAL CONTROL ALLEGATIONS

321.   At all relevant times, CCMP and MSD had the potential to control Hayward and did in fact exercise control over Hayward because:

- The CCMP and MSD Entities installed Holleran and Jones as CEO and CFO of Hayward

- The CCMP and MSD Entities acted as a group with beneficial ownership over each other's shares such that they were Hayward's majority shareholder;

- Hayward had the status of a "controlled company" under New York Stock Exchange rules

- In documents filed with the SEC, Hayward stated that the CCMP Entities, the MSD Entities, and AIMCo had "significant influence" and "effective[] control" over Hayward's business affairs and activities;

- Hayward's Board of Directors was not majority independent because designees from the CCMP Entities, MSD Entities, and AIMCo held a majority of the Company's director seats;

- The CCMP and MSD Entities controlled the membership of Hayward's entire Board of Directors through its designees on the Board and its majority shareholder status;

- The CCMP and MSD Entities' designees who sat on Hayward's Board, including Defendants McFadden, Walsh, Brenneman, Betrand, and Brown, controlled and/or sat on Hayward committees that oversaw key aspects of Hayward's business, its executives, its board of director members, and financial review and audit process;

- The CCMP and MSD Entities' designees who sat on Hayward's Board, including Defendants McFadden, Walsh, Brenneman, Betrand, and Brown, reviewed and approved all false and misleading documents issued by Hayward;

- Defendants McFadden, Walsh, Brenneman, Betrand, and Brown, signed false and misleading documents issued by Hayward, including Hayward's March 9, 2022 Form 10-K for FY 2021 and Hayward's May 2, 2022 Registration Statement;

- As a member of Hayward's Audit Committee, Defendant Bertrand reviewed and approved additional false and misleading financial statements issued by Hayward, including Hayward's Form 10-Q for 3Q-21; and

- Hayward's Board, controlled by the CCMP and MSD Entities, approved a share repurchase program and a secondary public offering that allowed the CCMP Entities and AIMCo to offload millions of shares during the Class Period at an inflated price.

A. **The CCMP and MSD Entities Agreed to Act as a Group with Beneficial Ownership Over Shares, Giving Them Majority Shareholder Control Over Hayward**

322.    The CCMP Entities and MSD Entities maintained and exercised majority shareholder control over Hayward by acting as a group with respect to their shares, including by explicit agreement.

323.    First, the CCMP Funds, the MSD Fund, and AIMCo entered into the Stockholder's Agreement with Hayward in which they agreed that the CCMP Entities, MSD Entities, and AIMCo would coordinate with respect to share sales and consult with each other before any sale.  Section 2.2 of the AARSA, "Restriction on Transfer; Coordination," contained the following provision in §2.2(f):

> Following the company IPO, the Investors shall use commercially reasonable efforts to coordinate with respect to the timing and manner of disposition by any Investor of any Stockholder Shares held by the Investors . . . .  During the Coordination Period,[2] the Investors shall use commercially reasonable efforts to keep the other Investors reasonably informed as to the timing and manner of any proposed dispositions by the Investors of any Stockholder Shares held by the Investors . . ., and any Investor wishing to Transfer any Stockholder Shares during such period shall (i) comply with any applicable advance notice provisions in ARTICLE V, and (ii) provide reasonable advance notice and consult with the other Investors prior to taking such action or entering into any definitive agreement with respect to such action . . . .

Section 2.2(f) also stated, "The Investors have agreed, pursuant to this Agreement and otherwise, to act together with respect to their Stockholder Shares for the duration of the Coordination Period and, as such, may be deemed to be a group for purposes of Section 13(d) of the Exchange Act."

324.    The AARSA also contained provisions that placed AIMCo under the control of the CCMP Entities and MSD Entities with respect to AIMCo's Hayward investment.  For example, AIMCo, unlike the CCMP and MSD Entities, could not request an underwritten shelf take-down

---

[2]    The Coordination Period lasted for three years after Hayward's IPO, or such time when the CCMP Entities or MSD Entities owned less than 5% of Hayward's shares or agreed to abandon coordination, whichever was earlier.

pursuant to a Shelf Registration—though if the CCMP or MSD Entities initiated an underwritten shelf take-down, AIMCo could "tag along."  Similarly, AIMCo was prevented from selling stock until after the CCMP Entities had "consummated a secondary sale after the Company IPO" in March 2021, and could only sell proportionate to the CCMP Entities' sales.  AIMCo also only held one seat on Hayward's Board, compared to the CCMP and MSD Entities' combined six seats for the majority of the Class Period.  Thus, AIMCo was controlled by, and beholden to, the CCMP and MSD Entities, and incentivized to support their actions.

