**LATHAM & WATKINS LLP**
Kevin M. McDonough (N.J. Bar No. 41892005)
Andrew B. Clubok (*pro hac vice*)
Corey A. Calabrese (*pro hac vice*)
1271 Avenue of the Americas
New York, New York 10020
Telephone: (212) 906-1200
Email: kevin.mcdonough@lw.com
Email: andrew.clubok@lw.com
Email: corey.calabrese@lw.com

*Counsel for Defendants Hayward Holdings, Inc.,*
*Kevin Holleran, and Eifion Jones*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CITY OF SOUTHFIELD FIRE AND POLICE RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>HAYWARD HOLDINGS, INC., *et al.*,<br><br>Defendants. | Civil Action No. 2:23-cv-04146-WJM-SDA<br><br>Hon. William J. Martini<br>Magistrate Judge Stacey D. Adams<br><br>Document Electronically Filed<br><br>**ORAL ARGUMENT REQUESTED**<br><br>**MOTION DAY:** March 17, 2025 |

## MEMORANDUM OF LAW IN SUPPORT OF THE
## HAYWARD DEFENDANTS' MOTION TO DISMISS
## <u>THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT</u>

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...............................................................................1

FACTUAL BACKGROUND ...................................................................................4

    A.    Hayward's Business ..........................................................................4
    B.    Hayward Achieves Record Success During The Pandemic..................5
    C.    Hayward Reports Strong Growth In The Third Quarter Of 2021........6
    D.    Hayward Reports A Reduced Rate Of Growth In The Fourth
          Quarter And Announces Conservative Guidance For 2022 .................8
    E.    Despite 10% Sales Growth In The Second Quarter Of 2022,
          Hayward Proactively Revises Its Full Year Net Sales Guidance .......10
    F.    This Lawsuit ..................................................................................11

LEGAL STANDARD............................................................................................12

ARGUMENT .......................................................................................................13

I.      PLAINTIFF FAILS TO ALLEGE A SECTION 10(B) CLAIM..................13

    A.    Plaintiff Fails To Plead A False Or Misleading Statement.................13
          1.    The Challenged Forward-Looking Statements Are
                 Protected By The PSLRA Safe Harbor....................................16
          2.    Statements Of Corporate Optimism Are Not Actionable........22
          3.    The Challenged Opinions Are Not Actionable.........................23
          4.    No Challenged Statement Was Misleading When Made .........25
          5.    Hayward's Risk Factor Disclosures Were Not Misleading......30
    B.    Plaintiff Fails To Plead Scienter .....................................................30
          1.    Insider Stock Sales Do Not Support Scienter .........................31
          2.    The CW Allegations Do Not Support Scienter.........................34
          3.    Plaintiff's Remaining Scienter Allegations Fail ......................38
          4.    The Non-Fraudulent Inference Is More Compelling................39

II.     PLAINTIFF FAILS TO ALLEGE A SECTION 20(A) CLAIM..................40

CONCLUSION ....................................................................................................40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*APERS v. Bristol-Myers Squibb Co.*,
   28 F.4th 343 (2d Cir. 2022) ...............................................................32

*Bauer v. Eagle Pharms., Inc.*,
   2017 WL 2213147 (D.N.J. May 19, 2017)..........................................20

*Bldg. Trades United Pension Tr. Fund v. Kenexa Corp.*,
   2010 WL 3749459 (E.D. Pa. Sept. 27, 2010)......................................34

*CalPERS v. Chubb Corp.*,
   394 F.3d 126 (3d Cir. 2004) ..........................................................35, 36

*Carole Tibbs v. Electrocore, Inc.*,
   2024 WL 4987243 (3d Cir. Dec. 5, 2024)......................................24, 28

*City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*,
   412 F. Supp. 3d 206 (E.D.N.Y. 2019)..................................................33

*Fergus v. Immunomedics, Inc.*,
   2019 WL 1435917 (D.N.J. Mar. 31, 2019) ..........................................33

*Fogel v. Wal-Mart de Mexico SAB de CV*,
   2017 WL 751155 (S.D.N.Y. Feb. 27, 2017) ........................................16

*Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*,
   336 F. Supp. 3d 196 (S.D.N.Y. 2018), *aff'd*, 779 F. App'x 69 (2d
   Cir. 2019) ............................................................................................34

*Glaser v. The9, Ltd.*,
   772 F. Supp. 2d 573 (S.D.N.Y. 2011) .................................................34

*In re Advanta Corp. Sec. Litig.*,
   180 F.3d 525 (3d Cir. 1999) ................................................................17

*In re Aetna, Inc. Sec. Litig.*,
   617 F.3d 272 (3d Cir. 2010) ..........................................................20, 22

*In re Amarin Corp. PLC.*,
2015 WL 3954190 (D.N.J. June 29, 2015).......................................................31

*In re Anadigics, Inc.*, *Sec. Litig.*,
2011 WL 4594845 (D.N.J. Sept. 30, 2011), *aff'd*, 484 F. App'x
742 (3d Cir. 2012)....................................................................22, 29, 37

*In re Astea Int'l Inc. Sec. Litig.*,
2007 WL 2306586 (E.D. Pa. Aug. 9, 2007) ..................................................32, 33

*In re Audible Inc., Sec. Litig.*,
2007 WL 1062986 (D.N.J. Apr. 3, 2007).....................................................31, 33

*In re Campbell Soup Co. Sec. Litig.*,
2020 WL 7022655 (D.N.J. Nov. 30, 2020) .............................................27, 36, 39

*In re CRM Holdings*,
2012 WL 1646888 (S.D.N.Y. May 10, 2012) ..................................................39

*In re Hain Celestial Grp. Inc. Sec. Litig.*,
2022 WL 18859055 (E.D.N.Y. Nov. 4, 2022), *R&R adopted*, 2023
WL 6360345 (E.D.N.Y. Sept. 29, 2023) .........................................................28

*In re Intelligroup Sec. Litig.*,
527 F. Supp. 2d 262 (D.N.J. 2007).......................................................27, 35, 36

*In re Newell Brands, Inc. Sec. Litig.*,
837 F. App'x 869 (3d Cir. 2020) ...............................................................28

*In re Nice Sys., Ltd. Sec. Litig.*,
135 F. Supp. 2d 551 (D.N.J. Mar. 8, 2001) .....................................................23

*In re Radian Sec. Litig.*,
2010 WL 1767195 (E.D. Pa. Apr. 30, 2010).....................................................34

*In re Radian Sec. Litig.*,
612 F. Supp. 2d 594 (E.D. Pa. 2009)............................................................32

*In re Synchronoss Tech., Inc. Sec. Litig.*,
2020 WL 2786936 (D.N.J. May 29, 2020).....................................21, 31, 32, 39

*In re Wilmington Tr. Sec. Litig.*,
852 F. Supp. 2d 477 (D. Del. 2012)...........................................................14, 16

iii

*Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*,
2021 WL 4191467 (D.N.J. Sept. 15, 2021)........................................................30

*Institut'l Invs. Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009) ......................................................18, 20, 31, 32

*Lewakowski v. Aquestive Therapeutics, Inc.*,
2023 WL 2496504 (D.N.J. Mar. 14, 2023) .................................................20, 24

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
144 S. Ct. 885 (2024)..........................................................................28

*Martin v. GNC Holdings, Inc.*,
2017 WL 3974002 (W.D. Pa. Sept. 8, 2017), *aff'd*, 757 F. App'x
151 (3d Cir. 2018).........................................................................30, 38

*Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*,
720 F. Supp. 2d 517 (D.N.J. Mar. 30, 2010) ...............................................*passim*

*OFI Asset Mgmt., v. Cooper Ti& Rubber*,
834 F.3d 481 (3d Cir. 2016) .................................................................13, 20

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension
Fund*, 575 U.S. 175 (2015) ..................................................................23, 24

*Oran v. Stafford*,
226 F.3d 275 (3d Cir. 2000) .....................................................................32

*Plymouth Cnty. Ret. Ass'n v. Array Techs., Inc.*,
2023 WL 3569068 (S.D.N.Y. May 19, 2023) ....................................................13

*Rahman v. Kid Brands, Inc.*,
736 F.3d 237 (3d Cir. 2013) ................................................................*passim*

*Robeco Cap. Growth Funds SICAV v. Peloton Interactive, Inc.*,
2023 WL 2711342 (S.D.N.Y. Mar. 30, 2023).....................................................20

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004) .....................................................................29

*Silverstein v. Globus Med., Inc.*,
2016 WL 4478826 (E.D. Pa. Aug. 25, 2016), *aff'd, Williams v.
Globus Med., Inc.*, 869 F.3d (3d. Cir. 2017) ...............................................17, 26

iv

*Smith v. Antares Pharma, Inc.*,
  2019 WL 2785600 (D.N.J. July 2, 2019) ..........................................................15

*Tanaskovic v. Realogy Holdings Corp.*,
  2021 WL 211049 (D.N.J. Jan. 21, 2021)...................................13, 22, 24, 25, 26

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)...................................................................................13, 30

