Matthew F. Gately

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
Park 80 West-Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, NJ 07663
Telephone: 201-845-9600
Facsimile: 201-845-9423
mfg@njlawfirm.com

*Counsel for Lead Plaintiff*
*Fulton County Employees' Retirement System*
*[Additional Counsel Appear on Signature Page]*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CITY OF SOUTHFIELD FIRE AND POLICE RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> HAYWARD HOLDINGS, INC., KEVIN HOLLERAN, EIFION JONES, CCMP CAPITAL ADVISORS, LP, CMP CAPITAL INVESTORS III, L.P., CCMP CAPITAL INVESTORS III (EMPLOYEE), L.P., CCMP CAPITAL ASSOCIATES III, L.P., CCMP CAPITAL ASSOCIATES III GP, LLC, CCMP CAPITAL, LP, AND CCMP CAPITAL GP, LLC, MSD AQUA PARTNERS, LLC, MSD PARTNERS, L.P., MSD PARTNERS (GP), LLC, MARK MCFADDEN, GREG BRENNEMAN, TIMOTHY WALSH, CHRISTOPHER BERTRAND, and KEVIN BROWN, <br><br> Defendants. | Civil Action No. 2:23-cv-04146 <br><br> Hon. William J. Martini <br><br> **PLAINTIFF'S OPPOSITION TO THE HAYWARD DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** |

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...............................................................................1

STATEMENT OF FACTS ......................................................................................2

    A.    By Mid-2021, Hayward's Channel Had Massive Excess Inventory ...............................................................................................2

    B.    Defendants Use Sales Gimmicks to Stave off Hayward's Collapse ...............................................................................................4

    C.    Cancellations Mount and Defendants' Scheme Begins to Unravel ...............................................................................................5

    D.    Defendants Concealed Hayward's Decline While Insiders Unloaded $558 Million in Stock .........................................................7

LEGAL STANDARD...............................................................................................8

ARGUMENT .............................................................................................................9

I.    THE SAC SATISFIES THE OCTOBER 2024 ORDER ...............................9

II.    THE SAC PLEADS ACTIONABLE STATEMENTS UNDER §10(b) ......11

    A.    Denials of Elevated Channel Inventory and Stalling Demand ...........11

        1.    October 27, 2021 Earnings Call.................................................11

        2.    March 2, 2022, Earnings Call ....................................................16

        3.    April 28, 2022, Earnings Call ....................................................19

    B.    Denials of Substantial Cancellations from the Channel......................20

    C.    Denials that Hayward was Trying to Reduce Production ...................22

    D.    Hayward's Purported Risk Disclosures Were False and Misleading ...............................................................................................24

    E.    Hayward's FY 2022 Volume Guidance Was False and Misleading ...............................................................................................26

III.    THE SAC PLEADS A STRONG INFERENCE OF SCIENTER ................28

      A.    Holleran's and Jones' Motive and Opportunity ..................................29

      B.    Holleran's and Jones' Conscious Misbehavior and Recklessness ......34

IV.    HOLLERAN AND JONES VIOLATED §20(a) ..........................................40

CONCLUSION ......................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Backe v. Novatel Wireless, Inc.*,
   642 F. Supp. 2d 1169 (S.D. Cal. 2009)..................................................................17

*Bldg. Trades United Pension Tr. Fund v. Kenexa Corp.*,
   2010 WL 3749459 (E.D. Pa. Sept. 27 2010)..........................................................30

*City of Birmingham v. Ryanair Holdings PLC*,
   2020 WL 2834857 (S.D.N.Y. June 1, 2020) ..........................................................35

*City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*,
   70 F.4th 668 (3d Cir. 2023) .....................................................................15, 16, 22

*City of Warwick Ret. Sys. v. Catalent, Inc.*,
   2024 WL 3219616 (D.N.J. June 28, 2024)..............................................................21

*Cunha v. Hansen Nat. Corp.*,
   2011 WL 8993148 (C.D. Cal. May 12, 2011)..........................................................21

*Franchi v. SmileDirectClub, Inc.*,
   633 F. Supp. 3d 1046 (M.D. Tenn. 2022) ..............................................................29

*In re Advance Auto Parts, Inc., Sec. Litig.*,
   2020 WL 599543 (D. Del. Feb. 7, 2020)................................................................36

*In re Advanta Corp. Sec. Litig.*,
   180 F.3d 525 (3d Cir. 1999) .....................................................................................8

*In re Anadigics, Inc., Sec. Litig.*,
   2011 WL 4594845 (D.N.J. Sept. 30, 2011)............................................................21

*In re Avon Sec. Litig.*,
   2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019)........................................................37

*In re Cambrex Corp. Sec. Litig.*,
   2005 WL 2840336 (D.N.J. Oct. 27, 2005) .......................................................10, 27

*In re Coinbase Glob., Inc. Sec. Litig.*,
   2024 WL 4053009 (D.N.J. Sept. 5, 2024)..........................................................18, 22

iii

*In re Countrywide Fin. Corp. Sec. Litig.*,
  588 F. Supp. 2d 1132 (C.D. Cal. 2008) ................................................................. 33

*In re Dentsply Sirona, Inc. Sec. Litig.*,
  665 F. Supp. 3d (E.D.N.Y. 2023) ........................................................................... 14

*In re: Enzymotec Sec. Litig.*,
  2015 WL 8784065 (D.N.J. Dec. 15, 2015) .............................................. 27, 30, 34

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
  986 F. Supp. 2d 487 (S.D.N.Y.2013) ..................................................................... 25

*In re Finisar Corp. Sec. Litig.*,
  2017 WL 1549485 (N.D. Cal. May 1, 2017), The MTD ......................................... 14

*In re Finisar Corp. Sec. Litig.*,
  646 F. App'x 506 (9th Cir. 2016) ........................................................................... 14

*In re Henry Schein, Inc. Sec. Litig.*,
  2019 WL 8638851 (E.D.N.Y. Sept. 27, 2019) ................................................. 16, 22

*In re Intuitive Surgical Sec. Litig.*,
  65 F. Supp. 3d 821 (N.D. Cal. 2014) ..................................................................... 10

*In re Nortel Networks Corp. Sec. Litig.*,
  238 F. Supp. 2d 613 (S.D.N.Y. 2003) .................................................................... 21

*In re NUI Sec. Litig.*,
  314 F. Supp. 2d 388 (D.N.J. 2004) ........................................................................ 30

*In re Oxford Health Plans, Inc.*,
  187 F.R.D. 133 (S.D.N.Y. 1999) ...................................................................... 30, 31

*In re Petco Animal Supplies Inc. Sec. Litig.*,
  2006 WL 6829623 (S.D. Cal. Aug. 1, 2006) .......................................................... 33

*In re Radian Sec. Litig.*,
  2010 WL 1767195 (E.D. Pa. Apr. 30, 2010) .......................................................... 30

*In re Smith & Wesson Holding Corp. Sec. Litig.*,
  604 F. Supp. 2d 332 (D. Mass. 2009) .................................................................... 18

iv

*In re Sturm, Ruger & Co. Inc. Sec. Litig.*,
    2011 WL 494753 (D. Conn. Feb. 7, 2011)........................................................39

*In re Suprema Specialties, Inc. Sec. Litig.*,
    438 F.3d 256 (3d Cir. 2006) ................................................................30, 31

*In re Toronto-Dominion Bank Sec. Litig.*,
    2018 WL 6381882 (D.N.J. Dec. 6, 2018)................................................9, 29, 38

*In re Tyco Int'l, Ltd.*,
    2004 WL 2348315 (D.N.H. Oct. 14, 2004)......................................................10

*In re Upstart Holding, Inc. Sec. Litig.*,
    2023 WL 6379810 (S.D. Ohio Sept. 29, 2023)............................................17, 22

*In re Urban Outfitters, Inc. Sec. Litig.*,
    103 F. Supp. 3d 635 (E.D. Pa. 2015).........................................................*passim*

*In re Veritas Software Corp. Sec. Litig.*,
    2006 WL 1431209 (D. Del. May 23, 2006) ......................................................27

*In re Wilmington Tr. Sec. Litig.*,
    852 F. Supp. 2d 477 (D. Del. 2012)................................................................11

*Institutional Inv. Grp. v. Avaya*,
    564 F.3d 242 (3d Cir. 2009) ...............................................................28, 39, 40

*Loc. 731 I.B. of T. Excavators v. Swanson*,
    2011 WL 2444675 (D. Del. June 14, 2011) ....................................................36

*Lozada v. TaskUs, Inc.*,
    710 F. Supp. 3d 283 (S.D.N.Y. 2024) ...........................................................37

*Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*,
    720 F. Supp. 2d 517 (D.N.J. 2010)................................................................38

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ....................................................................12, 24

