**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **CITY OF SOUTHFIELD FIRE AND POLICE RETIREMENT SYSTEM, Individually and on Behalf of Others Similarly Situated,**<br><br>**Plaintiff,**<br><br>v.<br><br>**HAYWARD HOLDINGS, INC., KEVIN HOLLERAN, EIFION JONES, CCMP CAPITAL ADVISORS, LP, MSD PARTNERS, L.P., CCMP CAPITAL INVESTORS III, L.P., CCMP CAPITAL INVESTORS III (EMPLOYEE), CCMP CAPITAL ASSOCIATES III, L.P., CCMP CAPITAL ASSOCIATES III GP, LLC, CCMP CAPITAL, LP, CCMP CAPITAL GP, LLC, MARK MCFADDEN, TIMOTHY WALSH, GREG BRENNEMAN, MSD ACQUA PARTNERS, LLC, MSD PARTNERS (GP), LLC, CHRISOPHER BERTRAND, KEVIN BROWN,**<br><br>**Defendants.** | Civ. No. 2:23-CV-04146 (WJM)<br><br>**OPINION** |

**WILLIAM J. MARTINI, U.S.D.J.:**

In this putative securities fraud class action by Lead Plaintiff Fulton County Employees' Retirement System ("Plaintiff") on behalf of purchasers of Hayward Holdings, Inc., ("Hayward") common stock between October 27, 2021 and July 28, 2022, inclusive ("Class Period"), Hayward and Kevin Holleran ("Holleran") and Eifion Jones ("Jones") ("Hayward Defendants") move to dismiss the Consolidated Amended Class Action Complaint ("ACC") pursuant to Fed. R. Civ. P. 12(b)(6). ECF No. 97. MSD Aqua Partners, LLC, MSD Partners (GP), LLC, Christopher Bertrand, Kevin Brown, and MSD Partners, L.P. ("MSD Defendants") also move to dismiss pursuant to Rule 12(b)(6). ECF No. 95. CCMP Capital Investors III, L.P., CCMP Capital Investors III (Employee), CCMP Capital Associates III, L.P., CCMP Capital Associates III GP, LLC, CCMP Capital, LP, CCMP Capital GP, LLC, Mark McFadden, Timothy Walsh, Greg Brenneman, and CCMP Capital Advisors, L.P. ("CCMP Defendants") also move to dismiss. ECF No. 96. The Court

decides the matter without oral argument. Fed. R. Civ. P. 78(b). For the reasons set forth below, each of the three pending motions to dismiss are **granted in part and denied in part**.

## I. BACKGROUND[1]

### A. Hayward's Business and Oversaturated Channel Inventory

Hayward designs and manufactures pool products, such as pumps, heaters, and filters. ACC ¶ 2, ECF No. 91. Initially headquartered in New Jersey, Hayward relocated to North Carolina in July 2022. *Id.* at ¶ 23. The majority of Hayward's sales are generated through distributors in its "channel," who in turn sell to pool builders, retailers, and servicers that work with the end users, *i.e.* the pool owners. *Id.* at ¶¶ 48-49. In 2017, a consortium led by the CCMP and MSD Defendants acquired Hayward and took control of it. *Id.* at ¶ 2. Holleran, installed in 2019, was at all relevant times Hayward's CEO and President. *Id.* at ¶¶ 24, 54. Jones, installed in 2020, was at all relevant times Hayward's CFO and Senior Vice President. *Id.* at ¶¶ 25, 54. Due to a burst of demand for outdoor and home-based activities from the Covid-19 pandemic, Hayward's revenue grew by about 20% year-over-year ("YoY") in 2020, from $733.4 million in 2019 to $875.4 million in 2020, prompting an initial public offering ("IPO") on March 11, 2021. *Id.* at ¶ 3.

In response to the surge in end-user demand in 2020, distributors loaded up on inventory to avoid logistics and supply chain challenges brought on by the pandemic. *Id.* at ¶ 60. Relying on statements from six confidential witnesses ("CWs"), Plaintiff contends that by mid-2021, "channel" (distributor) inventory levels had recovered and the channel had already purchased and had on hand two years' worth of inventory, or up to $150 million of excess product. *Id.* at ¶¶ 5, 11, 61. The channel was "stuffed" causing demand to significantly slow and making sales to distributors difficult. *Id.* at ¶¶ 60, 63. To counteract stalling channel demand and slumping sales, Hayward offered discounts and promotions, resorted to pressure tactics to prop up revenue and "pulling ahead" future orders, that is filling future customer orders "way ahead of schedule" to the detriment of future periods. *Id.* at ¶¶ 80-88. Customers overwhelmed with inventory began cancelling orders in March 2022. *Id.* at ¶¶ 94-95. Meanwhile, Hayward continued to manufacture at a high rate in excess of demand, which eventually resulted in excess unsold inventory. *Id.* at ¶¶ 100-12. Defendants knew about these issues but tried to minimize or conceal them by making a series of material misrepresentations and omissions during the Class Period to create the false impression that business was strong thereby artificially inflating prices. *Id.* at ¶ 113.

Net sales growth declined across fiscal year 2021. It increased 96% YoY to $334.4 million for 1Q-2021 and 66% YoY to $364.4 million for 2Q-2021. *Id.* at ¶ 60. At the start of the Class Period, Hayward reported that net sales growth in 3Q-2021 had increased 56% YoY. *Id.* at ¶ 132. On March 2, 2022, Hayward announced 4Q-2021 net sales growth of

---

[1] The factual allegations are derived from the ACC and are taken as true for the purposes of this motion unless otherwise noted.

35% and projected net sales growth of 9-12% for its 2022 full year outlook. *Id.* at ¶¶ 174, 185. Hayward's net sales growth for Q1 in 2022 was 23% and for Q2-2022 was 10% YoY. *Id.* at ¶¶ 243, 251.

B. <u>CCMP and MSD Defendants</u>

Plaintiff brings suit against seven CCMP entities that allegedly controlled Hayward and directly held or were the beneficial owners of Hayward stock: CCMP Capital Advisors, LP ("CCMP Advisors"), a private equity firm, and its affiliates - investment funds CCMP Capital Investors III, L.P. and CCMP Capital Investors III (Employee), L.P.; CCMP Capital Associates III, L.P.; CCMP Capital Associates III GP, LLC; CCMP Capital, LP and CCMP Capital GP, LLC ("CCMP Entities"). *Id.* at ¶ 27. Three executives of the CCMP Entities - Mark McFadden ("McFadden"), Timothy Walsh ("Walsh"), and Greg Brenneman ("Brenneman") - served on Hayward's Board of Directors ("Board") from 2017 to 2023. *Id.* at ¶¶ 27, 35-37. During that time, each of them was also a principal owner of CCMP Capital, LP. *Id.* at ¶¶ 35-37. At all relevant times, McFadden was the Chairperson of Hayward's three-person Compensation Committee and was also Managing Partner and co-Managing Director of CCMP Advisors. *Id.* at ¶ 35. Walsh was the Chairperson of Hayward's three-person Nominating and Corporate Governance Committee and was also the President and CEO of CCMP Advisors. *Id.* at ¶ 36. Brenneman served as the Executive Chairman of CCMP Advisors. *Id.* at ¶ 37. Walsh and Brenneman were also on the investment committee of CCMP Capital GP, LLC with respect to shares of Hayward's common stock. *Id.* at ¶¶ 36-37.

MSD Partners, L.P. ("MSD Partners") is the investment manager of MSD Aqua Partners, LLC, a New York-based investment fund that directly held Hayward common stock during the Class Period ("MSD Fund"). *Id.* at ¶ 41. MSD Partners (GP), LLC and MSD Partners were the beneficial owners of Hayward stock held by the MSD Fund. *Id.* at ¶¶ 42-43. Plaintiff purports that these Christopher Bertrand ("Bertrand") and Kevin Brown ("Brown") served as members of Hayward's Board starting from 2020 and 2017, respectively. *Id.* at ¶¶ 44-45. Bertrand was also a member of Hayward's three-person Audit Committee during FY 2021 until February 2022 as well as the Managing Director of MSD Partners' Private Capital Group. *Id.* at ¶ 44. During the Class Period, Brown was a member of Hayward's Compensation Committee with McFadden, and was also Co-Head of MSD Partners' Private Capital Group. *Id.* at ¶ 45.

Non-party AIMCo is a Canadian institutional investment manager that sometimes works with private equity firms targeting companies for buyout by acting as a minority investor. *Id.* at ¶ 38. Throughout the Class Period, AIMCo held a director seat on Hayward's Board. *Id.* at ¶ 39. The CCMP Entities advised and managed AIMCo on its investment in Hayward including coordinating sale of Hayward shares. *Id.* at ¶ 38-39.