325.    Consistent with the Stockholders' Agreement, the CCMP and MSD Entities and AIMCo each filed Schedule 13Gs during the Class Period stating that they were deemed a single "group" under the SEC Rules with beneficial ownership over each other's shares, making them Hayward's majority shareholder.[3]  For example, Defendant CCMP Capital Investors III, L.P. stated in a Schedule 13G filed on February 8, 2022:

> By virtue of the Stockholders' Agreement, the CCMP Investors, MSD and AIMCo may be deemed to be members of a group for the purposes of 13(d) of the Securities Exchange Act of 1934.  Based in part on information provided by the Issuer [Hayward], such a "group" would be deemed to beneficially own an aggregate of 179,852,865 shares of Common Stock, representing approximately 76.9% of the Common Stock of the Issuer outstanding, as of December 31, 2021.

326.    Likewise, in a Schedule 13G filed by Defendant MSD Partners, L.P. on March 21, 2022, MSD Partners, L.P. "acknowledge[d] and agree[d]" that it was acting as a single group with the CCMP Entities and AIMCo and controlled the majority of Hayward's shares.

**B.  CCMP and MSD Controlled Hayward Throughout the Class Period**

*1.    Hayward Had the Status of a Controlled Company Because CCMP and MSD Controlled the Majority of Its Voting Shares*

---

[3] In its Prospectus Supplement, Hayward explained that "[u]nder the rules of the SEC, a person is deemed to be a 'beneficial owner' of a security if that person has or shares 'voting power,' which includes the power to vote or to direct the voting of such security," and that "more than one person may be deemed a beneficial owner of the same securities and a person may be deemed a beneficial owner of securities as to which he has no economic interest."

327.    Hayward also conceded in SEC filings that the CCMP and MSD Entities had majority shareholder control over the Company.

328.    In its IPO Prospectus to investors, Hayward stated that it was a "controlled company" under the New York Stock Exchange (NYSE) rules because "more than 50% of the voting power in the election of our directors" was held by a group, and that its "Sponsors," *i.e.* the CCMP Entities, MSD Entities, and AIMCo, "will collectively control a majority of the voting power of shares eligible to vote in the election of our directors" after the IPO.[4]  Hayward repeated these statements in SEC documents filed during the Class Period, including in its 2021 Form 10-K and its April 8, 2022 Definitive Proxy Statement.  For example, in its 2021 Form 10-K, which was signed by McFadden, Walsh, Brenneman, Bertrand, and Brown, Hayward repeated that it was a "'controlled company' within the meaning of the corporate governance standards of the New York Stock Exchange" and that its Sponsors, *i.e.* the CCMP Entities, MSD Entities, and AIMCo "collectively control a majority of the voting power of shares."

### 2.    Hayward Admitted That the CCMP and MSD Entities Had Significant Influence and Control Over Its Business Affairs

329.    Hayward admitted in various SEC filings that its Sponsors had "significant influence" and "control of the Company."  In its IPO Prospectus, Hayward stated that its Sponsors (CCMP, MSD and AIMCo) "will continue to have significant influence over us and decisions made by our stockholders upon completion of this offering may have interests that differ from yours."  In its Form 10-K for 2021, Hayward stated:

> For as long as affiliates of our Sponsors continue to beneficially own a substantial percentage of the voting power of our outstanding common stock, they will

---

[4] "Controlled companies" are exempt from certain NYSE listing requirements, such as having a majority independent board.  As described below, Hayward's Board was not majority independent because individuals affiliated with its Sponsors held a majority of the Board positions.

continue to have significant influence over us. For example, they are able to strongly influence or effectively control the election of all of the members of our Board of Directors and our business and affairs, including any determinations with respect to mergers or other business combinations, the acquisition or disposition of assets, the incurrence of additional indebtedness, the issuance of any additional shares of common stock or other equity securities, the repurchase or redemption of shares of our common stock and the payment of dividends. This concentration of ownership may have the effect of deterring, delaying, or preventing a change of control of the Company, could deprive our stockholders of an opportunity to receive a premium for their common stock as part of a sale of the Company and might ultimately affect the market price of our common stock.