*Tyler v. Liz Claiborne, Inc.*,
  814 F. Supp. 2d 323 (S.D.N.Y. 2011) ..............................................................32

*Williams v. Globus Med., Inc.*,
  869 F.3d 235 (3d Cir. 2017) ....................................................................*passim*

*Wilson v. Merrill Lynch & Co.*,
  671 F.3d 120 (2d Cir. 2011) ............................................................................29

*Winer Family Trust v. Queen*,
  503 F.3d 319 (3d Cir. 2007) ............................................................................40

*Witriol v. Conexant Sys., Inc.*,
  2006 WL 3511155 (D.N.J. Dec. 4, 2006).....................................................35, 38

*Wu v. GSX Techedu Inc.*,
  2023 WL 2207422 (D.N.J. Feb. 24, 2023) .......................................................29

## STATUTES

15 U.S.C.
  § 78u-4 ..........................................................................................................13
  § 78u-5 .................................................................................................17, 18, 20

Securities Exchange Act of 1934
  § 10(b)...................................................................................11, 12, 13, 40
  § 20(a) ...............................................................................................11, 40

## RULES

Fed. R. Civ. P. 9(b) .....................................................................................*passim*

Fed. R. Civ. P. 12(b)(6).........................................................................................1

Pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act ("PSLRA"), Defendants Hayward Holdings, Inc. ("Hayward" or the "Company"), Kevin Holleran, and Eifion Jones (together with Hayward, the "Hayward Defendants") respectfully move to dismiss Plaintiff's Consolidated Amended Class Action Complaint ("SAC") (ECF No. 91) (Ex. 1).[1]

## PRELIMINARY STATEMENT

Plaintiff's second amended complaint (and third overall) fails to cure the fatal defects the Court identified when dismissing Plaintiff's prior pleading. This case remains an improper attempt to manufacture fraud from the Hayward Defendants' proactive disclosure of business setbacks that occurred during a period of unprecedented and rapidly changing global market conditions affecting the entire pool industry (among many others). Working backwards from those disclosed setbacks, Plaintiff's fraud claims rest on nothing but speculation and 20/20 hindsight. Plaintiff does not, because it cannot, assert particularized allegations of fact that the Hayward Defendants made materially false statements and did so with fraudulent intent. The SAC thus fails the exacting threshold requirements of the PSLRA, Rule 9(b), and bedrock Third Circuit precedent, and it should be dismissed—with prejudice.

---

[1] Unless otherwise indicated, all internal citations and quotation marks are omitted, emphasis is added, citations to "¶ _" refer to the SAC, and citations to "Ex. _" refer to exhibits attached to the Declaration of Kevin M. McDonough.

1

Throughout 2020 and 2021, Hayward delivered record-setting sales, as consumers invested in their outdoor living spaces during the COVID-19 pandemic, and Hayward successfully managed through unpredictable supply chain disruptions and inventory challenges. *See* ¶¶ 56, 174; Ex. 13 at 1, 3 (Mar. 2, 2022 Press Release); Ex. 2 at 69 (IPO Prospectus).[2] In 2022, management expressed optimism about future sales but also cautioned investors about headwinds and risks from the changing landscape of the pandemic, growing inflation, and other factors. *E.g.*, Ex. 13 at 6 (Mar. 2, 2022 Press Release); Ex. 19 at 7-8, 14-15 (Q1-2022 Earnings Call).

Hayward's 2022 sales projections proved correct through the first half of the year, with Hayward achieving significant sales growth in the first and second quarters. *See* ¶¶ 243, 251; Ex. 19 at 5 (Q1-2022 Earnings Call); Ex. 27 at 4 (Q2-2022 Earnings Call). But when it became apparent that sales growth in the second half of 2022 was unlikely to match Hayward's expectations, management proactively disclosed that to investors in July 2022; Hayward's stock price declined; and Plaintiff filed this opportunistic, fraud-by-hindsight lawsuit, second-guessing management decisions in the highly volatile pandemic environment. ¶¶ 251-62.

The Court dismissed Plaintiff's last complaint because it failed to satisfy the requirements of the PSLRA and Rule 9(b), to specify "*which* statements are

---

[2] The Court may consider SEC filings and other public documents on a motion to dismiss. *See* Or. on Mot. to Dismiss ("Dismissal Or.") at 8, ECF No. 89.

2

purportedly actionable" or "*why* each statement is false or misleading."  Dismissal Or. at 8-10.  Plaintiff has not fixed that fundamental pleading flaw.  The SAC, like its predecessor, is a puzzle pleading that jumbles together statements and allegations and requires the Court and Defendants to play "connect the dots" to understand Plaintiff's claim.  And the SAC does not specify why Plaintiff's conclusory, speculative allegations establish falsity, let alone fraud.  Furthermore, Plaintiff was unable to muster a *single* new confidential witness ("CW"), nor a *single* new allegation from its existing CWs, none of whom supplies the first-hand accounts that are required to plead securities fraud.  Plaintiff tries to mask its failure to develop particularized allegations of fraud by adding defendants and doubling down on its fact-free conspiracy theory that multiple defendants colluded on a stock fraud while at the same time maintaining enormous quantities of Hayward stock.  That is not a coherent theory of fraud, and the SAC fails for multiple, independent reasons.

*First*, as before, the SAC does not plead particularized facts establishing a single false or misleading statement by Kevin Holleran, Eifion Jones, or Hayward, and the overwhelming majority of the statements Plaintiff challenges remain inactionable under bedrock legal doctrines immunizing forward-looking statements, statements of corporate optimism, and opinions.

*Second*, Plaintiff's "new" scienter allegations do not remotely support the requisite "strong" inference that any of the Hayward Defendants acted with

3

fraudulent intent.  As the Hayward Defendants explained in their prior motion, and as Plaintiff well knows, Jones *increased* his Hayward stockholdings and Hayward *bought* (repurchased) its own stock during the Class Period,[3] both of which demonstrate *the exact opposite* of motive to commit fraud.  And Holleran's sales (as well as sales by non-defendants) were made pursuant to pre-established Rule 10b5-1 trading plans, and thus do not support a compelling inference of scienter.

Plaintiff's rehashing of its prior, failed CW allegations—from lower-level employees, most of whom had no alleged interaction with Holleran or Jones, and none of whom alleges that either was aware of any information contradicting their challenged statements at the time they were made—fails to support a strong inference of scienter.  The same is true of Plaintiff's baseless speculation about the retirement of Hayward's former Chief Supply Officer ("CSO") Donald Smith (who is not a defendant in the case).  And Plaintiff's remaining hodgepodge of conclusory allegations that the Hayward Defendants somehow must have known their statements were false are similarly insufficient as a matter of law.

The SAC must be dismissed with prejudice.

<u>**FACTUAL BACKGROUND**</u>

**A.    Hayward's Business**

Hayward is an industry-leading designer and manufacturer of pool equipment

---

[3] The alleged "Class Period" is October 27, 2021 to July 28, 2022, inclusive. ¶ 1.

4

with a highly-recognized, quality brand, one of the largest installed bases of pool equipment in the world, decades-long relationships with its partners and customers, and a history of technological innovation. ¶ 23; Ex. 2 at 1, 101-02 (IPO Prospectus) (incorporated by reference in public filings referenced in the SAC). The Company does not sell directly to consumers, but instead sells the majority of its products to distributors through a variety of "channels," with "remaining revenue from direct major builders, retailers and buying groups." ¶ 48; Ex. 2 at 7-8, 104-05 (IPO Prospectus); Dismissal Or. at 2. Hayward became a public company in March 2021, when it completed an initial public offering ("IPO"). ¶ 4. Holleran and Jones serve as Hayward's CEO and CFO, respectively. ¶ 1.

> **B.    Hayward Achieves Record Success During The Pandemic**

In the decade prior to the COVID-19 pandemic, the pool industry experienced modest growth. ¶ 47. But with the onset of the pandemic in 2020, demand for pool products spiked, as consumers sought to enhance their outdoor living spaces while subject to stay-at-home orders, and the pool industry continued to operate as an "essential" business. ¶ 55; Ex. 2 at 2 (IPO Prospectus); Dismissal Or. at 2. Meanwhile, Hayward (like other manufacturers) experienced shortages from its raw materials suppliers that negatively affected its production capabilities. *See* Ex. 2 at 66 (IPO Prospectus). As a result, Hayward increased its purchase of raw materials to avoid slow-downs in production and accommodate demand. ¶¶ 100-05.

In 2020 and 2021, distributors of pool products, including those in Hayward's sales channel, began to build inventory levels to help counter logistics and supply chain challenges brought on by the pandemic and to serve the growing consumer demand. ¶ 60; Dismissal Or. at 2. For example, in 2021, Pool Corporation, Hayward's largest distributor, reported publicly that it had increased inventory by approximately 70% on a year-over-year basis, Ex. 5 at 7 (Pool Corp. Q3-2021 Earnings Call); Ex. 12 at 9 (Pool Corp. Q4-2021 Earnings Call), because "the increased level of industry demand put continued pressure on our supply chain partners"—*i.e.*, companies like Hayward. *Id.* Pool Corp. was not alone in that regard. On Hayward's October 2021 earnings call, an analyst asked about Pool Corp.'s "significant uptick in inventories," and Holleran disclosed that it "represent[ed] the industry as a whole." ¶ 122; Ex. 7 at 11 (Q3-2021 Earnings Call).