*Odeh v. Immunomedics, Inc.*,
    2020 WL 4381924 (D.N.J. July 31, 2020) .....................................................25

v

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
  367 F. Supp. 3d 16 (S.D.N.Y. 2019) ........................................................12

*Ollila v. Babcock & Wilson Enterps., Inc.*,
  2018 WL 792069 (W.D.N.C. Feb. 8, 2018) ...............................................18

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus.*
  *Pension Fund*,
  575 U.S. 175 (2015)....................................................................................17

*Palladin Partners v. Gaon*,
  2006 WL 2460650 (D.N.J. Aug. 22, 2006) ...............................................14

*Rahman v. Kid Brands, Inc.*,
  736 F.3d 237 (3d Cir. 2013) ......................................................................38

*Ret. Sys. v. Bos. Sci. Corp.*,
  523 F.3d 75 (1st Cir. 2008)................................................................24, 34, 35

*Ret. Sys. v. Dell Inc.*,
  2016 WL 6075540 (W.D. Tex. Sept. 16, 2016) .........................................24

*Ret. Sys. v. Toll Bros. Inc.*,
  2008 WL 4058690 (E.D. Pa. Aug. 29, 2008) ............................................27

*Robb v. Fitbit Inc.*,
  216 F. Supp. 3d 1017 (N.D. Cal. 2016).....................................................40

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*,
  351 F. Supp. 3d 874 (E.D. Pa. 2018)........................................................18

*Smith v. Antares Pharma, Inc.*,
  2019 WL 2785600 (D.N.J. July 2, 2019) ...............................................9, 10

*Stevelman v. Alias Rsch. Inc.*,
  174 F.3d 79 (2d Cir. 1999) ........................................................................29

*Stumpf v. Garvey*,
  2005 WL 2127674 (D.N.H. Sept. 2, 2005).................................................13

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007)..........................................................................8, 9, 28

*Van Dongen v. CNinsure Inc.*,
    951 F. Supp. 2d 457 (S.D.N.Y. 2013) ..................................................................30

*Voit v. Wonderware Corp.*,
    977 F. Supp. 363 (E.D. Pa. 1997) *abrogated on other grounds by*
    *Advanta*, 180 F.3d 525 ..............................................................................30, 34

*Weston v. DocuSign, Inc.*,
    669 F. Supp. 3d 849 (N.D. Cal. 2023)..........................................................13, 31

*Wu v. GSX Techedu Inc.*,
    738 F. Supp. 3d 527 (D.N.J. 2024)..................................................................39

## PRELIMINARY STATEMENT

This securities fraud class action arises from a blatant fraud perpetrated by Defendants Hayward Holdings, Inc. ("Hayward" or the "Company"), CEO Kevin Holleran ("Holleran") and CFO Eifion Jones ("Jones").  Beginning in October 2021, Holleran and Jones concealed that there was a massive buildup of inventory among Hayward's distributors and a resulting collapse in demand for Hayward products, while they, other Hayward executives and Hayward's private equity owners unloaded $558 million in stock during the Class Period.

Hayward is a pool manufacturing supply company that sells 75% of its inventory through distributors (hereinafter referred to as the "Channel").  Near the beginning of COVID, Hayward benefited from the rush by Channel distributors to buy large amounts of pool supplies to meet surging pool demand and to guard against potential supply shortages.  However, by mid-2021, the Channel's buying surge had left it with up to $150 million of excess product, severely undercutting its demand and leading to rampant cancellations of Hayward orders.

Holleran and Jones concealed these problems from the market.  In the face of repeated questions from analysts, they denied that Channel inventory was elevated, and that Hayward was suffering cancellations and other indicia of declining demand.  For example, on October 27, 2021, Holleran claimed that over the previous quarters Channel inventory "certainly" had not changed "too much," when it had exploded

earlier in the year. Likewise, on March 2, 2022, Holleran insisted that Channel inventory was not "elevated," that its "bookings" had not "slowed," and that "cancellations" were "negligible," when Channel inventory was highly elevated, booking demand was plummeting, and cancelations were rampant. Meanwhile, Hayward's management implemented gimmicks like discounting and pulling orders forward to prop up its sales in the short run.

Further, Holleran and Jones knew of and closely tracked the Channel's elevated inventory and plummeting demand, when falsely denying those problems. Indeed, Holleran later conceded that by late 2021 he knew the oversaturated Channel was reducing orders. CWs also recounted the considerable data Holleran and Jones had documenting Channel inventory and demand problems, including that Jones requested reports on the Channel cancellations that were "hammering" Hayward, and that Jones described "concern" over how this contributed to Hayward's unsold products reaching $100 million. The inference of scienter is further strengthened by Hayward insiders dumping $558 million in stock through highly suspicious sales.

Accordingly, the motion to dismiss should be denied in full.

## STATEMENT OF FACTS

### A.     By Mid-2021, Hayward's Channel Had Massive Excess Inventory

Hayward manufactures pool supplies and more than 75% of its sales are to distributors who serve as middlemen and sell the supplies to end users. Hayward

2

refers to these distributors collectively as the "Channel." ¶¶48-49.[1] If the Channel has more inventory than it needs, it reduces orders, hurting Hayward's sales. ¶50.

At the outset of the Covid pandemic, Channel distributors significantly increased their orders to Hayward in response to the increased interest in pools and supply constraints. ¶¶55-56. Orders were often double the normal size. ¶70. Hayward also "strongly encouraged" Channel distributors to load up on inventory and place more orders than they currently needed. ¶¶66, 91. As Defendant Holleran admitted after the end of the Class Period, the Channel placed orders during this time to accomplish a "meaningful inventory build" and store excess "safety stock" for future periods. ¶71. Owing to these excess Channel orders, Hayward's net sales for 1H 2021 jumped by $300 million from 1H 2020, for unprecedent growth. ¶¶56, 60.

However, by mid-2021, these excess orders had left the Channel with far more inventory than it needed to satisfy end users, which heavily reduced Channel demand for more orders from Hayward. For example, in May 2021, CW2 heard from Channel distributors that they had about two years' worth of inventory and thus, were not going to purchase additional products from Hayward. ¶65. CW1, whose job included managing Hayward's marketing efforts in support of products that were not selling, also learned that the "channel was stuffed" in mid-2021, and reviewed

---

[1]    All cites to ¶__ are to the Consolidated Amended Class Action Complaint ("SAC") (ECF No. 91); and unless otherwise noted, all emphasis is added and citations are omitted throughout this Memorandum.

3

Hayward's substantial data tracking this problem. ¶¶63, 76-78; *see also* ¶¶70, 96 (CW3 recounted the Channel order bubble stopped in mid-2021 as the Channel subsequently had too much inventory); ¶¶79-80 (by 3Q 2021, CW4 recalled there was "an overage of inventory," and "general concerns" that Hayward was not "selling enough"). Concerns about elevated Channel inventory were thus: "water cooler talk" throughout Hayward, what "everyone discussed," and information that "product managers . . . anyone in operations management . . . and management definitely would have known" of. ¶¶63, 67, 110. Confirming those accounts, Holleran later admitted that the Channel had up to $150 million of excess inventory. ¶¶71, 264-65.

## B. Defendants Use Sales Gimmicks to Stave Off Hayward's Collapse

By mid-2021, Hayward's sales teams "weren't hitting their numbers," due to decreased Channel demand, which caused management to resort to sales gimmicks. *E.g.*, ¶76 (CW1); ¶89 (CW2 stated it was hard for district managers to hit their sales targets in 2021 and that CW2 was "not hitting those overall dollars on the sales end standpoint" as the Channel had too much inventory); ¶¶79-87 (CW4 recounted that Hayward had insufficient orders to hit its financial goals in Fall 2021).

To bolster Hayward's flagging sales, in mid-2021, management directed marketing teams to make programs to "get product off the shelves"—including "buy more to save more" schemes that give discounts if customers increase orders, and a

4

"sales blitz." ¶¶76-77.  Its VP of Sales also held regular meetings in 2021 discussing elevated inventory, and the sales team received instructions to "strongly encourage" the Channel to take more orders, including with discounts and rebates.  ¶¶90-91.

Because management was forced to use those tactics to try to induce the Channel to take on additional inventory, in 2021, Hayward substantially reduced its normal 4Q Early Buy discount program, which was supposed to load the Channel up with inventory for the next spring, but was redundant as the Channel was already oversaturated.  ¶¶67, 92.  Instead, with Hayward not "hav[ing] enough volume with current orders to sustain what higher-ups needed," its shipping team received top-down instructions to "pull ahead" future orders—that customers did not want to receive or pay for until well into the future—and ship them immediately, so Hayward could immediately recognize revenue on them.  ¶¶80-85.  Notably, the CWs recounted that management's campaign of discounts and pull aheads depressed demand even further and only propped up sales in the short run, because it depended on accelerating future orders.  *E.g.*, ¶75; ¶77 (CW1 observed that sales blitzes did not ultimately change sales dynamics); ¶91 (CW2 explained that inducing sales meant the Channel still had enough inventory to go "unsold for two years").