The CCMP and MSD Entities were Hayward's two largest shareholders. *Id.* at ¶¶ 27, 40. Prior to the IPO, the CCMP Entities and MSD Entities each owned approximately

38.1% of Hayward's outstanding common stock. *Id.* AIMCo was Hayward's third-largest shareholder with 19.6% of Hayward's outstanding stock before Hayward's IPO. *Id.* at ¶ 39. After selling over $ 260 million in stock in the IPO, the CCMP and MSD Entities each owned 30.9% each of the total outstanding Hayward common stock. *Id.* at ¶¶ 39, 40, 52, 57, 58. AIMCo owned 15.91% of Hayward common stock. *Id.* at ¶¶ 39, 52, 58. Because the majority of its voting shares were beneficially owned by a single shareholder "group," Hayward was deemed a "controlled company" under the New York Stock Exchange (NYSE) rules. *Id.* at ¶ 53. In addition, Plaintiff alleges that the CCMP and MSD Entities had majority shareholder control over Hayward because non-independent directors affiliated with the CCMP (McFadden, Walsh, and Brenneman) and MSD (Brown and Bertrand) Entities maintained a seven-person majority on Hayward's 12 or 13-member Board during the Class Period. *Id.* at ¶ 321. McFadden, Walsh, Brenneman, Bertrand, and Brown signed Hayward's March 9, 2022 Form 10-K for fiscal year 2021 and the May 2, 2022 Form S-3 Registration Statement ("Form S-3"). *Id.* at ¶¶ 192, 229.

C. Insider Sales

During the Class Period, Hayward's leading insiders (including Holleran, Jones, the CCMP Entities, and AIMCo) sold Hayward stock at what Plaintiff alleges were artificially inflated prices totaling nearly $558 million and nearly $150 million in illicit profits. *Id.* at ¶¶ 11, 287-306. The CCMP Entities sold in total more than 24.4 million Hayward shares, which was more than 34% of its stock, netting over $379 million during the Class Period. *Id.* at ¶ 287. AIMCo sold over 11 million shares for over $161 million in proceeds. *Id.* at ¶ 295. Jones made several sales in November 2021. *Id.* at ¶ 299. In June 2022, he exercised an option to purchase 280,000 shares and then sold 44.5% of his Hayward stock for about $1.95 million. *Id.* at ¶ 297. During the Class Period, Jones sold a total of 189,945 Hayward shares resulting in approximately $3.3 million in proceeds. *Id.* at ¶¶ 25, 296. In November and December 2021, Holleran sold 50,272 shares for approximately $1.18 million in proceeds. *Id.* at ¶ 300.

D. Alleged Misstatements and Omissions

1. *Risk Disclosures*

Hayward's October 27, 2021 Form 10-Q for 3Q-2021 contained risk warnings that customers "could stop distributing our products or reduce sales of our products" and that "as a result our business, financial condition, results of operations and cash flows could be materially impacted." *Id.* at ¶ 141. It also warned that "material cancellation, reduction, or delay in purchases" could occur and as a result Hayward's "business, financial condition, results of operations and cash flows could be materially impacted." *Id.* at ¶ 142. Other risk warnings included: "[o]ur operating results will be harmed if we are unable to effectively manage and sustain growth or scale our operations;" if Hayward is unable to "maintain pricing without significant discounting" that "would have a material and adverse effect on or operating results;" "[i]f we do not manage product inventory in an effective and efficient

manner, it could adversely affect profitability …Failure to do so may harm our long-term growth prospects"; growth due to higher demand from the COVID-19 pandemic "may not be sustainable and may not be repeated in future periods." *Id*. at ¶¶ 144-46. These risk warnings were also incorporated in subsequent securities filings. *Id.* at ¶ 154 (December 20, 2021), ¶ 161 (January 24, 2022), ¶ 196 (March 9, 2022), ¶ 228 (April 29, 2022), ¶¶ 232-33 (May 2 and 3, 2022). Plaintiff contends the risk warnings were false and misleading because they characterized events as mere possibilities that could hypothetically occur when they were already having an actual negative impact on Hayward. *Id.* at ¶¶ 140, 143.

### 2. October 27, 2021, 3Q-2021 Earnings Call & Presentation, Press Release, and Form 10-Q

On the 3Q-2021 earnings call, an analyst asked Holleran what he saw in the "channel in terms of inventory levels" and what distributors were asking for because Pool Corp., a major distributor, had reported a "significant uptick in inventories" in its own quarterly reporting the previous week. *Id.* at ¶ 122. Holleran responded:

> Inventories are in a healthier position that they were a quarter or 2 ago. If you look at from a days-on-hand standpoint, it's still in a -- it's an improving position, but certainly not too much by any means. Admittedly, the mix of that inventory may not be as ideal as any of us would like it. There's still some products that are in shorter supply. So we're working feverishly to address that. But in total, I think we're taking some extra shelf space right now. So we look at it really through 2 lenses: in absolute terms, what's -- what are the inventory levels looking like, but also then are [we] accounting for some additional shelf space through our share gains.

*Id.* at ¶¶ 122, 126. Holleran assured investors that "we keep close tables" and "have good insight from our large distributor partners" on channel inventory. *Id.* at ¶ 124.

The 3Q-2021 Press Release stated that "current demand levels and Hayward's production capabilities remain strong." *Id.* at ¶¶ 133-34. Holleran also claimed, "[o]ur third quarter results were driven by our team's ability to execute and capture the sustained demand for Hayward products as we continue to see strength in the pool market." *Id.* at ¶¶ 135-36.

In Form 10-Q, Hayward described net sales results for 3Q-2021 in North America as "mostly due to higher sales of residential pool equipment as demand for more efficient, environmentally friendly and automated pool products remains robust," and made other substantially similar claims even though Plaintiff contends that channel demand was stalling and Hayward had resorted to actively propping up its sales. *Id.* at ¶¶ 138-39.

### 3. December 20, 2021 Press Release and Stock Repurchase Program

Hayward's $450 million stock repurchase program, announced in the December 2021 press release, included repurchase of 4.08 million shares from its sponsors, the CCMP Entities and its client and minority partner AIMCo. *Id.* at ¶ 149. Holleran explained that Hayward undertook the repurchase program because "[o]ur business is performing well

and we remain confident in our ability to continue executing our growth initiatives in the years ahead," *id.* at ¶ 150, and that the repurchase program reflected Hayward's "strong cash flow generation capability," *id.* at ¶ 152. Plaintiff claims the repurchase program allowed insiders to sell large amounts of stock before the truth fully emerged. *Id.* at ¶ 153.

### 4. January 24, 2022 Press Release

Hayward stated that its 4Q-2021 net sales and growth primarily occurred because "we continued to see demand from aftermarket upgrades and new construction." *Id.* at ¶ 157. Hayward represented that its sales growth "continues to benefit from the demand environment for outdoor living products" and from "our production capabilities," which enable it to meet that demand. *Id.* at ¶ 159. According to Plaintiff, the truth began to emerge when preliminary 4Q-2021 net sales ($348-$354 million), which were flat compared to 3Q-2021 net sales ($350.6 million), reflected slowing demand. *Id.* at ¶¶ 239-40.

### 5. March 2, 2022 4Q-2021 Earnings Call and Press Release

During the 4Q-2021 earnings call, when an analyst asked about the potential contradiction between Holleran's prior claims that channel inventory levels were "closer to normal" and claims that Hayward's backlog was still at "record levels," Holleran explained "I think it's a very credible order file" and that if "the channel was feeling as if they had too much or were unhappy with their inventory turns, I think there was opportunity for them to slow the bookings or even cancel and we've seen negligible cancellations through those time periods. So we feel very good about the credibility of that order file." *Id.* at ¶¶ 163-64. Holleran stated that channel inventory was getting back to more "normal levels" and did not believe it to be "elevated." *Id.* at ¶ 166. He also recognized "shortages of some particular SKUs" and that "it's not a perfectly balanced [channel] inventory from a SKU standpoint, but we're working hard to solve that." *Id.* at ¶ 168. Holleran further asserted that Hayward's FY 2022 is "starting out pretty similar to 2021 with some elevated backlogs starting the year" and portrayed Hayward's early-buy discount program in late 2021 as "very much curtailed from a historical standpoint because of the order file that already existed in our possession." *Id.* at ¶ 170. Guidance for FY 2022 was that Hayward would "grow net sales in the range of 9% to 12% compared to 2021" reflecting "strong carryover demand" and "conversion of current order file." *Id.* at ¶¶ 174, 176. Jones represented Hayward as entering 2022 with a "very strong order file" and "see[s] and expect[s] a strong volume metric period in Q2." *Id.* at ¶ 172. When an analyst asked why the guidance was not higher given Hayward's purported order file and share gains, Jones explained there was a "level of conservatism built into our forecast here… it's fair to say that the guidance we've given right now does have an element of conservatism." *Id.* at ¶ 181. Rather than a "conservative" picture of volume growth, Plaintiff maintains that there was already substantially inflating volume growth in 2022. *Id.* at ¶ 182.

Concurrently, Defendants issued a press release claiming a "continuation of robust organic growth in net sales" and that "entering 2022 with significant momentum, we remain encouraged by underlying industry demand levels supported by both new construction and aftermarket activity." *Id.* at ¶ 186. Hayward's increase in net sales for 4Q-

2021 was described as "primarily" due to "continued demand in residential pool equipment sales," that sales growth benefitted from a "robust demand environment for outdoor living products" and "increased capacity and capabilities leading to higher output" of Hayward's production. *Id.* at ¶ 188. Hayward was represented as "well positioned to deliver continued net sales and adjusted EBITDA growth in 2022 following the tremendous success in 2021 given the sustainable secular trends driving demand for pool products." *Id.* at ¶ 190.