330.    Hayward's Prospectus Supplement filed in connection with the SPO contained substantially similar language as above, and stated that the CCMP and MSD Entities "will continue to have significant influence over" Hayward, even after the SPO.

### 3. *The CCMP and MSD Entities Installed a Majority of Hayward's Board and Controlled the Composition of the Entire Board*

331.    According to its April 8, 2022 Definitive Proxy Statement ("2022 Proxy Statement"), Hayward's Board of Directors "is responsible for the supervision and oversight of our business affairs. In executing this responsibility, our board of directors establishes corporate policies, sets strategic direction and oversees management."

332.    Hayward did not have a majority independent Board. Hayward acknowledged in its IPO Registration Statement that "immediately following this offering [in March 2021] we do not expect that the majority of our directors will be independent or that any committees of our Board of Directors, other than our audit committee, will be composed of independent directors." Hayward made similar statements its 2021 Form 10-K and in its 2022 Proxy Statement that its Board would not be majority independent because more than half of the directors on its Board would be affiliated with Hayward's Sponsors. In total, the CCMP Entities and MSD Entities placed nine of their high-ranking executives or affiliates onto Hayward's Board, seven of whom

served through the May 2022 SPO.[5]   During the Class Period, Hayward's Board consisted of 12 to 13 directors, and non-independent directors affiliated with the CCMP and MSD Entities maintained a seven-person majority at all relevant times.   The non-independent directors that served on Hayward's Board during the Class Period included Defendants McFadden, Walsh, and Brenneman, who were affiliated with the CCMP Entities, and Defendants Brown, and Bertrand who were affiliated with the MSD Entities.

333.   In addition to controlling a majority of the Board, the CCMP and MSD Entities controlled the composition of Hayward's *entire* Board during the Class Period.   Defendant Walsh chaired Hayward's Nominating and Corporate Governance Committee, which was responsible for selecting director candidates, according to Hayward's IPO Prospectus.   Candidates selected by the Committee were voted on by shareholders, and thus the CCMP and MSD Entities controlled the outcome of Board elections through their majority voting power.   Hayward acknowledged in its 2021 Form 10-K and in its Prospectus Supplement that it may be "difficult for stockholders to elect directors that are not nominated by the current members of our Board of Directors or take other corporate actions, including effecting changes in our management."   In addition, Hayward's directors could only be removed for cause and only by majority shareholder vote.

### 4. *Walsh, McFadden, Bertrand, and Brown Held Key Committee Positions on Hayward's Board*

334.   In addition to Walsh chairing the Nominating and Corporate Governance Committee, Defendant McFadden chaired the Compensation Committee, which was responsible for recommending and approving compensation plans for Holleran, Jones, and other Hayward

---

[5] In addition to Defendants McFadden, Walsh, Brenneman, Brown, and Betrand, Christopher Stevenson, Douglas Londal, Jason Peters, and Ali Afraz were also non-independent directors affiliated with one of the Sponsors.   Stevenson and Londal resigned from the Board in March 2021, before the IPO.

executives.  According to Hayward's IPO Prospectus, the Compensation Committee "reviews and recommends to our Board of Directors compensation plans, policies, and programs and approves specific compensation levels for all executive officers."  Defendant Brown also served on the three-person Compensation Committee alongside McFadden.

335.    Defendant Betrand was on Hayward's Audit Committee, which, according to Hayward's IPO Prospectus, was responsible for "review[ing] and discuss[ing] with management" the Company's audited and unaudited annual and quarterly financial statements, the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and "any significant financial reporting issues and judgments made in connection with the preparation of [Hayward's] financial statements."

### C.  McFadden, Walsh, Brenneman, Bertrand, and Brown Signed Misleading SEC Filings

336.    By virtue of their positions on Hayward's Board and/or various Committees that controlled Hayward's business affairs and management, McFadden, Walsh, Brenneman, Bertrand, and Brown possessed actual power and authority to control the contents of Hayward's SEC filings, press releases, and other market communications.  They were provided with copies of Hayward's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  They had access to material information available to them but not to the public, knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations being made were then materially false and misleading.

337.    McFadden, Walsh, Brenneman, Bertrand, and Brown signed and/or approved false and misleading SEC filings, including Hayward's 2021 Form 10-K and Form S-3 Registration Statement.  As a member of the Audit Committee, Bertrand reviewed and approved all false and misleading financial statements issued by Hayward, including Hayward's 10-Q for 3Q-21.