In the midst of these unprecedented market dynamics, Hayward achieved record-setting growth, with net sales increasing by *19.4%* in 2020 and *60%* in 2021. *See* ¶ 56; Ex. 2 at 69 (IPO Prospectus); Ex. 13 at 3 (Mar. 2, 2022 Press Release).

### C.    Hayward Reports Strong Growth In The Third Quarter Of 2021

The Class Period starts on October 27, 2021, ¶ 1, when Hayward announced its third quarter 2021 financial results—the accuracy of which Plaintiff does not challenge. Ex. 7 at 4-5 (Q3-2021 Earnings Call). Hayward reported net sales growth

of 56% year-over-year and raised its guidance for 2021's net sales growth. *Id.*

Although Hayward's outlook was promising, in October 2021 and throughout the Class Period, it repeatedly warned investors that product demand could decline and that the Company faced a volatile environment with supply chain and inflation headwinds—all of which could materially affect its operations and financial performance. For example, Holleran warned on the Q3-2021 Earnings Call that "the [order] backlog does stretch certainly into 2022. It's at elevated levels still despite some of our production capacity improvements." ¶ 128; *see also, e.g.*, Ex. 6 at 43-44 (10-Q Q3-2021); Ex. 7 at 4-5 (Q3-2021 Earnings Call) (Hayward had seen "an acceleration of our supply chain and inflation headwinds," and "expect[ed] a volatile environment in the near term"); Ex. 16 at 5-39 (2021 10-K) ("Risk Factors" incorporated by reference in public filings referenced in the SAC).

During the same period, Hayward also warned investors about the specific risks posed by COVID-19 and updated investors on inventory dynamics in the industry. Hayward flagged that "[w]hile we have experienced higher demand in our pool business as pool owners sheltered-in-place and have spent more time at home as a result of the COVID-19 pandemic, such growth may not be sustainable and may not be repeated in future periods." Ex. 2 at 26-27, 29, 35 (IPO Prospectus); Ex. 16 at 19-20 (2021 10-K). As to inventory, Hayward warned that, although some raw materials and pool parts were "in shorter supply," inventory was in "a healthier

7

position" than it had been in prior periods.  Ex. 7 at 11 (Q3-2021 Earnings Call).

> **D.    Hayward Reports A Reduced Rate Of Growth In The Fourth Quarter And Announces Conservative Guidance For 2022**

On March 2, 2022, Hayward issued a press release reporting fourth quarter 2021 net sales growth of 35% (down from 56% in the third quarter), and 60% net sales growth for full year 2021.  Ex. 13 at 1-3 (Mar. 2, 2022 Press Release).  Across fiscal year 2021, Hayward reported a net sales growth rate that declined from 96% in the first quarter to 66% in the second quarter, 56% in the third quarter, and then 35% in the fourth quarter.  Ex. 3 at 1 (May 5, 2021 Press Release); Ex. 4 at 1 (Aug, 2, 2021 Press Release); Ex. 9 at 1 (Oct. 27, 2021 Press Release).

Regarding its 2022 full year outlook, Hayward informed investors that it was projecting net sales growth of 9% to 12%, thus signaling that the trend of slowing net sales growth was expected to continue.  Ex. 13 at 1 (Mar. 2, 2022 Press Release).[4] Hayward reiterated that guidance on a March 2 earnings call, during which management disclosed that while shortages remained in certain products, inventory was "getting back to more normal levels."  Ex. 14 at 9, 13 (Q4-2021 Earnings Call). During that same call, Holleran explained to investors that Hayward was not assuming its distributors would build inventories as they had during the height of the pandemic: "at this point, *we're not assuming additional channel load*."  *Id.* at 14-15.

---

[4] Meanwhile, Hayward's largest customer, Pool Corp., projected a greater 17 to 19% sales growth for 2022.  Ex. 12 at 9 (Pool Corp. Q4-2021 Earnings Call).

8

Additionally, Jones cautioned that while Hayward was optimistic about the first and second quarters of 2022, there was uncertainty regarding the second half of the year. *Id.* at 12, 13 ("we'll see how the balance of the year develops as we get into that time period"); *id.* at 14 ("as we step into the primary season period of Q2, we'll get a better read on how the balance of the year is building"). Following these statements, Hayward's stock price declined from a close of $17.60 on March 1, 2022, to a close of $16.65 on March 4, 2022. App'x C (Stock Price Chart).

Despite tempering expectations for 2022, Hayward delivered record-setting net sales of $410 million in the first quarter of 2022, and its 23% growth in that period easily exceeded the Company's full year projection of 9% to 12% in net sales growth. ¶ 243; Ex. 19 at 5, 8 (Q1-2022 Earnings Call). Nevertheless, on the first quarter earnings call in April, Hayward again struck a cautionary note by merely reaffirming its 2022 net sales growth projection and explaining that the first quarter growth was driven more by price than volume of sales. Ex. 19 at 6, 8. As Holleran noted, "I think it's wise to be cautionary right now . . . before getting out ahead of ourselves from the second half when there's so many unknowns at this point." *Id.* at 14-15. He also explained that inventories "are largely replenished and in a much better position starting the 2022 [pool] season than they were either in the last 2 years," and projected "greater sell *out* than sell *into* the channel." *Id.* at 13.

Market analysts took note of Hayward's cautious commentary and outlook,

9

with one analyst noting that Hayward was taking a "very conservative" approach to its projections for 2022. *Id.* at 14. Hayward's stock price fell from a close of $16.61 on April 28, 2022, to a close of $15.90 on April 29, 2022. ¶ 247.

> **E.    Despite 10% Sales Growth In The Second Quarter Of 2022, Hayward Proactively Revises Its Full Year Net Sales Guidance**

On July 28, 2022, Hayward announced its financial results for the second quarter of 2022, which included net sales growth of 10%—*i.e.*, within the range of the Company's full year projections of 9-12%. Ex. 27 at 4 (Q2-2022 Earnings Call). However, after gaining visibility into distributors' inventory needs for the second half of the year, which were impacted by shifting market conditions, Hayward proactively reduced its guidance for fiscal year 2022 to a projected decline in net sales of 2% to 6%. *Id.* at 8-10. On Hayward's second quarter 2022 earnings call, management explained that Hayward experienced a decline in sales volume in the period due to numerous factors, including inflationary headwinds; a "sharp reduction" in European sales due to the Ukraine war's impact on consumer sentiment; poor weather in seasonal markets, which "delayed pool construction"; and the decision by distributors to "start[] reducing safety stocks as a result of improved supply chain and shorter lead times for specific products." *Id.* at 6, 7; *see also id.* at 8, 9 (revised 2022 net sales guidance also driven by "economic uncertainty" that caused "elevated channel inventories" and reduced restocking

10

orders Hayward "typically would deliver in late second quarter and third quarter").[5]

Following Hayward's second quarter 2022 earnings announcement and its revision to full year guidance, the Company's stock price declined by $2.50 per share to $11.21, ¶ 262, and this lawsuit followed.

## F.    This Lawsuit

Plaintiff initially asserted claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") against the Hayward Defendants, CCMP, and MSD for allegedly making 36 false and misleading statements regarding the projected demand for Hayward's products in 2022. *See generally* ECF No. 41 (the "CCC"). On October 2, 2024, the Court dismissed Plaintiff's CCC with leave to amend, holding, among other things, that Plaintiff "has not pled its securities fraud claims with sufficient particularity" because Plaintiff did not specify "*which* statements are purportedly actionable" or "explain why or how each statement is false or misleading." Dismissal Or. at 8-10. On November 1, 2024, Plaintiff filed the SAC asserting the same claims under the Exchange Act against the same Hayward Defendants, and challenging many of the same statements[6] based on the same incoherent theory of fraud, *e.g.*, ¶¶ 122-23, while

---

[5] Hayward's peers also revised guidance in 2022. *See, e.g.*, Ex. 26 at 4 (Pentair: "tightening" full year guidance due to "headwinds from FX translation" and "higher interest expense with the rise in rates"); Ex. 28 at 4 (Fluidra: revising guidance).

[6] Plaintiff omitted 9 statements from the SAC that it previously alleged were false and misleading, but alleges an additional 11 statements are false and misleading that

admitting that the Hayward Defendants made *truthful* cautionary disclosures about slowing growth throughout the Class Period, ¶¶ 122, 166, 207, 240-50.[7]  The SAC fails to cure any of the prior flaws that led to the Court's dismissal Order, and its illogical and facially defective theory still cannot support a securities fraud claim.