**C.    Cancellations Mount and Defendants' Scheme Begins to Unravel**

With Channel demand continuing to drop, by late 2021, Channel distributors informed Hayward that they would reduce inventory (¶93), and cancellations of

backlog orders by the Channel mounted.  Cancellations were such a problem by late February 2022 that Jones asked CW3 for reports on them.  ¶¶95-96; *see also* ¶69 (CW3 worked on business intelligence and data analysis, and with C-suite members like Jones and Hayward's Chief Supply Officer).  As CW3 recounted, Hayward was getting "hammered" by cancellations because the overwhelmed Channel already did not "have room for all" its existing inventory—as an example, CW3 described a cancellation of heaters "[t]hat ended up being $11 million of inventory" that Hayward "was stuck with just from one order." ¶¶95-96.  Similarly, CW4 recounted that "customers were not happy" receiving pull ahead orders "way ahead of schedule," and customer rejections of orders—another form of cancellations— became an issue that Hayward tracked. ¶82 (Hayward's management acknowledged they would have to "deal with the aftermath" of pull aheads); *see also* ¶¶84, 86. CW6, an executive who attended regular meetings on Hayward's Sales, Inventory and Operations Planning, which Holleran led and Jones attended, also recalled discussions of large-scale returns of orders, *i.e.*, rejections.  ¶¶110, 111.

These problems in turn caused Hayward's own stock of unsold products to grow at an alarming rate.  Between Q2 and Q3 2021, when Channel demand was cratering, Hayward's unsold products spiked 33%. ¶104.  CW5, a manager involved in manufacturing, recounted that by late 2021 there was "absolutely" awareness that Hayward had excess unsold products—and corporate then directed a manufacturing

6

"slow down" to match stalling Channel demand.  ¶¶100-01, 106-07.  By late February 2022, CW3 was preparing reports for Jones on Hayward's stock of unsold products, which was impacted by cancellations.  ¶¶95-96.  By March 2022, Jones told CW3 of concerns that Hayward had $100 million of unsold products.  ¶103.

**D.    Defendants Concealed Hayward's Decline While Insiders Unloaded $558 Million in Stock**

Instead of admitting that the bottom had fallen out of Hayward's revenue stream, Holleran and Jones covered it up.  In the face of intense market interest, they repeatedly and falsely denied that Channel inventory was elevated (¶¶122, 166), its demand was cratering (¶¶124, 209), cancellations were mounting (¶¶164, 198), and that any of this was impacting Hayward's unsold products (¶¶128, 188, 212).  Holleran and Jones also continued to issue earnings forecasts that had no basis in reality.  ¶¶174-75, 214-15.  *See also infra* §II.  These misstatements, combined with Hayward's pull forward and sales gimmicks, concealed for a time the dire problems that Hayward was facing.

While Holleran and Jones misled the market, Hayward insiders sold an extraordinary $558 million in Hayward stock in a brazen effort to monetize the fraud.  *Infra* §III.A.  Hayward was dominated by a small consortium of investors—the CCMP Defendants, their client and minority partner AIMCo, and the MSD Defendants—who owned 80% of Hayward's stock and controlled its Board of Directors.  ¶¶51-53.  The CCMP Defendants, AIMCo, and four of Hayward's five

7

senior-most executives, including Holleran and Jones, sold huge amounts of stock in trades that were suspiciously timed to benefit from the fraud. ¶¶287-317. Tellingly, the one top-five officer who did not participate in this selling, the Chief Supply Officer, resigned in March 2022 in the middle of the selloff. He was the lone C-suite member not installed by the consortium, and had expressed concern over the bubble of Channel orders in 1H 2021, as well as Hayward's response to it. ¶¶12, 115, 125, 273, 278.

About a month after the final insider sales, Holleran and Jones finally and belatedly revealed the full truth. In July 2022, they admitted that Hayward was suffering from "elevated channel inventories" and significant "reductions in channel inventory" (¶117)—as they had long known (*infra* §III.B). Further, they admitted that this would cost Hayward over $100 million of revenue, and that Hayward's sales for FY 2022 were in fact declining. ¶117. That caused a sharp drop in Hayward's stock, which, as planned, the insiders avoided. ¶118.

## LEGAL STANDARD

The Court must consider the SAC in its entirety, accept all well-pleaded allegations as true and draw all reasonable inferences in favor of Plaintiff. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-23 (2007). To plead falsity, Rule 9(b) simply requires Plaintiff to set forth "the who, what, when, where and how" of the alleged fraud, *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d

8

Cir. 1999), and the PSLRA likewise only requires Plaintiff to "specify each statement alleged to have been misleading and the reason or reasons why" it is so. *Tellabs*, 551 U.S. at 321.  The PSLRA also requires a "strong" inference of scienter, *i.e.*, a "knowing or reckless" mental state based on holistic allegations.  *Id.* at 319.

## ARGUMENT

### I.     THE SAC SATISFIES THE OCTOBER 2024 ORDER

The Hayward Defendants say Plaintiff is puzzle pleading.  MTD at 13-16. That is not true.  Closely following the Court's October 2, 2024 order dismissing the previous complaint (the "October 2024 Order"), the SAC specifically identifies: (1) each actionable statement; (2) where it occurred; (3) who made it; (4) when it was made; and (5) why it is false and misleading—as detailed in the following §II.  *E.g.*, ¶¶122-23, 164-65, 198-99; SAC App'x A (reproducing foregoing details).  This is not puzzle pleading.  Indeed, the SAC is on all fours with other complaints that courts have found satisfy the PSLRA.  *E.g.*, *In re Toronto-Dominion Bank Sec. Litig.*, 2018 WL 6381882, at *8 (D.N.J. Dec. 6, 2018) (no puzzle pleading where complaint "explain[ed] why the statement was misleading" and explanation was "specifically tailored to the alleged misstatement at issue.").

Defendants' argument that the SAC was required to do more is wrong.  The SAC bears no resemblance to the complaint in *Smith v. Antares Pharma, Inc.*, 2019 WL 2785600, at *10-11 (D.N.J. July 2, 2019), on which Defendants rely.  The *Smith*

9

complaint simply repeated identical general allegations of falsity for each statement. *Id.*, at 11. By contrast, the SAC provides specifically tailored and detailed explanations of why each statement is false; while these explanations sometimes summarize other portions of the SAC for the sake of brevity, that is obviously a permissible form of drafting and not puzzle pleading. *E.g., In re Cambrex Corp. Sec. Litig.*, 2005 WL 2840336, at *4 (D.N.J. Oct. 27, 2005) (particularity satisfied where complaint set forth "the basis for alleging that the statements are false" in separate section); *In re Tyco Int'l, Ltd.*, 2004 WL 2348315, at *9 (D.N.H. Oct. 14, 2004) (cross-reference "reasonable way to address a complicated securities fraud case."). Defendants ignore the SAC's actual allegations with respect to the one statement they focus on involving Hayward's guidance (MTD at 14-15), when as required the SAC specifically alleges that Holleran and Jones knew it was unattainable (*infra* §II.E).

Defendants are also wrong that the SAC does not provide sufficient "context" for the statements at issue. The SAC complies with the October 2024 Order's direction to identify specific actionable statements without using "lengthy block quotes." *Id.* at 9. This approach is widely accepted. *E.g., In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 831 (N.D. Cal. 2014) ("Plaintiff generally avoids lengthy quotations in favor of highlighting problematic portions of statements," satisfying pleading standard). Indeed, Defendants made the opposite argument

10

about the previous complaint, arguing that the *inclusion* of those same elongated quotes for context prevented them from identifying what statements were actionable. ECF No. 68-1 at 14 & n.8.  Again, by contrast, Defendants' sole case involved a complaint that "[m]ost often [only] contains two or three quoted words" for false statements, did "not cite[]" documents they came from, and so failed to identify them. *See In re Wilmington Tr. Sec. Litig.*, 852 F. Supp. 2d 477, 490 (D. Del. 2012).[2]

## II.   THE SAC PLEADS ACTIONABLE STATEMENTS UNDER §10(b)

Investors and analysts were keenly focused on whether the Channel was holding excess inventory following the Covid demand bubble.  At every turn during the Class Period, Holleran and Jones denied that Channel inventory was elevated and misled investors into believing that there was no drop in demand or increase in cancellations.  In fact, throughout this period, Hayward's distributors had up to $150 million in excess demand and were rapidly slowing bookings and cancelling orders.