### 6. *March 9, 2022 Form 10-K FY 2021*

The FY 2021 10-K was signed by Holleran, Jones, Bertrand, Brenneman, Brown, McFadden, and Walsh. *Id.* at ¶ 192. Hayward claimed that, for FY 2021, "[t]he increase in net sales was primarily the result of higher volumes, mainly in residential pool equipment sales from continued demand for pool upgrades and increasing new pool construction" and attributed its increase in net sales in North America and Europe primarily to "robust" and "strong" demand. *Id.* at ¶ 194.

### 7. *April 28, 2022, 1Q-2022 Earnings Call and Press Release*

During the 1Q-2022 earnings call and accompanying press release, when an analyst asked if there were "any signs of consumer spending slowing down or cancellations in the file," Holleran answered: "We really haven't seen any kind of cancellations. We're in pretty close contact with both channel partners and our dealers… [W]e're still seeing robust demand and the order file on the books is still very strong." *Id.* at ¶¶ 198, 200, 202. When another analyst who was concerned about channel "restocking" asked "what your view of the channel partners is in terms of their inventory," Holleran responded: "we do keep close tabs on it with our channel partners to make sure we all feel comfortable with the amount of inventory" and that "we feel comfortable with our inventory position from a days on hand standpoint here at the start of the season." *Id.* at ¶ 205. While Holleran acknowledged that channel inventory was "largely replenished," he claimed additional inventory was needed to support "overall industry growth." *Id.* at ¶ 207. Holleran also explained that the FY 2022 "guidance assumes that there will be greater sell out than sell into the channel during the 2022 season." *Id.* at ¶ 245.

When an analyst inquired why Hayward's inventory was "growing faster than sales by quite a bit the last few quarters," Jones responded that 80% of the inventory climb was to meet channel demand: "Knowing the demand curve that we see out in the future, we are manufacturing certain products in terms of finished goods to get in into inventory to be a --an important position to be able to service the market." *Id.* at ¶¶ 211-12. Jones also represented that "the underlying growth drivers remain very strong" and "everything is pointing to strength in the industry and strength for Hayward. So in terms of our guidance, it really reflects just a cautionary view on how the second half may develop ..." *Id.* at ¶ 215.

The April 2022 press release claimed that "[n]et sales continue to be driven by trends in aftermarket upgrades and consumer investments in outdoor living spaces," and that "[n]et sales growth during the quarter was the result of higher volumes driven by production capabilities. *Id.* at ¶ 220. Hayward also claimed in the April 2022 Press Release

that it "remains well positioned to achieve net sales and adjusted EBITDA growth for the full year following the strong start in the first quarter of 2022," that "underlying market trends remain positive," and that both of those points supported the FY 2022 guidance. *Id.* at ¶ 223.

### 8. *April 29, 2022 Form 10-Q for 1Q-2022*

Hayward claimed that for the quarter its volume growth in net sales was mainly driven by demand for "new products" rather than management's campaign of discounting, pull-aheads, and similar tactics. *Id.* at ¶ 226.

### 9. *May 2 and 3, 2022 Automatic Shelf Registration (Form S-3) and Prospectus Supplement*

On May 2, 2022, Hayward filed Form S-3, which incorporated by reference Hayward's 10-K for 2021 and 10Q for 1Q-2022, including allegedly false and misleading statements in those two documents. *Id.* at ¶¶ 229, 231. On May 3, 2022, Hayward also filed a Prospectus Supplement in connection with a secondary public offering. The Prospectus Supplement, which was updated on May 4, 2022, incorporated the same statements from the Form S-3. *Id.* at ¶ 233.

### 10. *June 9, 2022 Conference Call*

During the June conference call, Holleran touted Hayward's "42% revenue growth LTM [last twelve months] through Q1 of this past year," which he claimed resulted from Hayward's ability to execute on "key drivers," including the creation of "specialization in our sales and commercial team where we have hunters and we have folks who manage the channel partnerships." *Id.* at ¶ 235. When an analyst asked about product flow, Jones represented: "we haven't seen demand destruction at the end of the channel right now. I still think there's pent-up demand for new construction." *Id.* at ¶ 237.

### 11. *July 28, 2022 Press Release and Earnings Call*

Hayward announced net sales for 2Q-2022 increased 10% and reduced its guidance for FY 2022 from the 9-12% increase predicted in March and late April 2022, to a projected net sales decline of 2-6% due to numerous factors including inflationary headwinds, reduction in European sales due to the Ukraine war's impact on customer sentiment, poor weather, and distributors' decision to reduce safety stocks. *Id.* at ¶¶ 251-53; Hayward Mot., Ex. 27 at 6-7, ECF No. 97-32. During the conference call, Holleran and Jones finally and fully disclosed that the channel was long saturated with inventory, that demand from the channel had consequently dropped significantly, Hayward was having difficulty selling to the channel, and that Hayward's own inventory, along with the expense thereof, was increasing because Hayward was manufacturing far in excess of its demand. *Id.* at ¶ 259.

### E. Procedural History

On December 19, 2023, the Court consolidated two separately instituted suits and appointed Fulton as Lead Plaintiff. *See* ECF Nos. 29, 30. Defendants filed a motion to

dismiss, which was granted on October 2, 2024. ECF Nos. 89, 90. Count I - violations of § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b–5, of the March 4, 2021 consolidated amended complaint was dismissed without prejudice against the Hayward Defendants and dismissed with prejudice against MSD Partners, L.P. and CCMP Advisors. Count II, shareholder control liability claims under § § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), was dismissed without prejudice.

Count I of the ACC realleges violations of § 10(b) and Rule 10b-5 against the Hayward Defendants. Count II alleges violations of § 20(a) of the Exchange Act against the CCMP Entities, MSD Entities, and additional CCMP and MSD affiliated entities and individuals. The Hayward Defendants, the CCMP Defendants, and the MSD Defendants separately move to dismiss the ACC.

## II.  DISCUSSION

### A.  Motion to Dismiss Standard

Rule 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if the plaintiff fails to state a claim upon which relief can be granted. The moving party bears the burden of showing that no claim has been stated. *Hedges v. United States,* 404 F.3d 744, 750 (3d Cir. 2005). Dismissal is appropriate only if, accepting all the facts alleged in the complaint as true, the plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007); *see also Umland v. PLANCO Fin. Serv., Inc.,* 542 F.3d 59, 64 (3d Cir. 2008). This assumption of truth is inapplicable, however, to legal conclusions couched as factual allegations or to "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal,* 556 U.S. 662 (2009). Although a complaint need not contain detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555. Thus, the factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, *see id.* at 570, such that the court may "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 556). While "[t]he plausibility standard is not akin to a probability requirement' ... it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

While a court "may not consider matters extraneous to the pleadings," *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997), it may "consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). Here, Defendants attach SEC filings and other public documents as exhibits to their motion to dismiss, which the Court may consider as those documents contain the alleged misstatements.

B. <u>Count I - §10(b), Rule 10b-5</u>

To state a claim for fraud in connection with the sale or purchase of securities under §10(b) and Rule 10b–5, Plaintiff must show that the Hayward Defendants: (1) made a misstatement or omission of a material fact, (2) with scienter, (3) in connection with the purchase or sale of a security, (4) upon which the plaintiff reasonably relied, (5) economic loss; and (6) loss causation. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011) (internal quotations omitted). The "materiality requirement is satisfied when there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *Id.* at 38 (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32, 238 (1988)). "Scienter is a 'mental state embracing intent to deceive, manipulate, or defraud,' *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n. 12 (1976), and requires a knowing or reckless state of mind." *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009).

Given the volume of alleged misstatements, the Court addresses them by category: (1) elevated channel inventory; (2) stalling channel demand; (3) Hayward's difficulty selling to the channel and use of tactics to prop up sales such as discounts, pull aheads and threats; (4) distributor order cancellations and returns; (5) Hayward's own excess inventory; (6) Hayward's FY 2022 guidance; and 7) already materialized risk warnings. Defendants maintain that their forward-looking statements are protected under the Safe Harbor provision of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, *et seq.,* and that Plaintiff's other statements fail to meet the first and second elements of a § 10(b) claim.

*1. Safe Harbor*

The Safe Harbor provision of the PSLRA, 15 U.S.C. § 78u-5(c)(1), protects forward-looking statements that are: "(1) identified as such, and accompanied by meaningful cautionary statements; or (2) immaterial; or (3) made without actual knowledge that the statement was false or misleading." *In re Aetna, Inc. Sec. Litig.,* 617 F.3d 272, 278–79 (3d Cir. 2010); 15 U.S.C. § 78u–5(c)(1); *see also GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 242 (3d Cir. 2004). The requirements surrounding liability for a forward-looking oral statement are similar. 15 U.S.C. § 78u–5(c)(2). A forward-looking statement is "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items." 15 U.S.C. § 78u–5(i). "[F]orward-looking statements include 'any statement of the assumptions underlying or relating to any statement described' in the definition." *Avaya*, 564 F.3d at 255 (citing § 78u–5(i)(1)(D)).

a. <u>Forward-Looking Statements</u>

Plaintiff, though insisting that statements regarding Hayward's FY 2022 guidance are still actionable, does not dispute that some of those statements are at least forward-looking. *See* Pl.'s Opp. Br. at 26; ACC ¶¶ 174, 180, 181, 214, 215. Statements that the

Court deems also to be forward-looking include: ¶ 176 (basis for FY 2022 "reflects strong carryover demand" and "conversion of current order file"), ¶ 190 ("Hayward is well positioned to deliver continued net sales and adjusted EBITDA growth in 2022"); ¶ 223 ("Hayward remains well positioned to achieve net sales and adjusted EBITDA growth for the full year" and "reaffirming its outlook" for FY 2022), ¶ 150 ("we remain confident in our ability to continue executing our growth initiatives"), ¶ 186 ("entering 2022 with significant momentum, we remain encouraged by underlying industry demand levels"), ¶ 215 ("everything is pointing to strength in the industry and strength for Hayward"). *See e.g., Avaya,* 564 F.3d at 254-56 (concluding that statement: "Our first quarter results position us to meet our goals for the year" and "we are on track to meet our goals for the year, even though there were some aspects to our performance that are below our expectations and that we are working on to improve" expressed comfort with and was reaffirmation of a future projection and thus forward-looking).