**D. The CCMP and MSD Entities Exercised Their Power Over Hayward to Sell Their Shares at Artificially Inflated Prices**

338.    The CCMP and MSD Entities used their control over the Company to, among other things, sell significant amounts of stock at inflated prices, including during the Class Period.  It was Hayward's Board, controlled by directors affiliated with the CCMP and MSD Entities, which approved the share repurchase program that enabled the CCMP Entities to offload close to $80.1 million (4.08 million shares) of stock at above-market prices in March 2022.  Hayward's Board likewise approved the May 2022 secondary public offering ("SPO") in which the CCMP Entities sold over $245 million worth of Hayward stock while it traded at artificially inflated price.

**IX.    LOSS CAUSATION / ECONOMIC LOSS**

339.    The wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiff and members of the Class.  During the Class Period, Plaintiff and Class Members purchased or otherwise acquired Hayward's common stock at artificially inflated prices caused by the misconduct, as alleged herein.  The price of Hayward's common stock declined significantly when the substantial problems and risks concealed by the false and misleading statements were disclosed and/or materialized, and the material misrepresentations and omissions were revealed to the market, causing investors' losses as set forth above.

340.    Before the end of the Class Period, on July 28, 2022, investors had been unaware of the following material facts about Hayward that had been known to Defendants Hayward, Holleran and Jones:

a.    the extent to which and that the channel was saturated with inventory;

b.    part and parcel with that, the extent to which and that channel demand was dropping significantly and Hayward was therefore having difficulty selling to the channel;

c. the substantial cancellations hammering Hayward;

d. the campaign of discounting, pull aheads and similar tactics propping up Hayward's sales;

e. that Hayward's own inventory, along with the expense thereof, was increasing because Hayward was manufacturing far in excess of its demand; and

f. the negative impact of the foregoing conditions on Hayward's net sales, manufacturing rate, and inventory.

341. The misrepresentations and omissions and fraudulent statements, as alleged herein, misrepresented and concealed the true adverse material facts from the market during the Class Period, misleading investors about the true state of Hayward's business and the obstacles it was facing.

342. As alleged in §VII, *supra*, these material facts were gradually revealed to investors via a series of partial corrective disclosures and materializations of the undisclosed risks.

343. The market reacted swiftly and negatively to each of these disclosures, resulting in significant losses for investors.

## X. NO SAFE HARBOR

344. The federal statutory safe harbor is provided for forward-looking statements under certain circumstances and does not apply to any of the allegedly false statements pled herein, as the statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent any of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and were unaccompanied by meaningful cautionary statements that identified important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

345.    Alternatively, to the extent that the statutory safe harbor is found to apply to any forward-looking statements pled herein, those statements are nonetheless actionable, because, at the time each such statement was made, the speaker had actual knowledge that it was materially false or misleading, and/or the statement was authorized or approved by an executive officer of Hayward who knew that the statement was materially false or misleading when made.

## XI.    CLASS ACTION ALLEGATIONS

346.    Plaintiff brings this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all those who purchased or otherwise acquired Hayward common stock during the Class Period and were damaged thereby (the "Class").  Excluded from the Class are the Defendants named herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

347.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Hayward common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time, and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Hayward or its transfer agent and/or the NYSE, and may be notified of the pendency of this action by mail or email, using the form of notice similar to that customarily used in securities class actions.

348.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal laws that are complained of herein.

349.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

350.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.    whether the Exchange Act was violated by Defendants as alleged herein;

b.    whether statements made by Defendants Hayward, Holleran and Jones to the investing public during the Class Period misrepresented or omitted material facts about the business, operations, and management of Hayward;

c.    whether Defendants Holleran and Jones acted knowingly or recklessly in issuing false and misleading statements;

d.    whether the prices of Hayward common stock during the Class Period were artificially inflated because of the conduct complained of herein; and

e.    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

351.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

352.    Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

XII.   **APPLICABILITY OF THE FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS OF RELIANCE**

353.   Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a.   Defendants Hayward, Holleran and Jones made public misrepresentations or failed to disclose material facts during the Class Period;

b.   the omissions and misrepresentations were material;

c.   Hayward common stock is traded in an efficient market;

d.   the Company's common stock is liquid and traded with moderate to heavy volume during the Class Period;

e.   the Company's common stock traded on the NYSE in the United States;

f.   the Company was covered by securities analysts;

g.   the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

h.   Plaintiff and members of the Class purchased or acquired Hayward common stock between the time of the material misrepresentations and omissions and the time the true facts were disclosed without knowledge of the omitted or misrepresented facts.