## LEGAL STANDARD

"To state a claim for fraud under § 10(b) and Rule 10b-5, a plaintiff must demonstrate that a defendant: (1) made a misstatement or omission of a material fact, (2) with scienter, (3) in connection with the purchase or sale of a security, (4) upon which the plaintiff reasonably relied, (5) economic loss, and (6) loss causation." Dismissal Or. at 8.  Plaintiff must also satisfy the heightened pleading requirements of both Rule 9(b) and the PSLRA, which require Plaintiff to "specify each statement alleged to have been misleading, and the reason or reasons why the statement is misleading," and "set forth the details of allegedly fraudulent statements or omissions, including who was involved, where the events took place, when the events took place, and why any statements were misleading." *Id.*  Those demanding requirements are not met by allegations of "fraud by hindsight" or "conjecture based on subsequent events." *Williams v. Globus Med., Inc.*, 869 F.3d 235, 244 (3d Cir.

---

were not pled in the CCC.  *See* App'x A (identifying challenged statements).

[7] The SAC also names CCMP and MSD-related persons and entities as defendants.

12

2017); *OFI Asset Mgmt., v. Cooper Ti& Rubber*, 834 F.3d 481, 497 (3d Cir. 2016).[8]

Plaintiff must also plead allegations establishing a "strong" inference of scienter—*i.e.*, a "'knowing or reckless' mental state 'embracing intent to deceive, manipulate, or defraud.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007); 15 U.S.C. § 78u-4(b)(2).  The "strong" inference must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 309.

## ARGUMENT

### I.    PLAINTIFF FAILS TO ALLEGE A SECTION 10(B) CLAIM

The Complaint is a classic example of "fraud by hindsight," and it fails to establish that (i) any challenged statement was false or misleading; and (ii) any Hayward Defendant acted with fraudulent intent in making those statements.

#### A.    Plaintiff Fails To Plead A False Or Misleading Statement

As a threshold matter, despite the Court's prior Order, the SAC remains an improper puzzle pleading that fails to satisfy the PSLRA's and Rule 9(b)'s pleading requirements.  *See* Dismissal Or. at 8-10.  That alone warrants dismissal.

*First*, for the alleged misstatements, *see* ¶¶ 119-238, Plaintiff repeats its

---

[8] *See also Tanaskovic v. Realogy Holdings Corp.*, 2021 WL 211049, at *6 (D.N.J. Jan. 21, 2021) ("allegations that defendants should have anticipated future events" and made disclosures "earlier than they actually did" cannot support a securities fraud claim); *Plymouth Cnty. Ret. Ass'n v. Array Techs., Inc.*, 2023 WL 3569068, at *20 (S.D.N.Y. May 19, 2023) (rejecting "classic fraud by hindsight" allegations).

flawed approach from the CCC by reciting a statement and then following it with "general and conclusory claims" that "do not explain why or how each statement is false or misleading." Dismissal Or. at 10. The superficial revisions to certain falsity allegations are not nearly enough as Plaintiff continues to assert in conclusory fashion that "as detailed above and described by CWs," each of the challenged statements is false based on "multiple reasons" and generalized allegations that lack the precision required by the PSLRA and Rule 9(b). *See, e.g.*, ¶¶ 123, 151, 165, 171; *Wilmington Tr.*, 852 F. Supp. 2d 477, 490 (D. Del. 2012) (dismissing complaint that "forced the parties to speak in generalities when the PSLRA requires specificity").

Take, for example, Holleran's statement discussed in the Order that Hayward expected to "grow net sales in the range of 9% to 12% compared to 2021." ¶ 174. In finding Plaintiff's allegations insufficient, the Court observed that "[f]actors such as drop in channel demand or saturation of channel inventory, even if true, do not explain why the predicted growth was false." Dismissal Or. at 10. Yet Plaintiff makes the same mistake in the SAC, *i.e.*, that "Hayward's 'volume' was set to decrease in 2022" "based on events that already happened and information that Defendants Holleran and Hayward already had" and that "after having been *oversaturated with inventory* since mid-2021, *the channel informed Defendants Holleran and Hayward* by late 2021 *that it was taking strategic positions to reduce its inventory*," ¶ 175, without specific reference to who from the channel informed

14

the Hayward Defendants, what they allegedly said, or when. Dismissal Or. at 9 ("the complaint fails to identify the specific statements on which plaintiffs base each of their claims"); *Smith v. Antares Pharma, Inc.*, 2019 WL 2785600, at *11 (D.N.J. July 2, 2019) ("Plaintiff's pleading fails because Plaintiff does not relate Defendants' statements to specific reasons why the statements were false or misleading.").

*Second*, the SAC once again fails to identify which statements it alleges are false and/or withholds the full content or context of the alleged misstatements. Instead, Plaintiff quotes only portions of statements, uses ellipses, resorts to unsupported characterizations, and repeatedly classifies various short phrases— often disconnected by multiple pages in a call transcript or other public filing and spoken in very different contexts—as one statement. *E.g.*, ¶¶ 128-29 (statements eight pages apart); ¶¶ 194-95 (multiple statements about different regions presented as one false statement); ¶¶ 122, 170, 172, 174, 176, 180, 198 (quoting only portions of statements). The result of Plaintiff's game of "create your own statement" is at best confusing and at worst a deeply misleading set of falsity allegations that raises questions about Plaintiff's compliance with Rule 11. As just one illustrative example, in Paragraph 172, Plaintiff partially quotes Jones as describing a "strong volume metric period in Q2." The SAC misleadingly omits Jones's prefatory words ("We do see and *expect* . . ."), which have clear legal significance under the PSLRA. *See* Section I.A.1, *infra*. Plaintiff cannot sidestep the legal doctrines that apply to

15

Defendants' actual statements by omitting from its pleading those words that Plaintiff finds inconvenient.[9]   Plaintiff's selective excerpting of Defendants' statements is woefully inadequate to plead falsity under the securities laws and reveals just how flimsy Plaintiff's case is. *See Wilmington Tr.*, 852 F. Supp. 2d at 490 (dismissing claim where alleged misstatements "contain[] two or three quoted words or a short quoted phrase without providing the context of the full sentence").

*Third*, the SAC "frequently cross-references other paragraphs," rather than specifying why certain statements are false and misleading, and thus improperly requires the Court to "play connect-the-dots in order to identify the facts and trends upon which plaintiffs base their claim." Dismissal Or. at 10; *see, e.g.*, ¶¶ 171, 173.

In addition to these foundational defects, Plaintiff's allegations in the SAC remain woefully insufficient to establish falsity for any of the more than 30 challenged statements related to Hayward's future outlook, performance, business condition, and inventory. *See* ¶¶ 119-238; App'x A.[10]

1.     **The Challenged Forward-Looking Statements Are Protected By The PSLRA Safe Harbor**

Many of the challenged statements are not actionable pursuant to the

---

[9] To avoid any doubt, Defendants' full statements are in Appendix A filed herewith, and all citations herein to the falsity allegations in SAC incorporate that Appendix. *Fogel v. Wal-Mart de Mexico SAB de CV*, 2017 WL 751155, at *18 (S.D.N.Y. Feb. 27, 2017) (accepting appendices as "organizational tools").

[10] Plaintiff's appendix suffers from the same flaws as the SAC. *See* ECF No. 91-1.

16

PSLRA's safe harbor for forward-looking statements. Forward-looking statements include financial "projection[s]," statements about "future economic performance," and "any statement of the assumptions underlying or relating to" any projection or plan. 15 U.S.C. § 78u-5(i)(1)(A)-(D); *see Advanta Corp.*, 180 F.3d 525, 528 (3d Cir. 1999) ("Advanta will experience a large increase in revenues" is forward-looking); *Silverstein v. Globus Med., Inc.*, 2016 WL 4478826, at *5-7 (E.D. Pa. Aug. 25, 2016), *aff'd*, *Williams v. Globus Med., Inc.*, 869 F.3d at 245 (3d. Cir. 2017) (sales projections forward-looking). A forward-looking statement is inactionable where (i) it "is identified as such and accompanied by meaningful cautionary language"; *or* (ii) "plaintiff fails to show the statement was made with actual knowledge of its falsehood." *Globus*, 869 F.3d at 245; 15 U.S.C. § 78u-5(i)(1)(A)-(B).

The SAC, like the CCC, challenges classically forward-looking statements that the Hayward Defendants made in press releases and earnings calls regarding Hayward's financial forecasts, expectations for demand, and the Company's ability to meet its financial objectives. *See, e.g.*, App'x A at 11, 12 (providing full context for ¶ 174 ("We *expect* to grow net sales in the range of 9% to 12% compared to 2021."); ¶ 180 (reaffirming 2022 outlook); ¶ 172 ("*expect* a strong volume metric period in Q2")); ¶ 150 ("we remain confident in our ability *to continue executing our growth initiatives in the years ahead*"). Plaintiff also challenges statements describing the assumptions underlying or relating to Hayward's outlook and

17

projections.  *See, e.g.*, App'x A at 8, 11, 18 (providing full context for ¶ 130 (assumptions for "Updated 2021 Financial Outlook"); ¶ 183 (same for 2022 Outlook); ¶¶ 157, 159, 174, 176, 180-81, 190, 204-05, 207, 215, 217, 222-23). Those statements too are forward-looking under the PSLRA.  *See* 15 U.S.C. § 78u-5(i)(1)(D); *Institut'l Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 255 (3d Cir. 2009).  The challenged forward-looking statements easily qualify for protection—under both of the two independent inlets of the safe harbor.