### A.   Denials of Elevated Channel Inventory and Stalling Demand

### 1.   October 27, 2021 Earnings Call

The first misrepresentations occurred on October 27, 2021.  During the

---

[2]   It is undisputed that the SAC accurately quotes the false statements, and it provides their context accurately too.  That is also true for the one March 2022 statement noted in the MTD (at 15), which quotes a metric that had not yet been completed, volume in "Q2" 2022, and so provides context that this statement has a forward-looking component, as well as a present component, because the metric is based in part on events that had already happened, which Jones touted.  ¶172.

earnings call that day, a concerned analyst asked what Hayward was "seeing in the channel in terms of inventory levels and what your distributors are asking for," after a large Channel distributor indicated an uptick in its inventory. Holleran responded by dismissing that report and denying that Channel inventory had changed much from previous quarters, falsely stating "[i]f you look at it from a days-on-hand standpoint . . . it's an improving position, but certainly not too much by any means." ¶122. To reinforce that point, Holleran added the false claim that Hayward was still striving to meet Channel demand, stating "we keep close tabs" and "have good insight from our large distributor partners" on their inventory, so the Channel was then seeking orders to address insufficient inventory, as "these are conversations that we have with them in understanding what they need more of." ¶124.

Holleran's statement that Channel inventory had "certainly" not changed "much by any means" was false, because its inventory had changed enormously. By mid-2021, following exorbitant orders earlier in the year, Channel inventory had surged to up to two years, or $150 million, of excess product. ¶123. That was a huge problem for Hayward, which faced cratering demand while the Channel worked down its elevated inventory. Holleran's false inventory statement is thus actionable. *E.g.*, *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 31 (S.D.N.Y. 2019) (statement that inventory had increased "a bit" or was "flat" actionable); *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000)

12

(statements that inventory was "in good shape" and "under control" actionable).

Holleran's statement regarding Channel inventory levels was also misleading, because it indicated that Channel demand for Hayward's products was still high—which Holleran then sought to corroborate with the additional misstatement that Hayward kept "close tabs" on Channel inventory and its conversations with the Channel involved "what they need more of." ¶124. But Channel orders were then plummeting, causing Hayward to miss sales targets, due to the Channel's already excessive inventory. ¶¶123, 125; *supra* SoF.A-B. These misleading representations of demand are actionable. *Stumpf v. Garvey*, 2005 WL 2127674, at *8 (D.N.H. Sept. 2, 2005) (touting "demand" which was then dropping due to customers' "already-existing oversupply" actionable); *Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 881 (N.D. Cal. 2023) (concealing customers' declining need for more orders).

Defendants' arguments regarding these statements fail.[3] *First*, they make the dubious claim that these statements lack "anything to do" with the Channel having elevated inventory. MTD at 26-27. But Holleran's statements were a direct response to an analyst concerned with whether Channel inventory had increased enough to impact Channel demand, which is asking if it was elevated. ¶122. Thus, Defendants

---

[3]    Defendants concede that each statement regarding Channel inventory, Channel demand, cancellations and Hayward's product level, discussed in this §II.A, and §§II.B & II.C below, are *not* forward-looking and so *not* protected by the PSLRA safe harbor or bespeaks caution doctrine. *See* MTD at 17-18.

are simply wrong, and Holleran's response denying this occurred "direct[ly]" to an analyst was especially "material to investors." *In re Dentsply Sirona, Inc. Sec. Litig.,* 665 F. Supp. 3d at 255, 284 (E.D.N.Y. 2023).  At most, Defendants raise a factual dispute that is impermissible at the pleading stage; and, regardless, these statements are still misleading as set forth above.

*Second*, Courts roundly reject Defendants' related claim (MTD at 26), that Holleran disclosed the truth by briefly noting Channel inventory was "healthier" in the sentence before the false and misleading statements at issue.  Not only does it ignore those statements, but those statements also undercut the notion of materially increased Channel inventory.  Such attempts to "down-play[] concerns of a looming inventory bubble" are actionable.  *E.g.*, *In re Finisar Corp. Sec. Litig.*, 646 F. App'x 506, 507 (9th Cir. 2016) (defendant denied its "customers were building inventory beyond [its] actual production demand," when customers were doing so); *In re Finisar Corp. Sec. Litig.*, 2017 WL 1549485, at *1-2 (N.D. Cal. May 1, 2017).[4]

*Third*, Defendants raise factual challenges that are inappropriate for resolution at this stage, *Palladin Partners v. Gaon*, 2006 WL 2460650, at *5 (D.N.J. Aug. 22, 2006), and baseless in any event.  To begin with, they contend that the SAC lacks

---

[4]    The MTD (at 22) also argues that Holleran's characterization of inventory as "healthier" is puffery.  This is irrelevant, as the SAC challenges his representation that "from a days on hand standpoint" Channel inventory had "certainly" not increased "too much," which is indisputably a concrete factual statement.  *In re Urban Outfitters, Inc. Sec. Litig.,* 103 F. Supp. 3d 635, 651 (E.D. Pa. 2015).

14

allegations contradicting Holleran's statement that inventory had not improved over the preceding quarters. MTD at 27. But the SAC contains numerous allegations which do so, by showing that over 1H 2021 Channel inventory had increased dramatically, grown elevated, and was undercutting Channel demand (*supra* SoF.A).

Further, numerous sources confirm that Channel inventory was massively elevated by mid-2021. This includes: the Channel's excessive ordering to build up safety stock for future periods in 1H 2021, resulting in Hayward's net sales jumping by $300 million over 1H 2020; CW2's recollection that, as a result, the Channel had up to two years of inventory by mid-2021, which CW2 learned while serving as a sales executive at Hayward and from talking to Channel distributors; that similar to the excess 1H 2021 sales, the Channel had up to $150 million of excess inventory, as Holleran admitted at the Class Period's end; and, also consistent with those figures, after demand from the oversaturated Channel stalled in mid-2021, it caused Hayward's own stock of unsold products to spike by $80 million over the Class Period. *Supra* SoF.A-C. These allegations corroborate each other and are more than sufficient to allege falsity. *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 692 (3d Cir. 2023) (CW testimony was reliable because it was corroborated by company's disclosure and other sources).

*Finally*, without providing any actual argument, Defendants appear to classify Holleran's two statements discussed above as opinions. MTD at 23. This is

15

baseless, as they are unquestionably factual statements that do not even contain words like "think." Indeed, the statement that Channel inventory had not increased materially is a verifiable fact, as is the statement that its demand remained strong— but both were far from the truth. *In re Henry Schein, Inc. Sec. Litig.*, 2019 WL 8638851, at *13 (E.D.N.Y. Sept. 27, 2019) ("'[i]t's a fiercely competitive market'" is not opinion, as it does "not reflect the judgment of the speaker").

### 2.    March 2, 2022 Earnings Call

Additional misrepresentations occurred on March 2, 2022. First, during that day's earnings call, another analyst suggested that "inventory levels in the channel are at least a little closer to normal" and asked if that was negatively impacting the Channel's "underlying demand" for Hayward products or for Hayward's order file "backlog." ¶163. Holleran again dismissed that concern regarding Channel inventory, and responded with the false statement "[w]e don't think it's elevated," adding that it was still only in the process of "getting back to more normal levels." ¶166. This was false because the Channel in fact then had enough safety inventory to last for up to two years, which amounted to up to $150 million of excess inventory, a highly elevated level that had been causing its demand to plummet since mid-2021, and left Hayward's management scrambling to prop up sales. ¶167; *supra* SoF.A-B. Accordingly, Holleran's misrepresentation is actionable. *Prudential*, 70 F.4th at 690 (statements that insurance risk "had been within a normal range" actionable

16

when defendants discussed taking a reserve charge due to its actual elevated risk).

Holleran also responded by denying that Channel inventory was causing demand to drop, falsely stating that distributors did not feel they "had too much" inventory because "I think there was opportunity for them to slow the bookings or even cancel" but Hayward had not "seen" that occur. ¶164. This was false and misleading as Channel bookings had slowed enormously, and Hayward was missing sales targets, with management struggling to induce Channel orders. ¶165. Such statements denying stalling demand are actionable. *Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1181 (S.D. Cal. 2009) ("strong demand" actionable).

Defendants cannot excuse Holleran's blatant misrepresentations, that Channel inventory was not "elevated" and that Hayward was not "see[ing]" the Channel "slow the bookings or even cancel," as inactionable opinions. MTD at 23. These statements are factual because they are "objectively determinable" and "purport to state historical facts." *In re Upstart Holding, Inc. Sec. Litig.*, 2023 WL 6379810, at *14 (S.D. Ohio Sept. 29, 2023). Even if the overall statements were opinions, they are still actionable, as they "contain embedded statements of fact," or "omit[ted] material facts" that "conflict with what a reasonable investor would take from the statement itself." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185 (2015). Holleran was specifically conveying that, as a matter of fact, Channel inventory was not elevated and the additional supporting fact

17

that Hayward had not seen the Channel slow the bookings or cancel, when, as discussed, he had substantial evidence the exact opposite was occurring.  That is fraud.  *See In re Coinbase Glob., Inc. Sec. Litig.*, 2024 WL 4053009, at *11 (D.N.J. Sept. 5, 2024) (touting company's ability to secure customers' assets contained an embedded fact statement that assets were safe, which was false); *SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 911 (E.D. Pa. 2018) (opinion that reformulated drug was less prone to abuse was actionable as it omitted contrary facts company had indicating substantial abuse).