In contrast, in "mixed present/future statements" that contain reference to both future predictions and *current* channel inventory, demand, order files, or cancellations, the part of the statement that refers to the present is not entitled to safe harbor protection. *See id.* at 255-56 (discussing *Makor Issues & Rights, Ltd. v. Tellabs Inc. (Tellabs II),* 513 F.3d 702, 705 (7th Cir. 2008) (finding that sales were "still going strong" meant both that current sales were strong and would continue to be so and representation concerning current sales not protected by safe harbor) and *In re Stone & Webster, Inc., Sec. Litig.,* 414 F.3d 187, 207 (1st Cir. 2005) (deciding statement that company "has on hand and has access to sufficient sources of funds to meet its anticipated ... needs" was not forward-looking given company's alleged dire cash shortage was then present fact)). In this case, forward-looking statements that contain a present component include: ¶ 172 ("we've entered '22 with a very strong order file" and "see and expect a strong volume metric" in Q2); ¶ 130 (October 27, 2021 Earnings Call "Updated 2021 Financial Outlook" reflects that "[t]rade customer backlogs continue to support healthy demand"); ¶ 178 ("[i]f retail demand and pull-through continue on the robust pace we've seen in the last 2 years in absolute terms, there could be some increase to support the forward-looking days on hand."); ¶ 212 ("Knowing the demand curve that we see out in the future, we are manufacturing certain products in terms of finished goods to get in into inventory to be a – an important position to be able to service the market"). *See e.g., Ortiz v. Canopy Growth Corp.,* 537 F. Supp. 3d 621, 642, 663 (D.N.J. 2021) (noting statements that inventories are scaled to current expectations of market demand are "plainly expressions of management's expectation that their current levels of inventory are appropriate for what they anticipate demand will be in the future" and are forward-looking but have present-focused component in that they allegedly served as pretext to conceal company's overproduction of inventory) (citing *Avaya,* 564 F.3d at 255)); *see also Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.,* 720 F. Supp. 2d 517, 532 (D.N.J. 2010) (finding statements relating to "present value of the backlog" were not forward-looking but backlog as a predictor of future performance was forward-looking). Safe Harbor does not apply to the part of statements that refer to the present, but

11

to be actionable, must be false or misleading as to a material fact and made with scienter. *See* discussion *infra* II.B.2,3.

      b.  Actual Knowledge of Falsity

Assuming Plaintiff is correct that the forward-looking statements are material and that no meaningful cautionary language accompanied those statements, liability does not attach if the plaintiff "fails to prove that the forward-looking statement ... was made with actual knowledge ... that the statement was false or misleading." 15 U.S.C. § 78u–5 (c)(1)(B)(i). To be actionable, Plaintiff must allege facts that "give rise to a strong inference that defendants actually knew of the statements' falsity." *Avaya,* 564 F.3d at 259.

Plaintiff claims that by late 2021, Holleran and Jones had actual knowledge that Hayward's order volume was actually set to decrease in FY 2022 contrary to the 9-12% net sales guidance for FY 2022 given in March 2022. *Id.* at ¶¶ 174, 180. As support, Plaintiff points to Holleran's statement during the July 28, 2022 2Q-2022 earnings call that "[w]e expected to sell less into the channel versus sellout due to the strategic positions that many of our channel partners took at the end of 2021." *Id.* at ¶¶ 93, 175, 258. Holleran also stated in July 2022 that "[o]verall, when we set coming into the year, with last year's retail pull-through in front of us, we expected some moderation off a very, very high pull through the channel last year." *Id.* at ¶¶ 93, 257. The Court disagrees that these statements show that Hayward had "long" expected a lower volume of orders. The July 2022 statements do not suggest *when* Hayward learned of the channel partners' "strategic positions" or the extent of the moderation they expected. In any event, the expectation of decreased sales does not provide a strong inference that Holleran and Jones had actual knowledge that Hayward's 2022 guidance was false or misleading.

Moreover, because the CW statements do not support an inference of scienter for statements of current fact, *see* discussion *infra,* II.B.4.ii, they cannot support Plaintiff's allegation of actual knowledge for forward-looking statements. *See Avaya,* 564 F.3d at 274 ("Since this [Safe Harbor] provision specifies an 'actual knowledge' standard, the scienter requirement for forward-looking statements is stricter than that for statements of current fact. Whereas liability for the latter requires a showing of either knowing falsity or recklessness, liability for the former attaches only upon proof of knowing falsity." (citations omitted). Defendants' forward-looking statements fall within the protection of the PSLRA's Safe Harbor provision.

      2.  *Misstatement or Omission*

      a.  Levels of Channel Inventory, Demand, and Sales

Plaintiff challenges as false or misleading statements denying or downplaying that Hayward had excess inventory, channel demand for Hayward's products was plummeting, and sales results were being manufactured by sales campaigns including discounts, sales blitzes, and pressure tactics. For instance, in October 2021, Holleran represented that inventories were "in a healthier position" than in previous quarters but "not ideal" and that

there was "certainly not too much" improvement from a "days-on-hand standpoint," assuring investors that Hayward Defendants were keeping "close tabs" and had "good insight from our large distributor partners" on channel inventory and demand. *Id.* at ¶¶ 122, 124, 126. Holleran explained that order "backlog does stretch certainly into 2022," that it was at "elevated levels" despite "production capacity improvements," and further that this backlog "certainly supports volume growth." *Id.* at ¶ 128. Holleran and Jones made similar statements in March and April 2022 regarding inventory levels and backlog of orders. *See id.* at ¶¶ 166, 170, 200, 204, 205, 207, 209. Sales and growth were also purportedly sustained by demand that was described as "healthy," "sustained," "strong," "robust," and "continued." *See id.* at ¶¶ 130, 133, 135, 138, 157, 159, 183, 188, 194, 202, 217, 226, 237.

According to Plaintiff, statements that channel inventory had not changed much were purportedly false because by mid-2021, there was up to 2 years or $150 million of excess channel inventory. *Id.* at ¶ 123. As evidence of falsity, Plaintiff points to Hayward's disclosure in 3Q-2022 indicating that total channel inventory correction was expected to be between "$120 million to $150 million." *Id.* at ¶ 265. However, this statement was made three months after the end of the Class Period and fails to show what the channel inventory was at the time each challenged statement was made.

To the extent Plaintiff relies on CW statements to plead falsity, the Court notes that confidential sources need not be named "provided they are described in the Complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.,* 394 F.3d 126, 146 (3d Cir. 2004) (citing *Novak v. Kasaks,* 216 F.3d 300, 314 (2d Cir. 2000), *cert. denied,* 531 U.S. 1012 (2000) (emphasis in original)). Confidential witness allegations must also be "adequately particularized." *Avaya,* 564 F.3d at 263. "[C]ourts should assess the 'detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia.'" *Rahman v. Kid Brands, Inc.,* 736 F.3d 237, 244 (3d Cir. 2013) (citing *Avaya,* 564 F.3d at 261). "If, after that assessment, 'anonymous source allegations are found wanting with respect to these criteria ... [courts] must discount them steeply.'" *Avaya,* 564 F.3d at 261. For instance, CW statements that are "generic and conclusory allegations based upon rumor or conjecture" or lack indicia of reliability, must be discounted. *See California Pub. Employees' Ret. Sys.,* 394 F.3d at 155.

The Court steeply discounts CW statements that are based on rumor or that lack other indicia of reliability such as the following: CW1, a Senior Product Marketing Manager from 2016 to December 2022 who worked in New Jersey and North Carolina, recalled "hearing" that the "channel was stuffed" and that concern of excess inventory was "general knowledge around the Company" and "'water cooler talk,'" ACC ¶¶ 62-63; CW2, who worked in sales on the west coast from January 2016 to September 2022 and was a District Sales Manager from November 2020 to September 2022, "began to hear about excess inventory at distributors," stating that "everyone discussed it," and that one of Hayward's large pool products distributors "at one point" had 2 years-worth of Hayward

products, *id.* at ¶¶ 65, 68; CW2 attended monthly or quarterly sales meetings without specifying when those meetings occurred or what "inventory issues in 2021" the VP of Sales discussed, *id.* at ¶ 90; CW3, a Senior Business Intelligence Visualization Developer, "saw" that the supply chain bubble popped later in 2021, *id.* at ¶¶ 70, 95; CW4, Hayward's Director of Shipping Operations from September 2021 to April 2022 responsible for day-to-day shipping of finished materials from the Mocksville, North Carolina, warehouse to vendors, "saw" there were "'general concerns'" that Hayward was not "selling enough." *Id.* at ¶¶ 79-80; CW5, a Quality Manager from September 2011 to July 2022 at the Nashville, TN plant, stated "there was 'absolutely' awareness" that Hayward held too much inventory near the end of 2021, *id.* at ¶¶ 106-07; CW6, a Global Commodity Manager of Electronics from February 2016 to December 2022 in the Rhode Island office, concluded "all the evidence was there" such that "anyone" in "management definitely would have known" that the channel was full. *Id.* at ¶¶ 108-10.