354.   Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

355.   In addition, and alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), as Defendants Hayward, Holleran and Jones omitted material

information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## CLAIMS FOR RELIEF

### COUNT I
### Violations of §10(b) of the Exchange Act and Rule 10b-5
### (Against Hayward, Holleran and Jones)

356.     Plaintiff repeats and realleges each and every allegation contained in ¶¶1–355 above as if fully set forth herein.

357.     This Count is asserted against Defendants Hayward, Holleran and Jones, and is based upon §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

358.     During the Class Period, Defendants Hayward, Holleran and Jones, engaged in a plan, scheme, conspiracy, and course of conduct pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Hayward common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Hayward common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants Hayward, Holleran and Jones, and each of them, took the actions set forth herein.

359.    Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Defendants Hayward, Holleran and Jones, participated, directly or indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the wires and/or mails, in the preparation and/or issuance of the annual reports, SEC filings, press releases, and other statements and documents, as described above, including statements made to securities analysts and the media, that were designed to influence the market for Hayward common stock.  Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Hayward's business and operations.

360.    By virtue of their positions at Hayward, Defendants Holleran and Jones had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants Holleran and Jones acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants Holleran and Jones.  Said acts and omissions of Defendants Holleran and Jones were committed willfully or with reckless disregard for the truth.  In addition, Defendants Holleran and Jones knew or recklessly disregarded that material facts were being misrepresented or omitted, as described above.

361.    Defendants Holleran and Jones are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, Defendants Holleran and Jones were able to, and did, directly or indirectly, control the content of the statements of Hayward.  As officers and/or directors of a publicly held company, and controlling shareholders, Defendants Holleran and Jones  had a duty to disseminate timely, accurate, truthful, and complete

information with respect to Hayward's business. As a result of the dissemination of the aforementioned false and misleading public statements, the market price of Hayward common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Hayward's business, which were concealed by Defendants Hayward, Holleran and Jones, Plaintiff and the other members of the Class purchased or otherwise acquired Hayward common stock at artificially inflated prices and relied upon the price of the securities, integrity of the market for the securities, and/or statements disseminated by Defendants Hayward, Holleran and Jones and were damaged thereby.

362. During the Class Period, Hayward common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein—which the Defendants Hayward, Holleran and Jones, made, issued, or caused to be disseminated—or relying upon the integrity of the market, purchased, or otherwise acquired Hayward stock at prices artificially inflated by the wrongful conduct of Defendants Hayward, Holleran and Jones. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Hayward common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Hayward common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

363. By reason of the conduct alleged herein, Defendants Hayward, Holleran and Jones, have knowingly or recklessly—directly or indirectly—violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

364.    As a direct and proximate result of the wrongful conduct of Defendants Hayward, Holleran and Jones, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's stock during the Class Period, upon the materializations of the undisclosed risk and disclosure of the omitted material information.

### COUNT II
### Violations of §20(a) of the Exchange Act
### (Against the CCMP Entities, the MSD Entities, Holleran, Jones, McFadden, Walsh, Brenneman, Bertrand, and Brown)

365.    Plaintiff repeats and realleges each and every allegation contained in ¶¶1–364 above as if fully set forth herein.

#### *The CCMP Entities and the MSD Entities*

366.    At all relevant times, the CCMP Entities and MSD Entities individually and together had the power and/or potential power to, and did, either directly or indirectly, control the activities of Hayward.    The CCMP Entities and MSD Entities were Hayward's largest shareholders, with each beneficially owning approximately 31% of Hayward Common Stock after the IPO, and together beneficially owning the majority of Hayward's shares.    As Sponsors of Hayward, the CCMP Entities and MSD Entities had significant influence and control over Hayward, its business, and its affairs.    Executives from the CCMP Entities and MSD Entities each held seats on Hayward's Board of Directors and on its various committees.    Through their designees' numerous positions on Hayward's Board and key committees, and by virtue of their status as Hayward's controlling shareholders, the CCMP Entities and MSD Entities controlled Hayward's Board, controlled the membership of Hayward's Board, and actively participated in the oversight, operation, and management of Hayward, its business affairs, and its executives, including Holleran and Jones.

367.     Because of their position of control and authority, the CCMP Entities and MSD Entities were able to, and did, control the contents of the various press releases and public filings that Hayward disseminated in the marketplace during the Class Period concerning the Company's business.  Throughout the Class Period, the CCMP Entities and MSD Entities exercised their power and authority to cause Hayward to engage in the wrongful acts complained of herein and participated in the unlawful conduct alleged herein, which artificially inflated the market price of Hayward's common stock.