*First*, each forward-looking statement is identified as such and accompanied by meaningful cautionary language that appeared in Hayward's SEC filings and was echoed during its earnings calls.  Hayward's SEC filings identify as forward-looking those statements that use words such as "expect," "believe," "will," and "continue," among other "similar expressions," and those that describe the Company's "business prospects" and "financial position," among other similar topics.  Ex. 6 at intro. (10-Q Q3-2021).   Hayward explicitly cautioned investors that its forward-looking statements were "predictions," not "guarantees," and "involve[d] risks and uncertainties that are difficult to predict."  *Id.*  Further, Hayward advised investors that they "should not place significant reliance" on the Company's forward-looking statements, which were subject to "[i]mportant factors that could affect our future results and could cause those results or other outcomes to differ materially" from Hayward's predictions.  *See, e.g., id.*; Ex. 7 at 4 (Q3-2021 Earnings Call); Ex. 18 at

18

5-6 (Apr. 28, 2022 Press Release); Ex. 21 at intro. (10-Q Q1-2022). Those important factors included Hayward's ability to "execute on [its] growth strategies," as well as impacts from "seasonality and unfavorable economic and business conditions," "material cost and other inflation," "COVID-19," and "political" and other risks with "operating foreign businesses." Ex. 6 at intro. (10-Q Q3-2021).

As the Court observed, Hayward went even a step further by directing investors to its extensive disclosure of "Risk Factors," *see* Dismissal Or. at 4, 6 (acknowledging that Hayward's public statements directed investors to its "Risk Factors"), which warned investors about "uncertainty regarding demand for some or all of our products," risks of "material cancellation, reduction, or delay in purchases," and failure to "manage our inventory efficiently." Dismissal Or. at 4; ¶¶ 140-47, 154, 161, 196. Hayward also explicitly warned investors that while it "experienced higher demand" during the COVID-19 pandemic, "*such growth may not be sustainable and may not be repeated in future periods*." *See, e.g.*, Ex. 6 at 43-44 (10-Q Q3-2021); Ex. 16 at 20 (2021 10-K) (same); Ex. 21 at 30 (10-Q Q1-2022). And management explained that the reasons to be "cautionary" about expectations for future performance included "replenished" inventories at its channel partners. Ex. 19 at 13-15 (Q1-2022 Earnings Call).

These and Hayward's other warnings constitute "meaningful" cautionary language because they are "substantive and tailored to the future-looking

19

statements" they accompanied, *i.e.*, Hayward identified specific risks and reasons that "provide[d] clear warning to investors" why its projections may not hold, including the risk that demand and growth could slow due to a number of factors. *Aetna, Inc.*, 617 F.3d 272, 283 (3d Cir. 2010).[11]

*Second*, the PSLRA safe harbor applies for the independent and alternative reason that the SAC does not allege particularized facts demonstrating that Defendants had "actual knowledge" that the forward-looking statements were "false or misleading" when made. 15 U.S.C. § 78u-5(c)(1)(B); *OFI Asset Mgmt.*, 834 F.3d at 502-03. "[A]ctual knowledge" sets a very high bar that "attaches only upon proof of knowing falsity." *Lewakowski v. Aquestive Therapeutics, Inc.*, 2023 WL 2496504, at *9 (D.N.J. Mar. 14, 2023). Plaintiff's allegations do not remotely clear that very high bar. There is not one allegation of fact in the SAC—let alone any particularized allegations—that Holleran or Jones *actually knew* that Hayward's 9-12% net sales growth projections (which proved accurate through the first half of 2022) or any of the other challenged projections were unachievable when those projections were made (and they were not). ¶ 175; *Avaya*, 564 F.3d at 266-67

---

[11] *See Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 535 (D.N.J. Mar. 30, 2010) (same for "a list of specific factors and uncertainties that could affect … future economic performance"); *Bauer v. Eagle Pharms., Inc.*, 2017 WL 2213147, at *10 (D.N.J. May 19, 2017) (same for "warn[ing] investors about the very risks of which Plaintiffs now complain"); *Robeco Cap. Growth Funds SICAV v. Peloton Interactive, Inc.*, 2023 WL 2711342, at *12 (S.D.N.Y. Mar. 30, 2023) (same for specific COVID-19 risk warnings).

("successful Q1 results do not belie" contention that "at the time of the forecast-related statements . . . the projections were possible to achieve"); *Synchronoss Tech., Inc.*, 2020 WL 2786936, at *21 (D.N.J. May 29, 2020) (no actual knowledge of falsity where plaintiff does not explain "the Company did not, in fact, expect [disclosed events] would come to fruition").

Plaintiff points to Holleran's July 2022 statement that Hayward "expected to sell less into the channel versus sellout" in 2022 "due to the strategic positions that many of our channel partners took at the end of 2021" to claim that Defendants knew since mid-2021 that demand trends had slowed. ¶ 93. But Holleran's statement as of a later date in no way establishes that he (or anyone else) knew that Hayward's earlier projections concerning 2022 net sales—based on the volume of products Hayward expected to sell at that time, expected pricing and other factors, Ex. 19 at 8 (Q1-2022 Earnings Call)—were false when made. *Globus*, 869 F.3d at 246 (rejecting argument that later revision of projections or knowledge that sales "might decrease" showed "actual knowledge that the company's overall sales projections are false"). In fact, Holleran's July 2022 statement merely confirmed what he had *already* told investors in March 2022 that Hayward's 2022 guidance did "not assum[e] additional channel load" and again in April 2022 that Hayward's guidance assumed "there will be greater sell out than sell into the channel during the 2022 season." ¶¶ 178, 245. That Holleran reiterated in July 2022 a fully disclosed

21

assumption underlying Hayward's 2022 projections cannot remove those projections from the safe harbor. *See Anadigics, Inc.*, 2011 WL 4594845, at *28 (D.N.J. Sept. 30, 2011), *aff'd*, 484 F. App'x 742 (3d Cir. 2012) (statement not false where disclosures were "consistent" throughout class period).

### 2.    Statements Of Corporate Optimism Are Not Actionable

Plaintiff also challenges numerous statements of corporate optimism, which are "too vague to be actionable" under well-settled law. *Aetna*, 617 F.3d at 283. This category of statements includes, *e.g.*, (1) Hayward's statement that it was "well positioned to deliver continued net sales and Adjusted EBITDA growth in 2022," and long-term secular trends and demand trends were "strong," ¶¶ 190, 222-23; *see also* ¶¶ 130, 138, 183, 188, 194, 217; (2) Holleran's statements about Hayward's "incredibly strong" consumer demand and its "significant momentum," ¶¶ 186, 204; *see also* ¶¶ 128, 133, 135, 150, 163-64, 174, 176, 178, 198, 200, 202; and (3) Jones's statements that Hayward's growth drivers were "strong" and the Company's 2022 forecast included "a level of conservatism," ¶¶ 181, 215; *see also* ¶ 122 ("Inventories are in a healthier position."); ¶¶ 164, 172 ("very strong," "very credible" order file); ¶¶ 152, 170, 180. *See* App'x A. These statements are quintessential vague and optimistic statements that courts routinely hold are inactionable. *See Aetna*, 617 F.3d at 284 ("solid and balanced growth"); *Realogy*, 2021 WL 211049, at *20 ("we continue to make great progress" and "remain focused on maintaining our business

22

momentum"); *Nice Sys., Ltd.*, 135 F. Supp. 2d 551, 579-80 (D.N.J. Mar. 8, 2001) ("strong competitive position").

### 3. The Challenged Opinions Are Not Actionable

Plaintiff next challenges multiple opinion statements, which are inactionable under the U.S. Supreme Court's *Omnicare* test. For example, Plaintiff challenges Holleran's statement that "I think it's a very credible order file . . . If the channel was feeling as if they had too much or were unhappy with their inventory turns, I think there was opportunity for them to slow the bookings or even cancel and we've seen negligible cancellations through those time periods," ¶ 164, as well as other subjective statements about what the speaker "fe[els]," "think[s]," "expect[s]," or "believe[s]," ¶ 126; App'x A (providing full context for ¶¶ 122, 124, 126, 128, 150, 166, 168, 170, 172, 174, 176, 178, 180-81, 186, 190, 204-05, 207, 215, 237).[12] Such opinion statements are inactionable unless Plaintiff pleads particularized facts that (i) "the speaker did not hold the belief she professed" or included a false "supporting fact," or (ii) the opinion "omits material facts about the [speaker's] inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185-86, 189

---

[12] Plaintiff's use of excerpts that omit words making clear a statement is an opinion is another example of Plaintiff's spurious pleading tactics. *See* App'x A.

(2015).  Plaintiff does not satisfy this demanding test.