Also in response to the analyst, and based on the foregoing misrepresentations, Holleran falsely stated that Hayward had a "very credible order file" (¶164), when its order file backlog was then crumbling from poor Channel demand and cancelations.  ¶165.  Such statements are actionable too.  *Ollila v. Babcock & Wilson Enterps., Inc.*, 2018 WL 792069, at *4 (W.D.N.C. Feb. 8, 2018) (claim of "strong backlog" actionable where company failed to disclose significant problems impacting performance); *In re Smith & Wesson Holding Corp. Sec. Litig.*, 604 F. Supp. 2d 332, 342 (D. Mass. 2009) ("[s]tatements regarding the strength of past demand and 'backlog' orders are definite," not puffery).

Second, later in the earnings call, Holleran characterized the Channel as still demanding so many orders, that as the Class Period began Hayward did not bother to further incentivize the Channel with its standard Early Buy discount program.  He

18

falsely stated that the 2021 Early Buy program was "very much curtailed from a historical standpoint because of the order file that already existed in our possession." ¶170. This was false and misleading, as, in truth, demand from the Channel was so poor that since mid-2021 Hayward had already been trying to induce sales with discounts and other incentives, and Channel demand for more inventory remained so limited that Hayward was forced to drastically reduce the 2021 Early Buy program, because the Channel did not need more inventory. ¶171, *supra* SoF.A-B. This demand statement is actionable for the same reasons. Defendants barely respond, offering only a baseless generic argument that it was accurate. MTD at 25.

### 3. April 28, 2022 Earnings Call

Misrepresentations also occurred on April 28, 2022. During the earnings call, Holleran repeated his earlier fabrications on Channel inventory and demand.[5]

Also on that earnings call, Jones falsely stated that Hayward's Q1 2022 net sales were higher than normal "from a seasonal perspective" because Channel demand required Hayward to "continue to work through a large backlog" in order "to make sure that the channel is appropriately stocked." ¶209. But, in truth, its Q1 2022 net sales were substantially propped up by management inducing the Channel to take orders with discounts and pull aheads, as the Channel already had far more

---

[5]    *E.g.*, ¶¶198, 200, 201 ("the work on the books and new lead generation both remain strong"). This is actionable for the reasons detailed above at II.A.1-2.

19

inventory than it needed and was reducing and cancelling orders. ¶210. Such statements describing "strong demand" when Defendants are actually propping up sales with discounts are actionable. *Urban Outfitters*, 103 F. Supp. 3d at 644, 651. Defendants offer no response other than a baseless, generic assertion that this statement was accurate (MTD at 25, MTD App'x A at 23).

**B.    Denials of Substantial Cancellations from the Channel**

On Hayward's March 2, 2022 earnings call, an analyst asked whether, given the Channel's "inventory levels," Hayward faced "a risk from a cancellation perspective" for orders in its backlog. ¶163. Holleran responded with the blatantly false and misleading denial, "we've seen negligible cancellations." ¶164.

Likewise, on Hayward's April 28, 2022 earnings call, an analyst again asked if there were "any signs of consumer spending slowing down or cancellations in the order file[.]" Holleran maintained his outright false and misleading denial, insisting "[w]e really haven't seen any kind of cancellations." ¶198.[6]

---

[6]    Contrary to the MTD (at 27), this statement refers to Channel, *not* consumer, cancellations: it never uses "consumers" or any similar term, and it responds to an analyst's conjunctive question regarding cancellations in the "order file," *i.e.*, cancellations in *Hayward's* order backlog from the Channel. ¶198. Holleran's continued response confirms this, as to support the claim that he had not "seen any kind of cancellations," he added, "we're in pretty close contact with both *channel* partners and our dealers" and the "the work on the books and new lead generation both remain strong." ¶200. Defendants' factual argument is also inappropriate here, and irrelevant as the statement would still be misleading, with Channel cancellations then hammering Hayward. *See Cunha v. Hansen Nat. Corp.*, 2011 WL 8993148, at

These statements were false when made because, far from having "seen "negligible cancellations" or not "see[ing] any kind of cancellations," Hayward was then getting "hammered" by Channel cancellations and rejected orders. ¶¶164-65, 198-99, *supra* SoF.C. Holleran's statements are thus actionable. *In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 630-31 (S.D.N.Y. 2003) (claims of "strong order backlog" actionable where "customers were cancelling orders and were planning to reduce orders in the coming years"); *City of Warwick Ret. Sys. v. Catalent, Inc.*, 2024 WL 3219616, at *9 (D.N.J. June 28, 2024) (concealing that "some customers [were] request[ing] to reduce their purchases from Catalent or even cancel their business altogether" was actionable).

Defendants respond by challenging the factual basis for the SAC's cancellations allegations (MTD at 29), but those allegations include a wealth of corroborating facts from CWs and Hayward's own statements (*supra* SoF.C).[7] Defendants focus only on CW3, notwithstanding that CW3 acquired knowledge of the cancellations through performing assigned work at Hayward, including preparing reports on cancellations at Jones' request and preparing reports for Jones

---

*2 (C.D. Cal. May 12, 2011) ("statements about strong 'sales' without clarifying" that they referred to "sales to distributors, not end-users" are misleading).

[7]    The MTD (at 29) cites *In re Anadigics, Inc., Sec. Litig.*, 2011 WL 4594845, at *25 (D.N.J. Sept. 30, 2011). It is inapposite because plaintiff conceded defendants could not have known about cancellations until after misstatements were made.

21

on Hayward's stock of unsold products, which was being impacted by the cancellations. ¶95. CW3 also described a specific example of a large cancellation, and accurately recalled the large amount of Hayward's stock of unsold products in March 2022; while CW4 and CW6 both corroborated that Hayward was suffering from rejected orders which are another type of cancellation; and Holleran eventually admitted that by late 2021 the Channel was reducing orders. ¶¶86, 93, 95-97, 110. CW3's statement along with the other allegations are more than sufficient to reliably allege cancellations. *Prudential*, 70 F.4th at 692.

To the extent Defendants argue that Holleran's March 2022 statement (¶164) is an inactionable opinion because he elsewhere use the word "think," their argument fails. Holleran made a verifiable assertion directly responding to an analyst's question regarding cancellations, thus his statement—"we've seen negligible cancellations"—is one of pure fact. *Schein*, 2019 WL 8638851, at *13; *Upstart*, 2023 WL 6379810, at *14. Even if this statement were an opinion, it would still be actionable for containing a false embedded statement of fact, as Hayward was then actually getting hammered by cancellations. *Coinbase*, 2024 WL 4053009, at *11.

## C.    Denials That Hayward Was Trying to Reduce Production

On Hayward's October 27, 2021, earnings call, Holleran falsely stated that demand was so high, Hayward had to "improv[e] production levels" of finished products just to try to keep up with "the demand levels and backlog growth." ¶128.

22

Similarly, Hayward's March 2, 2022 Press Release falsely stated that its 4Q-2021 sales "benefit[ed] from a robust demand environment" and its response thereto of "increased capacity and capabilities leading to higher output" of products.  ¶188.

By Hayward's April 28, 2022 earnings call, a concerned analyst noted that Hayward's stock of finished products was increasing significantly, "growing faster than sales by quite a bit the last few quarters," and asked why that was occurring. ¶211.  In response, Jones spun a story, falsely stating that 80% of the increase in Hayward's inventory was necessary to meet Channel demand, and insisting that "[k]nowing the demand curve that we see out in the future, we are manufacturing certain products in terms of finished goods to get in into inventory to be a -- an important position to be able to service the market."  ¶212.

These statements are false and misleading because they touted having to "increase" production to meet Channel demand, when Hayward's management had actually ordered a *decrease* of production, precisely to match the Channel's *reduced* demand.  ¶107.  Further, Hayward's stock of unsold products was not ballooning "to meet Channel demand," rather it was ballooning due to reduced orders and cancellations from the Channel—such that reports were made for Jones on this issue, Jones noted concern when Hayward had $100 million unsold products, and this also concerned Hayward's then-Chief Supply Officer.  ¶¶129, 189, 213; *Supra* SoF.C. Courts have found similar statements actionable.  *City of Pontiac Gen. Emps.' Ret.*

23

*Sys. v. Dell Inc.*, 2016 WL 6075540, at *3-4 (W.D. Tex. Sept. 16, 2016) (actionable to tout revenue where defendant's "growth was stagnant, shipments were stalling and inventories were stockpiling, all of which resulted in far too much product and not enough demand"); *Novak*, 216 F.3d at 311-12 ("despite knowledge of the true reasons for rising inventory levels," defendants gave "false reassurances that inventory was under control or giving false explanations for its growth").