In contrast, some CW statements need little to no discounting. *See e.g,* ACC ¶¶ 65-66 (CW2 heard "directly from distributors in 2021 that they simply had too much inventory already, about two years' worth" and thus were not going to load up on additional product); ¶¶ 76-77 (CW1 stated that in mid-2021, management requested that marketing teams develop programs to "'get product off the shelves,'" such as offering discounts on increased volume of an order); ¶¶ 80-83 (CW4 recalled that during daily staff meeting in October 2021, first instruction came to "pull ahead" future orders). In sum, there are enough reliable CW statements that taken together, corroborate one another and support Plaintiff's claims that statements denying excess channel inventory, downplaying the improvement of order backlogs, and portraying demand as "sustained," "robust," or "healthy," were false or misleading. *See Makor Issues & Rights, Ltd. v. Tellabs, Inc.,* 437 F.3d 588, 597 (7th Cir. 2006) (holding that statement that demand for company's product was strong - "[w]e're still seeing that product continue to *maintain its growth rate;* it's still experiencing strong acceptance" - went beyond puffery as it was "misleading to describe a decline as equivalent to a continued growth rate"), *vacated on other grounds by Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007).

b. Cancellations and Returns

During the March 2, 2022 Q4-2021 earnings calls, Holleran stated that Hayward saw only "negligible cancellations." ACC ¶ 164; *see also* ¶ 198 (April 28, 2022 statement that "[w]e haven't seen any kind of cancellations"). Plaintiff contends that these were false statements because Hayward had such a large number of cancellations and returned orders that around the end of February 2022, Jones asked CW3 to compile reports on inventory backlog and cancellations. *Id.* at ¶ 95; *see id.* at ¶ 9 (alleging Jones received cancellation reports *by* February 2022), ¶ 95 (CW3 believed cancellations and lack of new orders began around March 2022). Through CW3's job duties, CW3 had visibility into how much inventory Hayward had on hand and published these reports on a Tableau dashboard (a visual analytics platform) that Jones could view. *Id.* Additionally, inventory, sales, and

purchasing data were also stored in a program called Snowflake and a database called Cognos. *Id.* at ¶¶ 78, 95, 271.

But as the Hayward Defendants rightly note, CW3 does not allege the basis for concluding Hayward was getting "hammered" by distributors who no longer wanted their orders, what information these reports contained, specifically whether they contradicted any challenged statements, when these cancellations occurred, or whether and when Jones even viewed the reports. *Id.* at ¶ 96; *see San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc.,* 75 F.3d 801, 812–13 (2d Cir. 1996) ("[R]eferences to unreleased or internal information that allegedly contradict[s] [defendants'] public statements" should indicate such matters as "who prepared the projected figures, when they were prepared, how firm the numbers were, or which [company] officers reviewed them." (citing *Arazie v. Mullane,* 2 F.3d 1456, 1467 (7th Cir.1993)).

The Court discounts CW4's general recollection of order rejections, of CW6's recollection of "talks" of large-scale returns, *see* ACC ¶ 97, and of CW3's recollection that the cancellation of a special order for heaters resulted in Hayward being "stuck" with $11 million of inventory, *id.* at ¶ 95. Even if such recollections are not based on rumor, the ACC does not provide particularized facts including when those rejections or cancellations occurred. Plaintiff fails to plead sufficient facts to show that Holleran and Jones's statements regarding cancellation of orders were false or misleading, and even if they were, that the Hayward Defendants acted with scienter. *See* discussion *infra* II.B.4.

### c. Hayward's Inventory

Jones reported in 3Q-2022 that Hayward was holding approximately 6 weeks of extra inventory. ACC ¶ 265. Plaintiff does not challenge Hayward's business decision regarding production levels or dispute that Hayward reported its $100 million stock of finished products. *See id.* at ¶ 213; Pl.'s Opp. at 24. Instead, Plaintiff argues that statements that Hayward was "improving production levels" were false because management had actually ordered Hayward's production to slow down due to reduced demand. *Id.* at ¶ 128. According to CW5, at the end of 2021 and start of 2022, the "manufacturing team received a directive from corporate to 'slow down operations.'" *Id.* at ¶¶ 106-07. Despite any manufacturing slow-down order in CW5's Nashville plant, it is unclear whether that directive applied broadly to other plants as well. In fact, Plaintiff insists that contrary to a slow-down order, Hayward did not prioritize "lean manufacturing," "enlarged its manufacturing output," and continued to purchase large quantities of raw materials. *See id.* at ¶¶ 100-01, 105, 107, 129, 130, 212-13. That would appear to make true Holleran and Jones's statement that Hayward was increasing production levels. Plaintiff has not plausibly pled that statements that Hayward was still focused on increasing production were false or misleading and even if they were, that those statements were made with the requisite intent. *See* discussion *infra* II.B.4.

### d. Hayward's Risk Disclosures

Plaintiff challenges Hayward's risk disclosures, *see* ¶¶ 141-42, 144-46, 154, 161, 196, 228, 232-33, as false or misleading claiming that the risks had already occurred at the time the warnings were issued. *See Williams v. Globus Med., Inc.,* 869 F.3d 235, 242 (3d Cir. 2017) ("[A] company may be liable under Section 10b for misleading investors when it describes as hypothetical a risk that has already come to fruition."). For instance, Plaintiff warned that customers "could stop distributing our products or reduce sales of our products" or there could be a "reduction, or delay in purchases" which "could have a material adverse effect on our business, financial condition, results of operations and cash flows" had already materialized. *Id.* at ¶¶ 141-42. The risks warned of are "material adverse effects" on "business, financial condition, results of operations and cash flows." *See Williams,* 869 F.3d at 242 (determining that where warning was that loss of independent distributor could affect sales, despite allegation that loss of distributor *in fact* had occurred, the "risk actually warned of is the risk of adverse effects on sales – not simply the loss of independent distributors generally" so "risk at issue only materialized … if sales were adversely affected at the time the risk disclosures were made."). Taking as true that Hayward already had too much inventory or sales and demand had stalled, Plaintiff's claim that "a material adverse effect" had already materialized by mid-2021 is conclusory and not particularized. *See* Pl. Opp'n at 25; ACC ¶¶ 143 (reduction of sales, ordering, and purchases of Hayward products had *actually* been occurring since mid-2021 and "*already* 'having a material adverse effect' on Hayward's 'business'"), ¶ 147 (alleging "conditions" [Hayward *could* be unable to effectively manage and sustain growth or scale operations, *could* be unable to manage inventory efficiently, and growth *may* not be sustainable] were *already* having a "material and adverse effect" on Hayward).

Additionally, because Plaintiff has not sufficiently pled that statements relating to cancellation/return of orders or Hayward's inventory were false or misleading at the time they were made, *see* discussion *supra,* II.B.2.b,c, Plaintiff cannot prove that the risk disclosures relating to those issues had already materialized. *See Hurwitz v. LRR Energy, L.P.,* 241 F. Supp. 3d 491, 504–05 (D. Del. 2017) ("[I]f plaintiff is able to prove the allegations in the Complaint, the 'cautionary statements would themselves be misleading.'" (citing *In re MobileMedia Sec. Litig.,* 28 F. Supp. 2d 901, 930 (D.N.J. 1998)).

### 3. Material Fact

"[S]ubjective analysis or extrapolations, such as opinions, motives and intentions, or general statements of optimism" are "no more than 'puffery' and are understood by reasonable investors as such." *In re Aetna,* 617 F.3d at 283 (internal quotes and citations omitted). Positive portrayals, expressions of general optimism about a company's financial health and projections about financial growth are not actionable under § 10(b). *Key Equity Investors, Inc. v. Sel-Leb Marketing Inc.,* 246 Fed. Appx. 780, 785 (3d Cir. 2007); *see e.g., In re Aetna,* 617 F.3d at 284 (finding statements "[w]e continue to adhere to a disciplined

pricing policy" and "[w]e have a very strong amount of pricing discipline" to be too vague to be material). Generally, statements about "strong" and "record" financial results constitute puffery. *In re Hertz Glob. Holdings, Inc. Sec. Litig.,* No. 13-7050, 2017 WL 1536223, at \*11 (D.N.J. Apr. 27, 2017), *aff'd sub nom. In re Hertz Glob. Holdings Inc.,* 905 F.3d 106 (3d Cir. 2018); *In re Nice Sys., Ltd. Sec. Litig.,* 135 F. Supp. 2d 551, 580 (D.N.J. 2001) ("strong competitive position" was puffery). In contrast, statements that are "determinate" and "verifiable" are not puffery. *Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pension Fund,* 575 U.S. 175, 184 (2015); *see e.g., In re Urb. Outfitters, Inc. Sec. Litig.,* 103 F. Supp. 3d 635, 651 (E.D. Pa. 2015) (finding alleged misstatements and omissions implying strong demand for company products were material and not puffery).