368.     By reason of the above conduct, the CCMP Entities and MSD Entities are liable pursuant to §20(a) of the Exchange Act for the violations committed by Hayward.

### *Holleran and Jones*

369.     This Count is also brought against Kevin Holleran and Eifion Jones for control person liability under §20(a) of the Exchange Act.

370.     During the Class Period, Defendants Holleran and Jones participated in the operation and management of Hayward and conducted and participated, directly and indirectly, in the conduct of Hayward's business affairs.  Because of their senior positions at and/or control of the Company, Holleran and Jones knew the truth about Hayward's business and the scheme to artificially inflate the Company's stock price.

371.     Because of their position of control and authority as senior directors and/or officers of Hayward, Holleran and Jones were able to, and did, control the contents of the various press releases and public filings that Hayward disseminated in the marketplace during the Class Period concerning the Company's business.  Throughout the Class Period, Holleran and Jones exercised their power and authority to cause Hayward to engage in the wrongful acts complained of herein,

and directly participated in the unlawful conduct alleged herein, which artificially inflated the market price of Hayward's common stock.

372.    By reason of the above conduct, Defendants Holleran and Jones are liable pursuant to §20(a) of the Exchange Act for the violations committed by Hayward.

### McFadden, Walsh, Brenneman, Bertrand, and Brown

373.    This Count is also brought against Mark McFadden, Greg Brenneman, Timothy Walsh, Christopher Bertrand, and Kevin Brown for control person liability under §20(a) of the Exchange Act.

374.    During the Class Period, Defendants McFadden, Walsh, Brenneman, Bertrand, and Brown participated, through their positions on Hayward's Board of Directors and/or their positions on key Board committees, in the operation and management of Hayward and conducted and participated, directly and indirectly, in the conduct of Hayward's business affairs.  Because of their positions of control and authority as directors of Hayward, Defendants McFadden, Walsh, Brenneman, Bertrand, and Brown knew the truth about Hayward's business and the scheme to artificially inflate the Company's stock price.

375.    Because of their positions of control and authority as directors of Hayward, McFadden, Walsh, Brenneman, Bertrand, and Brown were able to, and did, control the contents of the various press releases and public filings that Hayward disseminated in the marketplace during the Class Period concerning the Company's business.  Throughout the Class Period, McFadden, Walsh, Brenneman, Bertrand, and Brown exercised their power and authority to cause Hayward to engage in the wrongful acts complained of herein.

376.    Defendants McFadden, Walsh, Brenneman, Bertrand, and Brown each signed Hayward's false and misleading March 9, 2022 10-K for FY 2021, and Hayward's March 2, 2022

Form S-3.  In addition, Defendant Bertrand reviewed and approved all false and misleading financial statements when he was a member of the Audit Committee, including Hayward's false and misleading October 27, 2021 10-Q for Q3-21.  In so doing, Defendant McFadden, Walsh, Brenneman, Bertrand, and Brown participated in the unlawful conduct alleged herein, which artificially inflated the market price of Hayward's common stock.

377.    By reason of the above conduct, Defendants McFadden, Walsh, Brenneman, Bertrand, and Brown are liable pursuant to §20(a) of the Exchange Act for the violations committed by Hayward.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.    Determining that this action is a proper class action;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the other members of the Class pre- and post-judgment interest, as well as reasonable attorneys' fees, expert fees, and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  November 1, 2024

COHN LIFLAND PEARLMAN
HERRMANN & KNOPF LLP

*/s/ Matthew F. Gately*

Peter S. Pearlman
Matthew F. Gately
Park 80 West-Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, NJ 07663
Telephone: 201-845-9600
Facsimile: 201-845-9423
psp@njlawfirm.com
mfg@njlawfirm.com

*Liaison Counsel*

SCOTT+SCOTT ATTORNEYS AT LAW
LLP
Max R. Schwartz (*pro hac vice*)
Susan Hu (*pro hac vice*)
Donald A. Broggi
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile: 212-223-6334
mschwartz@scott-scott.com
dbroggi@scott-scott.com

SCOTT+SCOTT ATTORNEYS AT LAW
LLP
Cornelia Gordon (*pro hac vice*)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile: 619-233-0508
cgordon@scott-scott.com

*Lead Counsel for Lead Plaintiff and the Class*

114