*First*, the SAC does not plead any facts showing that any Hayward Defendant secretly disbelieved any of the other subjective statements Plaintiff challenges.  *See* Section I.A.1, *supra*.  Nor does Plaintiff plead that any of the challenged opinions contained an embedded false statement of fact.  *See generally* SAC.  *Second*, Plaintiff fails to plead that any challenged opinion was false by omission, which "is no small task."  *Omnicare*, 575 U.S. at 194.  It requires Plaintiff to "identify particular (and material) facts" regarding the basis of Defendants' opinions, whose omission makes an opinion "misleading to a reasonable person reading the statement fairly and in context."  *Id*.  Plaintiff has not done so.  For example, Plaintiff fails to allege any particular and material facts omitted regarding the basis for Holleran's October 27, 2021 statement that "the mix of that inventory may not be as ideal as any of us would like it," and he "think[s]" Hayward was "taking some extra shelf space right now," ¶ 126, or his December 21, 2021 statement that "we remain confident in our ability to continue executing our growth initiatives," ¶ 150.  The same is true for all of the other opinions Plaintiff challenges.

Therefore, none of the challenged opinions is actionable.  *See Lewakowski*, 2023 WL 2496504, at *8 (complaint "does not plausibly allege that the topline results announced by Defendants were not honestly believed and lacked a reasonable basis"); *Realogy*, 2021 WL 211049, at *20 (same); *see also Carole Tibbs v.*

24

*Electrocore, Inc.*, 2024 WL 4987243, at *4 (3d Cir. Dec. 5, 2024) ("neither CW3's competing opinion, nor the fact that those estimates ultimately proved too optimistic, renders [opinions] material misrepresentations").

### 4.   No Challenged Statement Was Misleading When Made

Even if, *arguendo*, the challenged statements do not qualify for protection under the legal doctrines addressed above (and they do), the SAC still fails to allege particularized facts showing that any of the challenged statements were "actionably unsound when made." *Globus*, 869 F.3d at 244.  For example, the SAC is devoid of any factual allegations that Hayward's sales projections, expectations for demand, inventory numbers, or reasons for growth were anything other than what the Hayward Defendants disclosed in their public statements, *e.g.*, ¶¶ 128, 138, 157, 159, 170, 188, 194, 209, 211-12, 220, 226, or that Holleran or Jones lacked the confidence and optimism they expressed to investors about Hayward's business, *e.g.*, ¶¶ 128, 130, 133, 135.[13]  *See Realogy*, 2021 WL 211049, at *6-7 (plaintiff does not "explain *why* . . . at the time that these statements were made, that these statements would

---

[13] Similarly, Plaintiff does not allege facts contradicting statements that Hayward had "strong cash flow generation capability," ¶ 152, or saw 42% revenue growth through a "sales and commercial team" with "folks who manage the channel partnership," ¶ 235.  Nor does Plaintiff state facts contradicting statements that Hayward (1) was "taking extra shelf space" ¶ 126, on its way to record-setting sales growth in 2021; (2) was "working hard to solve" issues from a "SKU standpoint," ¶ 168; ¶ 207; and (3) had taken "strategic positions" to manufacture "certain products in terms of finished goods" and "secure a position in raw materials," ¶ 212.

turn out to be untrue"); *Globus*, 2016 WL 4478826, at *6 (plaintiff failed to plead detailed facts contradicting defendants' projections). Far from misrepresenting or concealing challenges to Hayward's growth as the pandemic and supply chain disruptions eased, the Hayward Defendants repeatedly disclosed that inventory was "in a healthier position," tempered investor expectations for 2022, and even noted that Hayward expected "greater sell *out* than sell *into* the channel" in 2022. Ex. 7 at 11 (Q3-2021 Earnings Call); Ex. 19 at 13 (Q1-2022 Earnings Call). Those disclosures cannot be the basis of falsity. *See Realogy*, 2021 WL 211049, at *8-13 (finding no misstatements when "looking at the full statement[s] in context").

Plaintiff's additional attempts to plead a false statement all fail. *First*, Plaintiff repeatedly mischaracterizes the Hayward Defendants' statements in a misguided attempt to manufacture falsity. For example, Plaintiff concedes that Holleran disclosed during the October 2021 earnings call that the "significant uptick in inventories" reported by Hayward's largest customer (Pool Corp.) was representative of the "industry as a whole" and that "[i]nventories were in a healthier position" than earlier in 2021. ¶ 122. Nevertheless, Plaintiff faults Holleran for supposedly "bolster[ing] the impression that channel inventory was not elevated," based on his statements during the same call that there was "not too much" improvement in inventory position from a "days-on-hand standpoint," that Hayward "ke[pt] close tabs" with its distribution partners, or "the mix of [channel] inventory

26

may not be as ideal as any of us would like it." ¶¶ 122, 124, 126.  The problem with Plaintiff's theory is that none of these statements has anything to do with whether channel inventory was then elevated, and Plaintiff's baseless characterization of the statements does not render them false.  *Intelligroup*, 527 F. Supp. 2d 262, 325, 335 (D.N.J. 2007).   In any case, Plaintiff fails to allege any facts about Hayward's relationship with distributors, channel inventory from a "days-on-hand standpoint," or the mix of channel inventory that would contradict Holleran's statements at that time.  Plaintiff also misreads Holleran's statement that "[w]e really haven't seen any kind of cancellations" and Jones's statement that "we haven't seen demand destruction at the end of the channel." ¶¶ 198, 237.  Both were made in response to questions about *consumer*, not channel/distributor, demand.   Plaintiff makes no allegations about consumer demand, let alone as of June 2022. ¶¶ 234-38.

*Second*, Plaintiff attempts to plead falsity based on vague assertions from the CWs about general sentiments they held or heard from others about inventory.  *See, e.g.*, ¶¶ 63, 67, 80, 89.  But those allegations lack any meaningful connection to the challenged statements—in timing or content—and thus cannot establish that any challenged statements were false (by omission or otherwise) when they were made. *See Campbell Soup Co.*, 2020 WL 7022655, at *6-8, 12 (D.N.J. Nov. 30, 2020). Worse, Plaintiff relies on non-existent allegations.  For example, Plaintiff asserts that the channel "had up to $150 million of excess product" in 2021, *see, e.g.*, ¶¶ 61, 167,

179, but the SAC contains zero allegations (from any CWs or otherwise) supporting this assertion. Plaintiff lifts this figure from a disclosure Hayward made in Q3 2022—three months *after* the Class Period ended—that the potential inventory correction *in the future could* reach $150 million. ¶ 265. Similarly, Plaintiff asserts that "since mid-2021, the channel had been communicating to Hayward that it already had elevated inventory and did not need more," *see, e.g.*, ¶¶ 125, 173, 210, but that allegation is invented out of thin air. At most, the SAC alleges that CW2—a local sales manager with no alleged connection to either Holleran or Jones, ¶ 64—"heard" or "came to understand" from certain distributors sometime in 2021 that "they were not going to load up on any additional product," ¶¶ 65, 89.

*Third*, Plaintiff challenges statements concerning Hayward's own inventory. *See* ¶ 211-12. Plaintiff does not allege facts contradicting statements that Hayward had taken steps to build its own inventory, but rather admits Hayward did exactly that, and disclosed its rising levels of inventory on-hand. ¶¶ 100, 104-05. That Plaintiff may disagree with Hayward's decision to build inventory does not render any statements about inventory misleading. *See Electrocore*, 2024 WL 4987243, at *5; *Newell Brands, Inc.*, 837 F. App'x 869, 876 (3d Cir. 2020).[14]

---

[14] Plaintiff criticizes the Hayward Defendants' alleged use of sales incentives, ¶¶ 119, 158, but fails to challenge any statement on this topic. "Rule 10(b)-5(b) does not proscribe pure omissions." *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 144 S. Ct. 885, 891 (2024). Hayward's SEC filings also disclosed its sales strategies, extinguishing any fraud claim. *See* Ex. 2 at 67 (IPO Prospectus); *Hain*

*Fourth*, Plaintiff challenges Holleran's statement that Hayward had seen "negligible cancellations" of orders, ¶ 164, but the SAC contains no particularized facts showing that Hayward had experienced notable cancellations by March 2022, when the challenged statement was made. Plaintiff cites CW3's vague allegations about Jones asking to see cancellation reports at the end of February 2022 (*see* ¶¶ 9, 95), but CW3 fails to allege what these reports said or that he ever gave them to Jones, much less that they contradicted any challenged statement. *See Anadigics*, 2011 WL 4594845, at *28 (conclusory statements regarding canceled orders and drop in demand insufficient to plead falsity).[15] And CW3's alleged memory of one "special order" cancellation of heaters (¶ 95), which in the context of Hayward's $410 million in sales in Q1 2022 is negligible (or reasonably could be described as such), is not nearly enough to show that Defendants' statements about cancellations were false when made. *See Rombach v. Chang*, 355 F.3d 164, 173-74 (2d Cir. 2004).[16]

---

*Celestial Grp. Inc.*, 2022 WL 18859055, at *22 (E.D.N.Y. Nov. 4, 2022), *R&R adopted*, 2023 WL 6360345 (E.D.N.Y. Sept. 29, 2023).