Defendants' arguments about these "production" statements all fail. MTD at 28. First, the SAC is *not* challenging the wisdom of a business decision regarding production levels, rather it alleges that management actually ordered Hayward's production to slowdown, when Holleran and Jones falsely claimed that the Company was still focused on increasing production. Second, that Hayward reported its stock of finished products in no way insulates Holleran and Jones, as they misleadingly stated that this was due to strong Channel demand, when it was due to cratering orders. *Novak*, 216 F.3d at 311-12; *Miss. Pub. Emps.' Ret. Sys. v. Bos. Sci. Corp.*, 523 F.3d 75, 87 (1st Cir. 2008) (misleading to report a problem with product and claim it involved "doctor unfamiliarity," when product actually had a "defect").

**D.    Hayward's Purported Risk Disclosures Were False and Misleading**

Hayward's purported risk warnings were inadequate and actionable, beginning on October 27, 2021, because they warned of "potential risk[s] when such a risk had already materialized." *Odeh v. Immunomedics, Inc.*, 2020 WL 4381924,

24

at *6 (D.N.J. July 31, 2020). Those risk disclosures in the 3Q-2021 10-Q (¶¶140-47), and repeated throughout the Class Period (¶¶154, 161, 196, 228, 232), stated for example: that "any material cancellation, reduction, or delay in purchases by [one or more of our largest] customers . . . *could* have a material adverse effect on our business, financial condition, results of operations and cash flows" (¶142); and that "higher demand . . . as a result of the COVID-19 pandemic . . . *may* not be sustainable and *may* not be repeated in future periods" (¶146). These statements were false and misleading, because the surge of demand in 1H 2021 was already stalling due to excess Channel inventory, and it was then "having a material adverse effect" on Hayward's business (§§II.A-B). Moreover, the risk disclosures stated that Hayward "*may* be unable to manage our inventory efficiently" (¶145), which was false and misleading because Hayward's own inventory was already ballooning far beyond demand and having adverse consequences as discussed above (§II.C). These are not conclusory allegations (MTD at 30), rather they lay out how specific events had already come to fruition at the time Defendants minimized them as mere potential problems. Moreover, the risk warnings are statements of "present fact." *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 518 (S.D.N.Y.2013) (risk warnings are present statements as they hide events "that 'had' already occurred").

25

### E.    Hayward's FY 2022 Volume Guidance Was False and Misleading

Holleran and Jones made false and misleading statements regarding Hayward's FY 2022 guidance that, though forward-looking, are actionable, and not subject to either prong of the PSLRA safe harbor.  Such misstatements include, for example: that Hayward would "grow net sales in the range of 9% to 12% compared to 2021" including "volume" growth (Holleran, 3/2/2022, ¶174, and 4/28/2022, ¶214; reiterated by Jones, 3/2/2022, ¶180); and that volume growth could be even larger than the guidance called for because there was "a level of conservatism built into [the] forecast" (Jones, 3/2/2022, ¶181; reiterated by Jones, 4/28/2022, ¶215).

These statements are actionable because Holleran and Jones made them with actual knowledge of their falsity.  Notably, their guidance provided for Hayward's volume of orders to increase in FY 2022.  *E.g.*, ¶¶174, 180.  However, Holleran and Jones knew by late 2021 that Hayward's order volume was actually set to *decrease* in FY 2022.  They had long "expected" a lower volume of orders based on the Channel's previous build-up of safety inventory in 2021, and the "strategic positions" the Channel took "at the end of 2021" to reduce elevated inventories in 2022.  ¶¶175, 258, 270; *infra* §III.B.  Moreover, Holleran and Jones knew that, following the COVID-surge in 2021, the Channel also had reduced end user sales in 2022, which further reduced Channel orders from Hayward year-over-year.  *Id*.

Thus, the guidance did not inform investors of Hayward's actual

circumstances, Holleran did not do so in April 2022 when noting Channel sell out would be greater than Channel sell in that year, and none of those claims was conservative. MTD at 21-22. For Holleran and Jones "knew that [Hayward's] earnings guidance…was unattainable," and its volume growth "false and misleading." *In re Veritas Software Corp. Sec. Litig.*, 2006 WL 1431209, at *7 (D. Del. May 23, 2006); *Cambrex*, 2005 WL 2840336, at *13-14 (forecasts actionable given post-hoc concession that loss of major contract "was known during earlier forecasts"); *City of Hialeah Emps.' Ret. Sys. v. Toll Bros. Inc.*, 2008 WL 4058690, at *2 (E.D. Pa. Aug. 29, 2008) (projections "unreasonable" when company was then experiencing "difficulty" with new sales opportunities and "softening" demand).

Nor was the guidance accompanied by meaningful cautionary language. As set forth above, the so-called risk disclosures were deficient, because they concealed the historical facts that the Channel had already determined in 2021 to reduce its orders for the next year due to highly elevated inventory, which was necessary to allow investors to assess the accuracy of the volume projection. *See In re: Enzymotec Sec. Litig.*, 2015 WL 8784065, at *11 (D.N.J. Dec. 15, 2015) ("generalized warnings" were "unreasonable" and insufficient "when Defendants knew, or should have known, of the specific regulations and their likely effect").[8]

---

[8]     The MTD addresses the SAC's actionable statements with sweeping generic defenses, and there is not space here to respond for each statement. That said:

27

## III.    THE SAC PLEADS A STRONG INFERENCE OF SCIENTER

Courts apply a "holistic" analysis to scienter that evaluates "motive and opportunity to commit fraud" as well as evidence of "conscious misbehavior or recklessness." *Tellabs,* 551 U.S. at 326; *Institutional Inv. Grp. v. Avaya*, 564 F.3d 242, 268 (3d Cir. 2009).  Viewed holistically, the allegations here plead a strong inference that Holleran and Jones concealed the Channel's elevated inventory and cratering demand, by propping up sales and falsely assuring investors the Channel continued to need and demand much more inventory long after the COVID bubble burst, so that insiders could dump their stock at inflated prices before the bottom fell out.  Plaintiff has alleged extraordinary and highly suspicious trading by a flotilla of high-ranking Hayward insiders.  These sales provided powerful incentive to defraud, and evince a coordinated effort to monetize the misrepresentations.  Further, Plaintiff

---

statements on elevated Channel inventory and stalling demand, in ¶¶122-30, 133-36, 138-39, 150-53, 157-60, 163-73, 186-89, 194-95, 198-210, 220-21, 226-27, 231, 233, 235-38, are actionable as detailed in §II.A.  Statements on cancellations, in ¶¶163-65, 198-99, are actionable as detailed in §II.B.  Statements on Hayward's production, in ¶¶128-29, 133-34, 188-89, 211-13, are actionable as detailed in §II.C. Many of those statements are indisputably not forward-looking, but to the extent those in ¶¶174-83, 190-91, 214-16, 222-24 were so (MTD at 16-22), they are actionable as detailed in §II.E.  Likewise, many of the foregoing statements are indisputably not opinions, but to the extent those in ¶¶122, 124, 126, 128, 150, 164, 166, 168, 170, 172, 174, 176, 178, 180-81, 186, 190, 204-05, 207, 215, 237 were so (MTD at 23-25), they are actionable as detailed in §II.A.  Last, contrary to the MTD (at 22-23), and for the reasons set forth in §II.A, the following statements are not puffery: ¶¶128, 130, 133, 135, 138, 150, 152, 163-64, 170, 172, 174, 176, 178, 180-81, 183, 186, 188, 190, 194, 198, 200, 202, 204, 215, 217, 222-23.

28

has pled that Holleran and Jones were well aware of the Channel's elevated inventory and collapsing demand when making the misrepresentations to investors. These allegations reinforce each other and plead a strong inference of scienter.

### A.   Holleran's and Jones' Motive and Opportunity

The SAC pleads that Holleran and Jones were motivated to commit fraud in order to inflate Hayward's stock price and make large insider sales. These sales support scienter because they are "unusual in scope or timing," in terms of "the amount of profit made, the amount of stock traded, the portion of stockholdings sold, [and] the number of insiders involved." *Toronto*, 2018 WL 6381882, at *15.