Here, statements that the Court finds are too vague to be actionable include: ¶ 205 ("we feel comfortable with our [channel] inventory position from a days on hand standpoint here at the start of the season"); ¶ 168 ("it's not a perfectly balanced inventory from a SKU standpoint, but we're working hard to solve that"); ¶ 236 (stating revenue growth came from "drivers," sales force "specialization," or "manage[ment]" of "channel partnerships").

Holleran's October 27, 2021 statements that "the mix of that inventory may not be as ideal as any of us would like it, … I think we're taking some extra shelf space right now," *id.* at ¶ 126, "certainly not too much by any means," *id.* at ¶ 122, or "I think it's a very credible order file," *id.* at ¶ 164, are opinion. Even where there are no signaling words such as I "think" or "believe," the Court agrees with Defendants that these statements express personal judgment that is not based on objective or verifiable fact. However even an opinion statement is misleading and actionable "if it: (i) was not sincerely believed when made; (ii) contains an expressly embedded, untrue factual assertion; or (iii) reasonably implies untrue facts and omits appropriate qualifying language." *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.,* 70 F.4th 668, 686 (3d Cir. 2023) (discussing *Omnicare, Inc.,* 575 U.S. 175). As discussed above, Plaintiff has sufficiently pled that statements denying elevated inventory and suggesting strong demand and sales are untrue factual assertions or imply untrue facts making these opinion statements misleading and actionable under *Omnicare.*

### 4. Scienter

Unlike Rule 9(b), which permits state of mind to be plead generally, PSLRA's "[e]xacting pleading standard for scienter" requires that a securities fraud complaint, as to each act or omission, state "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2); *Tellabs,* 551 U.S. at 313; *City of Warren,* 70 F.4th at 681, n.1. "Scienter" means "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs,* 551 U.S. at 308. "The inference [of] scienter need not be irrefutable, *i.e.,* of the 'smoking-gun genre, or even the most plausible of competing inferences." *Id.* (internal quotation and citation omitted). But it must be "more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Id.* at 324. "Omissions and

ambiguities count against inferring scienter." *Id.* at 326. "[A] court must consider plausible, nonculpable explanations for the defendant's conduct." *Id.* at 324. The determination of scienter requires that all allegations in the complaint be "considered collectively." *Id.* at 325. "Accordingly, as with all totality-of-the circumstances tests, [the Court's] analysis will be case specific. It will ultimately rest not on the presence or absence of certain types of allegations but on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter." *Avaya, Inc.,* 564 F.3d at 269.

Plaintiffs may establish a "strong inference" of scienter either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *GSC Partners CDO Fund*, 368 F.3d at 237 (internal quotes and citation omitted).

### i.  Motive and Opportunity

"[M]otive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference," *Tellabs,* 551 U.S. at 325, but allegations of "motive and opportunity may not serve as an independent route to scienter." *Avaya,* 564 F.3d at 277. Though motive need not be plead to establish scienter, "its presence can be persuasive when conducting a holistic review of the evidence." *Rahman,* 736 F.3d at 245 (citing *Tellabs,* 551 U.S. at 325–26). If motive is alleged, "'[m]otives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from this fraud.'" *Id.* at 245-46 (citing *Avaya,* 564 F.3d at 278). A stock sale that is "unusual in scope or timing" may support motive to commit fraud. *In re Suprema Specialties, Inc. Sec. Litig.,* 438 F.3d 256, 277 (3d Cir. 2006) (citations and quotations omitted). "Whether a sale is 'unusual in scope' depends on factors such as 'the amount of profit made, the amount of stock traded, the portion of stockholdings sold, or the number of insiders involved.'" *Id.* at 277 (internal citation omitted). The failure to plead motive is not fatal, but "its presence can be persuasive when conducting a holistic review of the evidence." *Rahman,* 736 F.3d at 245. The lack of a convincing motive "may raise the threshold of persuasion regarding conscious disregard or recklessness." *Ortiz,* 537 F. Supp. 3d at 678 (citing *GSC Partners*, 368 F.3d at 238 (lack of motive may require that quantum of other proof "be correspondingly greater.")).

At the outset, the Hayward Defendants claim that stock sales made by Holleran and Jones pursuant to an automatic 10b5-1 trading plan are "of minimal value in establishing an inference of scienter." *In re Synchronoss Techs., Inc. Sec. Litig.,* No. 17-2978, 2020 WL 2786936, at *17 (D.N.J. May 29, 2020). In considering sales under a 10b5-1 trading plan, the adoption date of the plan is crucial. Without that date, the Court cannot determine whether a 10b5-1 plan may have been established or modified while in possession of material nonpublic information or whether "such trading plans removed entirely from defendants' discretion the question of when sales would occur or that they were unable to

amend these trading plans." *Mississippi Pub. Employees' Ret. Sys. v. Bos. Sci. Corp.,* 523 F.3d 75, 92 (1st Cir. 2008). Here, because Defendants have not disclosed the date that the plan was adopted, the fact that stock sales occurred pursuant to the 10b5-1 plans do not preclude an inference of scienter. *See Dang v. Amarin Corp. plc,* 750 F. Supp. 3d 431, 480, n.34 (D.N.J. 2024) ("the cases do not support imposing a 'burden' on Plaintiffs to affirmatively plead how the Rule 10b5-1 plans do not undermine the scienter allegations"); *but see In re Synchronoss Techs.,* 2020 WL 2786936, at *17 ("it is Plaintiff's burden to allege when the Plan was adopted or amended.").

On March 16, 2021 before the start of the Class Period, Holleran sold 24,528 shares (5.12%)[2] pursuant to a Rule 10b5-1 trading plan, compared to a sale of 50,272 of his 454,185 shares (11%) during the Class Period. *See* ACC ¶ 309. Specifically, on November 4, 2021, he sold 12,772 shares (2.81% of his Hayward shares); on December 20, 2021, he sold 19,709 shares (4.46%); on December 21, 2021, Holleran sold 17,791 shares (4.22%). *Id.* at ¶ 300. Holleran's stock sales are relatively small. *See Avaya,* 564 F.3d at 279 (no scienter from sale of 1.7% for $1.4 million proceeds and 17.7% for $3.77 million proceeds where trading practices remained consistent year-over-year and each defendant retained large percentage of common stock holdings); *In re Suprema Specialties,* 438 F.3d at 277-78 (scienter supported by defendants' sale of over 30% holdings at a time when stock price was artificially inflated as a result of the scheme and occurred suspiciously 6 weeks before resignations). Here, the timing of the sales in November and December 2021 and in June 2022 is not particularly suspicious in light of the relatively small percentage of holdings that were traded, which weakens any inference of scienter.

Jones's exercise of stock options also does support an inference of scienter. In the period between the IPO and start of the Class Period, pursuant to a Rule 10b5-1 trading plan, Jones sold 83,000 (26.46%) shares in contrast to 189,945 shares (52%) sold during the Class Period. ACC ¶ 309. Specifically, share sales occurred during the Class Period as follows: on November 16, 2021, he sold 25,000 shares (29.33%); on November 17, 2021, he sold 8,410 shares (13.96%); on November 18, 2021, he sold 13,483 shares (26.02%); on November 19, 2021, he sold 2,551 shares (6.65%). *Id.* at ¶ 299. Jones's largest stock transaction occurred on June 17, 2022 when he exercised an option to purchase 280,000 shares of stock and then sold 140,501 shares of that stock (44.5%) of his Hayward stock generating $1.95 million in proceeds. *Id.* at ¶ 297. The exercise of these options and corresponding sales were part of time-restricted options with a vesting schedule that Jones was awarded in April 2020 and did not expire until April 2030. *Id.* at ¶ 298. Exercising time-restricted stock options upon vesting is a standard practice that does not, by itself, suggest scienter. Plaintiff suggests that the timing is suspicious because June 2022 was Jones's last chance to buy and sell stock before the truth was disclosed the following month. The Court disagrees. Jones's largest stock transaction occurred five months after January 2022 when Plaintiff alleges that the "truth" began to emerge, *see id.* at ¶¶ 239-266, and

---

[2] For purposes of this motion, the Court accepts as true the percentage calculations in the ACC.

when Hayward stock was nearly $8 lower than it was at the end of January 2022, *see id.* at ¶ 242. In addition, Jones's sale was immediately after exercising an option to purchase stocks, which could have been to fund attendant tax liabilities. *See In re Astea Int'l Inc. Sec. Litig.*, No. 06-1467, 2007 WL 2306586, at *14 (E.D. Pa. Aug. 9, 2007) (no scienter where "sales by the individual defendants were based on the exercise of stock options"); *In re Radian Sec. Litig.,* 612 F. Supp. 2d 594, 611 (E.D. Pa. 2009) ("sales to cover tax liabilities … weigh[] against an inference of scienter").