[15] CW3's allegation that "*around the end of February*," Jones "*began to ask for cancellation reports to be put together*" ¶ 95, is undermined by Plaintiff's improper embellishment of that allegation elsewhere, ¶ 9. *Wu v. GSX Techedu Inc.*, 2023 WL 2207422, at *7 (D.N.J. Feb. 24, 2023) (rejecting allegations that "misconstrue [CW's] statements"); *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 133 (2d Cir. 2011) (pleading inconsistencies "undermine the force" of plaintiff's contentions).

[16] CW6's remark that he "recalled 'talks' of large-scale returns of Hayward orders," ¶ 110, is far too abstract to plead falsity, *Anadigics*, 2011 WL 4594845, at *28.

29

### 5. Hayward's Risk Factor Disclosures Were Not Misleading

As with the CCC, the SAC challenges Hayward's risk disclosures regarding demand for its products and its ability to manage its growth and inventory, ¶¶ 141-42, 144-46, 154, 161, 196, 228, 231-33, as misleading because the warned-of risks had "actually been occurring leading up to and during the Class Period." ¶ 147. But Plaintiff fails to plead anything other than conclusory allegations that the exact risks that Plaintiff takes issue with had—word for word—"already come to fruition." *See, e.g., id.*; (warning that Hayward "could be unable to effectively manage and sustain growth" was false because Hayward was "actually" unable "effectively manage" its inventory); *Globus*, 869 F.3d at 242-43 (warnings not false when plaintiffs failed to "sufficiently plead[] that a drop in sales was inevitable"); *Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, 2021 WL 4191467, at *14 (D.N.J. Sept. 15, 2021) (sales impact warnings not false when "[t]his risk [did] not manifest until" later). In any event, the risk disclosures are protected forward-looking statements. *See, e.g.*, Ex. 16 at 4-5 (2021 10-K) (identifying "Risk Factors" as forward-looking); *Martin v. GNC Holdings, Inc.*, 2017 WL 3974002, at *9 n.13 (W.D. Pa. Sept. 8, 2017), *aff'd*, 757 F. App'x 151 (3d Cir. 2018).

### B. Plaintiff Fails To Plead Scienter

Plaintiff's claims fail for the independent reason that their allegations do not support the required "strong" inference of fraudulent intent. *Tellabs*, 551 U.S. at

30

319.  Allegations of motive alone are not "an independent route to scienter," *Avaya*, 564 F.3d at 277, but where motive is alleged, Plaintiff must adequately allege "a concrete and personal benefit" to a defendant from the alleged fraud, *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 245-46 (3d Cir. 2013).  Nothing of that sort is alleged.

### 1.    Insider Stock Sales Do Not Support Scienter

Plaintiff's primary theory of scienter rests on "insider" stock sales.  ¶¶ 286-317.  To establish scienter, Plaintiff must show these sales are "unusual in time and scope." *In re Amarin Corp. PLC.*, 2015 WL 3954190, at *10 (D.N.J. June 29, 2015).  Although Plaintiff has increased the quantity of its stock sale allegations—by adding allegations of sales by three new individuals in the SAC—the quality of Plaintiff's averments remains sorely lacking.  None of the new (nor the old) stock sale allegations comes close to establishing a compelling inference of scienter.

*First*, Plaintiff adds stock sale allegations against Holleran, but readily admits that all of his sales were made pursuant to an automatic 10b5-1 trading plan.  ¶ 300; Ex. 29, Form 4s.  "Courts have consistently held that trades made under automatic trading plans are of minimal value in establishing an inference of scienter." *Synchronoss*, 2020 WL 2786936, at *17 (no scienter where defendants' sales were made on the basis of trading plans); *Audible Inc.*, 2007 WL 1062986, at *12 (D.N.J. Apr. 3, 2007) (stock sales "made via Rule 10(b)5–1 plans" not "considered in the motive and opportunity analysis"); *Avaya*, 564 F.3d at 279 (similar).  Moreover,

31

Holleran sold, at most, 10% of his Hayward stock during the Class Period and still held 403,913 shares at the end of it. *See* App'x B. Such a small percentage reduction is not indicative of fraud. *See Avaya*, 564 F.3d at 279 (no scienter from 17.7% sales); *Synchronoss*, 2020 WL 2786936, at *16 (no scienter from 30% sales); *Astea Int'l Inc.*, 2007 WL 2306586, at *14, n. 20 (E.D. Pa. Aug. 9, 2007) (no scienter from 20% or 43.5% sales). Accounting for Holleran's stock options, as courts regularly do, he *increased* his holdings. App'x B; *Astea*, 2007 WL 2306586, at *14.

*Second*, as it did in the CCC, Plaintiff selects a few of Jones's stock sales while conveniently omitting that Jones's stockholdings *more than doubled* during the Class Period, App'x B, which eviscerates any inference of fraudulent intent. *See Radian*, 612 F. Supp. 2d 594, 610-11 (E.D. Pa. 2009) (stock increase "is more consistent with an inference of nonculpability than with a strong inference of scienter"); *APERS v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 355-56 (2d Cir. 2022) (sales not suspicious where defendants "bought more shares than they sold during the putative class period").[17] Plaintiff also admits that all except for one of his stock sales were made under a 10b5-1 trading plan, which does not support a strong inference of scienter, as noted above. ¶ 312; Ex. 30, Form 4s.

---

[17] The SAC's failure to allege Holleran's or Jones's total Hayward stockholdings, percentage change during the period, or total profits (if any) is "fatal" to Plaintiff's motive theory. *See Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000); *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 335 (S.D.N.Y. 2011).

With respect to Jones' sole "sale outside his 10b5-1 trading plan" (¶ 310), Plaintiff again omits, as it did in the CCC, that the net result of that "sale" *increased* Jones's Hayward stockholdings by about 400%. *See* App'x B. Such an investment indicates a belief in the long-term prospects of Hayward's stock, not fraudulent intent. Moreover, as courts in this Circuit have recognized, "a large number of today's corporate executives are compensated in terms of stock and stock options" and thus will sell company shares "in the normal course of events." *Audible*, 2007 WL 1062986, at *3 n.9. Such trading cannot be the basis of scienter. *Astea*, 2007 WL 2306586, at *14 (no scienter where sales "were based on the exercise of stock options"). Nor is the timing of Jones' transaction remotely suspicious. It occurred when Hayward's stock price was $13.80—less than half of the Class Period high of $27.60 in November 2021—and after the Hayward Defendants had already allegedly disclosed much of the "truth." *See* ¶¶ 239-50; App'x C (Stock Price Chart). There could be no strong inference of scienter on these facts.[18] *See Fergus v. Immunomedics, Inc.*, 2019 WL 1435917, at *12 (D.N.J. Mar. 31, 2019) (no scienter from sales "at prices well below their trading high"); *City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*, 412 F. Supp. 3d 206, 227 (E.D.N.Y. 2019) (no scienter from sales after corrective disclosures).

---

[18] An options exercise, like this, includes a sale of some shares to pay the taxes from the options exercise. *See* Ex. 33, Romeo & Dye's Section 16 Handbook, Model Form 123 (cashless exercises typically involve sales for fees and taxes).

33

*Third*, the allegations of stock sales of two *non-defendants*, Roetken and Blasco that Plaintiff added to the SAC, ¶¶ 301-06, are irrelevant, as a matter of law, to the state of mind of *Defendants*. *See Pharmanet*, 720 F. Supp. 2d at 550 (non-defendant sales are not probative of defendants' scienter) (collecting cases); *Radian*, 2010 WL 1767195, at \*11 (E.D. Pa. Apr. 30, 2010) (same); *Bldg. Trades United Pension Tr. Fund v. Kenexa Corp.*, 2010 WL 3749459, at \*11 (E.D. Pa. Sept. 27, 2010) (same). Moreover, Plaintiff admits the non-defendants' sales were pursuant to Rule 10b5-1 plans, ¶¶ 301, 304, which, again, does not give rise to scienter.

*Finally*, as it did in the CCC, Plaintiff cites Hayward's initiative to repurchase $450 million of its own stock as somehow indicative of scienter. ¶ 149. That is backwards. A company's repurchase does not strengthen, but "*negate[s]* a finding of scienter because it would make no economic sense for a company to buy back its stock at a price it knows to be inflated." *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 225 (S.D.N.Y. 2018), *aff'd*, 779 F. App'x 69 (2d Cir. 2019); *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 593 (S.D.N.Y. 2011) ("repurchase of shares … signal[s] only confidence in the future of [the] company.").

## 2. The CW Allegations Do Not Support Scienter

The SAC relies on the same allegations from the same six CWs that were identified in the CCC, and they fall far short of pleading scienter. When analyzing allegations from CWs, "courts should assess the detail provided by the confidential

34

sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, . . . the coherence and plausibility of the allegations, and similar indicia." *Rahman*, 736 F.3d at 244. "If, after that assessment, anonymous source allegations are found wanting with respect to these criteria courts must discount them steeply." *Id.* Plaintiff's CW allegations are not reliable and their vague, speculative allegations do not come close to supplying "key" detail—regarding what Holleran and Jones allegedly knew at the time of their challenged statements—required to support a strong inference of scienter. *Witriol v. Conexant Sys., Inc.*, 2006 WL 3511155, at *4 (D.N.J. Dec. 4, 2006).