The large number of high-ranking insiders who participated in the selling here supports scienter. Four of Hayward's top five officers, including Holleran and Jones, unloaded stock, and the only top officer who did not sell resigned during the Class Period. ¶¶114, 278. Further, two of Hayward's three controlling shareholders, including the CCMP Entities and their client and minority partner AIMCo, made large sales as well. *Id.* Courts have found that such widespread sales, by Defendants and other insiders, establish scienter. *E.g., Stevelman v. Alias Rsch. Inc.*, 174 F.3d 79, 85-86 (2d Cir. 1999) (fact that "several officers made large sales," including non-defendants, supported inference that defendant CEO "withheld disclosures that would depress his stock until he had profitably sold his shares"); *Franchi v. SmileDirectClub, Inc.*, 633 F. Supp. 3d 1046, 1088 (M.D. Tenn. 2022) ("appropriate

29

to consider" sales of non-defendants in scienter analysis); *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 474-76 (S.D.N.Y. 2013) (same). The cases Defendants cite also support scienter under these circumstances.[9]

The size of the sales—$558 million—and the illicit profits the insiders earned by making them before disclosure of the truth—$150 million (¶307)—are "massive by any measure" and also support an inference of scienter. *E.g.*, *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 139-40 (S.D.N.Y. 1999) ($78 million in insider sales were "massive"); *In re NUI Sec. Litig.*, 314 F. Supp. 2d 388, 411-12 (D.N.J. 2004) (insiders sold $37 million). Indeed, courts have found scienter based on insider sales that generated only about $1 million in gross proceeds, and each of the insiders here sold at least that much individually. *E.g.*, *Enzymotec*, 2015 WL 8784065, at *19.

The insiders also unloaded very large percentages of their stock. On average, they sold almost 50% of their holdings. ¶¶300, 308. Five of the insiders sold between 30.4% and 95.5% of their holdings, and the sixth sold 10%, easily establishing scienter. ¶¶300, 308. *E.g.*, *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 278 (3d Cir. 2006) (sales of 31% of holdings); *Voit v. Wonderware Corp.*, 977 F. Supp. 363, 374 (E.D. Pa. 1997) (sales of 71.9%, 14.9%, and 10.6% of

---

[9]   *E.g. Bldg. Trades United Pension Tr. Fund v. Kenexa Corp.*, 2010 WL 3749459, at *9, (E.D. Pa. Sept. 27 2010) (scienter against defendants would have been bolstered if "other two officers" who were not defendants had made insider stock sales); *In re Radian Sec. Litig.*, 2010 WL 1767195, at *11-12 (E.D. Pa. Apr. 30, 2010) (considering non-defendant insider sales but their patterns were normal).

holdings) *abrogated on other grounds by Advanta*, 180 F.3d 525.  The SAC lists each insiders' percentages of holdings sold and profits generated.  ¶¶287-306.

Next, these sales were a significant departure from the insiders' previous patterns, with all of the insiders selling approximately twice as many shares during the Class Period as they sold before it—several sold almost three times more, another sold almost 20 times more, and another did not sell any shares at all previously (¶309).  This also demonstrates scienter.  *E.g., Suprema*, 438 F.3d at 278 (scienter pled where insider sales "nearly doubled" profits from prior period).

In addition, the timing of the insider sales was extremely suspicious, as they all occurred at two critical points.  One point was before or by the first partial corrective disclosure in January 2022,[10] when Hayward's stock price was most elevated (¶¶310-15), which supports scienter.  *E.g., Weston*, 669 F. Supp. 3d at 885 (sales "a month prior to the first partial corrective disclosure").  The other point was in May or June 2022, just after Holleran and Jones affirmed the false volume guidance and made other false statements but before the final corrective disclosure triggered the largest percentage loss for Hayward during the Class Period (¶¶310-15).  This supports scienter as well.  *Oxford*, 187 F.R.D. at 139 (insider sales two months before corrective disclosure support scienter).

---

[10]    One insider sale closed in March 2022, however it was part of Hayward's repurchase of CCMP's stock and was set and priced at the same self-interested price as CCMP's January 2022 block trade.  ¶¶288-89.

31

To the extent Defendants respond to the insider sales, their arguments not only fail, but also highlight why those sales are suspicious. First, Defendants do not address the massive total sales made by the insiders at all, or the substantive sales by the CCMP Defendants, AIMCo, Roetken, who was Hayward's President of North America, or Blasco, who was its VP and General Manager for Europe & Rest of World. Defendants' only excuse for doing so is that these trades were not made by Holleran or Jones (MTD at 34), but courts reject that argument. *Supra* at 29.

Defendants also contend that since Hayward offered a repurchase program during the Class Period, it suggests that management had confidence in the Company's prospects (MTD at 34), but they ignore that the repurchase program here was actually part of the massive insider sell off. Specifically, the repurchase program consisted of the CCMP Defendants and AIMCo selling, at prices preferential to them, their shares to Hayward. ¶¶288-94, 321. The so-called repurchase program bled into a large SPO, soon before the final corrective disclosure, through which the CCMP Defendants and AIMCo sold additional shares to Hayward (and to unsuspecting investors). ¶¶290-92, 294. In total, through this "program" and the SPO, the CCMP Defendants unloaded $380 million of stock for $105 million in illicit profits, and AIMCo unloaded another $161 million in stock for $37.7 million illicit profits. ¶¶287, 295. Courts have found similar repurchase programs actionable, whereas the cases Defendants cite all involve the standard

32

repurchase of shares from regular investors on the open market. *E.g. In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1187-88 & n.67 (C.D. Cal. 2008) (repurchase program that made "it easier for insiders to find buyers and allowing more sales without depressing prices" supported scienter).

Defendants' next contention, that Jones' June 2022 sale was made in the "normal course of events" (MTD at 33), strains credulity as it triggers each suspicious factor: it was the largest single sale Jones *ever* made, by itself netting him about $2 million in proceeds; it was about five times larger than *any* of his other Class Period sales; it disposed of a staggering *44%* of his then holdings; and it was admittedly *outside* of his already suspect 10(b)(5) trading plan. ¶297. Further, Jones only increased his Hayward stockholdings during the Class Period so that he could undertake this blatantly fraudulent sale. Specifically, Jones executed stock options with a *de minimis* strike price of $1.40/share, then promptly sold the bulk of them in the June 2022 trade for profits that far exceeded the low acquisition from all the exercised options combined. ¶¶297-98. Thus the net result of this transaction was to monetize and significantly reduce his exposure to Hayward stock, supporting scienter. *In re Petco Animal Supplies Inc. Sec. Litig.*, 2006 WL 6829623, at *19 (S.D. Cal. Aug. 1, 2006) (scienter supported where defendant "suddenly exercised his option on a large number of shares, and immediately sold" them about one month before disclosure). Nor was that option exercise part of his 2022 compensation, as

33

the options had been granted two years prior and were not set to expire for several more years. ¶298. These facts, which are distinct from every case Defendants cite, show that Jones' only reason for his outsized June 2022 sale was that it was his last chance to sell before *he* disclosed the truth the next month and prices sank sharply.

Defendants' few arguments regarding Holleran fail too. While the MTD (at 31-32) seeks to minimize Holleran's $1.18 million in sales (¶300), courts have found that such sales are more than sufficient to establish scienter, especially in light of all the allegations here and the other substantial insider selling. *E.g.*, *Voit*, 977 F. Supp. at 374; *Enzymotec*, 2015 WL 8784065, at *19. Also, contrary to Defendants' contention, *none* of their MTD attachments or anything else indicates that Holleran took any steps to increase his stock holdings during the Class Period.

Finally, Defendants note that certain insider sales, including by Holleran and Jones, were part of 10(b)(5) trading plans, but by failing to disclose when those plans were implemented publicly or in the MTD (at 31-32), they lose any protection the plans might otherwise provide. *E.g.*, *Bos. Sci.*, 523 F.3d at 92. Absent that information, Defendants cannot refute the inference that they retained discretion over "when sales would occur" and were not "unable to amend these trading plans" to take advantage of artificially inflated prices. *Id.*

**B.    Holleran's and Jones' Conscious Misbehavior and Recklessness**

The allegations that Holleran and Jones knew of and had access to information

34

contradicting their false statements are based on multiple sources that readily establish scienter, most of which Defendants have no response to.