Also of note, Jones owned 85,227 shares of Hayward stock at the start of the Class Period but at the end of the Class Period, he owned 175,582 shares. *See* Hayward Defs.' Mot. at 32, App'x B. Although Jones sold shares during the Class Period, his purchase of 280,000 shares in that time more than doubled the shares he held at the start of the Class Period. This net increase of Jones's ownership of shares after the June 2022 options exercise weakens any inference of scienter. *See Radian,* 612 F. Supp. at 610-11 (finding inference of scienter not cogent or at least as compelling as inference of nonculpability where defendant increased investment in stock over course of class period); *Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.,* 28 F.4th 343, 355 (2d Cir. 2022) (finding no strong inference of scienter in part because defendants "bought more shares than they sold during the putative class period."). In sum, Jones's stock transactions and financial gains do not show motive to commit fraud and does not weigh heavily in favor of a scienter inference.

Next, Defendants argue that Hayward's initiative to repurchase $450 million of its own stock negates scienter because buying back stock signals confidence in its future. Plaintiff disagrees and posits that the standard repurchasing of shares from regular investors in the open market is inapposite in this case where the repurchase program consisted of CCMP Defendants and AIMCo unloading $380 million of stock for $105 million in profits and $161 million in stock for $37.7 million in profits, respectively, to Hayward and unsuspecting investors as part of the insider sell off. *See* ACC ¶¶ 287, 295, 307. However, sales by other defendants or nonparties such as Richard Roetken (Hayward's President, North America) and Fernando Blasco (Hayward's VP, General Manager, Europe & Rest of World), *see id.* at ¶¶ 301, 304, are not indicative of the state of mind of Holleran or Jones. Nor has Plaintiff alleged that either Holleran or Jones received concrete, personal benefit from the stock repurchases. *See Winer Fam. Tr. v. Queen*, 503 F.3d 319, 335 (3d Cir. 2007) (rejecting group pleading doctrine because "scienter must be pleaded in regards to 'each act or omission' sufficient to support a strong inference that 'the defendant' acted with the required state of mind." (citing 15 U.S.C. § 78u–4(b)(2)). Thus, the stock repurchase program does not negate or support an inference of scienter.

## ii.    Circumstantial Evidence

Scienter may be established by "setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior.'" *In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 534-35 (3d Cir. 1999), *overruled in part on other grounds*, *Tellabs*, 551 U.S. 308 (2007) (citing *Weiner v. Quaker Oats Co.,* 129 F.3d 310, 318 n.8 (3d Cir. 1997)). To prove

scienter by circumstantial evidence, "the plaintiff must support his allegations by detailing, with particularity, 'the who, what, when, where and how' of the events at issue and present clear facts verifying plaintiff's deductions with respect to defendant's state of mind." *In re Synchronoss Sec. Litig.*, 705 F. Supp. 2d 367, 400, n. 43 (D.N.J. 2010) (citing *In re Burlington Coat Factory*, 114 F.3d at 1422). Recklessness involves "not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *In re Advanta Corp.*, 180 F.3d at 535 (quoting *McLean v. Alexander,* 599 F.2d 1190, 1197 (3d Cir. 1979)). Reckless behavior should not be defined liberally, otherwise there is a risk of losing the distinction between scienter and negligence. *In re Digital Island Sec. Litig.,* 223 F. Supp. 2d 546, 555 (D. Del. 2002), *aff'd,* 357 F.3d 322 (3d Cir. 2004). "'Conscious misbehavior is alleged by stating with particularity facts giving rise to a strong inference of conscious wrongdoing, such as intentional fraud or other deliberate illegal behavior.'" *Roofer's Pension Fund v. Papa,* No. 16-2805, 2018 WL 3601229, at *18 (D.N.J. July 27, 2018) (citing *Aviva Partners LLC v. Exide Techs.,* No. 05-3098, 2007 WL 789083, at *12 (D.N.J. Mar. 13, 2007) (quotations omitted)).

To demonstrate an inference of nonfraudulent intent, Hayward Defendants insist that they made good faith statements and projections while navigating a global pandemic. Due to a spike in pandemic-related demand and shortages of raw materials, Hayward increased its purchase of raw materials to avoid production delays and meet demand. Notwithstanding sales growth in 2020 and 2021, Hayward lowered its guidance for 2022 (9-12%) and included warning of risk. During the earnings call on March 2, 2022, Holleran acknowledged that channel inventory was "getting back to more normal levels" and again in April 2022 that channel inventory was "largely replenished" and "in a much better position starting the 2022 season" than in the prior 2 years. *See* ACC ¶¶ 166, 202, 207. At the April 28, 2022 conference call, the expectation that sales into the channel would be less than sales from distributors to consumers was specifically disclosed: "[o]ur guidance assumes that there will be greater sell out than sell into the channel during the 2022 season." *Id.* at ¶ 245. After achieving net sales in the first half of 2022 consistent with its projections (10%), sales began to slow due to a variety of unforeseen developments,[3] which prompted the Hayward Defendants to proactively disclose that and revise their 2022 outlook to a projected decline in net sales of 2-6%.

To show an opposing inference of scienter, Plaintiff relies on the CW statements as well as statements by Holleran and Jones. First, the CW statements do not create a strong inference of reckless or conscious behavior. For example, CW6 recalled attending, along with 40-60 managers, monthly sales, inventory and operations planning meetings that were chaired by Holleran and attended by Jones. *Id.* at ¶ 111. However, CW6 does not indicate

---

[3] Hayward attributed the decline in sales volume to: inflationary headwinds, a reduction in European sales due to the Ukraine war's impact on consumer sentiment, poor weather in seasonal markets, and distributors' decision to reduce safety stocks due to improved supply chain and shorter lead times for specific products. Hayward Def. Mot. at 10.

when these regular monthly meetings began and assuming they occurred during the Class Period, discussion of "forecasting and sales, including 'what's selling good, what's not selling good,'" does not describe what Holleran or Jones learned or knew that made them aware their statements were false or misleading. *Id.* This account is "little more than generalized allegations with few specifics and even less concrete support." *Rahman,* 736 F.3d at 245. Allegations that "management definitely would have known" and "if C-Suite did not know about it, it was gross incompetence . . . they had to know" are conclusory and insufficient to establish a strong inference of scienter. *Id.* at ¶¶ 110-11; *see In re Advanta Corp.,* 180 F.3d at 539 ("It is well established that a pleading of scienter 'may not rest on a bare inference that a defendant 'must have had' knowledge of the facts.'" (quoting *Greenstone v. Cambex Corp.,* 975 F.2d 22, 26 (1st Cir.1992)); *Avaya, Inc.,* 564 F.3d at 263 (noting that "omissions and ambiguities" of confidential witness statements count against inferring scienter). "[A]llegations that a securities-fraud defendant, because of his position within the company, 'must have known' a statement was false or misleading are 'precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate to withstand Rule 9(b) scrutiny.'" *Id.* (quoting *Maldonado v. Dominguez,* 137 F.3d 1, 10 (1st Cir. 1998)).

Even if the Court had concluded earlier that statements regarding cancellations and returns, Hayward's inventory levels, and risk disclosures were false or misleading, those claims do not survive dismissal for the additional reason that Plaintiff fails to show that Holleran or Jones acted with scienter at the time those statements were made. For example, CW3's statements do not indicate whether or when Holleran or Jones accessed the inventory, sales, and cancellation reports that CW3 prepared. Additionally, because CW3 believed cancellations began around March 2022, it is not reasonable to infer that Holleran knew about cancellations when he made statements on the March 2, 2022 earnings call or that by the April 2022 earnings call, he knew about the contents of the reports that *Jones* had asked for. Although CW3 recounted that Jones raised concerns regarding $100 million of Hayward's unsold products, Plaintiff has clarified that it does not dispute Hayward's decision regarding production levels or that Hayward reported its stock of finished products. *See supra,* II.B.2.c. Plaintiff has also not pled facts that support its claim that Hayward's risk disclosures were made with recklessness or conscious misbehavior. Without "some additional allegation of specific information conveyed to management and related to the fraud," the Court declines to find scienter as to these issues under the "core operation doctrine." *Martin v. GNC Holdings, Inc.,* 757 F. App'x 151, 155 (3d Cir. 2018); *Rahman,* 736 F.3d at 246.

In contrast, an inference of reckless or conscious misbehavior is supported by the "content and context" of Holleran's and Jones's express denials or downplaying of channel inventory and demand issues in response to direct and repeated questions by analysts. *See* ACC ¶ 122, 163, 205 (Holleran); ¶¶ 211-12, 237 (Jones). Although the "specific nature of the analysts' inquiries, by itself" does not create a "strong inference of a culpable state of mind," the content (consistent denials or downplaying of issues) and context (specific analyst queries) support an inference of scienter. *See Avaya,* 564 F.3d at 270; *see e.g., In*

*re Urb. Outfitters,* 103 F. Supp. 3d at 653; *Roofer's Pension Fund,* 2018 WL 3601229, at *21. Even if Holleran and Jones did not know the "full extent" of issues alleged by Plaintiff, they "might be culpable as long as what [they] knew made obvious the risk that [their] confident, unhedged denials … would mislead investors." *Avaya,* 564 F.3d at 270. Repeated inquiries regarding channel inventory and demand levels would have alerted Holleran and Jones to the importance of those issues to the investing public. *See Roofer's Pension Fund,* 2018 WL 3601229, at *21. As in *Avaya,* "[g]iven the specificity and repetition of the analysts' questions," Holleran's position as CEO, Jones's position as CFO, and the purported state of Hayward's business at the time the questions were asked, Plaintiff has made a threshold showing that statements denying excess channel inventory, weak channel demand, and slowing sales were reckless. *See Avaya,* 564 F.3d at 270. Moreover, the Hayward Defendants' failure to make "good faith explanations" for their misstatements adds to the inference of scienter. *See In re Urb. Outfitters,* 103 F. Supp. 3d at 655.