**CW1, CW2, CW4 & CW5**. These CWs were far removed from Hayward's headquarters, where Holleran and Jones were located, and they do not allege a single interaction of any kind with Holleran or Jones. *See* ¶¶ 62, 64, 79, 106. Nor do they allege holding positions that gave them access to the C-Suite level information that would inform the Hayward Defendants' public statements. *See id*. Accordingly, these four CWs cannot support an inference of scienter. *See CalPERS v. Chubb Corp.*, 394 F.3d 126, 152 (3d Cir. 2004) ("former employees who held positions that would not appear to render them privy to" relevant information do not support scienter); *Pharmanet*, 720 F. Supp. 2d at 540 (discounting CWs who "were not employed in a position to know" whether statements were false); *Intelligroup*, 527 F. Supp. at 366 (no "indicia of reliability" where there is "no indication" CW

35

"obtained personal knowledge about" company's accounting).

Moreover, none of these CWs even attempts to allege what Holleran or Jones knew at the time of the challenged statements. They merely offer second-hand accounts, speculation, and their own conclusory beliefs of what Holleran and Jones *might* have been known. *See, e.g.*, ¶ 63 ("water cooler talk"); ¶ 67 (inventory overages "often brought up among colleagues"; "convinced" the "C-suite" "would have known" about distributor inventory); ¶ 80 ("general concerns" and "general understanding" of sales practices); ¶ 107 ("there was 'absolutely' awareness that there was too much inventory on hand"). Such allegations fall far short of the PSLRA's requirement to plead particularized facts supporting a strong inference that the Jones and Holleran acted with an intent to deceive. *See Chubb*, 394 F.3d at 155 ("Generic and conclusory allegations based upon rumor or conjecture are undisputedly insufficient"); *Campbell*, 2020 WL 7022655, at *8 n.5 (same); *Intelligroup*, 527 F. Supp. 2d at 361 (CWs lacked "firsthand information").

**CW6.** This CW, who also was far removed from Hayward's headquarters, ¶ 108, alleges attending company-wide meetings that Holleran and Jones attended, along "with 40 to 60 managers representing every section of Hayward," ¶ 111. But CW6 does not say whether these alleged meetings occurred during the Class Period, and CW6's only allegation about the content of the meetings is that Holleran discussed "what's selling good, what's not selling good." ¶ 111. CW6's other

36

allegations are his personal views about the "C-Suite" and speculation that "management definitely would have known" information about inventory, but without specifying what would have been known, by whom (specifically), and when. ¶¶ 110-11.   Such allegations are patently insufficient to support scienter.   *See Pharmanet*, 720 F. Supp. 2d at 542-43 (meetings with executives where "issue was widely discussed" and that defendants "must have known" insufficient); *Anadigics*, 2011 WL 4594845, at *32 (references to "daily production meetings" insufficient).

**CW3**.  CW3 says nothing at all about Holleran but alleges he "heard from Jones" once in "February or March 2022" that there was "a concern of excess inventory" at Hayward, but CW3 does not say who harbored this concern, whether Jones agreed, or how it was addressed.   ¶ 103.   CW3 similarly "recalled conversations with" former CSO Donald Smith who supposedly "'knew right away' that ordering would slow down once Covid ended," ¶ 98, but CW3 again provides no details about the timing or content of those conversations, or whether this information was ever communicated to Holleran or Jones.  In any event, Hayward's inventory levels were publicly (and accurately) disclosed, and Plaintiff repeatedly relies on them in the SAC.  *See, e.g.*, ¶ 104.  CW3 also alleges preparing "cancellation" reports for Jones, but does not say that Jones viewed the alleged reports or when, what specific information the alleged reports revealed, or whether any information in the alleged reports was inconsistent with any Class Period

37

statement Jones made after the reports were generated. *See, e.g.*, ¶ 95.[19]  Such content-free allegations come nowhere close to supporting an inference of scienter for Jones. *See Rahman*, 736 F.3d at 245 (discounting allegations of CW "who allegedly spent more than five years reviewing Kid Brands' internal financial information [but] offers little more than generalized allegations with few specifics and even less concrete support"); *Pharmanet*, 720 F. Supp. 2d at 544 (discounting CW allegations that did not allege "particular transactions where revenues were improperly recorded" or the timing, customers or amounts involved).

### 3.  Plaintiff's Remaining Scienter Allegations Fail

As with the CCC, the SAC avers that Defendants' alleged monitoring of inventory and efforts to increase sales support an inference of scienter. *See, e.g.*, ¶¶ 269-70, 273-74, 276-77, 283.  But these speculative allegations do not establish scienter "absent some additional allegations of specific information conveyed to management and related to fraud," which are not present here. *Rahman*, 736 F.3d at 246-47; *Witriol*, 2006 WL 3511155, at *4 (similar).  Plaintiff again relies on the supposed "magnitude" of "elevated inventory," ¶ 276, as a disguised version of the "core operations" doctrine.  But that doctrine cannot independently support scienter, *GNC*, 757 F. App'x at 155, and Plaintiff's reference to stock sales by non-Hayward

---

[19] Plaintiffs speculate that "Tableau" "published reports" on "channel cancellations" and Hayward's inventory, ¶ 271, but CW3 alleges only that he published "cancellation reports" on a "Tableau dashboard that Jones *could* review," ¶ 95.

entities, ¶ 278, does not and cannot show that Holleran or Jones received any concrete, personal benefit from such sales. *Rahman*, 736 F.3d at 245.

Plaintiff's new allegation that the CSO's resignation somehow was suspicious, ¶ 273, likewise fails to support an inference of scienter. There is not a single factual allegation in the SAC that Smith left Hayward for any reason other than his "planned retirement," as Hayward disclosed, *see* Ex. 17 (Mar. 31, 2022 Press Release); Ex. 24 (May 16, 2022 Press Release), and Plaintiff's baseless speculation is insufficient as a matter of law. *See Synchronoss*, 2020 WL 2786936, at *15 ("unusual[ly] timed" resignations did not support scienter) (collecting cases). Moreover, Smith's departure is irrelevant to *Holleran or Jones's* scienter. *In re CRM Holdings,* 2012 WL 1646888, at *29 (S.D.N.Y. May 10, 2012).

### 4. The Non-Fraudulent Inference Is More Compelling

Plaintiff's fraud theory is "simply not as compelling as the opposing [inference]." *Campbell*, 2020 WL 7022655, at *11. Indeed, it defies all logic. Plaintiff's theory posits that the Hayward Defendants made misleading statements, while *at the same time* repeatedly disclosing "bad news" throughout the first half of 2022 and telling the full "truth" mere months later. Plaintiff's theory further posits the alleged fraud artificially inflated the price of Hayward's stock, but rather than taking advantage of that, Holleran held onto the majority of his stockholdings (403,913 shares), Jones increased his stockholdings, and the Company initiated a

39

program to repurchase its own stock.  That makes no sense as a theory of fraud.

The far more—and indeed only—compelling inference is that the Hayward Defendants made good faith statements and projections about demand for Hayward's products while navigating a historic global pandemic, and all that it entailed.  And notwithstanding explosive sales growth in 2020 and 2021, the Hayward Defendants offered a measured tone for 2022 while expressing overall optimism about Hayward's long-term prospects.  After the Company achieved net sales in the first half of 2022 in line with its projections, sales began to slow due to a variety of unforeseen developments, and the Hayward Defendants proactively disclosed that and revised their 2022 outlook.  That is not even remotely suggestive of securities fraud.  *Winer Family Trust v. Queen*, 503 F.3d 319, 331 (3d Cir. 2007) ("most plausible inference was that [defendant] revised its cost estimates in response to new information and to negotiations during the intervening time period").

## II.    PLAINTIFF FAILS TO ALLEGE A SECTION 20(A) CLAIM

Because Plaintiff fails to plead a primary violation of Section 10(b), its Section 20(a) claims must also be dismissed.  *Rahman*, 736 F.3d at 247.

## CONCLUSION

For the foregoing reasons, the Hayward Defendants respectfully request that this Court dismiss Plaintiff's SAC with prejudice.

Dated:  December 18, 2024

Respectfully submitted,

**LATHAM & WATKINS LLP**

By: /s/ Kevin M. McDonough

Kevin M. McDonough (N.J. Bar No. 41892005)
Andrew B. Clubok (*pro hac vice*)
Corey A. Calabrese (*pro hac vice*)
1271 Avenue of the Americas
New York, New York 10020
Telephone: (212) 906-1200
Email: kevin.mcdonough@lw.com
Email: andrew.clubok@lw.com
Email: corey.calabrese@lw.com

*Counsel for Defendants Hayward Holdings, Inc., Kevin Holleran, and Eifion Jones*

41