*First*, Holleran and Jones touted that they personally tracked Channel inventory levels, and that in 2021 the Channel told Hayward its inventory was elevated and demand was dropping. Holleran admitted knowing that "due to the *strategic positions* that many of our channel partners took at the *end of 2021*" Hayward "*expected to sell less* into the channel than sellout"—that is, the Channel had a deliberate strategy of reducing its excess inventory by dropping its demand for Hayward sales. ¶270. Further evidencing that he had long known of this dropping demand, Holleran also admitted at the Class Period's end that "*coming into the year* [2022], with last year's retail pull-through in front of us, *we expected some moderation* off a very, very high pull through the channel last year." *Id.* On top of that, Holleran and Jones admitted that they had abundant information showing that Channel inventory was elevated, as: Holleran repeatedly explained that he kept "*close tabs on*" channel inventory, and had "*good insight from our large distributor partners*" (¶269); with Jones likewise confirming his "*good channel inventory knowledge*," that its "*inventory positions [were] reported to us*," and that Hayward received "*good sell-through information as well*." ¶280. Defendants have no response to these admissions. Indeed, admissions substantially similar to and with the same level of detail as those here establish scienter. *E.g., City of Birmingham v.*

35

*Ryanair Holdings PLC*, 2020 WL 2834857, at \*3 (S.D.N.Y. June 1, 2020) (scienter pled where defendant's admission he "long anticipated" unionization contradicted his previous claim that it was no threat); *Loc. 731 I.B. of T. Excavators v. Swanson*, 2011 WL 2444675, at \*12 (D. Del. June 14, 2011) (defendants' "'monitor[ing] [of] why advertisers reduce or cancel their programs'" supported scienter).

*Second*, the CWs recounted not only that Hayward had abundant data showing the Channel's elevated inventory and dropping demand, but also that Holleran and Jones had access to and were provided with this data, which also establishes scienter. *In re Advance Auto Parts, Inc., Sec. Litig.*, 2020 WL 599543 at \*8 (D. Del. Feb. 7, 2020) (inference of scienter "regularly" drawn based on defendants' "access" to relevant data). For example, by late February 2022, Channel cancellations had become so bad that Jones asked for reports on them, which CW3 prepared and provided to him, and which conveyed Hayward getting "hammered" by cancellations from the oversaturated Channel. ¶¶95-96. Concurrently, CW3 built out a system so that, "whenever he wanted," Jones could see reports on Hayward's stock of unsold products, which was then ballooning, and the impact the cancellations were having on that stock. ¶103. As such, in February or March 2022, CW3 recounted that Jones raised concerns that Hayward's unsold products had reached $100 million—which matches the amount of Hayward's unsold products at the end of the March 2022 quarter, Q1 2022. *Id.*; ¶104. Contrary to Defendants'

36

contention (MTD at 37-38), courts have found that substantially similar CW allegations are sufficiently particularized, and like CW3's statements, establish scienter. *Lozada v. TaskUs, Inc.*, 710 F. Supp. 3d 283, 323 (S.D.N.Y. 2024) ("reasonable inference" defendant knew of high attrition as he requested report on attrition data and later discussed attrition); *In re Avon Sec. Litig.,* 2019 WL 6115349, at *20 (S.D.N.Y. Nov. 18, 2019) ("[e]ither Defendants received reports detailing the rising delinquency rate. . . [or] deliberately ignored" them).[11]

Other CWs confirmed that Holleran, Jones, and management had access to large quantities of data enabling them to see how elevated the Channel's inventory had grown and its negative effect on Channel sales. ¶¶78, 271. This data was stored on Hayward's analytics database called Cognos, which from mid-2021 management used to generate reports on what products were not selling to the Channel and needed propping up with short run tactics, as CW1, who learned this while working on the marketing team, recounted. ¶¶76-78, 271. Hayward tracked other relevant key performance indicators too, including rejected orders, as CW4, who worked with

---

[11]    The SAC does not embellish CW3's statements. MTD at 29 n.15. CW3 stated that: Jones asked CW3 to prepare reports on Channel cancellations; CW3 did so, and CW3 also prepared a dashboard with information on Hayward's stock of unsold products that Jones could access whenever he wanted to; and Jones noted concern that this stock had reached $100 million by March 2022, which is the amount of such stock that Hayward eventually reported for the quarter ending that month, 1Q 2022. ¶¶95-96, 103-04. Courts hold that based on such statements it is a fair inference that Jones received the reports (¶9). *Lozada*, 710 F. Supp. 3d at 323.

such orders, recalled. ¶86. Hayward also tracked missed sales targets, which CW2, who was a sales executive, explained. ¶89. Defendants discount these CWs' statements because they are from mid-level executives (MTD at 35-36), but, as courts consistently hold, these are reliable accounts of the essential data Hayward used to run its business, as they are based on the similar, personal experiences the CWs had while working there. *E.g.*, *Toronto*, 2018 WL 6381882, at \*13; *Urban Outfitters*, 103 F. Supp. 3d at 653-54) (that employees had access to internal sales figures showing sales decline supported inference defendants knew of declines).[12]

*Third*, Holleran and Jones also gained knowledge of the Channel's elevated inventory and dropping demand from regular monthly meeting on Sales, Inventory and Operations Planning, which Holleran chaired and were also attended by Jones along with executives from across Hayward, including CW6. ¶¶111, 272. CW6 recounted that these meetings lasted several hours, and that, as the name indicates, they covered in depth topics involving sales and inventory, including what was "not selling" (*id.*)—and during the Class Period Hayward was missing sales targets which concerned management, while its VP of Sales was regularly holding meetings on elevated inventory, and management was also concerned that dropping demand was

---

[12]    Defendants' CWs cases, unlike here, involved CWs who did not hold jobs that involved the information they provided. *E.g.*, *Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 544 (D.N.J. 2010) (marketing manager not positioned to know about company's accounting practices); *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 245 (3d Cir. 2013) (same).

38

causing Hayward's stock of unsold products to spike. ¶¶70, 89-90, 98, 272-73. Moreover, by August 2021, its Chief Supply Officer was expressing concern regarding the impact on Hayward from the Channel's large bubble of double orders earlier in 2021, as CW3 recalled. ¶273. Thus, CW6 stated, "all the evidence was there" to see that Channel inventory was elevated, "management definitely would have known" this, and "if C-Suite did not know about it, it was gross incompetence . . . they had to know." ¶¶110-11. The MTD (at 36-37) repeats its baseless arguments regarding the sufficiency of CW6's statements, but their description of meetings Defendants "regularly attend" establish Defendants' scienter of the meetings' subject matter. *In re Sturm, Ruger & Co. Inc. Sec. Litig.*, 2011 WL 494753, at *9 (D. Conn. Feb. 7, 2011).

*Fourth*, the fact that the undisclosed information "relates to critical parts" of Hayward's business and involved "especially large" problems supports scienter. *Wu v. GSX Techedu Inc.*, 738 F. Supp. 3d 527, 563 (D.N.J. 2024). Hayward's sales to the Channel were critical as they constituted 76% of its entire business, and Channel demand was cratering, causing Hayward to miss sales targets, because the Channel had up to $150 million in excess inventory—which matched and were the inverse of Hayward's outsized sales growth in 1H 2021. *Supra* SoF.A-C. Thus Holleran and Jones had to be, and as set forth in the paragraphs above were, knowledgeable of these facts. *E.g.*, *Avaya*, 564 F.3d at 268; *Urban Outfitters*, 103 F. Supp. 3d at 653-

39

54. As the CWs stated, these substantial problems were widely known at Hayward.

*Fifth*, the desperate actions of Hayward's management and owners supports scienter. While management directed a plan to prop up sales to the Channel and to slowdown production in response to stalling Channel demand, Holleran and Jones along with Hayward's senior leadership, unloaded $558 million in stock, and the only C-Suite member who did not participate in that selling resigned. *See Robb v. Fitbit Inc.*, 216 F. Supp. 3d 1017, 1032 (N.D. Cal. 2016) (allegations that COO knew of undisclosed information "indicat[ed] scienter" by Company's other executives).

*Sixth*, "powerful evidence of scienter" comes from "the content and context of statements made by" Holleran and Jones. *E.g.*, *Urban Outfitters*, 103 F. Supp. 3d at 653; *Avaya*, 564 F.3d at 269. Here, they "explicitly denied the existence" of elevated Channel inventory, stalling Channel demand and cancellations, among other things, and did so in response to direct "questions about [them] by analysts," establishing that Holleran and Jones had knowledge of those topics. *Id*.

## IV.    HOLLERAN AND JONES VIOLATED §20(a)

As Jones and Holleran violated §10(b), they also violated §20(a).

## CONCLUSION

For the foregoing reasons, the Motion to Dismiss should be denied in full.

Dated:  February 6, 2025

COHN LIFLAND PEARLMAN
HERMAN & KNOPF LLP

 /s/ *Matthew F. Gately*
Matthew F. Gately
Park 80 West-Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, NJ  07663
Telephone: 201-845-9600
Facsimile:  201-845-9423
mfg@njlawfirm.com

*Liaison Counsel*

SCOTT+SCOTT
ATTORNEYS AT LAW LLP
Max R. Schwartz (*pro hac vice*)
Donald A. Broggi (*pro hac vice*)
Susan Hu (*pro hac vice*)
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY  10169
Telephone: 212-233-6444
Facsimile:  212-233-6334

SCOTT+SCOTT
ATTORNEYS AT LAW LLP
Cornelia Gordon (*pro hac vice*)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile:  619-233-0508

*Lead Counsel for Lead Plaintiff and the Class*

41