In considering all allegations collectively and accepting them as true, whether the inference of scienter[4] is strong is a close call but given that the inference needs only to be "at least as strong as any opposing inference," *Tellabs,* 551 U.S. at 326, Defendants' motion to dismiss the § 10(b) claims is **granted in part and denied in part** as set forth above.

C. Section 20(a) of the Exchange Act

Section 20(a) imposes joint and several liability on "[e]very person who, directly or indirectly, controls any person liable under any provision of [the Securities Exchange Act of 1934] …, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a); *see also Belmont v. MB Inv. Partners, Inc.,* 708 F.3d 470, 484 (3d Cir. 2013). A § 20(a) claim requires: (1) an underlying violation by the controlled entity; (2) circumstances establishing defendant's control over the company's actions, and (3) some meaningful culpable participation in the fraud by the defendants.[5] *See Belmont,* 708 F.3d at 485; *In re Digital Island Sec. Litig.,* 223 F. Supp. 2d at 560. "[T]he heightened standard of the PSLRA requires that a claim under Section 20(a) state with particularity the circumstances of both the defendants' control of the primary violator, as well as of the defendants' culpability as controlling persons. *In re Digital Island Sec. Litig.,* 223 F. Supp. 2d at 561.

*1. CCMP and MSD Entities*

Plaintiff makes conclusory claims that the CCMP and MSD Entities controlled Hayward through their high-ranking executives who were serving on Hayward's Board.

---

[4] "To establish a corporation's scienter, the mental state of an officer acting on the corporation's behalf may be imputed to it." *U.S. Sec. & Exch. Comm'n v. Mintz,* 723 F. Supp. 3d 386, 408 (D.N.J. 2024) (citation omitted).

[5] Whether Plaintiff must plead culpable participation at the pleading stage remains unsettled. *See Belmont,* 708 F.3d at 484, n.20.

No allegations in the ACC show that the individual Defendants were acting on behalf of the CCMP and MSD Entities when signing or reviewing Hayward's SEC filings. *See* ACC ¶ 321. As Defendants rightly note, a stockholder's appointment of board members is insufficient to show control over a company. *See e.g., In re Flag Telecom,* 308 F. Supp. 2d 249, 273–74 (S.D.N.Y. 2004) (holding that while defendant owning thirty percent of the voting stock and selecting three of nine board members may establish influence over the company, "they [did] not create the inference that [the defendant] could control [the company]"); *In re BioScrip, Inc. Sec. Litig.,* 95 F. Supp. 3d 711, 740 (S.D.N.Y. 2015) ("Certainly the ability to appoint a quarter of [the company's] board and owning about a quarter of the company's common stock afforded [defendant private equity firm] a great deal of sway over [the company], but that alone does not rise to the level of actual control.").

Next, the CCMP and MSD Defendants insist that Plaintiff cannot establish that they were controlling shareholders as a matter of law because each is a separate minority shareholder and only agreed to coordinate voting only "with respect to the timing and manner of disposition" of Hayward stock. CCMP Mot., Ex. 10 at ¶ 2.2(f), ECF No. 96-12. The Court agrees that generally, "each defendant's control must be evaluated separately unless there is some basis on which to consider their collective action" as "a contrary holding would mean that any shareholder, no matter how small, could be grouped with others to form a majority control group, even absent any allegations or facts supporting that shareholder's actual control." *LLDVF, L.P. v. Dinicola,* No. 09-1280, 2010 WL 3210613, at *12 (D.N.J. Aug. 12, 2010). Here, however, Hayward's SEC filings provide a basis to consider the minority shareholders collectively. Hayward was "acquired by entities affiliated with" CCMP Advisors, MSD Partners, and AIMCo ("Sponsors"). Hayward Mot., Ex. 2 at 18, ECF No. 97-7; Ex. 16 at 9, ECF No 97-21. According to Hayward's March 2021 IPO Prospectus and 2021 Form 10-K filed March 2022, Hayward is a "controlled company within the meaning of the corporate governance standards of the New York Stock Exchange" because "more than 50% of the voting power in the election of our directors" was held by a group, and that its Sponsors "will collectively control a majority of the voting power of shares eligible to vote in the election of our directors." *See* ACC ¶ 328; Hayward Mot., Ex. 2 at 51; Ex. 16 at 36. The IPO Prospectus and 10K also provide that Hayward's Sponsors "will continue to have significant influence over us." *Id.* at ¶ 329. Hayward's SEC filings also ascribe voting power to Sponsor "affiliates" stating "[f]or as long as affiliates of our Sponsors continue to beneficially own a substantial percentage of the voting power of our outstanding common stock, they will continue to have significant influence over us" and warned that the "concentration of ownership *may* have the effect of deterring, delaying, or preventing a change of control of the [Hayward], *could* deprive our stockholders of an opportunity to receive a premium for their common stock," and "*might* ultimately affect the market price of" Hayward's common stock. *Id.* (emphasis added). Additionally, CCMP and MSD Entities and AIMCo each filed Schedule 13Gs during the Class Period stating that they were a "group" deemed to beneficially own an aggregate of approximately 76.9% of common stock. *Id.* at ¶¶ 325-26. Accepting as true that each of the

24

seven CCMP affiliated Defendants and each of the three MSD affiliated Defendants is in fact a beneficial owner of Hayward stock, Hayward's public filing asserting "collective control" by the CCMP and MSD Defendants is sufficient to defeat a motion to dismiss. *See Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1048-49 (N.D. Ca. 2016) (denying dismissal of § 20(a) claims against minority shareholder where SEC filing stated shareholder "will continue to have significant influence over [the Company's] affairs").

Lastly, despite language ("may," "could," "might") that suggests only the *possibility* of control, "courts have given heavy consideration to the power or *potential* power to influence and control the activities of a person, as opposed to the actual exercise thereof." *Rochez Bros. v. Rhoades,* 527 F.2d 880, 890–91 (3d Cir. 1975) (emphasis added); 17 C.F.R. § 240.12b-2 (defining "control" or "controlling" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."); *Palladin Partners v. Gaon*, No. 05-3305, 2006 WL 2460650, at *16 (D.N.J. Aug. 22, 2006) ("The pleading of facts that 'support a reasonable inference that [defendants] had the potential to influence and direct the activities of the primary violator' will survive a motion to dismiss." (citation omitted)).

In light of the SEC filings "collective control" disclosure, the "ultimate determination of whether defendants were controlling persons involves questions of fact not to be resolved at the pleading stage of this litigation." *See In re Cendant Corp. Litig.,* 60 F. Supp. 2d 354, 379 (D.N.J. 1999) (noting). The motion to dismiss the § 20(a) claims against the CCMP and MSD Entities is **denied**. This Court's previous dismissal with prejudice of the § 10(b) claims against CCMP Advisors is not a basis to dismiss the § 20(a) claims against it.

### 2. Individual Defendants McFadden, Walsh, and Brenneman (CCMP Affiliated), Bertrand and Brown (MSD Affiliated)

Officer or director status is alone insufficient to establish control. *See In re Digital Island Sec. Litig.*, 223 F. Supp. 2d at 561. Bertrand's mere membership on the audit committee also does not establish that he was a control person. *In re Livent, Inc. Sec. Litig.*, 78 F. Supp. 2d 194, 221 (S.D.N.Y. 1999); *see also Skeway v. China Nat. Gas, Inc.,* No. 10-728, 2012 WL 2877645, at *1 (D. Del. July 6, 2012) (finding that "bare fact" of membership on audit committee to allege control person liability under § 20(a), without any additional factual allegations, was insufficient to show control). McFadden and Brown's mere membership on Hayward's Compensation Committee and Walsh's service on the Nominating and Corporate Governance Committee are also inadequate grounds to show control over Hayward for purposes of § 20(a) liability.

However, control is sufficiently pled to survive a motion to dismiss as to the CCMP and MSD individual Defendants who not only served as directors, but also signed SEC filings at issue. *See Palladin Partners,* 2006 WL 2460650, at *16. Here, the individual

Defendants signed Hayward's March 9, 2022 Form 10-K for FY 2021 and the May 2, 2022 Form S-3. ACC ¶¶ 192, 229. The individual Defendants are subject to § 20(a) control person liability only for actionable false or misleading statements that they signed.[6]

## III.     CONCLUSION

For the reasons set forth above, Defendants' motions to dismiss are **granted in part and denied in part** in accordance with this Opinion. An appropriate order follows.

WILLIAM J. MARTINI, U.S.D.J.

Date: June 4, 2025

---

[6]Apart from arguing that there is no primary violation of § 10(b), Holleran and Jones offer no other grounds for dismissal of the § 20(a) claims against them.